# EXHIBIT 1

3/27/2017 8:00:00 AM
**Velva L. Price**
**District Clerk**
**Travis County**
D-1-GN-17-001330
victoria benavides

CAUSE NO. 2017-_____
D-1-GN-17-001330

| | | |
|---|---|---|
| **MWK Recruiting LLC** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **OF TRAVIS COUNTY, TEXAS** |
| | § | |
| **Evan P. Jowers, Yuliya Vinokurova,** | § | |
| **Alejandro Vargas, Jowers/Vargas, Jason** | § | |
| **Cunningham, and John Does #1-20** | § | |
| | § | **53rd** |
| *Defendants.* | § | _____ **JUDICIAL DISTRICT** |

## PLAINTIFF'S ORIGINAL VERIFIED PETITION
## AND APPLICATION FOR INJUNCTIVE RELIEF

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Plaintiff MWK Recruiting LLC (herein "MWK"), in the above-entitled and numbered cause and files its Original Verified Petition and Application for Injunctive Relief against Defendants Evan P. Jowers, Yuliya Vinokurova, Alejandro Vargas, Jowers/Vargas Recruiting Firm, and John Doe Defendants #1-20 (respectively, "Jowers," "Vinokurova," "Vargas," "Jowers/Vargas," "John Does," and together, the "Defendants"), and for cause of action would respectfully show the Court as follows:

### I.

### DISCOVERY CONTROL PLAN AND EXPEDITED DISCOVERY REQUEST

1.    MWK Recruiting requests discovery in this cause be conducted under Level 3 of Rule 190 of the Texas Rules of Civil Procedure, due to the complexity of the factual issues and the commercial value of MWK Recruiting's trade secrets at issue in this case.

2.    MWK Recruiting further requests expedited discovery, in order to permit the parties to prepare for a prompt hearing on MWK Recruiting's request for a temporary injunction

to prevent threatened irreparable harm to MWK Recruiting flowing from the acts complained herein.

**II.**

**PARTIES**

3.     Plaintiff MWK RECRUITING LLC is a Texas limited liability company, duly formed under the laws of Texas, authorized to do business in the State of Texas, having its principal place of business at 824 W 10th Street, Suite 202, Austin, TX 78703.

4.     Defendant EVAN JOWERS ("Jowers") is an individual American citizen, last known to be residing in Parkland, Florida. Defendant, a foreign individual, does not maintain a place of business, nor any registered agent for service of process in Texas. Defendant is not required to maintain a registered agent in this state and thus, service under section 17.044(b) of the Texas Civil Practice and Remedies Code shall be perfected through the office of Texas Secretary of State as the deemed agent for foreign corporations and non-resident natural persons. Defendant may be served by delivering to Jowers, in person, a true and correct copy of the citation with the date of delivery endorsed thereon with a copy of the petition attached thereto at his last known residence in Florida, **11384 NW 81st Place, Parkland, FL 33076**. Alternatively, defendant may be served by mailing to the defendant, by registered or certified mail, return receipt requested, a true copy of the citation with a copy of the petition attached thereto at **Four Seasons Place, Suite 5242, 8 Finance Street, Hong Kong SAR, China**.

5.     Defendant YULIYA VINOKUROVA ("Vinokurova") is an individual American citizen residing in St. Petersburg, Russia. Defendant may be served by delivering to the defendant, in person, a true and copy of the citation with the date of delivery endorsed thereon with a copy of the petition attached thereto at Manchesterskaya 2-118, Saint Petersburg 19456,

2

Russia. Alternatively, defendant may be served by mailing to the defendant, by registered or certified mail, return receipt requested, a true copy of the citation with a copy of the petition attached thereto at **Manchesterskaya 2-118, Saint Petersburg 19456, Russia**.

6.      Defendant ALEJANDRO VARGAS ("Vargas") is an individual, believed to be a Chilean citizen, residing in Hong **Kong, SAR, China**. Defendant may be served by delivering to the defendant, in person, a true and copy of the citation with the date of delivery endorsed thereon with a copy of the petition attached thereto at **Four Seasons Place, Suite 5242, 8 Finance Street, Hong Kong SAR, China**. Alternatively, defendant may be served by mailing to the defendant, by registered or certified mail, return receipt requested, a true copy of the citation with a copy of the petition attached thereto at Four Seasons Place, Suite 5242, 8 Finance Street, Hong Kong SAR.

7.      Defendant JOWERS-VARGAS Recruiting ("Jowers/Vargas") is a partnership, having its principal place of business at Four Seasons Place, Suite 5242, 8 Finance Street, Hong Kong SAR. Jowers/Vargas may be served by delivering to Jowers/Vargas Partners, Evan Jowers, or Alejandro Vargas in person, a true and correct copy of the citation with the date of delivery endorsed thereon with a copy of the petition attached thereto at Four Seasons Place, Suite 5242, 8 Finance Street, Hong Kong SAR, China. Alternatively, defendant may be served by mailing to the defendant, by registered or certified mail, return receipt requested, a true copy of the citation with a copy of the petition attached thereto at **Four Seasons Place, Suite 5242, 8 Finance Street, Hong Kong SAR, China**.

**III.**

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this litigation because the amount in controversy at issue is in excess of the minimum jurisdictional limits of this Court, and further, pursuant to Texas Civ. Prac. & Rem Code § 65.021, which authorizes this Court to hear and determine applications for writs of injunction.

9.     Venue is proper in Travis County, Texas, pursuant to Texas Civ. Prac. & Rem Code §§ 15.002, 15.005 and 65.023, for the reason that a substantial part of the events giving rise to MWK Recruiting's claims occurred in Travis County, Defendants Jowers and Vinokurova were employed by MWK Recruiting, whose principal office is located in Travis County, Texas at the time the events giving rise to this action occurred and the employment contracts of each specify that Jowers and Vinokurova agreed to the exclusive personal jurisdiction and venue of any court in Travis County, Texas, waiving any defense thereto.

### IV.

### NOTICE OF APPLICATION OF FOREIGN LAW

10.     In accordance with Texas Rule of Civil Evidence 203, MWK Recruiting hereby provides notice to Defendants that the laws of the State of Florida may govern some of the issues in this case.

### V.

### INTRODUCTION

11.     MWK Recruiting is the parent company of Kinney Recruiting LLC, Counsel Unlimited LLC, Kinney Recruiting Limited, and Kinney Recruiting GmbH, which together represent a leading global recruiting firm serving attorneys across the United States, Asia, the Middle East, and Europe.   The Kinney entities are referred to herein collectively and

interchangeably herein as "Kinney", "Kinney Recruiting", and "MWK Recruiting." This segment of the professional recruiting industry is extremely competitive. Over the 13 years since its inception, Kinney Recruiting has attained significant success and competitive advantage in the legal recruiting market, especially in the Hong Kong-based Asian Market, and has been involved in the placement of well over 1,000 attorneys.

12.     Kinney Recruiting's success, however, did not come easily, cheaply, or quickly. In order to maintain the competitive advantage Kinney Recruiting has worked so hard to achieve, absolute confidentiality and trust—with respect to the relationship with Kinney Recruiting's candidates and the client firms where they are placed—is essential.

13.     Early in the history of Kinney Recruiting, the business employed recruiters on the basis of trust and relied on the basic common law and criminal law protections against theft of trade secrets and proprietary information.   Not until after an employee stole a large portion of the Kinney database in 2006 did Kinney have written employment agreements executed by every employee.  Thus, since December 2006, every employee of Kinney Recruiting has been subject to contractual restrictions on the ability of employees to convert Kinney proprietary information and trade secrets to their own use, as well as restrictions on former employees' ability to continue to service candidates and clients of Kinney Recruiting for a period of up to one year following termination of employment at Kinney.   Where breaches of applicable post-employment restrictions have been suspected, Kinney has enforced them diligently and vigorously.

14.     Defendant Jowers was employed by Kinney from May 2006 until December 18, 2016 and Defenadant Vinokurova was employed by Kinney from December 17, 2007 until December 18, 2016.   Both Jowers and Vinokurova were subject to employment agreements containing restrictive covenants as described above. *See* Exhibit "A," a copy of Jowers's

employment agreement with Kinney Recruiting dated May 1, 2006 and Exhibit "B," a copy of Vinokurova's employment Agreement" dated December 17, 2007. These documents are incorporated herein by reference for all purposes, and referred to herein as the "Agreements."

15.     By the admission of Jowers and upon information and belief regarding Vinokurova, the two have breached the Agreements through their business relationship with Defendant Jowers/Vargas and Defendant Vargas, by the appropriation of proprietary confidential business information stolen to form the foundation of clientele of the partnership or affiliation of Jowers/Vargas.    Specifically, Jowers and Vinokurova are believed to have breached the confidentiality, non-disclosure, and non-solicitation provisions in the Agreements.    Further, Jowers and Vinokurova executed a concerted scheme of deception and misdirection against Kinney Recruiting that rises to the level of fraud.    As a result of Jowers and Vinokurovoa's unlawful conduct, Kinney Recruiting brings suit against Jowers and Vinokurova for injunctive relief, breach of contract, conversion of property, liability under the Texas Theft Liability Act (Tex.Civ.Prac.&Rem.Code §§134.001-134.005), common law fraud, misappropriation of trade secrets, inevitable disclosure of trade secrets, tortious interference with existing contracts, tortious interference with prospective relations, breach of their covenants not to compete, and civil conspiracy.

16.     MWK Recruiting also brings this action against Jowers's and Vinokurova's new employer/partnership/business association, Jowers/Vargas.    Jowers/Vargas was very recently established for the primary purpose of acting as Kinney Recruiting's direct competitor in the Asian legal recruiting industry, and the global recruiting industry more broadly.    Kinney Recruiting brings this action against Jowers/Vargas to prevent Jowers/Vargas from interfering with Jowers's contractual obligations to Kinney Recruiting, including the covenant not to

6

compete against Kinney Recruiting, the inevitable—if not actual—disclosure and/or use of Kinney Recruiting's confidential, proprietary and trade secret information, and the anti-solicitation provisions of the Agreements. As a result of its employment or association with Jowers and its conduct regarding the same, MWK Recruiting seeks damages against Jowers/Vargas for injunctive relief, misappropriation of trade secrets, conversion of property, liability under the Texas Theft Liability Act (Tex.Civ.Prac.&Rem.Code §§134.001-134.005), tortious interference with existing contracts, tortious interference with prospective relations, and civil conspiracy.

17. MWK Recruiting also brings this action against Jowers's new employer/business partner/business associate, Alejandro Vargas. Alejandro Vargas and Jowers very recently established their mutual association, calling it Jowers/Vargas, for the primary purpose of acting as Kinney Recruiting's direct competitor in the Asian legal recruiting industry, and the global recruiting industry more broadly. MWK Recruiting brings this action against Vargas to prevent him from interfering with Jowers's contractual obligations to Kinney Recruiting, including the covenant not to compete against Kinney Recruiting, the inevitable—if not actual—disclosure and/or use of Kinney Recruiting's confidential, proprietary and trade secret information, and the anti-solicitation provision. As a result of his association with Jowers and his conduct regarding the same, MWK Recruiting seeks injunctive relief and damages against Jowers/Vargas for misappropriation of trade secrets, conversion of property, liability under the Texas Theft Liability Act (Tex.Civ.Prac.&Rem.Code §§134.001-134.005), tortious interference with existing contracts, tortious interference with prospective relations, and civil conspiracy.

18. MWK Recruiting also brings this action against John Doe Defendants #1-#20, who are persons or entities on notice of the existence of the Agreements and the restrictive

covenants contained therein, but who continue to act in concert with Jowers and Vinokurova to convert Kinney's confidential information and business opportunities. MWK Recruiting brings this action against John Doe Defendants #1-#20 to prevent them from interfering with Jowers and Vinokurova's contractual obligations to Kinney Recruiting, including the covenant not to compete against Kinney Recruiting and the anti-solicitation provisions of the Agreements. As a result of their actions, MWK Recruiting seeks injunctive relief and against John Doe Defendants #1-#20 for the inevitable—if not actual—disclosure and/or use of Kinney Recruiting's confidential, proprietary and trade secret information, tortious interference with existing contracts, tortious interference with prospective relations, and civil conspiracy.

## VI.

## FACTS APPLICABLE TO ALL CLAIMS

A.    **Kinney Recruiting's Services.**

19.    Thanks to its marketing and 13 year history, Kinney Recruiting is home of some of the best known legal recruiters in the world, proudly serving a niche market of high end law firms and exclusive in-house legal departments at Fortune 500 companies around the globe. Kinney's Asia practice includes clients in Hong Kong, Tokyo, Beijing, Shanghai, and Singapore, among others. The firm's U.S. services focus on Arizona, California, Florida, Illinois, Massachusetts, Texas, and New York. Additionally, Kinney Recruiting is active in the Middle East and in Europe, in particular in Germany.

Founded by a well-regarded former big-firm attorney, Kinney Recruiting has succeeded by gathering many years of combined legal recruiting and top law firm experience within its organization and leveraging technology and top-flight marketing to help the recruiters help their

clients. Kinney also has structured its organization to promote teamwork through trust, integrity, transparency, and honesty by and amongst its team members, and has been careful to promote the individual recruiters within the firm as much or more than the named principal, Robert Kinney.

**B.      Ownership of Kinney Recruiting's Corporate Property.**

20.      Kinney Recruiting's legal placement service is marketed worldwide by the MWK Recruiting group of companies. Plaintiff MWK Recruiting LLC, a US entity, is duly registered under the laws of the State of Texas. MWK Recruiting LLC owns or licenses all intellectual property of Kinney Recruiting and pays for the development of such intellectual property (including Defendants Jowers and Vinokurova's salaries).

**C.      Kinney Recruiting's Substantial Investment to Achieve Leadership in the Asian Legal Recruiting Market in Hong Kong and beyond.**

21.      Kinney Recruiting entered the already crowded Asian legal recruiting market in 2005, and increased its investment in the market in late 2006 with the establishment of a blog series called The Asia Chronicles, a paid feature on www.AboveTheLaw.com detailing issues relevant to US attorneys practicing law in Asia. Since that time, Kinney Recruiting has spent well over $1,000,000 investing in the development of the Asian legal recruiting market in advertising and travel costs alone. The result of this investment is an impressive client and candidate list focusing almost exclusively on the top associates, partners, and counsel at the best US and UK law firms present in Asia or working in other parts of the world and interested in moving to Asia. Much of Kinney Recruiting's success is due to the innovation and rapid development of Kinney Recruiting's Asia market presence through direct advertising and hard work by Kinney Recruiting employees, including Jowers and Vinokurova. Kinney Recruiting is

widely regarded by the best international law firms in the Asian market as the leading recruiter for connecting with the top legal talent. Kinney Recruiting continues to devote substantial financial and manpower resources to develop, improve, and market its recruiting services and maintain its leadership position in the Asian recruiting market.

**D. Jowers's and Vinokurova's Employment with Kinney Recruiting.**

22. Kinney Recruiting hired Jowers in May of 2006 as an employee based in Sunny Isles, Florida. At the time, Mr. Jowers was in financial despair and without prospects. A one-time recruiting colleague of Robert Kinney at a different company, Jowers came to Mr. Kinney looking for a job and a fresh start after a stint as an in-house lawyer and a halting start at beginning his own recruiting firm. Mr. Kinney saw Jowers as a potentially talented advisor to associate candidates and wanted to give him a break, but he also knew that Jowers would need guidance, a candidate pipeline, and financial backing to establish a market identity somewhere. Mr. Kinney decided to commit to providing those resources and hired Jowers at an initial salary of $3,000 per month, plus commissions. Salary payments to Jowers were recorded as "draw," against which earned commissions would be offset, but the draw was non-recourse should Jowers fail.

23. In Jowers's new role as associate recruiter, he reported directly to Mr. Kinney. Jowers joined Kinney Recruiting at a formative time in the company's Asia business-development history. As of May 2006, when Jowers started, Kinney Recruiting had two real clients in Asia, both in Hong Kong, and had only recently placed its first in-house candidate as general counsel in a private equity firm in Hong Kong. Mr. Kinney had a considerable number of personal and business contacts in Hong Kong through old friendships and through working on

a few searches prior to Jowers's arrival. Jowers was excited to dive into that market. Kinney was generous in sharing each of his contacts with Jowers.

24.     When Jowers began work with Kinney Recruiting, he was completely without financial means and highly indebted because of personal loans, student loans, and tax liens exceeding $100,000. Kinney Recruiting paid Jowers twice per month and supplemented his income with further loans. Jowers made a slow start with only a single, partial placement in 2006, and ultimately ran up a draw account of almost $100,000 by February 15 of 2007. By that time, Kinney Recruiting had begun to advertise heavily to support the Asia market where Jowers was focused. As the sole beneficiary of candidate leads from that advertising, Jowers's luck began to turn. Ultimately, Jowers managed to finish 2007 with gross earned income of almost $500,000, but he was never able to get ahead of his spending habits. At the end of 2007, Jowers finally managed to pay down an accumulated loan balance of over $110,000 to zero, but he quickly returned to indebtedness to Kinney and continued to remain dependent on draws and loans from Kinney Recruiting throughout his tenure at the company.

25.     As revenue increased, Kinney increased its investment in the Asia placement business. Kinney Recruiting advanced the funds for all necessary travel and advertising and ultimately paid for multiple trips to Asia for Jowers and other company employees. Kinney increased the advertising budget related to the Asia business year after year, and hired assistance in the Miami office for Mr. Jowers as well as marketers to assist in setting up meetings for Jowers when he was in Asia. Protected by the terms of the company's restrictive covenants in the employment agreements, Robert Kinney personally invested significant time, energy and money promoting Jowers personally as the lead recruiter for Kinney's Asia business and also

accompanied Jowers on multiple trips per year to Asia to enhance the firm's and Jowers's credibility.

26.     Managing Jowers was always a chore. He was never able to save any money, despite having had gross income ranging from approximately $300,000 per year to over $700,000 per year in every year of his employment with Kinney other than in 2006, his first year, and 2009, the worst year of the 2008-2009 financial crisis. Nevertheless, because Jowers was effective in handling candidates who came to Kinney with interest in Asia, and because Jowers's ego required that he be pushed forward personally rather than as part of a team, Kinney Recruiting continued to invest in promoting Jowers personally as the face of Kinney's Asia presence and Jowers enjoyed increasing notoriety in the region as a result.

27.     In 2007, Jowers wanted to earn more money so, to assist Jowers in increasing the size of the business for which he was responsible and create a basis to pay him more, Kinney Recruiting invested in other employees to work with and alongside Jowers. Few of these employees lasted long, but one who did was Vinokurova, Jowers's ex-wife, who joined Kinney on or about December 17, 2007.

28.     At Jowers's request, Kinney provided loans on a revolving line of credit secured primarily by Jowers's "in process" placement activity (the "Jowers Line of Credit"). Jowers could never get ahead of his spending despite repeated urging by Kinney to slow down his spending and save, so between January 2010 and December 2016, the balance owed by Jowers on the Jowers Line of Credit averaged approximately $76,000, but it ranged as high as $232,000 and went to a zero balance for less than two months during the almost seven years prior to Jowers's resignation. A true and correct copy of the Promissory Note, Loan Agreement, Security

Agreement, and Digital Signature Certificate of Completion (the "**Revolving Loan Agreement**") is attached hereto as **Exhibit "C"**.

29. At the beginning of 2012, in recognition of the results for 2012 in the Asia market for Kinney Recruiting, the company made a loan to Jowers of $50,000 that was forgivable over a period of 9 years, so long as Jowers remained employed by Kinney (the "**2012 Forgivable Loan**"). A true and correct copy of the note related to the Forgivable Loan is attached hereto as **Exhibit "D."**

30. Toward the end of 2014, Jowers began to increase the frequency of his trips to Asia from Kinney Recruiting's Miami-area office. By the early in 2015, Jowers began making trips of one or two weeks in length to Hong Kong, Singapore, Mainland China, and Korea, approximately every two months. Ever seeking ways to increase his disposable income, Jowers began to plan for a "permanent" move to Hong Kong, at least for tax purposes, and he began spending as many as 30 or more days at a time in Hong Kong after entering as a visitor. By the end of 2015, Jowers began agitating for Kinney to transfer him to the employment of MWK Recruiting's Hong Kong subsidiary, Kinney Recruiting Limited, and to sponsor his residency permit in Hong Kong, but he still had not been able to save any money, while the cost of maintaining his lifestyle had continued to spiral upward.

31. Jowers could never get his spending under control. While visiting Hong Kong for longer periods, he insisted on staying in the luxurious Four Seasons Place Apartments, the favorite residence of billionaires from the Chinese Mainland, all the while maintaining a household in Latvia and an outrageously expensive personal travel schedule. When Kinney's President would urge Jowers to adjust his lifestyle to something sustainable while investing in office space and new employees in Hong Kong, Jowers would argue that he could not effectively

schedule meetings unless he was living in the most expensive and most central residences in Hong Kong. In addition to paying for marketing and travel costs, Kinney Recruiting advanced and ultimately paid for Jowers's $12,000+/month apartment in Hong Kong during the time he was working for Kinney. Because Kinney expected that its Hong Kong subsidiary would have been required to support an employee it sponsored for residency in Hong Kong, and because Jowers's expenses were so far out of line with any realistic expectations about the prospects for business growth led by Jowers in Asia, it became impossible for Kinney to reconcile the necessary expenses related to running a proper office in Hong Kong with the necessity of supporting the spending habits of such a profligate manager. The entire business would have been in jeopardy with even a modest slowdown in placement activity, especially after adding the burden of office rent and staff salaries in Hong Kong. So the concept of transferring Jowers to Hong Kong as a resident employee of Kinney Recruiting Limited took a back seat to trying to manage Jowers into control of his personal finances through 2016. During this time, Kinney continued to finance the bulk of Mr. Jowers's travel and lodging directly.

32.     During 2015, Jowers earned $651,838.15 in gross income, including $3,927.62 of bonus. He also received $38,197.94 in cash reimbursements of business expenses he incurred, as well as business expense reimbursements of $82,993.71 that were paid on his behalf directly by Kinney. He spent approximately 181 days in Hong Kong during ten different trips. Since Jowers was not officially resident in Hong Kong, or any other overseas location, and remained the head of Kinney's Miami office, Kinney Recruiting's CPA advised that Kinney continue to pay Jowers in Florida, his tax home, with all taxes withheld based on his official residence there. See **Exhibit "E,"** Jowers letter regarding residence.

33. During 2016, prior to his resignation on Dec 16, 2016, Jowers earned $514,662.74 in gross income, including $32,677 in bonuses. He also received $52,684.91 in cash reimbursements of business expenses he incurred, as well as directly attributable business expense payments of $70,727.07 that were paid on his behalf directly by Kinney. He spent approximately 168 days in Hong Kong during nine different trips. By 2016, Jowers had decided that he would stay out of the United States as much as he could so as to try to qualify as a foreign resident for US tax purposes, whether officially resident in Hong Kong or not. Jowers spent the bulk of the remaining days of the year in other countries outside the United States. Jowers came and went from Florida on occasion.

34. Jowers was paid in full through December 15, 2016, both commissions and bonuses. On November 15, 2016, he was paid $26,250 in commission, the net payable after taxes from which was applied to his outstanding loan balance at that time of $95,971.24. On December 15, 2016, he was paid $14,572 in commission and $32,677 in bonuses, the net payable after taxes from which was applied to his outstanding loan balance at that time of $78,012.96. On December 16, as noted above, he resigned. As of the date of his resignation, there was $48,535.98 in balance outstanding under the Jowers Line of Credit. He also owed $24,552.17 under the 2012 Forgivable Loan.

35. For almost 11 years, until his resignation on December 16, 2016, Jowers remained intimately involved in the development and enhancement of the Kinney Recruiting brand and presence in Hong Kong and the greater Asian legal recruiting market. Jowers enjoyed being the spotlight of Kinney's Asia advertising, and thus became an ever-larger presence in the advertising paid for by Kinney Recruiting related to Asia. Jowers's responsibilities included: (1) meeting with prospects and current clients to understand their problems and needs, including

traveling to Asia with Mr. Kinney to do so; (2) assisting with preparation of material relevant to submission to candidates to law firms; (3) co-authoring articles about Kinney's Asia-related placement business for publication on the company website and on the Asia Chronicles blog at Abovethelaw.com; (4) writing up and submitting dossiers on candidates to clients; and (5) setting up interviews and negotiating offers.

36.    To a significant group of clients and candidates, Jowers was the face of Kinney Recruiting that shepherded Kinney's talent placement and relationships in Asia, and Kinney promoted this specifically because the company was protected by the restrictive covenants contained in Jowers's and Vinokurova's employment agreements. During Jowers's employment, Kinney Recruiting placed approximately 200 attorneys in highly coveted positions at numerous large law firms in Asia and the Middle East. Because of his central position in Kinney's Asia business, Jowers was personally involved to the extent of obtaining at least some of the credit in at least 175 of these placements during this time. He was intimately familiar with the thoughts and desires of many high-profile candidates and law firm clients alike, whether he participated individually as the recruiter who placed these individuals or developed Kinney Recruiting's relationships with their networks more broadly. Jowers understands the strengths and perceived weakness of the Kinney Recruiting legal network in Asia at a level that would be invaluable to Kinney Recruiting's competitors. Further and significantly, at the time of his resignation, Jowers had access to and was familiar with all plans and documentation for many Kinney candidates at open positions within that market. In fact, he led the efforts to cultivate the relationships and place these candidates with compatible law firms shortly before his resignation. Jowers was also privy to the most recent long-range company strategies, advertising evolution strategies, alliance strategies, customer satisfaction metrics and strategies, and in-progress deals across the company.

37. In sum, Jowers's job duties at Kinney Recruiting provided him with comprehensive knowledge and understanding of confidential and proprietary information relating to all aspects of current candidate placement efforts, future candidate placements, MWK Recruiting's long-range strategic plans, and countless other pieces of proprietary and confidential information. Disclosure of this confidential and proprietary information to any MWK Recruiting competitor, or use by Jowers for his personal financial benefit would be irreversibly damaging and potentially disastrous to MWK Recruiting's Asian market recruiting business.

**E.     Jowers's and Vinokurova's Contractual Obligations to Kinney Recruiting.**

38. In light of the exposure to highly protected confidential and proprietary information inherent in the Kinney Recruiting position Jowers and Vinokurova occupied, and in exchange for their employment compensation and benefits, each contractually agreed to maintain the confidentiality of the "Company's Proprietary Information" acquired during their employment with Kinney Recruiting and to refrain from soliciting candidates or clients of Kinney Recruiting subsequent to their employment. *See* ¶¶ 1.6 and 3.2 and 7.1-7.2 and 8.1-8.2 of the "**Jowers Agreement**" attached as **Exhibit "A"** and the "**Vinokurova Agreement**" attached as **Exhibit "B."**  All Kinney Recruiting employees, including Jowers and Vinokurova, are made aware of and required to agree to maintain the confidence of any and all "Proprietary Information," as part of the Employment Contract.  In fact, part of Jowers's role as an occasional manager of other recruiters was to make his team aware of these same obligations.  Specifically, Jowers and Vinokurova each agreed to the following:

> 1.6 "Company's Proprietary Information" means the Company's confidential information but not limited to client and candidate lists, interim employees, personal information supplied by candidates and interim employees, information concerning the identity of clients and their personnel, the personnel and partnership needs and requirements of clients, terms and conditions under which the Company deals with

clients, billing rates, profit margins, financial data, applications, resumes, candidate and employee data sheets, job orders, search assignments, planners, invoices, manuals, computer programs and data, Company personnel information, audio and video cassettes, records and any information received from a client or candidate under an expectation of confidentiality. The terms "customer list" and "candidate list" are not limited to physical writings or compilations. "Customer lists" and "candidate lists" include information contained in or reproduced from the memory of an employee. The company's Proprietary Information includes all such information developed by its employees, whether or not during working hours, that is related to Company's business. The Company's Proprietary Information may also be trade secrets.

3.2 The Employee has been provided access to, and has received, the Company's Proprietary Information, and understands that Employee will continue to have access to the Company's Proprietary Information throughout Employee's employment. In consideration of the Company's provision of Proprietary Information, Employee acknowledges and agrees that during Employee's service and thereafter, pursuant to this agreement, Employee will hold in strictest confidence and will not disclose, discuss, transmit, use, lecture upon, or publish any Proprietary Information, except as such disclosure, discussion, transmission, use or publication may be required in connection with Employee's service to the Company, or unless Robert Kinney expressly authorizes such in writing.

7. **Non-Disclosure Covenants**

7.1 Upon termination of employee's employment, the Employee will not retain any copies of the Company's Proprietary Information. When the Employee's service with the Company is completed, Employee will immediately deliver to the Company all Proprietary Information, together with all copies thereof, and any other material containing or disclosing any Proprietary Information. Employee will also immediately deliver all Company Property, including but not limited to laptops, pagers, cell phones, corporate credit cards, keys, and/or access cards. Employee further agrees that all property situated on the Company's premises and/or owned, leased, or licensed by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by personnel of the Company at any time with or without notice.

7.2 At all times during and after the Employee's employment, the Employee shall not use or disclose to any person the Company's Proprietary Information, except as such disclosure or use may be

required in connection with the Employee's employment, or unless the Robert Kinney expressly authorizes such in writing.

8. Non-Solicitation Covenants

8.1 For a period of one year following the effective date of termination of the Employee's employment, the **Employee shall not, in the course of the personnel placement service business, solicit or provide services to any candidate or client** with whom the Employee had contact with, knowledge of, or access to during the twelve months immediately preceding the effective date of termination, and shall not assist any entity other than the Company in so doing.

8.2 For a period of one year following the effective date of termination of the Employee's employment, the Employee shall not solicit or hire away any employee of the Company, or any person whose employment of the Company has been terminated for less than six months, nor shall Employee induce, solicit, or otherwise encourage any supplier, independent contractor, or any other business relation of the Company, or in any way interfere with the relationship between any such employee, supplier, independent contractor, or other business relation and the Company (including, without limitation, making any negative or disparaging statements regarding the Company or its respective officers, directors, employees, or principles).

39.     Moreover, Jowers and Vinokurova agreed to work exclusively for Kinney Recruiting during their employment relationship with MWK Recruiting, absent specific, written consent from MWK Recruiting. They agreed to the following:

4.4 The Employee shall not engage in any other business activities in competition with the Company's personnel placement service business and shall not engage in any activity related to the personnel placement service business other than in benefit of the Company.

**F.      Jowers's relationship with Jowers/Vargas.**

40.     On Friday, December 16, 2016, Jowers set the wheels in motion for his plans to either forcibly coerce his long-time friend and benefactor, Robert Kinney, to grant him a named partnership and an "equity" stake in MWK Recruiting, or to steal all of MWK Recruiting's Asia market clients and candidates on his way out the door. Astoundingly, Jowers's resignation email

(the **"Resignation Email"**, attached as **Exhibit "F,"** starts out, "I consider you a very good friend and love you like a brother, so this is a very difficult moment for me." From this point forward, the email makes clear how hollow those words truly are, revealing how the resignation ploy was only intended to create leverage over Kinney by threatening loss of the Company's business. Jowers states that he is only "resigning for now" but is "very much willing to work things out and have a nice discussion and return to Kinney (as quickly as this week) in a real partner role." Further attempting to apply pressure, the letter states, "If you don't want to work things out with me to have a real partnership so that we can really take the business to another level, then I will be starting my own shop (that I plan to grow into the best big law focused recruiting company in the world)."

41.     Jowers admitted entered into a business arrangement or partnership with a direct competitor of Kinney Recruiting – Alejandro Vargas – prior to his resignation from Kinney. Upon information and belief, Jowers revealed proprietary information to Vargas, for the specific purpose of misappropriating numerous candidates that Kinney Recruiting was already in the process of submitting for placement with law firm clients in Hong Kong. Jowers is engaged with Vargas in a partnership arrangement of some variety, and seeks to benefit directly from the candidates and other proprietary information he is attempting to steal from Kinney Recruiting. In addition, Jowers has made perfectly clear that he intends to continue to interact with all of the Kinney Recruiting candidates and clients actively seeking employment or considering a move that he was aware of or in contact with prior to his departure from Kinney. His stated purpose for forming Jowers/Vargas is to directly compete with Kinney Recruiting, starting with the very clients and candidates that he met, became aware of, or worked with because of his employment at Kinney Recruiting. It is inevitable that Jowers will illegally use and/or disclose more of

Kinney Recruiting's confidential, proprietary and trade secret information for his own benefit and to the benefit of Jowers/Vargas, thereby potentially destroying the value of Kinney Recruiting's trade secrets and its competitive position in the Asian legal recruiting market. He has already admitted to stealing multiple clients and giving them to his new business associate to submit through their new arrangement, as though it was some sort of wedding present for Vargas. "I knew that you would likely shut me out of representation when I left Kinney, so for these handful of candidates they were either submitted through Vargas just before I left Kinney or I submitted them through my new company shortly after leaving Kinney." *See* **Exhibit "G"**

**G.      Jowers's Bad Acts.**

42.      During his final months at Kinney Recruiting, Jowers engaged in a calculated scheme of deception and dishonesty designed to benefit himself, and Jowers/Vargas—all at the expense of Kinney Recruiting.  In spite of the fact that Kinney was willing to repeatedly loan money to Jowers to finance his heinously lavish, arrogant and unaffordable lifestyle choices (from $12,000 birthday parties for his wife and $30,000+ holiday vacations to living full time at the $12k/month Four Seasons Place Apartments in Hong Kong, Jowers still felt an entitlement to Kinney Recruiting's business as though it were his own. *See* **Exhibit "H."**  Beginning in November of 2016, if not prior, Jowers engaged in a covert series of bad acts apparently designed to deceive his employer and take financial advantage of the confidential and trade secret information he learned at Kinney Recruiting by using that information to the benefit of himself, Alejandro Vargas and Yuliya Vinokurova.

**a.   Jowers ensures receipt of loan prior to departure**

43.      On information and belief, Jowers postponed his decision to resign from Kinney Recruiting by at least a month in order to secure enough loans ($51,000) from Kinney to pay for

his extravagant holiday vacation plans to various Caribbean islands. Jowers emailed Robert Kinney on October 25, 2016 to request additional advanced pay loans. In that email he states in part:

> "Because of a lot of up front costs I am incurring in early November (portion of Caribbean holiday not yet paid for and Miami apartment January to April) I hope to get paid early on October 31 (by a few days to a few weeks) on the pending 7 placements (new hires started at each firm and invoices have been sent out, with start dates ranging from August to October, with 0% chance of reversals). However if the 7 soon to be paid placement fees are used to take away my entire current debt to Kinney, I will only have around $37,000 coming to me pre-tax. There is also the $14,000 I am due from profit sharing on Yuliya in '15. That brings me to $51,000 pre-tax. However, I need if possible around that much after tax on Oct. 31 pay day…"

He continues to justify advancement of pay in light of money spent/committed, though not yet earned:

> "Here are the expenses I have to cover October 26 to November 10, plus a few other items I will need to cover during November:
> - Miami hotel and rental car 4 days – around $1,200 total
> - $7,872 to Jade Mountain St. Lucia (this is the remaining balance owed for that 11 day stay – November 9 to 30). This charge will be debited from my bank card on October 31.
> - I also have an October 31 check in to a hotel in St. Martin for two nights (cost for both nights total around $800)
> - I have to pay by November 7 around $10000 for November 30 to December 15 Anguilla villa (I will be there until Dec. 6 and my wife will remain there until Dec. 15).
> - I have to on November 1 pay the remaining balance of around $1000 for 17 days rental car in St. Barts
> - I have to buy plane tickets for us from St. Martin to St. Lucia round trip. (approx.. $500 total)
> - I have to buy Tatiana's St. Martin to Aruba one way and Aruba to Miami one way (Approx. $700 total)
> - The St. Barts/St. Lucia month of November lodging will be paid for as I arrive to each place, but there will be spending there, I think it will be around $400 per day for a total of $12,000
> - The Anguilla 6 days with both of us there – around $300 per day - $1800 and then my wife only there 9 days around $100 per day – for $2700.
> - I have to buy a plane ticket to return from Hong Kong to US December 16 (I already have the Miami to Hong Kong December 6). Approx. $1000 round trip

- I need to pay for the St Martin to Miami ticket Dec. 6 (to connect for HK flight) – approx.. $400.
- I will need to book hotel in Hong Kong for 9 days Dec. 7 to 16 – approx. $2500
- My wife will need spending money in Aruba for New Year's with her friend and for that entire month – approx. $3000

...

I need 50k now though. That is the problem." *See* **Exhibit "I".**

**b. Jowers admits theft of corporate property and breach of contract.**

44.     On information and belief, perhaps as early as September 2016, Jowers and Vargas began communicating about possible partnership or affiliation in direct competition with Kinney Recruiting. Jowers was fully aware of the illegality of the deceit he was engaging in. Following numerous unheeded demands by Robert Kinney for a list of the Kinney recruits and placements Jowers was working prior to his departure, Jowers finally acquiesced to sending a partial list in an email on December 27, 2016. *See* **Exhibit "J".** In that e-mail, admits to his flagrant disregard for his contractual obligations, stating:

"These were the submissions right before I left Kinney (through Vargas) or right after-

[Six names deleted for confidentiality.]

I may be forgetting about one, off the top of my head, but I don't think so."

45.     Jowers's bad acts concerning the candidates Kinney Recruiting was actively working to place continues to present day. He has submitted multiple additional attorney candidates through Jowers/Vargas whose placements and information constitute confidential proprietary information belonging exclusively to Kinney Recruiting.

**c. Jowers solicits MWK Recruiting employee Yuliya Vinokurova**

46.     Apparently unconcerned with the terms of her contract, or the illegal actions of her ex-husband, Vinokurova informed Kinney that she would leave with Jowers. *See* **Exhibit**

**"K"**.  According to Jowers/Vargas' new website (www.evanjowers.com), Vinokurova acts as one of the company's primary associate recruiters.  It is unlikely, if not impossible, that Vinokurova will not be dealing with the stolen proprietary information upon which Jowers intends to build his new recruiting business.

I.    **Alejandro Vargas' and Jowers/Vargas' Bad Acts.**

47.    Alejandro Vargas enabled and helped further Jowers's plan by engaging in bad acts of his own.  While Jowers was on his extravagant vacation to the Carribean in November 2016, he was speaking to candidates of Kinney Recruiting by phone.  In several cases, he promised these candidates that he was inquiring with certain Kinney clients about their interest in hiring the candidates.  By his own admission (See Exhibits G and J), Jowers was sending these candidates out through Jowers/Vargas and Alejandro Vargas prior to termination of his employment.

   a.  **Vargas accepted and encouraged the disclosure of proprietary information of MWK Recruiting in his discussions with Jowers.**

48.    Upon information and belief, Vargas' decision to engage Jowers was made for the specific purpose of exploiting his knowledge of Kinney Recruiting's trade secrets and confidential and proprietary information in order to unlawfully utilize such information in the development of directly competitive recruiting services.  As demonstrated by Jowers's December 27, 2016 communication to Robert Kinney noted above, Vargas was aware of, and willingly accepted, Jowers's disclosure of information about Kinney Recruiting's candidates.   It is unlikely, if not impossible for Vargas to have accepted these candidate placement leads without knowing that they were generated by Kinney Recruiting and were still property of Kinney Recruiting.

### b. Vargas enabled Jowers to violate his obligations to MWK Recruiting by employing Jowers in Jowers/Vargas new partnership

49.     Despite his contractual obligations to the contrary, upon information and belief, Jowers's responsibilities at Jowers/Vargas are substantially the same as his job duties at Kinney Recruiting.  As stated above, Jowers is working on the placement of numerous of Kinney Recruiting's active candidates under the Jowers/Vargas name or through Vargas himself, and is seeking to solicit all of Kinney Recruiting's contacts in the Asian legal market in precisely the same way he was obliged to while employed at Kinney.  In addition, Jowers vows to interact with some of the same Kinney clients for whom he provided support and services related to the placement of attorneys or partners previously.  These activities are directed towards the financial and long-term benefit of Jowers/Vargas, as encouraged and rewarded by Vargas himself.

**J.      John Doe #'s 1-20**

50.     John Does #'s 1-20 are persons or entities on notice of the existence of the Agreements and the restrictive covenants contained therein, but who continue to act in concert with Jowers and Vinokurova to convert Kinney's confidential information, to convert Kinney business opportunities, and to breach their employment agreements.

**K.      MWK Recruiting's Protection of its Intellectual Property.**

51.     The Kinney Recruiting trade secrets and confidential and proprietary information at issue in this lawsuit are subject to stringent security measures and controls, including the designation of private or proprietary documents by appropriate labeling and markings, password protections, control of access to Kinney Recruiting databases and restriction of access to such information by non-Kinney Recruiting employees. Additionally, this proprietary information is circulated outside of Kinney Recruiting only on a strict need-to-know basis and subject to strictly-enforced agreements that require recipients of such materials to preserve confidentiality.

Jowers and Vinokurova recognized and agreed to these confidentiality terms when they executed the above-referenced employment Agreements.

52.     Because of their duties at Kinney Recruiting, Jowers and Vinokurova were given access to virtually all aspects of Kinney Recruiting's proprietary materials, strategic service strategies, advertising strategies and content, business plans, alliances, and customer relationships.  Of the confidential information and trade secrets that MWK Recruiting protects and controls, the following is a representative list of the categories of which Jowers has knowledge and that could provide an advantage to a competitor in the legal recruiting business:

1.    Kinney Recruiting's short-term and long-term business strategy.
2.    Kinney Recruiting's advertising strategy.
3.    Identities of in-process candidates and clients.
4.    Motivations of candidates, trigger points, and timing of their searches and potential future searches.
5.    Client hiring programs and timing of their current searches and potential future searches.
6.    Kinney Recruiting's existing and prospective client lists, client win/loss analysis, lists of client data, candidate go-by forms, and critical market requirements.
7.    Kinney Recruiting's business marketing plans, new service development, customer and internal market and product research, market studies, and critical details of the weakness of the existing services.
8.    Kinney Recruiting's expenses, revenues, pricing, forecasts, projections, and financial analyses of the recruiting business and Asian recruiting market.
9.    Kinney Recruiting organizational charts, internal job responsibilities, performance reviews, project assignments, and MWK Recruiting employee contact information.
10.    Sales methodologies, service delivery methodologies, and implementation tools, processes and best practices.
11.    Partner and alliance initiatives and strategies.

**L.    The Competitive Harm to Kinney Recruiting By Virtue of Disclosure or Use of its Confidential and Trade Secret Information.**

53.     With the benefit of Jowers's detailed knowledge of Kinney Recruiting's research, development, and business plans, and with the further benefit of Jowers's contact with Kinney

Recruiting's clients and candidates, Jowers/Vargas will be able to unfairly advance its competitive position in the market for its recruiting services in a fraction of the time it would have needed without the benefit of Kinney Recruiting's confidential and trade secret information. Jowers/Vargas's ability to market existing candidates and to develop new leads that are competitive with Kinney Recruiting or next cycle Kinney Recruiting candidates would be significantly enhanced by a Jowers/Vargas employee's access to Kinney Recruiting's proprietary data.

54.     Moreover, given his knowledge of Kinney Recruiting's confidential, proprietary, and trade secret information, and Jowers/Vargas's competition with Kinney Recruiting in the Asian legal recruiting market, it is inevitable that Jowers will illegally use and/or disclose Kinney Recruiting's confidential, proprietary and trade secret information to Kinney Recruiting's direct competitor, Jowers/Vargas, thereby potentially destroying the value of Kinney Recruiting's trade secrets and relinquishing Kinney Recruiting's competitive advantage in this area.

**M.     The Need for Injunctive Relief in This Case.**

55.     Until just recently, Kinney Recruiting had no knowledge of Jowers's relationship with Vargas, or even that he had agreed to assist and partner with Vargas, in violation of his contractual obligations.  If Jowers provides services under the Jowers/Vargas umbrella to existing or developing recruiting candidates and/or clients that are the same or similar to those to which he had exposure as a Kinney Recruiting employee, it would be virtually impossible for Jowers to do so without using or disclosing confidential and trade secret information which he obtained at Kinney Recruiting.  The fact that Jowers has already admittedly disclosed sensitive information of Kinney Recruiting to Vargas demonstrates the inevitability that Jowers has and/or will use

Kinney Recruiting's confidential and trade secret information in his new position at Jowers/Vargas.

56.     Jowers's conduct either already has impaired or seriously threatens to impair Kinney Recruiting's intellectual property and trade secret rights, and Kinney Recruiting will suffer irreparable harm and injury unless the requested temporary restraining order and temporary and permanent injunctions are issued. Unless Jowers is enjoined and ordered as requested herein, Kinney Recruiting will lose substantial, valuable trade secrets and confidential proprietary information. Because the value of and competitive advantages provided by this confidential and trade secret information will be lost forever if they are disclosed to or used by its competitor, Jowers/Vargas, Kinney Recruiting has no adequate remedy at law for Jowers and Jowers/Vargas' conduct.

57.     While Jowers may be free to pursue his chosen profession, he must do so in a way that honors his confidentiality and non-compete agreements with Kinney Recruiting. Marketing, selling, deploying, implementing and providing support for Jowers/Vargas' legal recruiting services in the Asian market violates those agreements.  Accordingly, Kinney Recruiting seeks an injunction against Jowers, Vargas, Jowers/Vargas and Vinokurova to prevent the use and disclosure of Kinney Recruiting's confidential and trade secret information.

## VII.

## CAUSES OF ACTION

## COUNT ONE-Temporary, Preliminary and Permanent Injunctive Relief

58.     Plaintiff re-alleges each and every allegation contained within Paragraphs 1 through 57, as if fully set forth herein.

59.     MWK Recruiting seeks injunctive relief, including a temporary restraining order

from this Court pursuant to both equitable principles and Tex. R. Civ. P. 680 and Tex. Civ. Prac.

& Code § 65.011, which provides in its pertinent part:

A writ of injunction may be granted if

> (1)     the applicant is entitled to the relief demanded and all or part of the
>         relief requires the restraint of some act prejudicial to the applicant;
>
> (2)     a party performs or is about to perform or is procuring or allowing
>         the performance of an act relating to the subject of pending
>         litigation, in violation of the rights of the applicant, and the act
>         would tend to render the judgment in that litigation ineffectual;
>
> (3)     the applicant is entitles to a writ of injunction under the principles
>         of equity and the statutes of this state relating to injunctions; [...]
>
> (4)     irreparable injury to real or personal property is threatened,
>         irrespective of and remedy at law.

60.     MWK Recruiting is suffering and will continue to suffer immediate and

irreparable harm to its business as a proximate result of the Defendants' conduct.   More

specifically, if Defendants Jowers and Vinokurova are not enjoined from breaching their non-

compete agreements and if they and the remaining Defendants are not enjoined from using and

disclosing Kinney Recruiting's confidential and trade secret information, the information will be

compromised forever and possibly converted by the Defendants to their own benefit to the

exclusion of Kinney.   Moreover, if Jowers and Vinokurova are not enjoined from providing

services to Kinney Recruiting's competitors, a relationship in which Jowers and Vinokurova

cannot avoid using or disclosing Kinney Recruiting's confidential and trade secret information, it

will be impossible to prevent Jowers/Vargas and other Defendants from obtaining further access

to Kinney Recruiting's confidential and trade secret information which will then be irretrievable.

61.     MWK Recruiting has no adequate remedy at law for the existing and potential

harm and damage inflicted on Kinney Recruiting. Damages will continue to accrue and are to a

large degree incalculable at this stage of this proceeding.

62.     MWK Recruiting requests this Court to grant a temporary injunction in this

lawsuit requiring that Jowers, Vinokurova, Jowers/Vargas, Alejandro Vargas, and their

employers, employees, agents, attorneys, assigns, representatives and/or entities acting in concert

with them:

      a.     Be restrained and enjoined from employing Jowers and/or Vinokurova at Jowers/Vargas in any position relating to the personnel placement business in which services are offered to any candidate or client of MWK Recruiting or its affiliates with whom they had contact with, knowledge of, or access to during the twelve months prior to December 18, 2016;

      b.     Be restrained from using, disclosing or transferring any information, knowledge or data of MWK Recruiting or its affiliates that Jowers or Vinokurova received, developed or had access to during the course of their employment at MWK Recruiting relating to MWK Recruiting's trade secrets, methods, or products, clients, or candidates, including knowledge of unsuccessful placements, interest in placement, or open and contemplated jobs, as well as any other matters that are of a private, secret or confidential nature, including information about the areas of knowledge of remaining MWK Recruiting employees and the identity of MWK Recruiting contacts, contractors, clients, potential clients and strategic partners;

      c.     Be restrained and enjoined from soliciting, either directly or indirectly, any employee, customer, candidate, client, or identified prospective customer or client of MWK Recruiting or its affiliates at the time of Jowers's and Vinokurova's separation from MWK Recruiting;

      d.     Be restrained and enjoined from developing, using, marketing, selling or otherwise working on any products or services developed or sold through the use of MWK Recruiting's confidential, proprietary or trade secret information, knowledge or data;

e.	Be restrained and enjoined from destroying, concealing, or disposing of any documents, emails, correspondence, files, contact lists or other materials obtained from or belonging to MWK Recruiting or containing or referring to MWK Recruiting confidential, proprietary or trade secret information, including all clients and candidates, or the hiring of Jowers or Vinokurova;

f.	Be restrained from entering, opening or in any way accessing any e-mail accounts with any on-line email account providers or deleting, down—loading or forwarding any e-mails within any such accounts so that all such e-mail accounts can be turned over in discovery, intact, or until further order of the court;

g.	Be restrained from using, activating, turning on, starting or in any way powering—up any computer, including desk top computers, lap top computers or personal computers or any other electronic data storage devices, including hand—held devices such as iPhones, iPads, Android phones, and all similar devices, in the possession or control of Jowers or Vinokurova so that those computers and devices may be turned over in discovery, intact, or until further order of the court;

h.	Be restrained and enjoined from altering, deleting, removing, or writing over in any respect any documents, e-mails, computer files, data, diskettes, or other things stored in any computer, including any desk top computers, lap top computers or personal computers or any other electronic data storage devices, including hand—held devices such as iPhones, iPads, Android phones, and all similar devices in the possession or control of Jowers or Vinokurova so that those materials may be turned over in discovery, intact, or until further order of the court;

i.	Be restrained and enjoined from using in any respect or manner any personal computers, including any desk top computers, lap top computers or any other personal computers or any other electronic data storage device in the possession or control of Jowers or Vinokurova and any and all computers and electronic data storage devices, including hand—held devices such as iPhones, iPads, Android phones, and all similar devices in the possession of his new employer and used by Jowers or Vinokurova, or to which Jowers or Vinokurova had or has

access, so that those materials may be turned over in discovery, intact, or until further order of the court; and

j.    To the extent appropriate, that a temporary restraining order incorporating the foregoing be placed in effect and continue in effect until the conclusion of a hearing on a temporary injunction, or until further Order of the Court.

## COUNT TWO-Common Law Fraud

63.    Plaintiff re-alleges each and every allegation contained within Paragraphs 1 through 57, as if fully set forth herein.

64.    As specified above, Jowers made material misrepresentations to MWK Recruiting in an attempt to induce MWK Recruiting to provide him advance payments and loans during the same time that he was actively providing services to Vargas and Jowers/Vargas. Specifically, in November 2016, Jowers misrepresented the need for money for a "vacation," claiming he had sufficient placed candidates with future start dates to provide security for all outstanding loans as well as the requested advances. Such representations were false, as, upon information and belief, Jowers and Vinokurova were actively providing services to the budding Jowers/Vargas. While Jowers was on "vacation," he was interviewing candidates and telling them that he had sent their information to clients of MWK, when in reality he was providing that information to competitors of MWK and was not, in fact, sending the candidates out to MWK clients at all. Not until December 16, 2016, several days after his "vacation" ended, but after he had been paid out on every placement, did Jowers resign from MWK Recruiting. At that time, upon information and belief, Jowers had already been actively participating in working on websites and sending out MWK candidates to MWK clients through third parties.

65.    The false representations were made by Jowers with the intention that they would be acted on by MWK Recruiting. MWK Recruiting did, in fact, rely on Jowers's false

representations and provided advance salary and commission draws to Jowers to finance his lavish living expenses at financial cost to MWK Recruiting.

**COUNT THREE—Breach of Contract-Employment Agreements**

66.    Plaintiff realleges each and every allegation contained within Paragraphs 1 through 57 as if fully set forth herein.

67.    In conjunction with their employment with MWK Recruiting, Jowers and Vinokuurova executed written confidentiality and non-competition agreements, prohibiting certain competitive activities and the disclosure or use of MWK Recruiting's confidential and trade secret information.  Upon information and belief, Jowers and Vinokurova are providing services to Jowers/Vargas in a position that has substantially the same functions and/or responsibilities as the position he occupied while at MWK Recruiting at the time of his resignation.  Jowers and Vinokurova are now attempting to place candidates they are contractually prohibited from placing, and to work with clients of MWK Recruiting for whom they are contractually prohibited from providing services.

68.    Without MWK Recruiting's consent, Jowers and Vinokurova have violated the restrictive covenants contained in these respective agreements and outlined above, and Jowers and Vinokurova have failed to perform their affirmative obligations.  Jowers and Vinokurova have breached the provisions of the Agreements as outlined in the "Facts Applicable to all Causes of Action" section above.

**COUNT FOUR—Tortious Interference with Contract and Prospective Relations**

69.    Plaintiff realleges each and every allegation contained within Paragraphs 1 through 57, as if fully set forth herein.__

33

70.     MWK Recruiting acquired contractual rights through the Agreements it entered into with Jowers and Vinokurova.

71.     Vargas and Jowers/Vargas intentionally and willfully interfered with and continue to interfere with the rights of MWK Recruiting and the obligations of Jowers and Vinokurova under the Agreements. As Jowers's new employer, Jowers/Vargas has knowingly and intentionally accepted the benefits of Jowers's and Vinokurova's breach of their Agreements. Any encouragement from Jowers/Vargas or Vargas for MWK Recruiting's employees to act contrary to such contractual obligations constitutes inducement of such breach and interference with contractual rights owed to MWK Recruiting.

72.     John Doe Defendants #1-#20, having been placed on notice of the rights of MWK Recruiting and the obligations of Jowers and Vinokurova not to provide services in the personnel placement business to any candidate or client of MWK for one year following the termination of Jowers's and Vinokurova's employment with MWK, knowingly and intentionally accepted the benefit of Jowers's and Vinokurova's breach of their Agreements by encouraging them to do so. Any encouragement from John Does #1-#20 for MWK Recruiting's employees to act contrary to such contractual obligations constitutes inducement of such breach and interference with contractual rights owed to MWK Recruiting.

73.     Jowers, Vinokurova, Vargas, and Jowers/Vargas have intentionally and willfully interfered with contractual relations between MWK Recruiting and its clients. Jowers and Vinokurova as well as Vargas and Jowers/Vargas have also interfered with MWK Recruiting's contractual relations with existing and prospective candidates. Jowers's, Vinokurova's, Vargas's, and Jowers/Vargas's interferences are the proximate cause of damages to MWK Recruiting that are in excess of the minimum jurisdictional limits of this Court.

**COUNT FIVE—Misappropriation and Disclosure of Confidential and Trade Secret Information**

74.     Plaintiff realleges each and every allegation contained within Paragraphs 1 through 57, as if fully set forth herein.

75.     Jowers's actions, as evidenced by his admission of sharing sensitive MWK Recruiting candidate information with Vargas, constitute a misappropriation of MWK Recruiting's property, specifically its confidential and trade secret information. Jowers/Vargas's use of MWK Recruiting's property, including its confidential and trade secret information, similarly constitutes misappropriation.

**COUNT SIX—Civil Conspiracy**

76.     Plaintiff realleges each and every allegation contained within Paragraphs 1 through 57 as if fully set forth herein.

77.     Upon information and belief, Defendants Jowers, Vinokurova, Vargas, Jowers/Vargas and John Does #1-#20 have embarked upon a deliberate scheme to conspire against MWK Recruiting in an effort to tortuously interfere with MWK Recruiting's existing and prospective contractual relationships with clients and candidates.  By engaging in these acts, both Jowers and Vargas had knowledge of, agreed to, and intended a common objective or course of action that has proximately caused damages to MWK Recruiting in an amount in excess of the minimum jurisdictional limits of this Court.

**COUNT SEVEN—Breach of Contract - Loans**

78.     Plaintiff realleges each and every allegation contained within Paragraphs 1 through 57 as if fully set forth herein.

79. As of the date of his resignation, there was $48,535.98 in balance outstanding under the Jowers Line of Credit. Jowers also owed $24,552.17 under the 2012 Forgivable Loan. Both the Jowers Line of Credit and the 2012 Forgivable Loan are in default under their terms due to Jowers's resignation of his employment.

## VIII.

### EXEMPLARY DAMAGES

80. Plaintiff realleges each and every allegation contained within Paragraphs 1 through 57 as if fully set forth herein.

81. The conduct of Defendants Jowers, Vinokurova, Vargas, and Jowers/Vargas, as specified above, was willful and intentional, and was performed in conscious disregard of MWK Recruiting's rights. MWK Recruiting is entitled to recover exemplary damages against Defendants in an amount to be determined by the trier of fact.

## IX.

### JURY DEMAND

82. MWK Recruiting requests that all issues of fact be tried before a jury.

## X.

### RELIEF REQUESTED

83. MWK Recruiting requests that this court enter judgment against Defendants for the following relief:

      a.    That a temporary restraining order be issued as requested and set forth above;

b.   That the Defendants be cited to appear and show cause, and that on such hearing a temporary injunction be issued, enjoining Defendants, their agents, servants and assigns as more fully described above;

c.   That a permanent injunction be ordered on final trial of this cause, enjoining Jowers and Hire.com, their agents, servants, and assigns as more fully described above;

d.   That compensatory damages be awarded in an amount to be determined at trial;

e.   Exemplary Damages against Defendant Jowers to be determined at trial;

f.   That costs of suit incurred herein be awarded;

g.   That pre- and post-judgment interest be awarded as provided by law;

h.   That such other and further relief be awarded in law or in equity to which MWK Recruiting may be justly entitled.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray that Jowers, Vinokurova, Jowers/Vargas, and Alejandro Vargas be cited to appear and answer, and that upon final trial, Plaintiffs have judgment against Defendants as follows:

1) actual damages in an amount to be determined by the trier of fact;

2) prejudgment interest at the legal rate;

3) post-judgment interest from the date of judgment until said judgment is paid, at the highest rate allowed by law;

4) costs of court; and

5) such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

**LAW OFFICES OF ROBERT E. KINNEY**
824 West 10th Street, Suite 202
Austin, Texas 78701
Telephone: (512) 636-1395
Email: Robert@KinneyRrecruiting.com

By: _____
Robert E Kinney
State Bar No. 00796888

**ATTORNEYS FOR PLAINTIFF**
**MWK RECRUITING LLC**

My name is Robert Emmett Kinney, my date of birth is May 10, 1971, and my address is 824 W 10th Street, Suite 202, Austin, TX 78703, USA. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Travis County, State of Texas, on the 11th day of March, 2017.

_____
Declarant

38

Exhibit "A"



# KINNEYRECRUITING

*excellence in legal search & placement*

### ASSOCIATE RECRUITER EMPLOYMENT AGREEMENT

THIS AGREEMENT is entered into and effective on May 1, 2006 between Kinney Recruiting, L.P. (the "Company") and Evan Jowers (the "Employee");

The parties agree as follows:

## 1. DEFINITIONS

The following terms shall have the following meanings as used in this agreement:

1.1   The "Office" means the office of the Company at which the employee is then employed.

1.2   "Personnel placement service business" means the business of finding positions of employment or partnership opportunities for persons, locating personnel or partners for clients, and related activities.

1.3   "Associate Recruiter" means the occupation of finding positions of employment or partnership opportunities for persons, locating personnel or partnership for clients, and related activities and includes the following activities: soliciting employers to become clients of the Company, contacting clients to ascertain their personnel or partner requirements, assisting clients in fulfilling their personnel or partner requirements, seeking candidates for positions of employment or partnership with clients, obtaining employment or partnership opportunities for candidates of the Company, interviewing candidates for employment or partnership with clients, and exercising discretion in the choice of the candidates to refer to clients.

1.4   "Client" means an employer which has given the Company a job order or search assignment, or which the Company has solicited for a job order or search assignment, and includes the personnel and partners of such an employer.

1.5   "Candidate" means a person who has provided the Company with the candidate's job history information, resume, or an application, for purposes of finding a position of employment or a partnership opportunity.

1.6   "Company's Proprietary Information" means the Company's confidential information, including but not limited to client and candidate lists, interim employees, personal information supplied by candidates and interim employees, information concerning the identity of clients and their personnel, the personnel and partnership needs and requirements of clients, terms and conditions under which the Company deals with

Initialed
Company

1

Initialed
Employee

clients, billing rates, profit margins, financial data, applications, resumes, candidate and employee data sheets, job orders, search assignments, planners, invoices, manuals, computer programs and data, Company personnel information, audio and video cassettes, records, and any information received from a client or candidate under an expectation of confidentiality. The terms "customer list" and "candidate list" are not limited to physical writings or compilations. "Customer lists" and "candidate lists" include information contained in or reproduced from the memory of an employee. The Company's Proprietary Information includes all such information developed by its employees, whether or not during working hours, that is related to Company's business. The Company's Proprietary Information may also be trade secrets.

## 2. THE COMPANY

2.1   The Company hereby employs the Employee as an Associate Recruiter for the Company's personnel placement service business at the Company's Office.

2.2   The Company will pay all of the usual and ordinary expenses involved in the operation of the Office.

2.3   The Company will provide the Employee with Proprietary Information during the Employee's employment.

2.4   The Company will provide training for the Employee.

## 3. ACKNOWLEDGEMENTS

The employee acknowledges that:

3.1   The Company will enable the Employee to contact the Company's clients and candidates and develop relationships with them on behalf of the Company.

3.2   The Employee has been provided access to, and has received, the Company's Proprietary Information, and understands that Employee will continue to have access to the Company's Proprietary Information throughout Employee's employment. In consideration of the Company's provision of Proprietary Information, Employee acknowledges and agrees that during Employee's service and thereafter, pursuant to this agreement, Employee will hold in strictest confidence and will not disclose, discuss, transmit, use, lecture upon, or publish any Proprietary Information, except as such disclosure, discussion, transmission, use, or publication may be required in connection with Employee's service to the Company, or unless Robert Kinney expressly authorizes such in writing.

3.3   The protection of the Company's Proprietary Information, good will, and relationships with its clients and candidates is vital to the continued successful operation of the Company's business.

3.4   The Company has expended and will expend considerable time and money procuring and training the Employee, providing facilities for the conduct of its business, and establishing relationships and good will with existing and prospective clients and candidates.

Initialed
Company

2

Initialed
Employee

3.5    The replacement of an Associate Recruiter who has developed such relationships and good will with the Company's candidates and clients on behalf of the Company requires the Company to expend additional time and money.

3.6    The Employee need not accept employment with the Company; there are other employment opportunities available to the Employee; the Employee has freely chosen to enter this Agreement; and entry into, adherence to, and compliance with this Agreement and its terms are conditions of the Employee's initial and continued employment with the Company.

3.7    The position of Associate Recruiter entails trust and confidence by the Company and requires the highest degree of loyalty, honesty, and integrity from the Employee.

3.8    The duties of an Associate Recruiter are confidential, sensitive, and professional in nature, and require the Employee to function in an independent, discretionary, administrative capacity with regard to selecting candidates for referral, selecting clients, advising candidates and clients, assisting them in negotiations, and otherwise developing, managing, and controlling the areas of the Company's business for which the Employee is assigned responsibility.

3.9    The Employee has been advised of the Company's policies against discrimination and harassment, and that the Company expects all employees to treat each other with dignity and respect.

3.10    If the Employee's employment is terminated, the Employee will be able to earn a livelihood without violating the restrictions contained in this Agreement and the Employee's ability to earn such a livelihood without violating such restrictions is a material condition to the Company's employment of the Employee.

## 4. THE ASSOCIATE RECRUITER

4.1    The Employee accepts the position of employment with the Company as an Associate Recruiter.

4.2    The Employee represents that the Employee is not a party to any contract or other obligation, which would prevent the Employee from accepting employment as an Associate Recruiter or restrict the activities of the Employee.

4.3    The Employee shall devote the Employee's full working time to the Employee's activities as an Associate Recruiter in a manner, which will maintain and increase the Company's ethical, moral, and professional standards, good will, and reputation.

4.4    The Employee shall not engage in any other business activities in competition with the Company's personnel placement service business and shall not engage in any activity related to the personnel placement service business other than in benefit of the Company.

4.5    The Employee shall pay to the Company any payment received by the Employee from anyone in connection with the personnel placement service business.

4.6    The Employee will promptly deliver the Company's Proprietary Information to the Company at any time the Company requests it from the Employee.

Initialed
Company

3

Initialed
Employee

4.7  The Employee shall not enter into any contract, agreement or arrangement for or on behalf of the Company, except those made in the normal course of the Employee's duties as an Associate Recruiter in accordance with the Company's procedures, policies and directions.

4.8.  The Employee authorizes the Company to notify any new employer or entity for whom the Employee provides services about the Employee's rights and obligations under this Agreement following the termination of the Employee's employment with the Company.

## 5. POLICY AGAINST DISCRIMINATION

5.1  The Employee shall screen and refer candidates for positions of employment only on the basis of the candidate's qualifications. The candidate's race, creed, color, religion, sex, age, national origin, handicap, disability, or other protected characteristics shall not be a factor in referral.

5.2  The Employee shall not accept a job order from any client, which contains any discriminatory provisions unless the client can provide evidence satisfactory to the Company that such discriminatory provision is a bona fide occupational qualification.

5.3  The Employee will not, in any manner whatever, code any forms or papers that would in any way indicate race, creed, color, religion, sex, age, national origin, disability, handicap, or other legally protected characteristic.

5.4  The Employee will quickly bring to the attention of the Company's management, any actions of any employee, which may be in violation of this policy

## 6. COMPENSATION

6.1  The Employee's compensation for the services rendered, as an employee of the Company shall be pursuant to the terms of exhibit A, which is attached to and made a part of this Agreement. Exhibit A may be modified from time to time as the Company, in its sole discretion, deems appropriate, provided that no such modification may be applied retroactively.

## 7. NON-DISCLOSURE COVENANTS

7.1  Upon termination of employee's employment, the Employee will not retain any copies of the Company's Proprietary Information.  When the Employee's service with the Company is completed, Employee will immediately deliver to the Company all Proprietary Information, together with all copies thereof, and any other material containing or disclosing any Proprietary Information.  Employee will also immediately deliver all Company property, including but not limited to laptops, pagers, cell phones, corporate credit cards, keys, and/or access cards.  Employee further agrees that all property situated on the Company's premises and/or owned, leased, or licensed by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by personnel of the Company at any time with or without notice.

7.2  At all times during and after the Employee's employment, the Employee shall not use or disclose to any person the Company's Proprietary Information, except as such disclosure

Initialed
Company

4

Initialed
Employee

or use may be required in connection with the Employee's employment, or unless the Robert Kinney expressly authorizes such in writing.

## 8. NON-SOLICITATION COVENANTS

8.1     For a period of one year following the effective date of termination of the Employee's employment, the Employee shall not, in the course of the personnel placement service business, solicit or provide services to any candidate or client with whom the Employee had contact with, knowledge of, or access to during the twelve months immediately preceding the effective date of termination, and shall not assist any entity other than the Company in so doing.

8.2     For a period of one year following the effective date of termination of the Employee's employment, the Employee shall not solicit or hire away any employee of the Company, or any person whose employment with the Company has been terminated for less than six months, nor shall Employee induce, solicit, or otherwise encourage any supplier, independent contractor, or any other business relation of the Company, or in any way interfere with the relationship between any such employee, supplier, independent contractor, or other business relation and the Company (including, without limitation, making any negative or disparaging statements regarding the Company or its respective officers, directors, employees, or principals).

## 9. REMEDIES

9.1     The actual damages resulting from violation of Sections 7 and/or 8 of this Agreement by the Employee will be difficult or impossible to ascertain. In the event of such a violation, the Employee shall pay to the Company, upon demand, as liquidated damages, and not as a penalty, the following:

9.1.1     Any fee paid for services rendered in violation of Sections 7 and/or 8, whether paid to the Employee or to any other person, firm or entity; plus

9.1.2     All costs and expenses, including reasonable attorney's fees, incurred by the Company in the enforcement of its rights relating to such violation.

9.2.    The liquidated damages will be in addition to any and all other remedies which the Company may have, including but not limited to injunctive relief.

9.3.    The Company will suffer material and irreparable damage if the Employee violates Sections 7 and/or 8, which cannot be adequately compensated even by the liquidated damages provided for by this Section, and the Company would not have an adequate remedy at law for such a violation. Therefore, the Company shall be entitled, in addition to all other available remedies, to an immediate injunction to restrain any such violation. If any present or future statute of this State provides protections or remedies relating to proprietary information, confidential information, or trade secrets, which are greater than the protections and remedies, provided by this Agreement, then the Company shall also have the benefit of such additional statutory protections and remedies.

9.4.    The one-year time periods referred to in Section 8 shall be extended to include any period of time during which the Employee engages in activities constituting a violation of that Section.

Initialed
Company

5

Initialed
Employee

9.5.    The obligations set forth in Sections 7 and/or 8 shall each be construed as agreements independent of any other provisions in this Agreement and the existence of any claim or cause of action of the Employee against Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of the provisions of Sections 7 and/or 8 or relieve the Employee of any such obligations.

9.6.    If the scope of enforceability of the restrictions contained in Section 8 is determined to be unreasonable, the court may modify and enforce such restrictions to the extent that they are found to be reasonable under the circumstances existing at that time.

## 10. INDEMNIFICATION

10.1    The Employee shall indemnify and save the company harmless from all claims, demands, and actions arising out of the Employee's breach of this Agreement, and shall reimburse the Company for all costs, damages and expenses, including reasonable attorney's fees, which the Company pays or becomes obligated to pay by reason of such activities or breach.

10.2.   This Section shall not be construed to avoid or limit any of the other rights granted to the Company or duties assumed by the Employee pursuant to this agreement.

## 11. EMPLOYMENT AT WILL

11.1    Either party shall have the privilege to terminate the employment relationship at any time, with or without cause, by delivering verbal or written notice to the other party specifying the effective date of such termination.

11.2.   If the employment relationship is terminated, and the Employee is later re-employed by the company, this Agreement will be applicable to such re-employment as if there had been no interruption of the employment relationship, without the necessity for the execution of a new agreement between the parties.

## 12. APPLICABLE LAW

12.1    This Agreement, and any controversies, claims, disputes or matters in questions arising out of or relating to this Agreement shall be construed, governed, and enforced in accordance with the laws of Florida.

## 13. EXCLUSIVE FORUM/JURY WAIVER

13.1    The Employee irrevocably agrees that the exclusive forum for any suit, action, or other proceeding arising out of or in any way related to this Agreement shall be in the state or federal courts in Florida, and the Employee agrees to the exclusive personal jurisdiction and venue of any court in Travis County, Texas and waives any defense thereto.

13.2    Each party hereto expressly waives the right to trial by jury in any lawsuit or proceeding relating to or arising in any way from this Agreement or Employee's Employment with Company.

Initialed
Company

6

Initialed
Employee

## 14. ENTIRE AGREEMENT

14.1.   This Agreement with Exhibit A attached contains the entire Agreement between the parties. There are no representations, inducements, arrangements, promises, or agreements outstanding between them, either oral or written, other than those contained in this Agreement. This Agreement supersedes any prior employment agreement between the Employee and the Company or any of its affiliates or subsidiaries. Any provisions of this Agreement may only be changed or modified in a writing, which is signed by the party to be charged.

## 15. SUCCESSORS AND ASSIGNS

15.1    The parties to this Agreement expressly authorize that the restrictive covenants contained herein be enforceable by the Company's assignees and/or successors.

## 16. NOTICES

16.1    All notices to be given under this Agreement shall be given in writing by registered or certified mail addressed to the Company at 824 W 10th Street, Suite 202, Austin, TX 78701, and to the Employee addressed as shown below, or by hand delivery to either party. Either party may designate a different address by written notice to the other party. Notices to the Company, which are hand delivered, may only be delivered to Robert E. Kinney, Esq., 824 W 10th Street, Suite 202, Austin, TX 78701.

## 17. CAPTIONS AND TERMINOLOGY

17.1    The caption to each section herein are used for convenience and are not a part of this Agreement, or to be used in interpreting it. Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural.

## 18. WAIVER AND SURVIVAL

18.1    The failure of the Company to insist upon strict adherence or compliance by the Employee with any of the terms of this Agreement, on one or more occasions, shall not constitute a waiver, and shall not deprive the Company of the right to require compliance with such term.

## 19. SEVERABILITY

19.1    If any portion of this agreement is held invalid or unenforceable for any reason, such holding shall not affect any other portion of this Agreement. The remaining portions shall remain in full force and effect.

19.2    The parties to this agreement expressly authorize that the restrictive covenants contained herein be enforceable by Kinney Recruiting L.P.assignees and/or successors.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement. The Employee acknowledges receipt of an executed copy of this Agreement.

I THE EMPLOYEE, ACKNOWLEDGE THAT I HAVE HAD ADEQUATE OPPORTUNITY TO REVIEW THIS AGREEMENT PRIOR TO ACCEPTING EMPLOYMENT OR CHANGING MY POSITION AND THAT I AM SIGNING THIS AGREEMENT OF MY OWN

_____                           _____
Initialed                                         Initialed
Company                                        Employee

7

FREE WILL, WITHOUT DURESS OR COERCION.   I UNDERSTAND THAT THIS
AGREEMENT RESTRICTS MY RIGHT TO DISCLOSE OR USE PROPRIETARY
INFORMATION DURING OR SUBSEQUENT TO MY EMPLOYMENT WITH THE
COMPANY, PROHIBITS ME FROM SOLICITING EMPLOYEES AND CUSTOMERS OF
THE COMPANY FOR ONE (1) YEAR AFTER MY SERVICE IS TERMINATED FOR ANY
REASON, AND REQUIRES ME TO PROVIDE LIQUIDATED DAMAGES TO THE
COMPANY IF I VIOLATE CUSTOMER OR CANDIDATE NON-SOLICITATION
PROVISIONS.

This Agreement shall be effective as of the first day of Employee's employment, namely:  May 1,
2006.


_____
Employee Signature

THE COMPANY

_____
By: Robert E. Kinney, Esq.


PLEASE PRINT OR TYPE THE FOLLOWING:


___Evan Jowers_____
Associate Recruiter's full name

_16 950   N. BAY  Rd.  #2514_
Home Address

_SUNNY ISLES   FL    33160_
City              State         Zip


_(917) 292 8657_____
Residence Telephone


                                                                    4660819.2


_____                              _____
Initialed                                                              Initialed
Company                                                            Employee

8

## ASSOCIATE RECRUITER EMPLOYMENT AGREEMENT "EXHIBIT A"
### Dated as of: May 2006

1. **DEFINITIONS.**

   The following definitions shall be applicable to this Exhibit:

   1.1. "NET CASH-IN" is defined as the Employee's portion of all placement fees received and retained by the Company which result from the placement of candidates with clients of the Company and fees received for other services provided by the Company ("Other Services") through the Employee's efforts, less refunds, credits, adjustments of placement fees, split fees paid to others, and any expenses incurred by the Company in the collection of the placement fees. The Employee's portion will be determined by the Company for each placement and may be modified for any placement prior to the placement being made. The determination of the Employee's portion of retainers and engagement fees will be made when the Company has the information necessary to make the determination.

   1.2. "OFFICE NET CASH-IN" is defined as the cumulative NET CASH-IN for all of the Company employees under the supervision of the Employee within the Employee's office, including the Employee's own NET CASH-IN.

   1.3. "COMMISSION QUOTA" is defined as the sum equal to the total of the Employee's compensation paid as provided in Subsections 2.1 and 2.2 during each pay period. If the Employee fails to meet the Employee's COMMISSION QUOTA in any pay period, the COMMISSION QUOTA for the next pay period shall be increased by the amount of the deficit from the previous pay period.

   1.4. "NET COMMISSIONS" is defined as GROSS COMMISSIONS for a pay period less COMMISSION QUOTA.

2. **COMPENSATION.**

   The Employee's compensation for the services to be rendered hereunder shall be as follows:

   2.1. A salary of $3,000 per pay period, less applicable withholdings and deductions, paid monthly.

   2.2. "GROSS COMMISSIONS" shall be computed each pay period on NET CASH-IN for the calendar year pursuant to the following schedule:

| Percentage of Commissions | Calendar Year Net Cash-In |
|---|---|
| 45% | Of the first $75,000 |
| 50% | Of the next $75,000 |
| 55% | Of the next $75,000 |
| 60% | Of the next $75,000 |
| 65% | Of the excess over $300,000 |

Initialed
Company

Initialed
Employee

Where applicable, thresholds for percentage increases shall be based on OFFICE NET CASH-IN for the calendar year, while the actual commission calculation shall apply only to NET CASH-IN for the calendar year.

2.3.    "NET COMMISSIONS" will be computed and paid each pay period. The Company, in its sole discretion, may postpone payment of a commission until the first regular pay date after the expiration of the guarantee period provided to the client by the Company.

3.    ADVANCES.

3.1.    The Company may from time to time grant to the Employee advances against the Employee's commissions and bonuses. Commissions for each pay period less all advances, if any, shall be paid to the Employee on or before the last day of the pay period following the close of said pay period. All monies paid to the Employee over and above the Employee's salary (including overtime compensation, if any) and commissions shall be deemed advances against commissions. Payments to the Employee which relate to actual or anticipated receipts from clients which are not or do not remain NET CASH-IN are recoupable.

4.    COMPENSATION UPON TERMINATION.

4.1.    If the Employee's employment is terminated for any reason other than those set forth in Subsection 4.3 of this Exhibit, the Employee will be paid commissions equal to thirty-five percent (35%) of NET CASH-IN received by the Company within thirty (30) calendar days after the effective date of the termination of employment that exceeds COMMISSION QUOTA, provided that the client has been invoiced by the Company on or before the effective date of the termination of employment, which commission will be further reduced by any other funds due the Company from the Employee.

4.2.    The Employee acknowledges that the Employee would normally have certain tasks to perform subsequent to the placement and prior to and subsequent to the Company's invoicing of a client. Since the Company will be required to perform those tasks, the Employee agrees that the compensation to be paid pursuant to Subsection 4.1 is fair and equitable.

4.3.    If the employment is terminated due to a breach or threatened breach by the Employee of the provisions of the Employee's Agreement relating to the duties of the Employee or to the restrictions relating to non-disclosure, non-solicitation, or other restrictive covenants, or if, subsequent to the effective date of termination of employment, the Employee breaches or threatens to breach any of such provisions, then the Employee will only be paid the Employee's commission based on the NET CASH-IN actually received by the Company on or before the effective date of termination of employment that exceeds COMMISSION QUOTA, which commissions will be further reduced by any other funds due the Company from the Employee.

4.4.    Payments to the Employee under Subsections 4.1 and 4.3 of this Exhibit will not be due until thirty (30) calendar days after the expiration of the guarantee periods provided to the client by the Company.

Initialed
Company

Initialed
Employee

4.5.   Should there be any Company advances still owed by the Employee at the time of the Employee's termination, the Employee authorizes the Company to deduct the advances from Employee's final paycheck, even if this causes Employee's total pay to be below the minimum wage for the final paycheck.

5.   MISCELLANEOUS.

5.1.   The Employee's compensation may be modified from time to time as the Company, in its sole discretion, deems appropriate, provided that no such modification may be applied retroactively.

4560825.2

Initialed
Company

Initialed
Employee

Exhibit "B"



# **KINNEY**RECRUITING

*excellence in legal search & placement*

## ASSOCIATE RECRUITER EMPLOYMENT AGREEMENT

THIS AGREEMENT is entered into and effective on May 1, 2006 between Kinney Recruiting, L.P. (the "Company") and Yuliya (the "Employee");

The parties agree as follows:

## 1. DEFINITIONS

The following terms shall have the following meanings as used in this agreement:

1.1 The "Office" means the office of the Company at which the employee is then employed.

1.2 "Personnel placement service business" means the business of finding positions of employment or partnership opportunities for persons, locating personnel or partners for clients, and related activities.

1.3 "Associate Recruiter" means the occupation of finding positions of employment or partnership opportunities for persons, locating personnel or partnership for clients, and related activities and includes the following activities: soliciting employers to become clients of the Company, contacting clients to ascertain their personnel or partner requirements, assisting clients in fulfilling their personnel or partner requirements, seeking candidates for positions of employment or partnership with clients, obtaining employment or partnership opportunities for candidates of the Company, interviewing candidates for employment or partnership with clients, and exercising discretion in the choice of the candidates to refer to clients.

1.4 "Client" means an employer which has given the Company a job order or search assignment, or which the Company has solicited for a job order or search assignment, and includes the personnel and partners of such an employer.

1.5 "Candidate" means a person who has provided the Company with the candidate's job history information, resume, or an application, for purposes of finding a position of employment or a partnership opportunity.

1.6 "Company's Proprietary Information" means the Company's confidential information, including but not limited to client and candidate lists, interim employees, personal information supplied by candidates and interim employees, information concerning the identity of clients and their personnel, the personnel and partnership needs and requirements of clients, terms and conditions under which the Company deals with

Initialed
Company

1

Initialed
Employee

clients, billing rates, profit margins, financial data, applications, resumes, candidate and employee data sheets, job orders, search assignments, planners, invoices, manuals, computer programs and data, Company personnel information, audio and video cassettes, records, and any information received from a client or candidate under an expectation of confidentiality. The terms "customer list" and "candidate list" are not limited to physical writings or compilations. "Customer lists" and "candidate lists" include information contained in or reproduced from the memory of an employee. The Company's Proprietary Information includes all such information developed by its employees, whether or not during working hours, that is related to Company's business. The Company's Proprietary Information may also be trade secrets.

## 2. THE COMPANY

2.1    The Company hereby employs the Employee as an Associate Recruiter for the Company's personnel placement service business at the Company's Office.

2.2    The Company will pay all of the usual and ordinary expenses involved in the operation of the Office.

2.3    The Company will provide the Employee with Proprietary Information during the Employee's employment.

2.4    The Company will provide training for the Employee.

## 3. ACKNOWLEDGEMENTS

The employee acknowledges that:

3.1    The Company will enable the Employee to contact the Company's clients and candidates and develop relationships with them on behalf of the Company.

3.2    The Employee has been provided access to, and has received, the Company's Proprietary Information, and understands that Employee will continue to have access to the Company's Proprietary Information throughout Employee's employment. In consideration of the Company's provision of Proprietary Information, Employee acknowledges and agrees that during Employee's service and thereafter, pursuant to this agreement, Employee will hold in strictest confidence and will not disclose, discuss, transmit, use, lecture upon, or publish any Proprietary Information, except as such disclosure, discussion, transmission, use, or publication may be required in connection with Employee's service to the Company, or unless Robert Kinney expressly authorizes such in writing.

3.3    The protection of the Company's Proprietary Information, good will, and relationships with its clients and candidates is vital to the continued successful operation of the Company's business.

3.4    The Company has expended and will expend considerable time and money procuring and training the Employee, providing facilities for the conduct of its business, and establishing relationships and good will with existing and prospective clients and candidates.

Initialed
Company

2

Initialed
Employee

3.5 The replacement of an Associate Recruiter who has developed such relationships and good will with the Company's candidates and clients on behalf of the Company requires the Company to expend additional time and money.

3.6 The Employee need not accept employment with the Company; there are other employment opportunities available to the Employee; the Employee has freely chosen to enter this Agreement; and entry into, adherence to, and compliance with this Agreement and its terms are conditions of the Employee's initial and continued employment with the Company.

3.7 The position of Associate Recruiter entails trust and confidence by the Company and requires the highest degree of loyalty, honesty, and integrity from the Employee.

3.8 The duties of an Associate Recruiter are confidential, sensitive, and professional in nature, and require the Employee to function in an independent, discretionary, administrative capacity with regard to selecting candidates for referral, selecting clients, advising candidates and clients, assisting them in negotiations, and otherwise developing, managing, and controlling the areas of the Company's business for which the Employee is assigned responsibility.

3.9 The Employee has been advised of the Company's policies against discrimination and harassment, and that the Company expects all employees to treat each other with dignity and respect.

3.10 If the Employee's employment is terminated, the Employee will be able to earn a livelihood without violating the restrictions contained in this Agreement and the Employee's ability to earn such a livelihood without violating such restrictions is a material condition to the Company's employment of the Employee.

## 4. THE ASSOCIATE RECRUITER

4.1 The Employee accepts the position of employment with the Company as an Associate Recruiter.

4.2 The Employee represents that the Employee is not a party to any contract or other obligation, which would prevent the Employee from accepting employment as an Associate Recruiter or restrict the activities of the Employee.

4.3 The Employee shall devote the Employee's full working time to the Employee's activities as an Associate Recruiter in a manner, which will maintain and increase the Company's ethical, moral, and professional standards, good will, and reputation.

4.4 The Employee shall not engage in any other business activities in competition with the Company's personnel placement service business and shall not engage in any activity related to the personnel placement service business other than in benefit of the Company.

4.5 The Employee shall pay to the Company any payment received by the Employee from anyone in connection with the personnel placement service business.

4.6 The Employee will promptly deliver the Company's Proprietary Information to the Company at any time the Company requests it from the Employee.

Initialed
Company

3

Initialed
Employee

4.7      The Employee shall not enter into any contract, agreement or arrangement for or on behalf of the Company, except those made in the normal course of the Employee's duties as an Associate Recruiter in accordance with the Company's procedures, policies and directions.

4.8.      The Employee authorizes the Company to notify any new employer or entity for whom the Employee provides services about the Employee's rights and obligations under this Agreement following the termination of the Employee's employment with the Company.

## 5. POLICY AGAINST DISCRIMINATION

5.1      The Employee shall screen and refer candidates for positions of employment only on the basis of the candidate's qualifications. The candidate's race, creed, color, religion, sex, age, national origin, handicap, disability, or other protected characteristics shall not be a factor in referral.

5.2      The Employee shall not accept a job order from any client, which contains any discriminatory provisions unless the client can provide evidence satisfactory to the Company that such discriminatory provision is a bona fide occupational qualification.

5.3      The Employee will not, in any manner whatever, code any forms or papers that would in any way indicate race, creed, color, religion, sex, age, national origin, disability, handicap, or other legally protected characteristic.

5.4      The Employee will quickly bring to the attention of the Company's management, any actions of any employee, which may be in violation of this policy.

## 6. COMPENSATION

6.1      The Employee's compensation for the services rendered, as an employee of the Company shall be pursuant to the terms of Exhibit A, which is attached to and made a part of this Agreement. Exhibit A may be modified from time to time as the Company, in its sole discretion, deems appropriate, provided that no such modification may be applied retroactively.

## 7. NON-DISCLOSURE COVENANTS

7.1      Upon termination of employee's employment, the Employee will not retain any copies of the Company's Proprietary Information. When the Employee's service with the Company is completed, Employee will immediately deliver to the Company all Proprietary Information, together with all copies thereof, and any other material containing or disclosing any Proprietary Information. Employee will also immediately deliver all Company property, including but not limited to laptops, pagers, cell phones, corporate credit cards, keys, and/or access cards. Employee further agrees that all property situated on the Company's premises and/or owned, leased, or licensed by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by personnel of the Company at any time with or without notice.

7.2      At all times during and after the Employee's employment, the Employee shall not use or disclose to any person the Company's Proprietary Information, except as such disclosure

Initialed
Company

4

Initialed
Employee

or use may be required in connection with the Employee's employment, or unless the Robert Kinney expressly authorizes such in writing.

## 8. NON-SOLICITATION COVENANTS

8.1    For a period of one year following the effective date of termination of the Employee's employment, the Employee shall not, in the course of the personnel placement service business, solicit or provide services to any candidate or client with whom the Employee had contact with, knowledge of, or access to during the twelve months immediately preceding the effective date of termination, and shall not assist any entity other than the Company in so doing.

8.2    For a period of one year following the effective date of termination of the Employee's employment, the Employee shall not solicit or hire away any employee of the Company, or any person whose employment with the Company has been terminated for less than six months, nor shall Employee induce, solicit, or otherwise encourage any supplier, independent contractor, or any other business relation of the Company, or in any way interfere with the relationship between any such employee, supplier, independent contractor, or other business relation and the Company (including, without limitation, making any negative or disparaging statements regarding the Company or its respective officers, directors, employees, or principals).

## 9. REMEDIES

9.1    The actual damages resulting from violation of Sections 7 and/or 8 of this Agreement by the Employee will be difficult or impossible to ascertain. In the event of such a violation, the Employee shall pay to the Company, upon demand, as liquidated damages, and not as a penalty, the following:

9.1.1    Any fee paid for services rendered in violation of Sections 7 and/or 8, whether paid to the Employee or to any other person, firm or entity; plus

9.1.2    All costs and expenses, including reasonable attorney's fees, incurred by the Company in the enforcement of its rights relating to such violation.

9.2.    The liquidated damages will be in addition to any and all other remedies which the Company may have, including but not limited to injunctive relief.

9.3.    The Company will suffer material and irreparable damage if the Employee violates Sections 7 and/or 8, which cannot be adequately compensated even by the liquidated damages provided for by this Section, and the Company would not have an adequate remedy at law for such a violation. Therefore, the Company shall be entitled, in addition to all other available remedies, to an immediate injunction to restrain any such violation. If any present or future statute of this State provides protections or remedies relating to proprietary information, confidential information, or trade secrets, which are greater than the protections and remedies, provided by this Agreement, then the Company shall also have the benefit of such additional statutory protections and remedies.

9.4.    The one-year time periods referred to in Section 8 shall be extended to include any period of time during which the Employee engages in activities constituting a violation of that Section.

Initialed
Company

5

Initialed
Employee

9.5. The obligations set forth in Sections 7 and/or 8 shall each be construed as agreements independent of any other provisions in this Agreement and the existence of any claim or cause of action of the Employee against Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of the provisions of Sections 7 and/or 8 or relieve the Employee of any such obligations.

9.6. If the scope of enforceability of the restrictions contained in Section 8 is determined to be unreasonable, the court may modify and enforce such restrictions to the extent that they are found to be reasonable under the circumstances existing at that time.

## 10. INDEMNIFICATION

10.1. The Employee shall indemnify and save the company harmless from all claims, demands, and actions arising out of the Employee's breach of this Agreement, and shall reimburse the Company for all costs, damages and expenses, including reasonable attorney's fees, which the Company pays or becomes obligated to pay by reason of such activities or breach.

10.2. This Section shall not be construed to avoid or limit any of the other rights granted to the Company or duties assumed by the Employee pursuant to this agreement.

## 11. EMPLOYMENT AT WILL

11.1. Either party shall have the privilege to terminate the employment relationship at any time, with or without cause, by delivering verbal or written notice to the other party specifying the effective date of such termination.

11.2. If the employment relationship is terminated, and the Employee is later re-employed by the company, this Agreement will be applicable to such re-employment as if there had been no interruption of the employment relationship, without the necessity for the execution of a new agreement between the parties.

## 12. APPLICABLE LAW

12.1. This Agreement, and any controversies, claims, disputes or matters in questions arising out of or relating to this Agreement shall be construed, governed, and enforced in accordance with the laws of Texas.

## 13. EXCLUSIVE FORUM/JURY WAIVER

13.1. The Employee irrevocably agrees that the exclusive forum for any suit, action, or other proceeding arising out of or in any way related to this Agreement shall be in the state or federal courts in Texas, and the Employee agrees to the exclusive personal jurisdiction and venue of any court in Travis County, Texas and waives any defense thereto.

13.2. Each party hereto expressly waives the right to trial by jury in any lawsuit or proceeding relating to or arising in any way from this Agreement or Employee's Employment with Company.

Initialed
Company

6

Initialed
Employee

## 14. ENTIRE AGREEMENT

14.1. This Agreement with Exhibit A attached contains the entire Agreement between the parties. There are no representations, inducements, arrangements, promises, or agreements outstanding between them, either oral or written, other than those contained in this Agreement. This Agreement supersedes any prior employment agreement between the Employee and the Company or any of its affiliates or subsidiaries. Any provisions of this Agreement may only be changed or modified in a writing, which is signed by the party to be charged.

## 15. SUCCESSORS AND ASSIGNS

15.1 The parties to this Agreement expressly authorize that the restrictive covenants contained herein be enforceable by the Company's assignees and/or successors.

## 16. NOTICES

16.1 All notices to be given under this Agreement shall be given in writing by registered or certified mail addressed to the Company at 824 W 10th Street, Suite 202, Austin, TX 78701, and to the Employee addressed as shown below, or by hand delivery to either party. Either party may designate a different address by written notice to the other party. Notices to the Company, which are hand delivered, may only be delivered to Robert E. Kinney, Esq., 824 W 10th Street, Suite 202, Austin, TX 78701.

## 17. CAPTIONS AND TERMINOLOGY

17.1 The caption to each section herein are used for convenience and are not a part of this Agreement, or to be used in interpreting it. Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural.

## 18. WAIVER AND SURVIVAL

18.1 The failure of the Company to insist upon strict adherence or compliance by the Employee with any of the terms of this Agreement, on one or more occasions, shall not constitute a waiver, and shall not deprive the Company of the right to require compliance with such term.

## 19. SEVERABILITY

19.1 If any portion of this agreement is held invalid or unenforceable for any reason, such holding shall not affect any other portion of this Agreement. The remaining portions shall remain in full force and effect.

19.2 The parties to this agreement expressly authorize that the restrictive covenants contained herein be enforceable by Kinney Recruiting L.P.assignees and/or successors.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement. The Employee acknowledges receipt of an executed copy of this Agreement.

I THE EMPLOYEE, ACKNOWLEDGE THAT I HAVE HAD ADEQUATE OPPORTUNITY TO REVIEW THIS AGREEMENT PRIOR TO ACCEPTING EMPLOYMENT OR CHANGING MY POSITION AND THAT I AM SIGNING THIS AGREEMENT OF MY OWN

Initialed
Company

7

Initialed
Employee

FREE WILL, WITHOUT DURESS OR COERCION. I UNDERSTAND THAT THIS AGREEMENT RESTRICTS MY RIGHT TO DISCLOSE OR USE PROPRIETARY INFORMATION DURING OR SUBSEQUENT TO MY EMPLOYMENT WITH THE COMPANY, PROHIBITS ME FROM SOLICITING EMPLOYEES AND CUSTOMERS OF THE COMPANY FOR ONE (1) YEAR AFTER MY SERVICE IS TERMINATED FOR ANY REASON, AND REQUIRES ME TO PROVIDE LIQUIDATED DAMAGES TO THE COMPANY IF I VIOLATE CUSTOMER OR CANDIDATE NON-SOLICITATION PROVISIONS.

This Agreement shall be effective as of the first day of Employee's employment, namely: ~~May 1, 2006.~~ December 17, 2007.

_____
Employee Signature

THE COMPANY

_____
By: Robert E. Kinney, Esq.

PLEASE PRINT OR TYPE THE FOLLOWING:

Yuliya _I. VINOKUROVA_
Associate Recruiter's full name

_418 S. Rexford Dr. apt C_
Home Address

_Beverly Hills, CA 90212_
City                State          Zip

_310.926.6707_
Residence Telephone

4560819.2

_____
Initialed
Company

8

_____
Initialed
Employee

**ASSOCIATE RECRUITER EMPLOYMENT AGREEMENT "EXHIBIT A"**

Dated as of: _December 5, 2007_

1. **DEFINITIONS.**

   The following definitions shall be applicable to this Exhibit:

   1.1. "NET PERM CASH-IN" is defined as the Employee's portion of all permanent placement fees (but not placement fees for contract placements) received and retained by the Company which result from the placement of candidates with clients of the Company which are intended to be permanent placements and fees received for other services (except contract placements) provided by the Company ("Other Services") through the Employee's efforts, less refunds, credits, adjustments of placement fees, split fees paid to others, and any expenses incurred by the Company in the collection of the placement fees. The Employee's portion will be determined by the Company for each placement and may be modified for any placement prior to the placement being made. The determination of the Employee's portion of retainers and engagement fees will be made when the Company has the information necessary to make the determination.

   1.2. "NET CONTRACT CASH-IN" is defined as the Employee's portion of the Gross Profit Margin earned on contract placements received and retained by the Company which result from the placement of candidates with clients of the Company which are intended to be contract placements, less CONTRACT BURDEN, refunds, credits, adjustments of placement fees, split fees paid to others, and any expenses incurred by the Company in the collection of the placement fees. The Employee's portion will be determined by the Company for each placement and may be modified for any placement prior to the placement being made.

   1.3. "CONTRACT BURDEN" shall be a percentage of gross payments made to contractors for the Company intended to account for the overhead associated with employment of contractors (including FICA, Federal Unemployment Tax, State Unemployment Tax, applicable gross receipts taxes and other overhead). Contract Burden is currently 15% but is subject to change at any time at the sole discretion of the Company.

   1.4. "NET COMMISSIONS" is defined as GROSS PERM COMMISSIONS plus GROSS CONTRACT COMMISSIONS plus BONUS COMMISSIONS for a pay period.

2. **COMPENSATION.**

   The Employee's compensation for the services to be rendered hereunder shall be as follows:

Initialed
Company

Initialed
Employee

2.1. A salary of $800 per pay period, paid semi-monthly.

2.2. In addition, the Employee will be paid one and one-half times the regular rate of pay for all hours for which overtime compensation is required by applicable law through the earlier of the Employee's sixth full semi-monthly pay period or the pay period in which the Employee makes his or her first placement. This will afford the Employee adequate time to begin to customarily and regularly exercise discretion and independent judgment in the performance of the Employee's duties. An employee who has had prior experience as an account executive will not receive such additional payments. The Employee expressly agrees not to work in excess of 40 hours in any workweek without the prior written consent of the Company during this initial period of employment.

2.3. "GROSS PERM COMMISSIONS" shall be computed each pay period on NET PERM CASH-IN for the calendar year pursuant to the following schedule:

| Percentage of Commissions | Calendar Year Net Perm Cash-In |
| --- | --- |

It is not expected that the Employee will be involved in permanent placement work initially except in the capacity of providing assistance to other recruiters. In the event there is mutual interest in the Employee working on permanent placement initiatives, the commission arrangements will be determined at that time.

2.4. "GROSS CONTRACT COMMISSIONS" shall be computed each pay period on NET CONTRACT CASH-IN for the calendar year pursuant to the following schedule:

| Percentage of Commissions | Calendar Year Net Contract Cash-In |
| --- | --- |
| 10% | Of the first $100,000 |
| 11% | Of the next $50,000 |
| 12% | Of the next $50,000 |
| 15% | Of the excess over $200,000 |

2.5. "BONUS COMMISSIONS" shall be computed and paid from time to time in the sole discretion of the Company. When Bonus Commissions are paid on the basis of assistance given to another Company employee in completion of a placement, the Employee shall be liable to return any such Bonus Commission to the Company in proportion to any refund paid to a client by the Company as a result of failure by the relevant candidate to remain employed for the complete guarantee period provided to the client by the Company.

Initialed
Company

Initialed
Employee

2.6. "NET COMMISSIONS" will be computed and paid each pay period. The Company, in its sole discretion, may postpone payment of a commission until the first regular pay date after the expiration of the guarantee period provided to the client by the Company.

3. ADVANCES.

3.1. The Company may from time to time grant to the Employee advances against the Employee's commissions and bonuses. Commissions for each pay period less all advances, if any, shall be paid to the Employee on or before the last day of the pay period following the close of said pay period. All monies paid to the Employee over and above the Employee's salary (including overtime compensation, if any) and commissions shall be deemed advances against commissions. Payments to the Employee which relate to actual or anticipated receipts from clients which are not or do not remain NET PERM CASH-IN or NET CONRACT CASH-IN are recoupable.

4. COMPENSATION UPON TERMINATION.

4.1. If the Employee's employment is terminated for any reason other than those set forth in Subsection 4.3 of this Exhibit, the Employee will be paid commissions equal to 10% of NET PERM CASH-IN or NET CONTRACT CASH-IN received by the Company within thirty (30) calendar days after the effective date of the termination of employment that exceeds COMMISSION QUOTA, provided that the client has been invoiced by the Company on or before the effective date of the termination of employment, which commission will be further reduced by any other funds due the Company from the Employee.

4.2. The Employee acknowledges that the Employee would normally have certain tasks to perform subsequent to the placement and prior to and subsequent to the Company's invoicing of a client. Since the Company will be required to perform those tasks, the Employee agrees that the compensation to be paid pursuant to Subsection 4.1 is fair and equitable.

4.3. If the employment is terminated due to a breach or threatened breach by the Employee of the provisions of the Employee's Agreement relating to the duties of the Employee or to the restrictions relating to non-disclosure, non-solicitation, or other restrictive covenants, or if, subsequent to the effective date of termination of employment, the Employee breaches or threatens to breach any of such provisions, then the Employee will only be paid the Employee's commission based on the NET PERM CASH-IN or NET CONTRACT CASH-IN actually received by the Company on or before the effective date of termination of employment that exceeds COMMISSION QUOTA, which commissions will be further reduced by any other funds due the Company from the Employee.

Initialed
Company

Initialed
Employee

4.4. Payments to the Employee under Subsections 4.1 and 4.3 of this Exhibit will not be due until thirty (30) calendar days after the expiration of the guarantee periods provided to the client by the Company

5. <u>MISCELLANEOUS.</u>

5.1. The Employee's compensation may be modified from time to time as the Company, in its sole discretion, deems appropriate, provided that no such modification may be applied retroactively.

5.2. If Employee starts employment after the first business day of a calendar year, the Calendar Year NET PERM CASH-IN or NET CONTRACT CASH-IN increments provided for in Subsection 2.3 and 2.4 for the first calendar year during which the Employee is employed will be pro rated by multiplying the increments by a fraction, the numerator of which is the number of days remaining in the calendar year, and the denominator of which is 365.

Initialed
Company

Initialed
Employee

p.4

Dec 05 07 11:50a

Exhibit "C"

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

# EVAN P. JOWERS

## PROMISSORY NOTE

November 1, 2012                                            $150,000.00
                                                            Austin, Texas

FOR VALUE RECEIVED, Evan P. Jowers, an individual (the "**Debtor**"), promises to pay to Counsel Unlimited LLC, a Texas corporation (the "**Lender**") the principal sum of One Hundred Fifty Thousand Dollars ($150,000.00) or so much thereof as shall have been advanced and is outstanding together with simple interest on the unpaid principal sum at a rate equal to six percent (17.0%) per annum, computed on the basis of the actual number of days elapsed and a year of 360 days. All unpaid principal, together with any then accrued but unpaid interest and any other amounts payable hereunder, shall be due and payable according to the terms set forth in this Promissory Note (this "Note").

**LOAN AGREEMENT.** This Note is the "Note" as defined in that certain Loan Agreement (the "Loan Agreement") of even date herewith, entered into by and between Debtor and Lender, as it may be amended from time to time, and is subject to all the terms and conditions thereof. All terms not defined herein shall have the same meaning as in the Loan Agreement. In the event of a conflict between the terms of this Note and the Loan Agreement, the terms of this Note shall prevail. Advances under this Note shall be made pursuant to Article 3 of the Loan Agreement.

**INTEREST RATE.** Interest on the outstanding principal balance of this Note shall be computed and calculated based upon a three hundred sixty (360)-day year and actual days elapsed and shall accrue at the per annum rate equal to 17%. Debtor understands that Lender may make loans based on other rates as well.

**PRINCIPAL AND INTEREST PAYMENTS.** Interest shall be due and payable month, in arrears, based upon the actual number of days elapsed for that month, commencing on November 1, 2012, and shall continue to be due and payable, in arrears, on the same day of each and every month thereafter until the Maturity Date (as hereinafter defined). Each Advance of principal hereunder shall be due and payable on the earlier to occur of (i) the date that is twelve (12) months from date such Advance is made or (ii) the Maturity Date. Upon the Maturity Date, the entire unpaid obligation outstanding under this Note, the Loan Agreement and any other Loan Documents shall become due and payable in full. All payments due hereunder, including payments of principal and/or interest, shall be made to Lender in United States Dollars and shall be in the form of immediately available funds acceptable to the Lender of this Note.

**REVOLVING LINE OF CREDIT; ADVANCES.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Debtor or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office as set forth in Section 7.12 of the Loan Agreement. Debtor agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Debtor's accounts registered with Lender. The unpaid

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Debtor or any guarantor is in default under the terms of this Note or any agreement that Debtor or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Debtor or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Debtor has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; (E) Lender in good faith believes itself insecure; or (F) any other Event of Default (as defined in the Loan Agreement) occurs.

**APPLICATION OF PAYMENTS**. All payments received by Lender from, or for the account of Debtor, due hereunder shall be applied by Lender, in its sole and absolute discretion, in the following manner, or in any other order or manner as Lender chooses:
a. First. To pay any and all interest due, owing and accrued;
b. Second. To pay any and all costs, advances, expenses or fees due, owing and payable to Lender, or paid or incurred by Lender, arising from or out of this Note, the Loan Agreement, and the other Loan Documents;
c. Third. To pay the outstanding principal balance on this Note.
All records of payments received by Lender shall be maintained at Lender's office, and the records of Lender shall, absent manifest error, be binding and conclusive upon Debtor. The failure of Lender to record any payment or expense shall not limit or otherwise affect the obligations of Debtor under this Note.

**MATURITY DATE**. On December 31, 2013 ("Maturity Date"), the entire unpaid principal balance, and all unpaid accrued interest thereon, shall be due and payable without demand or notice, subject to acceleration as provided in this Note. In the event that Debtor does not pay this Note in full on the Maturity Date then, as of the Maturity Date and thereafter until paid in full, the interest accruing on the outstanding principal balance hereunder shall be computed, calculated and accrued on a daily basis at the Default Rate (as hereinafter defined).

**UNPAID INTEREST, CHARGES AND COSTS**. Interest, late charges, costs or expenses that are not received by Lender within ten (10) calendar days from the date such interest, late charges, costs, or expenses become due, shall, at the sole discretion of Lender, be added to the principal balance and shall from the date due bear interest at the Default Rate.

**HOLIDAY**. Whenever any payment to be made under this Note shall be due on a day other than a Business Day, including Saturdays, Sundays and legal holidays generally recognized by banks doing business in California, then the due date for such payment shall be automatically extended to the next succeeding Business Day.

**NO OFFSETS OR DEDUCTIONS**. All payments under this Note shall be made by Debtor without any offset, decrease, reduction or deduction of any kind or nature whatsoever, including, but not limited to, any decrease, reduction or deduction for, or on account of, any offset, present or future taxes, present or future reserves, imposts or duties of any kind or nature, that are imposed or levied by or on behalf of any government or taxing agency, body or authority by or

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

for any municipality, state or country. If at any time, present or future, Lender shall be compelled by any Law, rule, regulation or any other such requirement which on its face or by its application requires or establishes reserves, or payment, deduction or withholding of taxes, imposts or duties to act such that it causes or results in a decrease, reduction or deduction, (as described above) in payment received by Lender; then Debtor shall pay to Lender such additional amounts, as Lender shall deem necessary and appropriate, such that every payment received under this Note, after such decrease, reserve, reduction, deduction, payment or required withholding, shall not be reduced in any manner whatsoever.

**DEFAULT**. An Event of Default under the Loan Agreement shall constitute a default under this Note (hereinafter "Default"). Upon the occurrence of a Default hereunder, Lender may, in its sole and absolute discretion, declare the entire unpaid principal balance, together with all accrued and unpaid interest thereon, and all other amounts and payments due hereunder, immediately due and payable, without notice or demand.

**DEFAULT RATE**. From and after the occurrence of any Default in this Note whether by nonpayment, maturity, acceleration, non-performance or otherwise, and until such Default has been cured, all outstanding amounts under this Note (including, but not limited to, interest, costs and late charges) shall bear interest at a per annum rate ("Default Rate") equal to seventeen percent (17%); provided, however, that in no event shall the Default Rate exceed the maximum rate authorized under applicable law.

**PREPAYMENT**. Debtor shall have the right at any time to prepay any portion of the principal amount without premium or penalty. Any such prepayment shall not result in a reamortization, deferral, postponement, suspension or waiver of any and all other payments due under this Note.

**LATE CHARGES**. Time is of the essence for all payments and other obligations due under this Note. Debtor acknowledges that if any payment required under this Note is not received by Lender within ten (10) calendar days after the same becomes due and payable, Lender will incur extra administrative expenses (i.e., in addition to expenses incident to receipt of timely payment) and the loss of the use of funds in connection with the delinquency in payment. Because, from the nature of the case, the actual damages suffered by Lender by reason of such administrative expenses and loss of the use of funds would be impracticable or extremely difficult to ascertain, Debtor agrees that five percent (5%) of the amount of the delinquent payment, together with interest accruing on the entire principal balance of this Note at the Default Rate, as provided above, shall be the amount of damages which Lender is entitled to receive upon Debtor's failure to make a payment of principal or interest when due, in compensation therefor. Therefore, Debtor shall, in such event, without further demand or notice, pay to Lender, as Lender's monetary recovery for such extra administrative expenses and loss of use of funds, liquidated damages in the amount of five percent (5%) of the amount of the delinquent payment (in addition to interest at the Default Rate). The provisions of this paragraph are intended to govern only the determination of damages in the event of a breach in the performance of Debtor to make timely payments hereunder. Nothing in this Note shall be construed as in any way giving Debtor the right, express or implied, to fail to make timely payments hereunder, whether upon payment of such damages or otherwise. The right of Lender to receive payment of such liquidated and actual damages, and receipt thereof, are without prejudice to the right of Lender to collect such

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

delinquent payments and any other amounts provided to be paid hereunder or under any of the Loan Documents, or to declare a default hereunder or under any of the Loan Documents.

**COSTS AND EXPENSES**. Debtor hereby agrees to pay any and all costs or expenses paid or incurred by Lender by reason of, as a result of, or in connection with the enforcement of this Note and the other Loan Documents, including, but not limited to, any and all attorneys' fees and related costs whether such costs or expenses are paid or incurred in connection with the enforcement of this Note and the other Loan Documents, or any of them, the protection or preservation of the collateral or security for this Note or any other rights, remedies or interests of Lender, whether or not suit is filed. Debtor's agreement to pay any and all such costs and expenses includes, but is not limited to, costs and expenses incurred in or in connection with any bankruptcy proceeding, in enforcing any judgment obtained by Lender, and in connection with any and all appeals therefrom, and in connection with the monitoring of any bankruptcy proceeding and its effect on Lender's rights and claims for recovery of the amounts due hereunder, any proceeding concerning relief from the automatic stay, use of cash collateral, proofs of claim, approval of a disclosure statement or confirmation of, or objections to confirmation of, any plan of reorganization. All such costs and expenses are immediately due and payable to Lender by Debtor, whether or not demand therefor is made by Lender.

**WAIVERS**. Debtor hereby waives grace, diligence, presentment, demand, notice of demand, dishonor, notice of dishonor, protest, notice of protest, any and all exemption rights against the indebtedness evidenced by this Note and the right to plead any statute of limitations as a defense to the repayment of all or any portion of this Note, and interest thereon, to the fullest extent allowed by law. No delay, omission or failure on the part of Lender in exercising any right or remedy hereunder shall operate as a waiver of such right or remedy or any other right or remedy of Lender.

**MAXIMUM LEGAL RATE**. This Note is subject to the express condition that at no time shall Debtor be obligated, or required, to pay interest on the principal balance at a rate (i) which could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge, or (ii) that exceeds the maximum interest rate authorized or permitted under applicable law. If, by the terms of this Note, Debtor is, at any time, required or obligated to pay interest on the principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate and interest payable hereunder shall be computed at such maximum rate and any portion of all prior interest payments in excess of such maximum rate shall be applied, or shall retroactively be deemed to have been payments made, in reduction of the principal balance, as the case may be.

**AMENDMENT; GOVERNING LAW**. This Note may be amended, changed, modified, terminated or canceled only by a written agreement signed by the party against whom enforcement is sought for any such action. This Note shall be governed by, and construed under the Laws of the State of Texas.

**AUTHORITY**. Debtor hereby represents and warrants to Lender that, by its execution below, Debtor has the full power, authority and legal right to execute and deliver this Note and that the

indebtedness evidenced hereby constitutes a valid and binding obligation of Debtor without exception or limitation.

IN WITNESS WHEREOF, Debtor has executed this Note on the day and year first above written.

Evan P. Jowers

# Signed with Docu*Sign*®



This document was securely signed using DocuSign Ink® on the DocuSign® Global Network. DocuSign provides a fast, easy and secure way to send your forms and documents, collect data and get electronic signatures for your business.

**The document you received includes the following security features:**

**1** It was signed in a secure online environment using digital encryption technologies from VeriSign

**2** An audit trail was created when the document was signed, and includes information such as the time the document was delivered, the IP address where the document was signed, the email address of the user signing the document and the location where the document was signed

**3** The signature you see in this PDF is linked to the signer's DocuSign ID which provides more information about the person who signed the document

**4** A tamper evident copy of the document has been saved in the signer's secure account

## Try DocuSign for **FREE**

When it comes to signatures, security is critical. This document has been securely signed and sent using DocuSign Ink. With DocuSign, you'll gain even greater control and security when SENDING documents for signature. Lower costs, eliminate errors, and get your transactions closed faster. Visit us at www.docusign.com/sender to learn more about the benefits of using DocuSign.

 VeriSign Secured

 TRUSTe

 SAS**70** TYPE II COMPLIANT

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

# LOAN AGREEMENT
## (Revolving Line of Credit)

This Loan Agreement (the "Agreement") is made as of the 29th Day of December 2012, by and between COUNSEL UNLIMITED LLC, a Texas limited liability company, ("Lender"), and Evan P. Jowers ("Debtor"):

## RECITALS

A. Lender has been assigned a note evidencing indebtedness from Debtor to Recruiting Partners GP, Inc. ("RPGP") pursuant to a revolving line of credit dating back several years, the principal balance of which as of the date of this agreement is $_____ (the "Old Debt").

B. Lender and Debtor desire to cancel the Old Debt and enter into a new revolving loan agreement for a revolving line of credit in the maximum principal sum of One Hundred Fifty Thousand and No/100 Dollars ($150,000.00) for the purpose of financing short term personal needs of Debtor.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1.
## DEFINITIONS AND INTERPRETATIONS

1.1 <u>DEFINITIONS</u>. The definitions set forth in the Recitals are incorporated herein by reference.

For purposes of this Agreement, the following terms shall have the following meanings:

"Documentation Fee" shall mean a fee in the amount of Five Hundred and no/100 Dollars ($500.00).

"Event of Default" shall mean any of the events or occurrences specified in Article 5 hereof, or as otherwise specified in the Loan Documents.

"Financial Statements" shall mean balance sheets, operating and income statements, statements of sources and applications of funds and any other similar document prepared by the Debtor.

"Law" shall mean, collectively, all federal, state, and local laws, rules, regulations, ordinances, and codes.

"Loan" shall mean the extension of credit by Lender to Debtor in the form of Advances under this Agreement and disbursement of Loan Proceeds pursuant to the provisions of Article 3 below.

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

"Loan Closing" shall mean the date on which the Loan closes, in accordance with Article 3 of this Agreement.

"Loan Closing Costs" shall mean any and all fees and costs incurred by Lender in connection with the negotiation and preparation of the Loan Documents, including attorneys' fees, and closing of the Loan as herein provided, and further including, without limitation, the Loan Fee.

"Loan Documents" shall mean, individually and collectively, this Agreement and the Note, and such other documents as Lender may require Debtor to give or cause to be given to or for the benefit of Lender as evidence of the Loan.

"Loan Fee" shall mean a loan fee in the amount of Five Thousand and no/100 Dollars ($5,000).

"Loan Proceeds" shall mean all funds advanced by Lender as the Loan to Debtor under this Agreement.

"Maturity Date" shall mean December 31, 2013, at which time the entire principal balance of the Loan, plus accrued interest thereon, is and shall be due and payable as provided in this Agreement and the Note, subject to acceleration as provided in the Loan Documents.

"Maximum Amount" shall have the meaning set forth in Section 3.1 hereof.

"Note" shall mean the Promissory Note of Debtor, in the amount of the Loan, payable to the order of Lender, duly executed by Debtor, as required by Lender to evidence the Loan.

"Obligations" means the Advances and any and all existing and future indebtedness and liability of every kind, nature and character, direct or indirect, absolute or contingent, joint or several (including all renewals, extensions and modifications thereof and all attorney's fees and expenses incurred by Lender in connection with the collection or enforcement thereof, including but not limited to, the enforcement of this Agreement under provisions of the U. S. Bankruptcy Code whether by motion for relief from stay or otherwise), of the Debtor to the Lender however and whenever created, arising, evidenced or acquired.

"Organizational Documents" shall mean the duly filed, certified and/or executed documents or instruments evidencing or confirming the lawful formation and existence of Debtor.

"Permitted Liens" means the following:
(a) purchase money security interests in specific items of equipment;
(b) leases of specific items of equipment; and
(c) the lien granted by Debtor pursuant to the IPA.

"Person" means any individual, sole proprietorship, general partnership, limited partnership, limited liability partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, government, or any Debtor or political division thereof, or any other entity.

1.2 <u>USE OF DEFINED TERMS</u>. Any defined terms used in the plural shall include the singular, and the masculine gender shall include the feminine and/or neuter, and such terms shall encompass all members of the relevant class.

1.3 <u>SCHEDULES AND EXHIBITS</u>. All schedules and exhibits to this Agreement, either as originally existing or as the same may from time to time be supplemented, modified or amended, are incorporated herein by reference.

1.4 <u>REFERENCES</u>. Any reference to this Agreement or any other document shall include such document, both as originally executed, and as it may from time to time be amended, supplemented and modified. References herein to Articles, Sections and Exhibits shall be construed as references to this Agreement unless a different document is named.

1.5 <u>OTHER TERMS</u>. The term "document" is used in its broadest sense and encompasses agreements, certificates, opinions, consents, instruments and other written material of every kind. The terms "including" and "include" shall mean "including (include), without limitation."

## ARTICLE 2.
## REPRESENTATIONS AND WARRANTIES OF DEBTOR

Debtor hereby represents and warrants to Lender as of the date of this Agreement, the date(s) the Loan Proceeds are disbursed to Debtor, and each and every date during the term of the Loan, or any portion thereof, as the context admits or requires, that:

2.1    <u>DEBTOR'S CAPACITY</u>. Debtor is an individual resident in the State of Florida The laws of the State of Texas and the State of Florida authorize the Debtor to enter into this Agreement and to carry out its obligations hereunder.

2.2    <u>VALIDITY OF LOAN DOCUMENTS</u>. The Loan Documents are and shall continue to be in all respects valid and binding upon Debtor according to their terms, subject to all Laws, including, without limitation, equitable principles, insolvency Laws, and other matters applying to creditors generally; provided, however, that the implementation of such Laws do not and will not affect the ultimate realization of the Obligations. The execution and delivery by Debtor, and the performance by Debtor, of all its obligations under the Loan Documents have been duly authorized by all necessary action and do not and will not:

    (a) Require any consent or approval not heretofore obtained of any other entity; or
    (b) Violate any provision of any Laws, or of any order, writ, judgment, injunction, decree, determination or award of any court or of any governmental Debtor; or
    (c) Result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under any indenture or loan or credit agreement or any other agreement, lease, or instrument to which Debtor is a party or by which Debtor or any property of Debtor is bound or affected.

2.3    DEBTOR NOT IN DEFAULT OR VIOLATION. Debtor is not in default under or in violation of any Laws, order, writ, judgment, injunction, decree, determination or award. Debtor is not in default under any obligation, agreement, instrument, loan, or indenture, whether to Lender or otherwise, or any lease. No event has occurred and is continuing, or would result from the making of any Advance, which constitutes an Event of Default, or would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

2.4    NO APPROVALS REQUIRED. No authorization, consent, approval, order, license, exemption from, or filing, registration, or qualification with, any governmental Debtor is or will be required to authorize, or is otherwise required in connection with the execution, delivery and the performance by Debtor of all or any of its obligations under the Loan Documents.

2.5    FINANCIAL STATEMENTS. All Financial Statements of Debtor, which have heretofore been submitted to Lender, fairly present the financial position of Debtor. Since the dates of such Financial Statements, there have been no material adverse changes in the financial condition of Debtor.

2.6    PENDING LITIGATION. There are no actions, suits, or proceedings pending, or to the knowledge of Debtor threatened, against or affecting Debtor or involving the validity or enforceability of any of the Loan Documents, at Law or in equity, or before or by any governmental Debtor, except actions, suits, and proceedings that are fully covered by insurance or which, if adversely determined, would not materially impair the ability of Debtor to perform each and every one of its obligations under and by virtue of the Loan Documents; and Debtor is not in default with respect to any order, writ, injunction, decree, or demand of any court or any governmental Debtor.

2.7    VIOLATION OF LAWS. There are no violations or notices of violations of any Law relating to Debtor.

2.8    SOLVENCY. Debtor is and shall continue to be able to pay its debts as they mature and the realizable value of its Assets is, and at all times that it may have obligations hereunder shall continue to be, sufficient to satisfy any and all obligations hereunder.

2.9    FULL DISCLOSURE. All information in the loan application, financial statement, certificate, or other document and all information prepared and delivered by Debtor to Lender in obtaining the Loan is correct and complete in all material respects, and there are no omissions therefrom that result in such information being incomplete, incorrect, or misleading in any material adverse respect as of the date thereof.

2.10    USE OF PROCEEDS. The proceeds of each Advance will be used by Debtor solely for the purposes specified in this Agreement.

# ARTICLE 3.
# THE LOAN

3.1 THE LOAN. This loan shall substitute for the loan assigned by Recruiting Partners GP, Inc. to the Lender as of the date hereof, which loan shall be forever extinguished and replaced by this loan. The total amount available for borrowing by Debtor hereunder on a revolving basis is the lesser of: (1) One Hundred Fifty Thousand and No/100 Dollars ($150,000.00) or (2) 90% of the total amount of regular commission expected to be earned by Debtor as a result of his employment at Kinney Recruiting LLC based on candidates whose start dates have been set and confirmed by all parties ("Maximum Amount"). The Maximum Amount shall be reduced by each Advance made hereunder. Further, the outstanding principal balance of the Loan will not exceed at any time the sum of One Hundred Fifty Thousand and No/100 Dollars ($150,000.00). Funds borrowed and repaid may be re-borrowed, but subject to the following conditions and limitations (in addition to any other conditions or limitations set forth in this Agreement or in the Note): (a) if, at any time, the aggregate amount advanced by Lender to Debtor exceeds the amount of the Maximum Amount, Debtor shall, no later than five (5) days following written notice thereof by Lender, pay down the Loan by such principal amount that exceeds the amount of the Maximum Amount, and (b) each Advance shall be due and payable on the earlier to occur of (i) the date that is twelve (12) months from the date such Advance is made, or (ii) the Maturity Date. Advances may be requested as set forth in the Note.

3.2 NOTE. The Loan shall be evidenced by the Note. Each payment under the Loan shall be evidenced and recorded upon Lender's loan records, which recordation shall be prima facie evidence of such payment; provided, however, that the failure by Lender to make any such recordation shall not limit or otherwise affect the obligations of Debtor hereunder or under the Note.

3.3 INTEREST; PAYMENTS; PREPAYMENT. Principal and interest under the Note shall be due and payable as provided for in the Note. The Note may be prepaid as provided for in the Note.

3.4 PURPOSE OF LOAN. Loan Proceeds shall be used by Debtor exclusively for the purpose or purposes set forth in this Agreement, including, without limitation, for the purposes described in Recital B of this Agreement.

3.5 CONDITIONS PRECEDENT TO LOAN. In addition to all other conditions of the effectiveness of this Agreement, the Loan Closing shall occur upon, and the obligations of Lender pursuant to this Agreement shall be subject to, the satisfaction of the following conditions, any or all of which may be waived, in whole or in part, by Lender:

(a) Debtor, at its sole expense, shall deliver to Lender, on or before the date of any of the Advances, the following, in form and substance satisfactory to Lender, in Lender's sole opinion and judgment:

        (i) This Agreement;
        (ii) The Note;
        (iii) The Loan Fee;

(iv) The Documentation Fee;
(v) Such additional agreements, certificates, reports, approvals, instruments, documents, consents, and opinions as Lender may request in connection with the making of the Loan.

(b) Review and approval by Lender of true and correct copies of current Financial Statements of Debtor, as shall be requested by Lender;

(c) No suit, action, or other proceeding shall be pending or threatened which seeks to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or to obtain damages or other relief in connection therewith;

(d) The Loan Fee and other Loan Closing Costs shall be paid by Debtor to Lender upon demand of Lender, upon 10 days' notice, which may be at any time prior to December 31, 2015. The Loan Fee shall be deemed fully earned and nonrefundable when paid;

(e) No breach of any warranty or representation by Debtor to Lender shall have occurred;

(f) No event or circumstance shall have occurred and be continuing which constitutes, or would upon the giving of notice or passage of time, constitute an Event of Default or a failure of any condition of this Agreement;

(g) At Lender's request, a favorable opinion of counsel for Debtor acceptable to Lender and its counsel, opining to, among other things, (1) Debtor's power and authority to execute the Loan Documents; (2) the validity and binding effect of the Loan Documents; (3) the absence of any agreement, covenant, judgment, order, restriction, contract, law, regulation or ordinance that would prohibit, or which would require consent or approval to be given to Debtor for the Loan, which has not been obtained; and (4) the Loan does not constitute a debt of the Debtor in contravention of any constitutional or statutory debt limitation or restriction.

3.6    <u>DISBURSEMENT OF LOAN PROCEEDS; RESTRICTIONS</u>. Lender shall have no obligation to monitor or verify the use or application of any Advance disbursed by Lender.

3.7    <u>APPLICATION OF PAYMENTS</u>. All payments received by Lender from, or for the account of, Debtor on the Loan shall be applied pursuant to the terms of the Note. All records of payments received by Lender shall be maintained at Lender's office, and the records of Lender shall, absent manifest error, be binding and conclusive upon Debtor. The failure of Lender to record any payment or expense shall not limit or otherwise affect the obligations of Debtor under the Note, this Agreement, and/or any other Loan Documents.

3.8    <u>LOAN TERM</u>. The term of the Loan will commence on the date of Loan Closing and the Loan will mature upon the Maturity Date, subject to acceleration or adjustment as provided in this Agreement and the other Loan Documents.

3.9    <u>OBLIGATIONS ABSOLUTE</u>. The obligations of the Debtor to repay the Obligations and to perform and observe the agreements and covenants contained herein are

absolute and unconditional and are not subject to any defense or right of setoff, counterclaim or recoupment arising out of any breach of the Debtor or Lender of any obligation to the Debtor, whether hereunder or otherwise, or out of indebtedness or liability at any time owing to the Debtor by the Lender. Unless and until the Obligations have been paid in full, the Debtor:

(a) will not suspend or discontinue repayment of the Obligations,
(b) will perform and observe all other agreements and covenants contained in this Agreement or any documents executed in connection therewith, and
(c) will not terminate this Agreement for any cause, including, without limiting the generality of the foregoing, the occurrence of acts or circumstances that may constitute the failure of consideration, eviction or constructive eviction, destruction of the Assets of the Debtor, the sale of the Assets of the Debtor, the taking by eminent domain of title to or temporary use of any Assets of the Debtor, commercial frustration of purpose, any change in the tax or other laws of the United States of America or the State of Texas or the State of Florida or any political subdivision thereof or any failure of Lender to perform and observe any agreement, whether express or implied, or any duty, liability or obligation arising out of or in connection with this Agreement.

## ARTICLE 4.
## DEBTOR'S COVENANTS

In addition to all other covenants of Debtor under the Loan Documents, Debtor agrees:

4.1 <u>LENDER MAY EXAMINE BOOKS AND RECORDS</u>. Lender shall have the right, from time to time, acting by and through its employees or agents, to examine the books, records, and accounting data of Debtor, and to make extracts therefrom or copies thereof. Debtor shall promptly make such books, records, and accounting data available to Lender, as 736100.9 9 stated above, upon written request, and upon like request shall promptly advise Lender, in writing, of the location of such books, records, and accounting data.

4.2 <u>COMPLIANCE WITH LAWS AND CONTRACTS</u>. Debtor shall comply with the requirements of all applicable Laws and orders of any governmental Debtor, provided that if Debtor has not so complied by the date prescribed in any such Law, order, or regulation, Debtor shall comply therewith by the date set forth in any order of the governmental Debtor charged with the enforcement of such Law, order or regulation if such date is later, and comply with all contracts, agreements, indentures or instruments by which it is bound.

4.3 <u>MAINTENANCE OF PROPERTIES AND PRESERVE EXISTENCE</u>. Debtor shall maintain and preserve, or cause to be maintained and preserved, all of its properties, necessary or useful in the proper conduct of its business, including such as may be under lease, in good working order and condition, ordinary wear and tear excepted. Debtor, so long as Debtor remains obligated on the Loan, shall do all things necessary to preserve and keep in full force and effect Debtor's organizational status, and will comply with all Laws, orders and decrees of any governmental Debtor or court applicable to Debtor or to any such property.

4.4    <u>BOOKS AND RECORDS; AUDIT AND EXAMINATION</u>. Debtor shall at all times during the term of the Loan, keep and maintain all books and records, in original form, as shall be required and as shall otherwise be appropriate, in Lender's opinion and judgment, pertaining to the performance by Debtor of its covenants and other obligations hereunder, and otherwise pertaining to its operations and activities. Debtor shall at all times permit Lender to review, audit and examine all such books and records, either directly or through one or more auditors designated by Lender, including independent contractors.

4.5    <u>REPORTING REQUIREMENTS</u>. So long as Debtor shall have any obligation to Lender under this Agreement and/or the other Loan Documents, Debtor shall prepare, or cause to be prepared, and deliver to Lender the following Financial Statements and reports:

(a) Within ten (10) days of becoming aware of any developments or other information which may materially and adversely affect Debtor's properties, business, prospects, profits or condition (financial or otherwise) or Debtor's ability to perform this Agreement or the other Loan Documents, telephonic or telegraphic notice specifying the nature of such development or information and such anticipated effect, which shall be promptly confirmed in writing.

(b) At Lender's request, such other information respecting the business, properties or the condition or operations, financial or otherwise, of Debtor.

4.6    <u>NO AUTOMATIC SET-OFF</u>. Debtor acknowledges and agrees that the fact of any sum or sums being on deposit with Lender shall in no way constitute a set-off against or be deemed to compensate the obligations of the Loan or any payment or performance due under the Loan Documents or this Agreement, unless and until Lender, by affirmative action, shall so apply said accounts or any portion thereof, and then only to the extent thereof as so designated by Lender.

4.7    <u>RELIANCE BY LENDER</u>. Debtor agrees that Lender may conclusively assume that the statements, facts, information, and representations contained herein and/or in any affidavits, orders, receipts, or other written instrument(s) that are filed with Lender or exhibited to it, are true and correct, and Lender may rely thereon without any investigation or inquiry, and any payment made by Lender in reliance thereon shall be a complete release in its favor for all sums so paid.

4.8    <u>RESTRICTIONS ON CHANGES</u>. Except as otherwise expressly provided in the IPA, Debtor shall not, without the prior written consent of Lender, become a party to any transaction whereby all or any substantial part of the properties, Assets or undertakings of Debtor (whether legally or beneficially owned by Debtor), would become the property of any other person or entity, whether by way of transfer, sale, conveyance, lease, sale and leaseback, or otherwise.

4.9    <u>OTHER DEBT</u>. Debtor shall pay, or cause to be paid, and discharge, or cause to be discharged, (a) when due all lawful claims (including, without limitation, claims for labor, materials, and supplies), which, if unpaid, might become a lien or encumbrance upon any of its Assets or property; and (b) all its other obligations and indebtedness when due; provided,

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

however, that Debtor may contest any of the foregoing in good faith and by appropriate proceedings diligently prosecuted by Debtor as long as Debtor has adequate reserves to pay any adverse determination or has otherwise provided Lender evidence of a surety or bond to pay any adverse determination.

4.10   <u>ADDITIONAL DEBT</u>. Without the prior written consent of Lender, Debtor shall not incur any additional direct or contingent unsecured or secured liabilities (other than those to Lender), or become liable for the liabilities of others.

4.11   <u>INSURANCE</u>. Debtor shall, at all times, carry such other insurance, with insurers reasonably acceptable to Lender, in such form and amounts as Lender may reasonably require, and Debtor shall provide evidence of such insurance to Lender, so that Lender is satisfied that such insurance is, at all times, in full force and effect. Any liability insurance policies of Debtor shall name Lender as an additional insured, and all property, casualty and related insurance policies of Debtor shall name Lender as a loss payee thereon and Debtor shall cause the issuance of a lender's loss payee endorsement in form reasonably acceptable to Lender. Upon receipt of the proceeds of any such insurance, Lender, at its sole option, either (i) shall apply such proceeds to the prepayment of the Obligations in such order or manner as Lender may elect, or (ii) shall disburse such proceeds to Debtor for application to the cost of repairs, replacements, or restorations. If Debtor fails to provide or pay for any insurance, Lender may, but is not obligated to, obtain the same at Debtor's expense.

4.12   <u>ANNUAL FIELD AUDITS</u>. Debtor shall, during normal business hours, from time to time, as frequently as Lender reasonably determines to be appropriate: (a) provide Lender and any of its officers, employees and agents access to its properties, facilities, advisors, officers and employees of Debtor, and (b) permit Lender, and any of its officers, employees and agents, to inspect, audit and make extracts from Debtor's books and records. If an Event of Default has occurred and is continuing, Debtor shall provide such access to Lender at all times and without advance notice. Debtor shall make available to Lender and its counsel reasonably promptly originals or copies of all books and records that Lender may reasonably request.

4.13   <u>ACCESS TO BOOKS AND RECORDS</u>.

(a) Absent the occurrence of an Event of Default which is continuing, at all reasonable times, Lender, by and through its employees or agents, shall have the right to inspect, verify, copy and all or Debtor's books and records relating to Debtor's business. Lender shall take reasonable steps to keep confidential all confidential information obtained in any Auditor appraisal, provided however that Lender shall have the right to disclose any such information to its auditors, regulatory agencies, and attorneys, and pursuant to any subpoena or other legal process.

(b) Upon the occurrence of an Event of Default which is continuing, Lender shall have the right to inspect, verify, copy and all or Debtor's books and records relating to Debtor's business.

(c) Debtor agrees to reimburse Lender immediately upon demand for all fees and out-of-pocket expenses for such audits and appraisals upon the occurrence of an Event of Default which is continuing.

(d) Debtor will not enter into any agreement with any accounting firm, service bureau or third party to store Debtor's books or records at any location other than Debtor's address set forth in Section 7.12 hereof without first notifying Lender of the same and obtaining the written agreement from such accounting firm, service bureau or other third party to give Lender the same rights with respect to access to books and records and related rights as Lender has under this Agreement.

(e) Lender shall have the right, at its sole discretion, to perform annual field examinations of Debtor's books, and records, including a field examination following the Closing Date. Debtor agrees to reimburse Lender for the cost of such annual field examinations. The actions described in this paragraph may be performed by employees of Lender or by independent appraisers.

4.15    VALID DEBT. The Loan does not constitute a debt of the Debtor in contravention of any constitutional or statutory debt limitation or restriction.

4.17    ACCOUNT. Debtor shall maintain its primary operating deposit account with Lender.

## ARTICLE 5.
## EVENTS OF DEFAULT

An "Event of Default" shall be deemed to have occurred hereunder if:

5.1    DEFAULT UNDER LOAN DOCUMENTS. Debtor shall fail to pay principal or interest, or both, when due under the terms of the Note; or Debtor shall fail to pay an amount owing under this Agreement or any of the other Loan Documents when due; or Debtor shall fail to perform or observe any term, covenant, or agreement contained in this Agreement or in any of the other Loan Documents; or

5.2    BREACH OF REPRESENTATIONS OR WARRANTIES. Any representations or warranties made or agreed to be made in any of the Loan Documents or this Agreement, or otherwise in connection with the Loan, shall be breached in any respect or shall prove to be false or misleading in any respect when made; or

5.3    ACTION AGAINST DEBTOR. Any suit shall be filed against Debtor, which, if adversely determined, could substantially impair the ability of Debtor to perform any or all of its obligations under and by virtue of this Agreement or any of the other Loan Documents, unless Debtor's counsel furnishes to Lender its opinion, to the satisfaction of Lender and Lender's counsel, that, in its judgment the suit is essentially without merit; or

5.4    LEVY UPON PROPERTY. A levy be made on any property of Debtor under

any process, or any lien creditor commences suit to enforce a judgment lien against any property of Debtor or any Assets of the Debtor and such levy or action shall not be bonded against by sureties deemed by Lender to be sufficient in its sole opinion and judgment; or

5.5     ACCELERATION OF OTHER DEBTS. Debtor does, or omits to do, any act, or any event occurs including, but not limited to, the occurrence of any breach or default by Debtor under the terms of any other agreement between Lender and Debtor, whether or not arising hereunder and/or relating to Debtor's ability to perform hereunder, as a result of which any material obligation of Debtor is declared immediately due and payable by the holder thereof; or

5.6     INSOLVENCY. Debtor shall fail to pay its debts as they become due, or shall make an assignment for the benefit of its creditors, or shall admit, in writing, its inability to pay its debts as they become due, or shall file a petition under any chapter of the United States Bankruptcy Code or any similar law, now or hereafter existing, or shall become "insolvent" as that term is generally defined under the United States Bankruptcy Code, or shall in any involuntary bankruptcy case commenced against it file an answer admitting insolvency or inability to pay its debts as they become due, or shall fail to obtain a dismissal of such case within thirty (30) calendar days after its commencement or shall convert the case from one chapter of the United States Bankruptcy Code to another chapter, or be the subject of an order for relief in such bankruptcy case, or be adjudged a bankrupt or insolvent, or shall have a custodian, trustee, or receiver appointed for, or have any court take jurisdiction of, its property, or any part thereof, in any voluntary or involuntary proceeding, including, but not limited to, those for the purpose of reorganization, arrangement, dissolution, or liquidation, and such custodian, trustee, or receiver shall not be discharged, or such jurisdiction shall not be relinquished, vacated, or stayed within thirty (30) days after the appointment; or

5.7     ATTACHMENT. Any proceeding shall be brought, the object of which is that any part of Lender's commitment to make the Advances hereunder shall at any time be subject or liable to attachment or levy by any creditor of Debtor; or

5.8     MISREPRESENTATION AND/OR NON-DISCLOSURE. Debtor has made certain statements and disclosures in order to induce Lender to make the Loan and enter into this Agreement, and, in the event Debtor has made material misrepresentations or failed to disclose any material fact, Lender may treat such misrepresentation or omission as a breach of this Agreement. Such action shall not affect or limit any remedies Lender may have for such misrepresentation or non-disclosure; or

5.9     CROSS-DEFAULT; OTHER OBLIGATIONS. Debtor commits a breach or default in the payment or performance of any other obligation of Debtor, or breaches any warranty or representation of Debtor, under the provisions of any other instrument, agreement, guaranty, or document evidencing, supporting, or securing any other loan or credit extended by Lender, or by any affiliate of Lender, to Debtor or to any affiliate of Debtor (which shall include, without limitation, the Corporation) (said financing is hereinafter referred to as "other financing"), including, but not limited to, any breach under the IPA or any documents relating thereto, any and all term loans, revolving credits, or lines of credit extended from time to time to Debtor (or any Person signing this Agreement on behalf of Debtor), or any other Person with

which Debtor is affiliated (including, without limitation, the Corporation); or Debtor causes the other financing, or any portion thereof, to be refinanced or repaid with funds lent, advanced, paid, or contributed, in whole or in part, directly or indirectly, by any other Person to or for the benefit of Debtor, or any affiliate of Debtor (including, without limitation, the Corporation).

5.10    <u>FINANCIAL CONDITION</u>. There shall be any material adverse change in the financial condition of Debtor.

## ARTICLE 6.
## REMEDIES

6.1    <u>CEASE PAYMENT AND/OR ACCELERATE</u>. Upon, or at any time after, the occurrence of an Event of Default, Lender shall have no obligation to make the Loan or any Advances, and all sums disbursed or advanced by Lender and all accrued and unpaid interest thereon shall, at the option of Lender, become immediately due and payable, and Lender shall be released from any and all obligations to Debtor under the terms of this Agreement.

6.2    <u>ENFORCEMENT OF RIGHTS</u>. Lender may enforce any and all rights and remedies under the Loan Documents, and may pursue all rights and remedies available at Law or in equity.

6.3    <u>RIGHTS AND REMEDIES NON-EXCLUSIVE</u>. The rights and remedies set forth above are not exclusive, and Lender may avail itself of any individual right or remedy set forth in this Agreement, or available at law or in equity, without utilizing any other right or remedy. In addition to the rights and remedies set forth in this Agreement, Lender shall have all the other rights and remedies accorded in equity and under all other applicable laws, and under any other instrument or agreement now or in the future entered into between Lender and Debtor, and all of such rights and remedies are cumulative and none is exclusive. Exercise or partial exercise by Lender of one or more of its rights or remedies shall not be deemed an election, nor bar Lender from subsequent exercise or partial exercise of any other rights or remedies. The failure or delay of Lender to exercise any rights or remedies shall not operate as a waiver thereof, but all rights and remedies shall continue in full force and effect until all of the Obligations have been indefeasibly paid and performed.

## ARTICLE 7.
## GENERAL CONDITIONS AND MISCELLANEOUS

7.1    <u>NONLIABILITY OF LENDER</u>. Debtor acknowledges and agrees that by accepting or approving anything required to be observed, performed, fulfilled, or given to Lender pursuant to this Agreement or any of the Loan Documents, including any certificate, financial statement, appraisal, statement of profit and loss, or other financial statement, survey, appraisal or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision, or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or representation to anyone with respect thereto by Lender.

7.2    NO THIRD PARTIES BENEFITTED. This Agreement is made for the purpose of defining and setting forth certain obligations, rights, and duties of Debtor and Lender in connection with the Loan and shall be deemed a supplement to the Note and the other Loan Documents, and shall not be construed as a modification of the Note or any of the other Loan Documents, except as provided herein. This Agreement is made for the sole protection of Debtor and Lender, and Lender's successors and assigns. No other Person shall have any rights of any nature hereunder or by reason hereof or the right to rely hereon.

7.3    INDEMNITY BY DEBTOR. To the extent permitted by applicable Law, Debtor hereby indemnifies and agrees to hold Lender and its directors, officers, agents, and employees (individually and collectively, the "Indemnitee(s)") harmless from and against:
    (a) Any and all claims, demands, actions, or causes of action that are asserted against any Indemnitee by any Person, if the claim, demand, action or cause of action, directly or indirectly, relates to a claim, demand, action, or cause of action that the Person has or asserts against Debtor; and
    (b) Any and all liabilities, losses, costs, or expenses (including court costs and attorneys' fees) that any Indemnitee suffers or incurs as a result of the assertion of any claim, demand, action, or cause of action specified in this Section 7.3.

7.4    NONRESPONSIBILITY. Lender shall in no way be liable for any acts or omissions of Debtor, Debtor's agents or Debtor's employees.

7.5    TIME IS OF THE ESSENCE. Time is of the essence of this Agreement and of each and every provision hereof, to the full extent that time can be of the essence of an agreement under the laws of the State of Texas.

7.6    NON-WAIVER. The waiver by Lender of any breach or breaches hereof shall not be deemed, nor shall the same constitute, a waiver of any subsequent breach or breaches.

7.7    BINDING EFFECT; ASSIGNMENT. This Agreement shall be binding upon and inure to the benefit of Debtor and Lender and their respective successors and assigns, except that Debtor may not assign its rights hereunder or any interest herein without the prior written consent of Lender, other than to a public Debtor which shall succeed to the interest of the Debtor and which (by operation of law, contract or otherwise) becomes legally bound to all of the terms and conditions hereof.. Lender shall have the right to assign its rights under this Agreement and to grant participations in the Loan to others, but all waivers or abridgements of Debtor's obligations that may be granted from time to time by Lender shall be binding upon such assignees or participants. Debtor shall, promptly upon demand, provide Lender or any such purchaser or participant, one or more written statements confirming Debtor's indebtedness to Lender and all obligations in connection with the Loan, including the existence of any default thereunder.

7.8    EXECUTION IN COUNTERPARTS. This Agreement may be executed in any number of counterparts, and any party hereto or thereto may execute any counterpart, each of which, when executed and delivered, will be deemed to be an original, and all of which counterparts of this Agreement, taken together will be deemed to be but one and the same

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

instrument. The execution of this Agreement or will not become effective until counterparts hereof or thereof, as the case may be, have been executed by all the parties hereto.

    7.9    <u>INTEGRATION; AMENDMENTS; CONSENTS</u>. This Agreement, together with the documents referred to herein, constitutes the entire agreement of the parties touching upon the subject matter hereof, and supersedes any prior negotiations or agreements on such subject matter. No amendment, modification, or supplement of any provision of this Agreement or any of the other Loan Documents shall be effective unless in writing, signed by Lender and Debtor; and no waiver of any of Debtor's obligations under this Agreement or any of the other Loan Documents or consent to any departure by Debtor therefrom shall be effective unless in writing, signed by Lender, and then only in the specific instance and for the specific purpose given.

    7.10    <u>COSTS, EXPENSES AND TAXES</u>. Debtor shall pay to Lender, on demand:

    (a) The costs and expenses of Lender in connection with the enforcement of this Agreement and any other Loan Document and any matter related thereto, including the fees and out-of-pocket expenses of any legal counsel, independent public accountants, and other outside experts retained by Lender and including all costs and expenses of enforcing any judgment or prosecuting any appeal of any judgment, order or award arising out of or in any way related to the Loan, this Agreement, or the Loan Documents;

    (b) Attorneys' fees and out-of-pocket expenses incurred by Lender in connection with the negotiation, preparation, execution, delivery, and administration of this Agreement and any other Loan Document and any matter related thereto, including but not limited to, any bankruptcy, insolvency, assignment for benefit of creditors, arrangement, reorganization or other debt relief proceeding under any federal or state Law, whether now existing or hereinafter enacted, filed by or against Debtor, or otherwise affecting or purporting to affect the Loan; and

    (c) All costs, expenses, fees, premiums, and other charges relating to or arising from this Agreement or any of the other Loan Documents or any transactions contemplated thereby or the compliance with any of the terms and conditions thereof.

All sums paid or expended by Lender under the terms of this Agreement shall be considered to be, and shall be, a part of the Loan. All such sums, together with all amounts to be paid by Debtor pursuant to this Agreement, shall bear interest from the date of expenditure at the default rate provided in the Note, and shall be immediately due and payable by Debtor upon demand.

    7.11    <u>SURVIVAL OF COVENANTS, REPRESENTATIONS AND WARRANTIES</u>. All representations and warranties of Debtor contained herein or in any and all other Loan Documents shall survive the making of the Loan and the execution and delivery of the Note, and are material and have been or will be relied upon by Lender, notwithstanding any investigation made by Lender or on behalf of Lender. For the purpose of this Agreement, all statements contained in any certificate, agreement, Financial Statement, or other writing delivered by or on

behalf of Debtor pursuant hereto or to any other Loan Document or in connection with the transactions contemplated hereby or thereby shall be deemed to be representations and warranties of Debtor contained herein or in the other Loan Documents, as the case may be.

7.12  NOTICES. All notices, requests, demands, directions, and other communications provided for hereunder and under any other Loan Document (a "notice"), must be in writing and must be mailed, delivered or sent by facsimile transmission or by overnight delivery service, to the appropriate party at its respective address set forth below or, as to any party, at any other address as may be designated by it in a written notice sent to the other parties in accordance with this Section 7.12. Any notice given by facsimile transmission must be confirmed within forty-eight (48) hours by letter mailed or delivered to the appropriate party at its respective address. If any notice is given by mail it will be effective three (3) calendar days after being deposited in the mail with first-class or airmail postage prepaid; if given by facsimile transmission, when sent; or if given by personal delivery, when delivered; if given by overnight delivery service, one (1) day after being deposited with the overnight delivery service. Such notices will be given to the following:

To Lender: COUNSEL UNLIMITED LLC
824 W 10TH STREET, SUITE 202
AUSTIN, TX 78701
Attention: Manager

To Debtor: EVAN JOWERS
1850 S OCEAN DRIVE, SUITE 4301
HALLANDALE, FL 99003

7.13  FURTHER ASSURANCES. Debtor shall, at its sole expense and without expense to Lender, do, execute and deliver such further acts and documents as Lender from time to time may require for the purpose of assuring and confirming unto Lender the rights hereby created or intended, now or hereafter so to be, or for carrying out the intention or facilitating the performance of the terms of any Loan Document.

7.14  GOVERNING LAW. The Loan shall be deemed to have been made in Texas, and this Agreement and the other Loan Documents shall be governed by and construed and enforced in accordance with the laws of the State of Texas.

7.15  SEVERABILITY OF PROVISIONS. Any provision in any Loan Document that is held to be inoperative, unenforceable, or invalid shall be inoperative, unenforceable, or invalid without affecting the remaining provisions, and to this end the provisions of all Loan Documents are declared to be severable.

7.16  CONSTRUCTION CONFLICTS. Whenever the context of this Agreement requires, the singular shall include the plural and the masculine gender shall include the feminine and/or neuter.

7.17  HEADINGS.  Article and Section headings in this Agreement are included for convenience of reference only and are not part of this Agreement for any other purpose.

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

7.18    DEBTOR.    Nothing in this Agreement shall be construed to constitute the creation of a partnership or joint venture between Lender and Debtor. Lender is not an agent or representative of Debtor.

7.19    NO PRESUMPTION AGAINST ANY PARTY. Neither this Agreement, any of the other Loan Documents, any other documents, agreement, or instrument entered into in connection herewith, nor any uncertainty or ambiguity herein or therein shall be construed or resolved using any presumption against any party hereto, whether under any rule of construction or otherwise. On the contrary, this Agreement, the other Loan Documents, and all other documents, instruments, and agreements entered into in connection herewith have been reviewed by each of the parties and by their respective counsel and shall be construed and interpreted according to the ordinary meanings of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

7.20    INDEPENDENCE OF PROVISIONS. All agreements and covenants hereunder, under the Loan Documents and the other documents, instruments, and agreements entered into in connection herewith shall be given independent effect such that if a particular action or condition is prohibited by the terms of any such agreement or covenant, the fact that such action or condition would be permitted within the limitations of another agreement or covenant shall not be construed as allowing such action to be taken or condition to exist.

7.21    NET CONTRACT. This Agreement shall be deemed and construed to be a net contract, and the Debtor hereby agrees that the repayment of the Obligations shall be an absolute net return to the Lender, free and clear of any expenses, charges or set-offs whatsoever.

7.22    WAIVER OF RIGHT TO TRIAL BY JURY; JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION THEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY. NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH PARTY HERETO HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE.

PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. EACH PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN. THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.

Debtor and Lender have initialed this Section 7.22 to further indicate their awareness and acceptance of each and every provision hereof.

EJ

RFK

Debtor's Initials
[signatures on following page]

Lender's Initials

IN WITNESS WHEREOF, Debtor and Lender have hereunto caused this Agreement to be executed as of the date first above written.

LENDER:

COUNSEL UNLIMITED LLC

By: _____
     Robert E. Kinney
     President

DEBTOR:

Evan P. Jowers

# Signed with 

This document was securely signed using DocuSign Ink® on the DocuSign® Global Network. DocuSign provides a fast, easy and secure way to send your forms and documents, collect data and get electronic signatures for your business.

**The document you received includes the following security features:**

**1.** It was signed in a secure online environment using digital encryption technologies from VeriSign

**2.** An audit trail was created when the document was signed, and includes information such as the time the document was delivered, the IP address where the document was signed, the email address of the user signing the document and the location where the document was signed

**3.** The signature you see in this PDF is linked to the signer's DocuSign ID which provides more information about the person who signed the document

**4.** A tamper evident copy of the document has been saved in the signer's secure account

## Try DocuSign for **FREE**

When it comes to signatures, security is critical. This document has been securely signed and sent using DocuSign Ink. With DocuSign, you'll gain even greater control and security when SENDING documents for signature. Lower costs, eliminate errors, and get your transactions closed faster. Visit us at www.docusign.com/sender to learn more about the benefits of using DocuSign.

  

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Security Agreement") is entered into as of October 15, 2012 (the "Effective Date"), by and between **COUNSEL UNLIMITED LLC**, a Texas limited liability company ("Secured Party"), and **EVAN P. JOWERS**, including any entities owned or controlled by him, directly or indirectly, now or hereafter ("Debtor"). Debtor and Secured Party agree as follows:

## ARTICLE ONE:
## DEFINITIONS

1.1     **Terms**.  Capitalized terms that are used herein but are not defined herein shall have the meaning given such terms in the Assignment.  Terms (whether or not capitalized) defined in the Code, which are not otherwise defined in this Security Agreement or the Assignment, are used herein as defined in the Code as in effect on the date hereof.

1.2     **Definitions of Certain Terms Used Herein**.  As used in this Security Agreement, the following terms shall have the following meanings:

"Accounts" mean any "account," as such term is defined in Chapter 9 of the Code, now owned or hereafter acquired by Debtor, and, in any event, shall include, without limitation, each of the following, whether now owned or hereafter acquired by Debtor:  (a) all rights of Debtor to payment for goods sold or leased or services rendered or the license of Intellectual Property, (b) all accounts receivable of Debtor, (c) all rights of Debtor to receive any payment of money or other form of consideration, (d) all security pledged, assigned, or granted to or held by Debtor to secure any of the foregoing, and (e) all guaranties of, or indemnifications with respect to, any of the foregoing.

"Account Debtor" means any Person who is or who may become obligated to Debtor under, with respect to, or on account of an Account.

"Article" means a numbered article of this Security Agreement, unless another document is specifically referenced.

"Assignment" means that certain Worldwide Assignment of Intellectual Property and License Agreement by and between the Debtor and Secured Party.

"Books" has the meaning set forth in Section 2.

"Chattel Paper" has the meaning set forth in Section 2.

"Code" means the Uniform Commercial Code as in effect in the State of Texas, as the same has been or may be amended or revised from time to time, or, another jurisdiction if so required with respect to any particular Collateral by mandatory provisions of applicable law.

"Collateral" has the meaning set forth in Section 2.

"Copyrights" means works of authorship (whether or not published, and whether or not copyrightable), copyrights and copyright registrations, including, without limitation, the copyright registrations and recordings thereof and all applications in connection therewith listed on Schedule 2 attached hereto and made a part hereof, and (i) all reissues, restorations, reversions, continuations, extensions or renewals thereof, (ii) all income, royalties, damages and payments now and hereafter due and/or payable under and with respect thereto, including, without limitation, payments under all licenses

entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iii) the right to sue for past, present and future infringements and dilutions thereof, (iv) the goodwill of the Debtor business symbolized by the foregoing and connected therewith, and (v) all of Debtor's rights corresponding thereto throughout the world.

"Copyright Security Agreement" means one or more Copyright Security Agreements between Debtor and Secured Party, granting to Secured Party a security interest in, and confirming the security interests granted herein with respect to, all of Debtor's Copyrights.

"Effective Date" means the date of this Security Agreement.

"Equipment" means any "equipment," as such term is defined in Chapter 9 of the Code, now owned or hereafter acquired by Debtor and, in any event, shall include, without limitation, all machinery, equipment, furnishings, fixtures and vehicles now owned or hereafter acquired by Debtor and any and all additions, substitutions, and replacements of any of the foregoing, wherever located, together with all attachments, parts, equipment, and accessories installed thereon or affixed thereto.

"General Intangibles" means any "general intangibles," as such term is defined in Chapter 9 of the Code, now owned or hereafter acquired by Debtor and, in any event, shall include, each of the following, whether now owned or hereafter acquired by Debtor: (a) all of Debtor's Intellectual Property, (b) all of Debtor's books, records, data, plans, manuals, (c) all of Debtor's contract rights, partnership interests, joint venture interests, securities, deposit accounts, investment accounts, and certificates of deposit, (d) all right of Debtor to payment under letters of credit and similar agreements, (e) all tax refunds and tax refund claims of Debtor, (f) all choses in action and causes of action of Debtor (whether arising in contract, tort, or otherwise and whether or not currently in litigation) and all judgments in favor of Debtor, (g) all rights and claims of Debtor under warranties and indemnities, and (h) all rights of Debtor under any insurance, surety, or similar contract or agreement.

"Indebtedness" means (a) all of the Obligations and any other indebtedness and liabilities of Debtor to Secured Party of any kind or character, now existing or hereafter arising, by virtue of , or pursuant to those arising under the Transaction Documents, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several or joint and several, and regardless of whether such Obligations, indebtedness and liabilities may, prior to their acquisition by Secured Party be or have been payable to or in favor of a third party and subsequently acquired by Secured Party, (b) all accrued but unpaid interest on any of the foregoing, (c) all costs and expenses incurred by Secured Party in connection with the collection and administration of all or any part of the foregoing described in (a) and (b) above or the protection or preservation of, or realization upon, the Collateral, including without limitation all reasonable attorneys' fees, and (d) all renewals, extensions, modifications, increases, and rearrangements of the indebtedness described in (a), (b), and (c) above.

"Intellectual Property" means any and all Intellectual Property Licenses, Patents, Copyrights, Trademarks, the goodwill associated with such Trademarks, confidential and proprietary information, customer lists, trade secrets and know-how (including, without limitation, processes, schematics, databases, formulae, drawings, prototypes, models, designs, technical data, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), all computer software, Internet web sites, and all other intellectual property or proprietary rights and claims or causes of action arising out of or related to an infringement, misappropriation or other violation of any of the foregoing, including, without limitation, rights to recover for past, present and future violations thereof.

"Intellectual Property Licenses" means rights under or interest in any patent, trademark, copyright or other Intellectual Property, including software license agreements with any other party, whether Debtor is a licensee or licensor under any such license agreement, including, without limitation, the license agreements listed on Schedule 2 attached hereto and made a part hereof, and the right to use the foregoing in connection with the enforcement of the Purchaser's rights under the Transaction Documents, including, without limitation, the right to prepare for sale and sell any and all Inventory and Equipment now or hereafter owned by Debtor and now or hereafter covered by such licenses.

"Inventory" means any "inventory," as such term is defined in Chapter 9 of the Code, now owned or hereafter acquired by Debtor, and, in any event, shall include, without limitation, each of the following, whether now owned or hereafter acquired by Debtor:  (a) all goods and other personal property of Debtor that are held for sale or lease or to be furnished under any contract of service,  and (b) all raw materials, work-in-process, finished goods, inventory, supplies, and materials of Debtor.

"Obligations" means all present and future indebtedness, obligations, and liabilities, and all renewals and extensions thereof, or any part thereof, now or hereafter owed to Secured Party by the Debtor, arising from, by virtue of, or pursuant to this Security Agreement, the Assignment, or any other Transaction Document, together with all interest accruing thereon and reasonable costs, expenses, and attorneys' fees incurred in the enforcement or collection thereof, whether such indebtedness, obligations, and liabilities are direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, or were, prior to acquisition thereof by Secured Party, owed to some other Person.

"Patents" means inventions, discoveries and ideas, whether patentable or not, and all patents, registrations, and applications therefor, including, without limitation, the patents and patent applications listed on Schedule 2 attached hereto and made a part hereof, and (i) all reissues, continuations, continuations-in-part, substitutes, extensions or renewals thereof, and improvements thereon, (ii) all income, royalties, damages and payments now and hereafter due and/or payable under and with respect thereto, including, without limitation, payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iii) the right to sue for past, present and future infringements and dilutions thereof, and (iv) all of Debtor's rights corresponding thereto throughout the world.

"Patent Security Agreement" means one or more Patent Security Agreements between Debtor and Secured Party granting to Secured Party a security interest in, and confirming the security interests granted herein with respect to, all of Debtor's Patents.

"Person" means any natural person, firm, partnership, joint venture, association, corporation, limited liability company, trust, governmental authority, or other legal entity.

"Proceeds" means any "proceeds," as such term is defined in Chapter 9 of the Code and, in any event, shall include, but not be limited to, (a) any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to Debtor from time to time with respect to any of the Collateral, and (b) any and all payments (in any form and from any source whatsoever) made or due and payable to Debtor from time to time in connection with any Collateral.

"Real Property" means any estates or interest in real property now owned or hereafter acquired by Debtor and the improvements thereto.

"Records" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

"Rights" means legal and equitable rights, remedies, powers, privileges, and benefits.

"Secured Party" has the meaning given such term in the introductory paragraph above.

"Section" means a numbered Section of this Security Agreement, unless another document is specifically referenced.

"Security Agreement" means this Security Agreement and all amendments, replacements, renewals, and extensions to this Security Agreement.

"Security Interest" has the meaning set forth in Section 2.

"Trademarks" means trademarks, trade names, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, brand names, certification marks, collective marks, d/b/a's, Internet domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names, and other indicia of origin, including, without limitation, the trade names, registered trademarks, trademark applications, registered service marks and service mark applications listed on Schedule 2 attached hereto and made a part hereof, and (i) all extensions, modifications and renewals thereof, (ii) all income, royalties, damages and payments now and hereafter due and/or payable under and with respect thereto, including, without limitation, payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iii) the right to sue for past, present and future infringements and dilutions thereof, (iv) the goodwill of Debtor's business symbolized by the foregoing and connected therewith, and (v) all of Debtor's rights corresponding thereto throughout the world.

"Trademark Security Agreement" means one or more Trademark Security Agreements between Debtor and Secured Party granting to Secured Party a security interest in, and confirming the security interests granted herein with respect to, all of Debtor's Trademarks.

"Transaction Documents" means this Security Agreement, the Assignment and all other documents at any time executed and delivered in connection therewith including, as applicable, any Copyright Security Agreements, Patent Security Agreements, or Trademark Security Agreements.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms.

## ARTICLE TWO:
## GRANT OF SECURITY INTEREST

2.1    **Security Interest**. Debtor hereby unconditionally pledges, assigns and grants to Secured Party a continuing security interest in all personal property of Debtor (other than Intellectual Property) whether now owned or hereafter acquired or arising and wherever located (hereinafter referred to as the "Security Interest,"), including, without limitation, Debtor's right, title and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located (the "Collateral") to secure the prompt and complete payment and performance of the Indebtedness and the performance of Debtor's Indebtedness under the Transaction Documents:

(a)    That certain vehicle (the "Vehicle") with Identification number WPIAB2A2XBLA50978, a 2011 Porsche Cayenne S, with certificate of title number GVWR 6261 and Florida license plate number TPABKA.

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

(b)     all of Debtor's Accounts, Deposit Accounts, Equipment, fixtures, General Intangibles (other than Intellectual Property), Inventory, and investment property;

(c)     all of Debtor's books and records (including all of its Records indicating, summarizing, or evidencing its assets (including the Collateral) or liabilities, all of its Records relating to its business operations or financial condition ("Books");

(d)     all of Debtor's chattel paper (as that term is defined in the Code) including, without limitation, tangible chattel paper and electronic chattel paper ("Chattel Paper");

(e)     all of Debtor's letters of credit, letter-of-credit rights, instruments, promissory notes, drafts, and documents ("Negotiable Collateral");

(f)     all of Debtor's rights in respect of supporting indebtedness (as such term is defined in the Code), including letters of credit, guaranties, chattel paper, documents, General Intangibles (other than Intellectual Property), instruments, or investment property;

(g)     all of Debtor's interest with respect to any commercial tort claims (as that term is defined in the Code), including, without limitation those commercial tort claims listed on Schedule 2 attached hereto ("Commercial Tort Claims");

(h)     all of Debtor's money, cash equivalents, or other assets of Debtor that now or hereafter come into the possession, custody, or control of Secured Party; and

(i)     all of the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance or commercial tort claims covering or relating to any or all of the foregoing, and any proceeds resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the property of Debtor, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein (the "Proceeds").

2.2     **Springing Security Interest in Intellectual Property**.  Subject to the next sentence, Debtor hereby pledges, assigns and grants to Secured Party a continuing security interest in all Intellectual Property of Debtor whether now owned or hereafter acquired or arising and wherever located (hereinafter referred to as the "IP Security Interest"), including, without limitation, Debtor's right, title and interest in and to any Patents, Trademarks, and Copyrights, whether now owned or hereafter acquired or arising and wherever located, together with all Proceeds of Debtor's Intellectual Property (collectively, the "IP Collateral") to secure the prompt and complete payment and performance of the Indebtedness and the performance of Debtor's Indebtedness under the Transaction Documents.  The foregoing grant of the IP Security Interest shall not attach and shall not be in effect unless and until an Event of Default occurs and is continuing past applicable grace and/or cure periods (the "Trigger Event").  Upon the occurrence of a Trigger Event, the IP Security Interest shall attach and become effective automatically and with no further action required on the part of the Debtor or the Secured Party, and Secured Party shall have the right to file financing statements on Form UCC-1 under the Code.  Debtor hereby authorizes Secured Party to make such filings immediately upon the occurrence of a Trigger Event and will, upon Secured Party's request, take such further actions and execute and deliver such other documents, at its expense, as Secured Party may reasonably request to perfect and protect its IP Security Interest granted hereby including, without limitation, executing and delivering to Secured Party upon request one or more Copyright Security Agreements, Patent Security Agreements, and Trademark Security Agreements.  If the Debtor fails to promptly execute and deliver any such Copyright Security Agreement, Patent Security

Agreement, or Trademark Security Agreement upon request from Secured Party after a Trigger Event, then Secured Party may executed such documents on behalf of the Debtor and the Debtor hereby grants to Secured Party an irrevocable power of attorney to sign such Copyright Security Agreements, Patent Security Agreements, and Trademark Security Agreements on behalf of the Debtor in such event.

2.3  **Security for Indebtedness**. This Agreement and the Security Interest (and if applicable, the IP Security Interest) created hereby secure the payment and performance of all the Indebtedness, whether now existing or arising hereafter. Without limiting the generality of the foregoing, this Security Agreement secures the payment of all amounts which constitute part of the Indebtedness and would be owed by Debtor to Secured Party but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving Debtor. The Security Interest shall attach to all Collateral without further act on the part of Secured Party or Debtor.

2.4  **Debtor Remains Liable**. Notwithstanding anything to the contrary contained herein, (a) Debtor shall remain liable under the contracts and agreements included in the Collateral and IP Collateral to the extent set forth therein to perform all of its respective duties and obligations thereunder to the same extent as if this Security Agreement had not been executed, and (b) Secured Party shall not have any obligation or liability under any of the contracts and agreements included in the Collateral or IP Collateral by reason of this Security Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

2.5  **Authorization to File Financing Statements**. Subject to Section 2.2, Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to prepare and file one or more financing statements describing the Collateral and IP Collateral as the Collateral exists on the effective date of this Security Agreement and as the IP Collateral exists on the date of the Trigger Event and, also, as the description and type of the Collateral or IP Collateral may change in the future.

**ARTICLE THREE:**
**REPRESENTATIONS AND WARRANTIES**

Debtor represents and warrants to Secured Party that:

3.1  **Title, Authorization, Validity and Enforceability**. Debtor has valid and marketable title to the Collateral and IP Collateral, free and clear of all Liens other than Permitted Liens, and has full power and authority to grant to Secured Party the Security Interest in such Collateral, and the IP Security Interest in the IP Collateral, pursuant hereto. The execution and delivery by Debtor of this Security Agreement has been duly authorized by proper entity proceedings, and this Security Agreement constitutes a legal, valid and binding obligation of Debtor and creates a Security Interest (and if applicable, an IP Security Interest) which is enforceable against Debtor in all now owned and hereafter acquired Collateral (and in the IP Collateral if the IP Security Interest becomes effective). When financing statements have been filed in the appropriate offices against Debtor, Secured Party will have a fully perfected security interest in that Collateral (and in the IP Collateral if the IP Security Interest becomes effective) in which a security interest may be perfected by filing, with priority over any other Liens on assets or property of Debtor other than Permitted Liens.

3.2  **Conflicting Laws and Contracts**. Neither the execution and delivery by Debtor of this Security Agreement, the creation and perfection of the Security Interest in the Collateral (or the IP Security Interest in the IP Collateral) granted hereunder, nor compliance with the terms and provisions hereof will violate any applicable law, rule, regulation, order, writ, judgment, injunction, decree or award binding on Debtor or Debtor's articles or certificate of incorporation, bylaws, articles of organization or

operating agreement or other charter documents, as the case may be, the provisions of any indenture, instrument or agreement to which Debtor is a party or is subject, or by which it, or its property, is bound, or conflict with or constitute a default thereunder, or result in the creation or imposition of any Lien pursuant to the terms of any such indenture, instrument or agreement (other than Liens granted to Secured Party).

3.3     **Jurisdiction of Formation; Principal Location**.  Debtor is an individual resident in the State of Florida.  Debtor's mailing address is disclosed in <u>Schedule 1</u>.  Other than Inventory loaned or shipped in the ordinary course of business, the Inventory and Equipment are located solely at the locations described in <u>Schedule 1</u>.  Debtor does not own any real property as of the Effective Date.  The exact legal name of Debtor is set forth on the signature pages of this Agreement.  Debtor has not conducted business under any name except the name in which it has executed this Security Agreement.

3.4     **Accounts**.  Each Account represents the valid and legally binding indebtedness of a bona fide Account Debtor arising from the sale or lease by Debtor of goods or the rendition by Debtor of services and is not subject to contra accounts, setoffs, defenses or counterclaims by or available to account debtors obligated on the Accounts except as disclosed by Debtor to Secured Party from time to time in writing.  The amount shown as to each Account on Debtor's books is the true and undisputed amount owing and unpaid thereon, subject only to discounts, allowances, rebates, credits and adjustments to which the Account Debtor has a right and which have been disclosed to Secured Party in writing.

3.5     **Inventory**.  The security interest in Inventory shall continue through all stages of manufacture and shall, without further action, attach to the Accounts or other Proceeds resulting from the sale or other disposition thereof and to all such Inventory as may be returned to Debtor by its Account Debtors.

3.6     **Intellectual Property**.  <u>Schedule 2</u> hereto contains a complete and accurate list of all Intellectual Property Licenses, Patents, Trademarks, Commercial Tort Claims, and registered Copyrights owned by the Debtor or in which the Debtor has any material right, title, or interest (including by license or other contract or agreement).

## ARTICLE FOUR:
## AFFIRMATIVE AND NEGATIVE COVENANTS

From the Effective Date and thereafter until this Security Agreement is terminated:

4.1     **General**.

(a)     <u>Records and Reports; Notification of Event of Default</u>.  Debtor will maintain complete and accurate books and records with respect to the Collateral and IP Collateral, and furnish to Secured Party such reports relating to the Collateral and IP Collateral as Secured Party shall from time to time reasonably request.  Debtor will give prompt notice in writing to Secured Party of the occurrence of any Event of Default and of any other development, financial or otherwise, which would reasonably be expected to have a Material Adverse Effect on the Collateral or IP Collateral.

(b)     <u>Inspection</u>.  Debtor will permit Secured Party, by its representatives and agents and during normal business hours with reasonable advance notice to Debtor (i) to inspect the Collateral and IP Collateral, (ii) to examine and make copies of the records of Debtor relating to the Collateral and IP Collateral, and (iii) to discuss the Collateral and IP Collateral and the related records of Debtor with, and to be advised as to the same by, Debtor's officers and employees.

(c)    Taxes.  Debtor will pay when due all taxes, assessments and governmental charges and levies upon the Collateral and IP Collateral, except those which are being contested in good faith by appropriate proceedings and with respect to which no Lien exists.

(d)    Defense of Title.  Debtor will take any and all actions necessary to defend title to the Collateral and IP Collateral against all persons and to defend the security interest of Secured Party in the Collateral and IP Collateral and the priority thereof against any Lien other than Permitted Liens.

(e)    Disposition of Collateral and IP Collateral.  Debtor will not sell, lease or otherwise dispose of the Collateral (or, should the IP Security Interest have become effective, the IP Collateral) except, until such time following the occurrence of an Event of Default as Debtor receives a notice from Secured Party instructing Debtor to cease such transactions,  (i) sales or leases of Inventory in the ordinary course of business, and (ii) proceeds of Inventory and Accounts collected in the ordinary course of business.

(f)    Liens.  Debtor will not create, incur, or suffer to exist any Lien on the Collateral or IP Collateral except the Security Interest (and if applicable, the IP Security Interest) created by this Security Agreement and Permitted Liens.  At the earliest opportunity, Debtor will pay off the first lien on the Vehicle, and will incur no further indebtedness on the vehicle.

(g)    Change in Location, Jurisdiction of Organization or Name.  Debtor will not (i) other than Inventory loaned or shipped in the ordinary course of business, have any Inventory or Equipment or Proceeds thereof at a location other than a location specified in Schedule 1, (ii) maintain a place of business at a location other than a location specified on Schedule 1, (iii) change its name or taxpayer identification number, (iv) change its mailing address, or (v) change its jurisdiction of organization, unless Debtor shall have given Secured Party not less than 30 days' prior written notice thereof, and Secured Party shall have determined that such change will not adversely affect the validity, perfection or priority of Secured Party's security interest in the Collateral or IP Collateral.

(h)    Other Financing Statements.  Debtor will not sign or authorize the preparation and filing of any financing statement covering all or any portion of the Collateral and, following the attachment of the IP Security Interest, the IP Collateral.

4.2    **Accounts**.

(a)    Collection of Accounts.   Except as otherwise provided in this Security Agreement, Debtor will collect and enforce, at Debtor's sole expense, all amounts due or hereafter due to Debtor under the Accounts.

(b)    Verification of Accounts.  Secured Party shall have the right, at any time or times hereafter, in its name or in the name of a nominee of Secured Party, to verify the validity, amount or any other matter relating to any Accounts, by mail, telephone, telegraph or otherwise.

(c)    Notice to Account Debtor.  Secured Party may, in its sole discretion, at any time or times after an Event of Default has occurred and is continuing, and without prior notice to Debtor, notify any or all Account Debtors that the Accounts have been assigned to Secured Party and that Secured Party has a security interest therein.  After an Event of Default has occurred and is continuing, Secured Party may direct any or all Account Debtors to make all payments upon the Accounts directly to Secured Party.  Secured Party will use reasonable efforts to furnish

Debtor with a copy of such notice, but failure to do so will not have an adverse effect on Secured Party's rights under this Security Agreement.

### 4.3   Inventory and Equipment.

(a)   Maintenance of Goods.  Debtor will do all commercially reasonable things necessary to maintain, preserve, protect and keep the Inventory and the Equipment in good repair and working and saleable condition.  Debtor has the risk of loss with regard to the Inventory and Equipment.

(b)   Insurance.  Debtor will (i) maintain fire and extended coverage insurance on the Inventory and Equipment and on such other Collateral and IP Collateral as reasonably requested by Secured Party containing a lender's loss payable clause in favor of Secured Party, and providing that said insurance will not be terminated except after at least 30 days' written notice from the insurance company to Secured Party, (ii) maintain such other insurance on the Collateral and IP Collateral for the benefit of Secured Party as Secured Party shall from time to time reasonably request, and (iii) furnish to Secured Party upon the request of Secured Party from time to time the originals of all policies of insurance on the Collateral and IP Collateral and certificates with respect to such insurance.

(c)   Safekeeping of Inventory; Inventory Covenants.  Secured Party shall not be responsible for: (i) the safekeeping of the Inventory; (ii) any loss or damage thereto or destruction thereof occurring or arising in any manner or fashion from any cause; (iii) any diminution in the value of Inventory; or (iv) any act or default of any carrier, warehouseman, bailee or forwarding agency or any other Person in any way dealing with or handling the Inventory, except to the extent that Debtor incurs any loss, cost, claim or damage from any of the foregoing as a result of the gross negligence or willful misconduct of Secured Party.  All risk of loss, damage, distribution or diminution in value of the Inventory shall, except as noted in the previous sentence, be borne by Debtor.

(d)   Records of Inventory.  Debtor shall keep correct and accurate records on a basis reasonably acceptable to Secured Party, itemizing and describing the kind, type, quality and quantity of Inventory and other information reasonably requested by Secured Party.  A physical count of the Inventory shall be conducted if requested by Secured Party.

### 4.4   Instruments, Securities and Chattel Paper.

(a)   Possession.  Debtor will deliver to Secured Party the originals (now and hereafter received by Debtor) of all Chattel Paper, certificated Securities and Instruments which constitute Collateral.

(b)   Control.  If the Collateral which is Investment Property is uncertificated or held by a Securities Intermediary, Debtor will take any actions necessary to cause (i) the issuers of uncertificated securities which are Collateral, and (ii) any financial intermediary which is the holder of any Investment Property, to cause Secured Party to have Control over such Collateral through a control agreement or similar arrangement which is satisfactory to Secured Party. Debtor will permit any Collateral which is registrable, to be registered in Secured Party's, or its nominee's, name.

(c)   Securities.  After an Event of Default occurs and is continuing, with regard to Securities which constitute Collateral, (i) Debtor shall permit Secured Party to exercise all voting

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

rights, and (ii) Debtor shall provide to Secured Party all cash and stock dividends which are distributed by the issuer.

4.5     **Deposit Accounts**.  Debtor will not open any new deposit accounts without prior written consent from Secured Party, which consent will not be unreasonably withheld.  Upon request by Secured Party, Debtor will take commercially reasonable actions necessary to cause any bank or financial institution which is the holder of any deposit account of Debtor, to cause Secured Party to have Control over such Collateral through a control agreement or similar arrangement which is reasonably satisfactory to Secured Party.

4.6     **Intellectual Property**.  Upon request by Secured Party after occurrence of a Trigger Event, Debtor shall execute and deliver one or more Copyright Security Agreements, Trademark Security Agreements, and/or Patent Security Agreements to evidence the IP Security Interest on Debtor's Patents, Trademarks, and/or Copyrights, and the IP Collateral of Debtor relating thereto or represented thereby;

(a)     Debtor shall, to the extent material to, desirable to, and commercially reasonable with respect to, the operation of Debtor's Business, (A) sue for infringement, misappropriation, or dilution and to recover any and all damages for such infringement, misappropriation, or dilution, (B) to prosecute diligently any trademark application or service mark application that is part of the Trademarks pending as of the date hereof or hereafter until the termination of this Agreement, (C) to prosecute diligently any patent application that is part of the Patents pending as of the date hereof or hereafter until the termination of this Agreement, and (D) to take all reasonable and necessary action to preserve and maintain all of Debtor's Trademarks, Patents, Copyrights, Intellectual Property Licenses, other IP Collateral, and its rights therein, including the filing of applications for renewal, affidavits of use, affidavits of noncontestability and opposition and interference and cancellation proceedings.  Any expenses incurred in connection with the foregoing shall be borne by Debtor.  Debtor further agrees not to abandon any Trademark, Patent, Copyright, or Intellectual Property License that is material to the operation of Debtor's Business without the prior written consent of Secured Party;

(b)     Debtor acknowledges and agrees that Secured Party shall have no duties with respect to the Trademarks, Patents, Copyrights, Intellectual Property Licenses or other IP Collateral.  Without limiting the generality of this Section, Debtor acknowledges and agrees that Secured Party shall not be under any obligation to take any steps necessary to preserve rights in the Trademarks, Patents, Copyrights, Intellectual Property Licenses, or other IP Collateral against any other Person, but the Secured Party may do so at its option from and after the occurrence of an Event of Default, and all expenses incurred in connection therewith (including, without limitation, reasonable fees and expenses of attorneys and other professionals) shall be for the sole account of Debtor and shall be chargeable to the Indebtedness following notice to Debtor;

(c)     In no event shall Debtor, either itself or through any Secured Party, employee, licensee, or designee, file an application for the registration of any Patent, Trademark, or Copyright with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency without giving Secured Party prior written notice thereof;

(d)     With respect to the Intellectual Property rights that are material to the conduct of Debtor Business, Debtor agrees to take reasonable and customary steps to protect such Intellectual Property.  Debtor hereby agrees to take corresponding steps with respect to each new or acquired Intellectual Property right to which it or any of its subsidiaries is now or later becomes entitled that are material to the conduct of their businesses.  Any expenses incurred in connection with such activities shall be borne solely by Debtor; and

(e)     Debtor shall take actions reasonably necessary to protect the confidentiality of the Intellectual Property rights that are material to the conduct of its Business, including, without limitation, protecting the secrecy and confidentiality of its confidential information and trade secrets by having and enforcing a policy requiring all appropriate parties to execute appropriate confidentiality agreements.

4.7     **Patent, Trademark, Copyright Security Agreements**.   The provisions of any Copyright Security Agreements, Trademark Security Agreements, and Patent Security Agreements executed pursuant to this Agreement are supplemental to the provisions of this Agreement, and nothing contained in the Copyright Security Agreements, Trademark Security Agreements, or the Patent Security Agreements shall limit any of the rights or remedies of Secured Party hereunder.

4.8     **Landlord Subordinations**.  Debtor shall cause each landlord of real property leased by Debtor to execute and deliver Collateral Access Agreements satisfactory in form and substance to Secured Party by which such landlord subordinates its rights, if any, in the Collateral and IP Collateral.

4.9     **Compliance with Agreements and Laws**.  Debtor shall comply with all mortgages, deeds of trust, instruments, and other agreements binding on it or affecting its properties or business. Debtor shall comply with all applicable laws, rules, regulations, and orders of any court or Governmental Authority.

4.10    **Performance by Secured Party**.  If Debtor fails to perform any agreement or obligation provided herein, Secured Party may itself perform, or cause performance of, such agreement or obligation, and the expenses of Secured Party incurred in connection therewith shall be a part of the Indebtedness, secured by the Collateral (and if applicable, the IP Collateral) and payable by Debtor on demand.

4.11    **Further Assurances**.  At any time and from time to time, upon the request of Secured Party, and at the sole expense of Debtor, Debtor shall promptly execute and deliver all such further instruments and documents and take such further action as Secured Party may deem necessary or desirable to preserve and perfect its security interest in the Collateral and IP Collateral and carry out the provisions and purposes of this Security Agreement, including, without limitation, (a) the preparation (and execution, if necessary) and filing of such financing statements as Secured Party may require and (b) the deposit of all certificates of title issuable with respect to the Collateral and noting the Security Interest thereon.

4.12    **Secured Party Appointed Attorney-in-Fact**.  Debtor hereby irrevocably appoints Secured Party its attorney-in-fact, with full authority in the place and stead of Debtor and in the name of Debtor or otherwise, at such time as an Event of Default has occurred and is continuing under this Security Agreement and/or the Assignment, to take any action and to execute any instrument which Secured Party may reasonably deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a)     (i) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with the Accounts or any other Collateral and IP Collateral of Debtor (ii) enforce payment of Accounts by legal proceedings or otherwise; (iii) exercise all of Debtor's rights and remedies with respect to proceedings brought to collect an Account; (iv) sell or assign any Account upon such terms, for such amount and at such time or times as Secured Party deems advisable; (v) settle, adjust, compromise, extend or renew an Account; (vi) discharge and release any Account; (vii) take control in any manner of any item of payment or proceeds thereof; (viii) prepare, file and sign

Debtor's name on any proof of claim in bankruptcy or other similar document against an Account Debtor; (ix) endorse Debtor's name upon any items of payment or proceeds thereof and deposit the same in Secured Party's account on account of the Indebtedness; and (x) do all acts and things which are necessary, in Secured Party's sole discretion, to fulfill Debtor's Indebtedness under this Security Agreement ;

(b)     to receive, open, and dispose of all mail addressed to Debtor, to notify postal authorities to change the address for the delivery of mail to Debtor to an address designated by Secured Party, to have access to any lock box or postal box into which any of Debtor's mail is deposited;

(c)     to receive, indorse, and collect any drafts or other instruments, documents, Negotiable Collateral or Chattel Paper;

(d)     to file any claims or take any action or institute any proceedings which Secured Party may deem necessary or desirable for the collection of any of the Collateral of Debtor or otherwise to enforce the rights of Secured Party with respect to any of the Collateral or IP Collateral;

(e)     to repair, alter, or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any Person obligated to Debtor in respect of any Account of Debtor ;

(f)     to use any labels, Patents, Trademarks, trade names, URLs, domain names, industrial designs, Copyrights, advertising matter or other industrial or intellectual property rights, in advertising for sale and selling Inventory and other Collateral and IP Collateral and to collect any amounts due under Accounts, contracts or Negotiable Collateral of Debtor; and

(g)     Secured Party shall, after the occurrence of an Event of Default, have the right, but shall not be obligated, to bring suit in its own name to enforce the Trademarks, Patents, Copyrights and Intellectual Property Licenses and, if Secured Party shall commence any such suit, Debtor shall, at the request of Secured Party, do any and all lawful acts and execute any and all proper documents reasonably required by Secured Party in aid of such enforcement.

This power of attorney is coupled with an interest and shall be irrevocable until this Agreement is terminated.

## ARTICLE FIVE:
## DEFAULT

5.1     **Events of Default**.  Each of the following constitutes an "Event of Default" under this Security Agreement (subject to all applicable grace and/or notice and cure provisions):

(a)     Non-Performance of Covenants.  The failure of Debtor to timely and properly observe, keep or perform any covenant, agreement, warranty or condition required herein or in any other Transaction Document (except Debtor's failure to timely pay the Indebtedness), and such failure is not cured within thirty (30) days after notice thereof to Debtor; or

(b)     Default Under Other Transaction Documents.  The occurrence of a default or failure to pay the Royalty under the Assignment or of any event of default or default under any of the other Transaction Documents; or

(c)     Legal Judgment.  The Debtor is a defendant in any lawsuit involving alleged damages against the Debtor in excess of $10,000; or

(d)     False Representation.  Any representation contained herein is false or misleading in any material respect when made; or

(e)     Action by Other Lienholder.  The holder of any lien or security interest on any of the assets of Debtor, including without limitation, the Collateral or IP Collateral (without hereby implying the consent of Secured Party to the existence or creation of any such lien or security interest on the Collateral), declares a default thereunder or institutes foreclosure or other proceedings for the enforcement of its remedies thereunder.

**ARTICLE SIX:**
**REMEDIES**

6.1     **Remedies Upon Default**.  If any Event of Default shall occur and be continuing, Secured Party may do any one or more of the following: (a) declare the entire unpaid balance of the Obligations, or any part thereof, immediately due and payable, whereupon it shall be due and payable; (b) reduce any claim to judgment; (c) exercise the Rights of offset and/or banker's Lien against the interest of the Debtor in and to every account and other property of the Debtor which are in the possession of Secured Party to the extent of the full amount of the Obligations (the Debtor being deemed directly obligated to Secured Party in the full amount of the Obligations for such purposes); (d) foreclose any or all Secured Party Liens and/or otherwise realize upon any and all of the Rights Secured Party may have in and to the Collateral, the IP Collateral, or any part thereof; and (e) exercise any and all other legal or equitable Rights afforded by the Transaction Documents, the Laws of the State of Texas or any other jurisdiction as Secured Party shall deem appropriate, or otherwise, including, but not limited to, the Rights to bring suit or other proceedings before any governmental authority either for specific performance of any covenant or condition contained in any of the Transaction Documents or in aid of the exercise of any Right granted to Secured Party in any of the Transaction Documents.  Secured Party is hereby granted a license or other right to use, without liability for royalties or any other charge, Debtor's labels, Patents, Copyrights, rights of use of any name, trade secrets, trade names, Trademarks, service marks and advertising matter, URLs, domain names, industrial designs, other industrial or intellectual property or any property of a similar nature, whether owned or licensable by Debtor or with respect to which Debtor has sublicensable rights under license, sublicense, or other agreements, as it pertains to the Collateral and IP Collateral, but solely in connection with preparing for sale, advertising for sale and selling any Collateral or IP Collateral.

6.2     **Application of Proceeds**.  If any Event of Default shall have occurred and be continuing, Secured Party may at its discretion apply or use any cash held by Secured Party as Collateral, and any cash proceeds received by Secured Party in respect of any sale or other disposition of, collection from, or other realization upon, all or any part of the Collateral and IP Collateral as follows in such order and manner as Secured Party may elect:

(a)     To the repayment or reimbursement of the reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Secured Party in connection with (i) the administration of the Transaction Documents, (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, the Collateral and IP Collateral, and (iii) the exercise or enforcement of any of the rights and remedies of Secured Party hereunder;

(b)     To the satisfaction of the Indebtedness;

(c)     To the payment of any other amounts required by applicable law; and

(d)     By delivery to Debtor or any other party lawfully entitled to receive such cash or proceeds whether by direction of a court of competent jurisdiction or otherwise.

6.3     **Deficiency**.  In the event that the proceeds of any sale of, collection from, or other realization upon, all or any part of the Collateral and IP Collateral by Secured Party are insufficient to pay all amounts to which Secured Party is legally entitled, Debtor shall be liable for the deficiency, together with interest thereon.

6.4     **Non-Judicial Remedies**.  In granting to Secured Party the power to enforce its rights hereunder without prior judicial process or judicial hearing, Debtor expressly waives, renounces and knowingly relinquishes any legal right which might otherwise require Secured Party to enforce its rights by judicial process.  Debtor recognizes and concedes that non-judicial remedies are consistent with the usage of trade, are responsive to commercial necessity and are the result of a bargain at arm's length. Nothing herein is intended to prevent Secured Party or Debtor from resorting to judicial process at either party's option.

6.5     **Other Recourse**.  Debtor waives any right to require Secured Party to proceed against any third party, exhaust any Collateral, IP collateral, or other security for the Indebtedness, or to have any third party joined with Debtor in any suit arising out of the Indebtedness or any of the Transaction Documents, or pursue any other remedy available to Secured Party.  Debtor further waives any and all notice of acceptance of this Security Agreement.  Debtor further waives any defense arising by reason of any disability or other defense of any third party or by reason of the cessation from any cause whatsoever of the liability of any third party.  Until all of the Indebtedness shall have been paid in full, Debtor shall have no right of subrogation and Debtor waives the right to enforce any remedy which Secured Party has or may hereafter have against any third party, and waives any benefit of and any right to participate in any other security whatsoever now or hereafter held by Secured Party.  Debtor authorizes Secured Party, and without notice or demand and without any reservation of rights against Debtor and without affecting Debtor's liability hereunder or on the Indebtedness to (a) take or hold any other property of any type from any third party as security for the Indebtedness, and exchange, enforce, waive and release any or all of such other property, (b) apply such other property and direct the order or manner of sale thereof as Secured Party may in its discretion determine, (c) renew, extend, accelerate, modify, compromise, settle or release any of the Indebtedness or other security for the Indebtedness, (d) waive, enforce or modify any of the provisions of any of the Transaction Documents executed by any third party, and (e) release or substitute any third party.

6.6     **Disclaimer of Warranties and Sales on Credit**.  In connection with any foreclosure sale of the Collateral or IP Collateral, Secured Party may specifically disclaim any warranties of title or the like.  This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral and IP Collateral.  If Secured Party sells any of the Collateral or IP Collateral upon credit, Debtor will be credited only with payments actually made by the purchaser, received by Secured Party and applied to the indebtedness of the purchaser.  In the event the purchaser fails to pay for the Collateral or IP Collateral, Secured Party may resell the Collateral and IP Collateral and Debtor shall be credited with the proceeds of the sale.

6.7     **License**.  Secured Party is hereby granted a license or other right to use, following the occurrence and during the continuance of an Event of Default, without charge, Debtor's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, customer lists and advertising matter, or any property of a similar nature, as it pertains to the Collateral and IP Collateral, in completing production of, advertising for sale, and selling any Collateral or IP Collateral,

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

and, following the occurrence and during the continuance of any Event of Default, Debtor's rights under all licenses and all franchise agreement shall inure to Secured Party's benefit.

## ARTICLE SEVEN:
## GENERAL PROVISIONS

7.1     **Entire Agreement**. This Security Agreement and the Transaction Documents contain the entire agreement of Secured Party and Debtor with respect to the Collateral and IP Collateral. If the parties hereto are parties to any prior agreement, either written or oral, relating to the Collateral and IP Collateral, the terms of this Security Agreement and the Transaction Documents shall amend and supersede the terms of such prior agreements as to transactions on or after the effective date of this Security Agreement, but all security agreements, financing statements, guaranties, other contracts and notices for the benefit of Secured Party shall continue in full force and effect to secure the Indebtedness unless Secured Party specifically releases its rights thereunder by separate release.

7.2     **Amendment**. No modification, consent or amendment of any provision of this Security Agreement shall be valid or effective unless the same is in writing and signed by the party against whom it is sought to be enforced.

7.3     **Actions by Secured Party**. The Security Interest and IP Security Interest and other rights of Secured Party hereunder shall not be impaired by (a) any renewal, extension, increase or modification with respect to the Indebtedness, (b) any surrender, compromise, release, renewal, extension, exchange or substitution which Secured Party may grant with respect to the Collateral or IP Collateral, or (c) any release or indulgence granted to any endorser, guarantor or surety of the Indebtedness. The taking of additional security by Secured Party shall not release or impair the Lien or other rights of Secured Party hereunder or affect the Indebtedness of Debtor hereunder.

7.4     **Waiver by Secured Party**. Secured Party may waive any Event of Default without waiving any other prior or subsequent Event of Default. Secured Party may remedy any default without waiving the Event of Default remedied. Neither the failure by Secured Party to exercise, nor the delay by Secured Party in exercising, any right or remedy upon any Event of Default shall be construed as a waiver of such Event of Default or as a waiver of the right to exercise any such right or remedy at a later date. No single or partial exercise by Secured Party of any right or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right or remedy hereunder may be exercised at any time. No waiver of any provision hereof or consent to any departure by Debtor therefrom shall be effective unless the same shall be in writing and signed by Secured Party and then such waiver or consent shall be effective only in the specific instances, for the purpose for which given and to the extent therein specified. No notice to or demand on Debtor in any case shall of itself entitle Debtor to any other or further notice or demand in similar or other circumstances.

7.5     **Costs and Expenses**. Debtor will upon demand pay to Secured Party the amount of any and all reasonable costs and expenses (including without limitation, reasonable attorneys' fees and expenses), which Secured Party may incur in connection with (a) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, the Collateral and IP Collateral, (b) the exercise or enforcement of any of the rights of Secured Party under the Transaction Documents, or (c) the failure by Debtor to perform or observe any of the provisions hereof.

7.6     **Severability**. If any provision of this Security Agreement is held by a court of competent jurisdiction to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable, shall not impair or invalidate the remainder of this Agreement and the effect thereof shall be confined to the provision held to be illegal, invalid or unenforceable.

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

7.7 **Notices**. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing. Any notice required or permitted to be delivered hereunder may also be given by confirmed facsimile transmission, addressed to the Debtor or Secured Party as the case may be, at the address and facsimile number for a Party as it may specify in writing to the other Party from time to time. If an attempt to give notice by facsimile transmission fails because of any problem with the recipient's designated facsimile number or facsimile equipment, such notice will nevertheless be considered to have been received at the time such transmission was attempted if it is also sent that day by guaranteed overnight delivery to the recipient for receipt on the following day. In any case, such notices, requests, demands, and other communications shall be sent to such other addresses as either Party shall notify the other by notice given in the manner described above.

7.8 **Binding Effect and Assignment**. This Security Agreement (a) creates a continuing security interest in the Collateral and a springing security interest on the IP Collateral upon occurrence of an Event of Default, (b) shall be binding on Debtor and the heirs, executors, administrators, personal representatives, successors and assigns of Debtor, (c) shall be binding on all parties who/which become bound as Debtor under this Agreement, and (d) shall inure to the benefit of Secured Party and its successors and assigns. Without limiting the generality of the foregoing, Secured Party may pledge, assign or otherwise transfer the Indebtedness and its rights under this Security Agreement and any of the other Transaction Documents to any other party. Debtor's rights and Indebtedness hereunder may not be assigned or otherwise transferred without the prior written consent of Secured Party.

7.9 **Termination**. Upon (a) the satisfaction in full of the Indebtedness, (b) the termination or expiration of any commitment of Secured Party to extend credit to Debtor, (c) written request for the termination hereof delivered by Debtor to Secured Party, and (d) written release or termination delivered by Secured Party to Debtor, this Security Agreement and the security interests created hereby shall terminate. Upon termination of this Security Agreement and Debtor's written request, Secured Party will, at Debtor's sole cost and expense, return and/or release to Debtor such of the Collateral and IP Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof and execute and deliver to Debtor such documents as Debtor shall reasonably request to evidence such termination.

7.10 **Cumulative Rights**. All rights and remedies of Secured Party hereunder are cumulative of each other and of every other right or remedy which Secured Party may otherwise have at law or in equity or under any of the other Transaction Documents, and the exercise of one or more of such rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of any other rights or remedies.

7.11 **Gender and Number**. Within this Security Agreement, words of any gender shall be held and construed to include the other gender, and words in the singular number shall be held and construed to include the plural and words in the plural number shall be held and construed to include the singular, unless in each instance the context requires otherwise.

7.12 **Descriptive Headings**. The headings in this Security Agreement are for convenience only and shall in no way enlarge, limit or define the scope or meaning of the various and several provisions hereof.

7.13 **GOVERNING LAW AND VENUE**. THIS AGREEMENT IS BEING EXECUTED AND DELIVERED, AND IS INTENDED TO BE PERFORMED, IN TRAVIS COUNTY, TEXAS AND THE LAWS (EXCLUDING CHOICE OF LAW PROVISIONS) OF SUCH STATE SHALL GOVERN THE VALIDITY, CONSTRUCTION ENFORCEMENT AND INTERPRETATION OF THIS AGREEMENT, EXCEPT TO THE EXTENT FEDERAL LAWS OTHERWISE GOVERN THE VALIDITY, CONSTRUCTION, ENFORCEMENT AND INTERPRETATION OF ALL OR ANY

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

PART OF THIS AGREEMENT. ALL LEGAL ACTIONS RELATED TO THIS AGREEMENT SHALL BE BROUGHT IN THE APPROPRIATE COURT OF LAW LOCATED IN TRAVIS COUNTY, TEXAS, TO THE EXCLUSION OF ALL OTHER VENUES.

7.14 **INDEMNITY**. COMPANY HEREBY AGREES TO INDEMNIFY SECURED PARTY AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, AGENTS, ATTORNEYS, AND EMPLOYEES, FROM AND AGAINST ANY AND ALL LIABILITIES, DAMAGES, PENALTIES, SUITS, COSTS, AND EXPENSES OF ANY KIND AND NATURE (INCLUDING, WITHOUT LIMITATION, ALL EXPENSES OF LITIGATION OR PREPARATION THEREFOR WHETHER OR NOT SECURED PARTY IS A PARTY THERETO) IMPOSED ON, INCURRED BY OR ASSERTED AGAINST SECURED PARTY OR THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AGENTS, ATTORNEYS, AND EMPLOYEES, IN ANY WAY RELATING TO OR ARISING OUT OF THIS SECURITY AGREEMENT, OR THE MANUFACTURE, PURCHASE, ACCEPTANCE, REJECTION, OWNERSHIP, DELIVERY, LEASE, POSSESSION, USE, OPERATION, CONDITION, SALE, RETURN OR OTHER DISPOSITION OF ANY COLLATERAL OR IP COLLATERAL (INCLUDING, WITHOUT LIMITATION, LATENT AND OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE BY SECURED PARTY OR COMPANY, AND ANY CLAIM FOR PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT).

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

Effective as of the date first written above.

**COMPANY:**

**COUNSEL UNLIMITED LLC**, a Texas
corporation

By: _Robert E Kinney_____
     Robert E Kinney
     President


Address for Notices:

824 W 10th Street, Suite 202
Austin, Texas 78701

Facsimile: 512-857-1202
Attention: Chief Executive Officer

**SECURED PARTY:**

**EVAN P. JOWERS,** an individual

DocuSigned by:
*Evan Jowers*
E62419B440594D1.
Evan P. Jowers


Address for Notices:

1850 S Ocean Drive, Suite 4301
Hallandale, FL 33009

**<u>SCHEDULE 1</u>**

**TO SECURITY AGREEMENT**

**MAILING ADDRESS, OFFICE LOCATION, ETC.**

1850 S Ocean Drive, Suite 4301

Hallandale, FL 33009

## SCHEDULE 2

## TO SECURITY AGREEMENT

**1.      INTELLECTUAL PROPERTY LICENSES**

As of October 15, 2012, the Debtor has no material intellectual property licenses.

**2.      PATENTS**

As of October 15, 2012, the Debtor has no current patents or patent applications pending.

**3.      TRADEMARKS**

As of October 15, 2012, the Debtor has no current trademarks or trademark applications pending.

**4.      COPYRIGHTS**

As of October 15, 2012, the Debtor has no registered copyrights.

**5.      COMMERCIAL TORT CLAIMS**

As of October 15, 2012, the Debtor has no commercial tort claims.

# Signed with Docu*Sign*®



This document was securely signed using DocuSign Ink® on the DocuSign® Global Network. DocuSign provides a fast, easy and secure way to send your forms and documents, collect data and get electronic signatures for your business.

**The document you received includes the following security features:**

**1** It was signed in a secure online environment using digital encryption technologies from VeriSign

**2** An audit trail was created when the document was signed, and includes information such as the time the document was delivered, the IP address where the document was signed, the email address of the user signing the document and the location where the document was signed

**3** The signature you see in this PDF is linked to the signer's DocuSign ID which provides more information about the person who signed the document

**4** A tamper evident copy of the document has been saved in the signer's secure account

## Try DocuSign for **FREE**▶

When it comes to signatures, security is critical. This document has been securely signed and sent using DocuSign Ink. With DocuSign, you'll gain even greater control and security when SENDING documents for signature. Lower costs, eliminate errors, and get your transactions closed faster. Visit us at www.docusign.com/sender to learn more about the benefits of using DocuSign.









## Certificate of Completion

Envelope Number: 328617C6CE4343D0A278A4CE30A6000B
Subject: Please DocuSign this document: Evan Jowers 2012 Forgivable Loan Docs2.pdf
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 6 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 1 | Initials: 0 | Robert Kinney |
| AutoNav: Enabled | | 2406 Harris Blvd |
| EnvelopeId Stamping: Enabled | | Austin, TX 78703 |
| | | robert@kinneyrecruiting.com |
| | | IP Address: 24.155.178.39 |

Status: Completed

## Record Tracking

Status: Original
  12/27/2012 8:23:05 PM CT

Holder: Robert Kinney
  robert@kinneyrecruiting.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Evan Jowers | | Sent: 12/27/2012 8:25:01 PM CT |
| evan@kinneyrecruiting.com | *Evan Jowers* | Delivered: 12/28/2012 12:42:44 PM CT |
| Security Level: Email, Account Authentication (None) | F674199440584D1 | Signed: 12/28/2012 12:43:03 PM CT |
| Consumer Disclosure: | Using IP Address: 67.191.25.151 | |
| Not Offered | | |
| ID: | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/27/2012 8:25:01 PM CT |
| Certified Delivered | Security Checked | 12/28/2012 12:42:44 PM CT |
| Signing Complete | Security Checked | 12/28/2012 12:43:04 PM CT |
| Completed | Security Checked | 12/28/2012 12:43:04 PM CT |

Exhibit "D"

## FORGIVABLE LOAN AGREEMENT

**THIS FORGIVABLE LOAN AGREEMENT** ("Agreement") is entered into as of the 1st day of February 2012 ("Effective Date") by and between Recruiting Partners GP, Inc. d/b/a Kinney Recruiting, Inc. (the "Company"), and Evan Jowers ("Employee").

**WHEREAS**, Employee has requested that the Company loan Employee Fifty Thousand Dollars ($50,000.00) for the purpose of purchasing a vehicle and other general expenses; and

**WHEREAS**, the Company has agreed to provide Employee with the loan in exchange for Employee's services as an employee of the Company and other valuable consideration.

**NOW THEREFORE**, the parties hereto agree as follows:

1.    **THE LOAN**. The Company shall loan ("Loan") Employee a total of Fifty Thousand US Dollars ($50,000.00) ("Loan Amount") while he is actively employed by the Company. For purposes of this Agreement, the "Principal Amount" shall mean the Loan Amount as adjusted by any reductions provided under Section 7 of this Agreement.

2.    **INTEREST**. The rate of interest shall be 1.17% per annum (or the Applicable Federal Rate as promulgated by the Internal Revenue Service for medium term loans as of the date of this Agreement, whichever is higher).

3.    **PROMISSORY NOTE**. The Loan shall be made pursuant to a promissory note in the form attached hereto as Exhibit A (the "Note"). Employee shall execute the Note concurrently with the execution of this Agreement.

4.    **TAXES.** Employee shall be responsible for, and shall pay in compliance with applicable law and without any assistance from the Company, all taxes that may become due and payable to any taxing authority as a result of or in connection with this Agreement or any transaction hereunder, including without limitation any forgiveness of the Loan or imputed interest. If the Company is required to withhold any amounts or to make any tax payments in respect of consideration provided by the Company, such amounts may be deducted from any salary, bonus, or other amounts otherwise payable by the Company to Employee. To the extent not withheld, Employee agrees to pay to the Company in cash or check an amount equal to any withholding obligation imposed on the Company by reason of this Agreement. Employee has sought his own counsel regarding this Agreement and its tax and other consequences, and acknowledges that the Company has not provided any tax or other advice or representations concerning this Agreement or the transactions hereunder.

5.    **REPAYMENT OF LOAN**. The outstanding Principal Amount and accumulated interest shall be due and payable in full on January 31, 2021, subject to (a) acceleration of payment under the circumstances described in Section 6 or Section 8 of this Agreement, and (b) the reductions provided under Section 7 or Section 8 of this Agreement. Any payments due from Employee under this Agreement shall be made payable to Kinney Recruiting, Inc., and shall be sent to the Company at the address set forth in Section 12(g).

DocuSign Envelope ID: 328617C6-CE43-43D0-A278-A4CE30A6000B

**6.** **ACCELERATION OF PAYMENT**.

(a) <u>Termination of Employment</u>. Except as provided in Section 8, upon Employee's termination of employment with the Company for any reason, any outstanding Principal Amount will be immediately due and payable. Any questions as to whether and when there has been a termination of employment and the cause of such termination shall be determined by the Company in its sole discretion, and its determination shall be final and binding.

(b) <u>Transfer of Employment</u>. Upon Employee's transfer to a position of employment with the Company or its affiliates different from the position Employee holds as of the Effective Date, any outstanding Principal Amount will be immediately due and payable. Notwithstanding anything herein to the contrary, for purposes of this paragraph 6(b), the outstanding Principal Amount shall be determined solely pursuant to Section 7(b).

**7.** **REDUCTION OF PRINCIPAL AMOUNT AND FORGIVENESS OF INTEREST**. The Principal Amount and applicable interest shall be reduced as follows:

(a) Provided that at all times during the nine years immediately following execution of this Agreement Employee remains employed by the Company or by a parent or subsidiary of the company, the Principal Amount shall be reduced by $1/216^{th}$ (9 years times 12 months times 2 pay periods per month) for each semi-monthly pay period during such nine year period and the Company shall forgive such portion of the Principal Amount as well as interest accumulated as of the date of such payment.

(b) If the Employee is employed by the Company upon the date of a sale or merger of the Company or its subsidiary, Kinney Recruiting Limited, with a third party (unaffiliated) company, the Principal Amount as of the date of such sale and all accumulated interest shall be forgiven in full.

**8.** **REDUCTION IN FORCE**. If Employee's employment is terminated by the Company as part of a reduction in force, then, provided Employee executes a release in a form acceptable to Company (the "Release") and Employee does not revoke the Release during any applicable revocation period, (i) if the amount of benefit to which Employee would be entitled under the Company's severance plan is greater than the outstanding Principal Amount, Employee shall receive the benefit under the severance plan and the outstanding Principal Amount shall become immediately due and payable, or (ii) if the amount of benefit to which Employee would be entitled under the Company's severance plan is less than the outstanding Principal Amount, the Company will forgive the outstanding Principal Amount and Employee shall waive any benefit under the severance plan. If Employee does not satisfy the requirement of a Release set forth above, then the provisions of Section 7(a) shall apply.

DocuSign Envelope ID: 328617C6-CE43-43D0-A278-A4CE30A6000B

**9.** **RECOURSE**. Until repaid or forgiven, the Loan shall be with full recourse to Employee and his estate and Employee shall be personally liable for all amounts that may become payable pursuant to this Agreement. The Company may (but shall not be obligated to), without limiting other remedies, reduce any repayment obligation Employee may incur by retaining amounts otherwise payable to Employee.

**10.** **NON-TRANSFERABLE**. This Agreement shall not be assignable or otherwise transferable by Employee but shall inure to the benefit of Employee's estate or Employee's legal successor upon death or disability. Subject to the foregoing, the rights and obligations of Employee and the Company under this Agreement shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

**11.** **NO RIGHT TO EMPLOYMENT**. Nothing herein shall confer upon Employee the right to continue in the employment of the Company or affect any right which the Company may have to terminate the employment of Employee.

**12.** **MISCELLANEOUS**.

(a)     This Agreement shall be governed exclusively by, and be construed and enforced in accordance with, the laws of the State of Texas. Venue for any disputes arising from or related to this Agreement shall lie solely, and is convenient, in Travis County, Texas. The parties agree that they will not contest the choice of venue and choice of law provisions of this Paragraph in any future proceedings.

(b)     This Agreement constitutes the entire agreement and understanding of the Company and Employee with respect to the subject matter hereof and supersedes all prior and contemporaneous written or verbal agreements and understandings between Employee and the Company relating to such subject matter. Employee and the Company each acknowledge and represent that this Agreement is entered without reliance on any promise or representation other than those expressly contained herein. This Agreement may be amended only by written instrument signed by Employee and an authorized officer of the Company. Any and all prior agreements, understandings or representations relating to the transactions contemplated herein are terminated and cancelled in their entirety and are of no further force or effect.

(c)     If any provision of this Agreement shall be held invalid, illegal or unenforceable, the remaining provisions of the Agreement shall remain in full force and effect and the invalid, illegal or unenforceable provision shall be limited or eliminated only to the extent necessary to remove such invalidity, illegality or unenforceability in accordance with the applicable law at that time.

(d)     Either party's failure to enforce any provision or provisions of this Agreement shall not in any way be construed as a waiver of any such provision or provisions, nor prevent that party thereafter from enforcing each and every other provision of this Agreement. The rights granted both parties herein are cumulative and

shall not constitute a waiver of either party's right to assert all other legal remedies available to it under the circumstances.

(e)    Performance under this Agreement is not intended and is not to be construed as an accord and satisfaction or other release or discharge of any obligations or indebtedness of Employee to the Company not otherwise evidenced specifically.

(f)    Any notices, demands or other communications required or desired to be given by any party shall be in writing and shall be validly given to another party if served either personally or if deposited in the United States mail, certified or registered, postage prepaid, return receipt requested. If such notice, demand or other communication shall be served personally, service shall be conclusively deemed made at the time of such personal service. If such notice, demand or other communication is given by mail, such notice shall be conclusively deemed given forty-eight (48) hours after the deposit thereof in the United States mail addressed to the party to whom such notice, demand or other communication is to be given as hereinafter set forth:

> To the Company:  Kinney Recruiting, Inc.
> 2406 Harris Blvd
> Austin, Texas 78703
> Attention: Robert E. Kinney
>
> To Employee:    Evan Jowers
> At his address of record as maintained in the Company's employment files

Either party may change its address for the purpose of receiving notices, demands and other communications by providing written notice to the other party in the manner described in this paragraph.

(g)    Employee agrees upon request to execute any further documents or instruments necessary or desirable to carry out the purpose or intent of this Agreement.

(h)    This Agreement may be executed in more than one counterpart, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

*[Signature Page Follows]*

DocuSign Envelope ID: 328617C6-CE43-43D0-A278-A4CE30A6000B

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the day and year first set forth above.

KINNEY RECRUITING, INC.

Robert E
Kinney

By: _____

Robert E Kinney, President

Digitally signed by Robert E Kinney
DN: cn=Robert E Kinney, o=Kinney
Recruiting, Inc., ou,
email=robert@kinneyrecruiting.com,
c=US
Date: 2012.01.29 22:26:17 -06'00'

**EMPLOYEE**

Evan Jowers

_____

Evan Jowers

DocuSign Envelope ID: 328617C6-CE43-43D0-A278-A4CE30A6000B

## Exhibit A

## PROMISSORY NOTE

$50,000.00                                                          Austin, Texas
                                                                December 16, 2011

For value received, I promise to pay to Kinney Recruiting, Inc., a Texas company (the "Company") or order, at its principal office at 824 W 10th Street, Suite 202, Austin, Texas 78701, or at such other place as the Company shall designate in writing, the aggregate principal amount of $50,000.00, together with interest thereon at the rate of 1.17 percent per annum, payable at the times and in the manner set forth in that certain Forgivable Loan Agreement (the "Agreement") dated concurrently herewith by and between the undersigned and the Company, the terms of which are incorporated herein by reference.

Principal and interest are payable in lawful money of the United States of America. The privilege is reserved to prepay any portion of this Note at any time without penalty.

I hereby waive presentment for payment, demand, protest, notice of protest, notice of dishonor and notice of non-payment of this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note.

This Note shall be exclusively governed by, and construed and enforced in accordance with, the laws of the State of Texas.

By: _Evan Jowers_____
DocuSigned by:
E62419B440584D1...
Evan Jowers

-6-

# Signed with DocuSign®



This document was securely signed using DocuSign Ink® on the DocuSign® Global Network. DocuSign provides a fast, easy and secure way to send your forms and documents, collect data and get electronic signatures for your business.

**The document you received includes the following security features:**

**1** It was signed in a secure online environment using digital encryption technologies from VeriSign

**2** An audit trail was created when the document was signed, and includes information such as the time the document was delivered, the IP address where the document was signed, the email address of the user signing the document and the location where the document was signed

**3** The signature you see in this PDF is linked to the signer's DocuSign ID which provides more information about the person who signed the document

**4** A tamper evident copy of the document has been saved in the signer's secure account

## Try DocuSign for **FREE** ▷

When it comes to signatures, security is critical. This document has been securely signed and sent using DocuSign Ink. With DocuSign, you'll gain even greater control and security when SENDING documents for signature. Lower costs, eliminate errors, and get your transactions closed faster. Visit us at www.docusign.com/sender to learn more about the benefits of using DocuSign.







Exhibit "E"



Evan Jowers <evan@kinneyrecruiting.com>

# my Florida address
3 messages

**Evan Jowers** <evan@kinneyrecruiting.com>                    Mon, Jul 27, 2015 at 8:17 AM
To: Renee Sommers <renee@kinneyrecruiting.com>
Cc: Robert Kinney <robert@kinneyrecruiting.com>

Here is my Florida address, where I will have as my home until I can permanently move to Hong Kong, with work via.

Evan Jowers
11384 NW 81st Place
Parkland, FL 33076

My wife and I will also be back at this address in December and January when we are in Florida.

Once I have my work visa for Hong Kong, my business trip will turn to a move to Hong Kong.

Until then, I only have up to 3 month stay in Hong Kong, for tourist or business purposes, as any US passport holder has here.

Best,

Evan

Evan P. Jowers, Esq.
Partner / Head of Asia
Kinney Recruiting
    mobile +852.5502.3361
    office +852.3606.6512


**Evan Jowers** <evan@kinneyrecruiting.com>                    Mon, Jul 27, 2015 at 8:40 AM
To: Renee Sommers <renee@kinneyrecruiting.com>
Cc: Robert Kinney <robert@kinneyrecruiting.com>

My drivers license and car insurance are Florida.

I surely don't want to pay Louisiana state taxes when I don't live there and have not lived there in more than a decade.

I can't declare Hong Kong as my permanent home until I have work visa for Hong Kong.

Best,

Evan
[Quoted text hidden]

**Evan Jowers** <evan@kinneyrecruiting.com>                    Mon, Jul 27, 2015 at 8:56 AM
To: Renee Sommers <renee@kinneyrecruiting.com>
Cc: Robert Kinney <robert@kinneyrecruiting.com>

In any event, a company can take a tax deduction for temporary housing for an employee who is working out of state for up to one year.

And a US citizen abroad can deduct his housing costs from US income taxes indefinitely (up to $114,000 per year in Hong Kong) IF he lives abroad for a year or more and is not in the US too many days during that time (I think it is around 60 days).

Evan P. Jowers, Esq.
Partner / Head of Asia
Kinney Recruiting
    mobile +852.5502.3361
    office +852.3606.6512


[Quoted text hidden]

Exhibit "F"



Robert Kinney <robert@kinneyrecruiting.com>

---

## with a heavy heart, I am going to have to resign now (at least temporarily, until we can figure out a more fair arrangement)

6 messages

---

**Evan Jowers** <evan@kinneyrecruiting.com>                          Fri, Dec 16, 2016 at 1:03 PM
To: Robert Kinney <robert@kinneyrecruiting.com>
Cc: Evan Jowers <evanjowers@yahoo.com>

Robert,

I consider you a very good friend and love you like a brother, so this is a very difficult moment for me.

But I can no longer allow myself to continue in the current situation for me at Kinney. The Alp split situation is just the small straw that broke the camel's back (after 50 or so more serious problems, frustrations, and disappointments I have had over the years, which I would be happy to discuss). I am paying for much of the Asia operation and getting a smaller % of my placement fees than I would receive at just about any other recruiting firm, and have very little platform to work with. It's been very hard for me to deal with things the past 17 months since i made the big move to Hong Kong.

I feel that I am a very unfair situation and I am not able to reach for the dreams that I have for myself in business and in life in general if I, simply out of loyalty to you and our friendship, spend the rest of my 40s and well into my 50s with a low ceiling (created by my Kinney platform). It's taken all the fun out of my work. I only have one life to live and have limited time to build a business that I can be proud of.

So I am resigning from Kinney now. I am very much willing to work things out and have a nice discussion and return to Kinney (as quickly as this week) in a real partner role (if you may be interested in that).

I have only stayed at Kinney 11 years because of loyalty to you, our close friendship, and my belief we can build something really special together, notwithstanding many disappointments I have had along the way. I still believe we can build Kinney together, but only if we go about it as a partnership and not where I am an employee with no leverage (and frankly being taken advantage of consistently).

It's 4am here and I am exhausted so let's have our conversation this weekend, so I can get some sleep now. I have meetings starting in 6 hours.

I hope we can figure things out in discussions so that I can return to Kinney (actually I prefer it to be Kinney & Jowers, but that is not a deal breaker for me by any means), in more of a partnership role.

We have never really had a real conversation about building a company together. It's not your fault, but you always had so much leverage over me, so that I really could not express my opinon. I can finally have that conversation about building a business together now, if you would like to. I hope we can work things out and move forward as partners.

I almost left Kinney several times in the past 4 years. I was really frustrated and pissed off on numerous occasions. I have each time decided to remain, because of my loyalty to you and our friendship. During the past few months, my family and close friends have been pushing me to reconsider things. As you know Lateral Link has been trying to recruit me for a while and they have given me a very attractive offer. I considered that and also have considered starting my own company.

If you don't want to work things out with me to have a real partnership so that we can really take the business to another level, then I will be starting my own shop (that I plan to grow into the best big law focused recruiting company in the world). If so, I hope we can remain great friends and perhaps you will change your mind and we can join forces again in business in the future.

I wrote this on the fly at 4am (had no idea I was going to resign exactly this evening), too tired and stressed to be very articulate. Am happy to have a nice long discussion this weekend about all my concerns and frustrations and hope we can work things out.

Best,

Evan

Exhibit "G"



Robert Kinney <robert@kinneyrecruiting.com>

# I am starting to interview attorneys in HK for our potential litigation
1 message

**Evan Jowers** <evan@evanjowers.com>                                    Mon, Dec 26, 2016 at 11:50 PM
To: Robert Kinney <robert@kinneyrecruiting.com>

I don't want to go the litigation route, but you seem to be heading in that direction so I will defend myself pro-actively. It's certainly time for me to lawyer up, if there ever was a time. If we do litigate it is my aim to match you dollar for dollar, no matter what sacrifices I have to make. My wife is fully on board. If it costs hundreds of thousands of USD then so be it. There never will be a more worthy cause in my life and career.

Have been very willing to come to an agreement with you on live candidates, but you are unwilling to even discuss terms (even though you already know I am willing to meet the terms you mentioned in our one phone call).

Any further discussion we have (by email or phone) will need to be about coming to terms for an agreement to settle this matter once and for all. I will no longer answer your emails that threaten me in various ways and simply direct me to provide a list. I will respond to communication that is to set up a phone call where we can discuss terms.

You are calling and sending threatening emails to my partners and also candidates, and trying to cause harm to my reputation in the market (but in the process making a fool of yourself).

I will not come up with a list until we first agree on terms (which can include that I provide a full list per our terms, or be in violation of agreement). Otherwise, you will harass these folks just before I left Kinney and could cause damage to their careers. You are a loose cannon and I don't trust you with information right now, until you calm down.

I was not trying to "steal" the live candidates. They chose to work with me and asked me to make sure I would not lose representation of them. I knew that you would likely shut me out of representation when I left Kinney, so for these handful of candidates they were either submitted through Vargas just before I left Kinney or I submitted them through my new company shortly after leaving Kinney. These candidates did not want you involved in their search. I always planned to share the potential fees with you for any of these live candidates, while also making sure I could represent them in their job search going forward, according to their wishes.

Your continued actions are going to put your own reputation and Kinney's goodwill at risk, at least in the Asia markets. It's already in the rumor mill around town you are threatening candidates, including one call you made in particular to a candidate.

Best,

Evan

**Evan P. Jowers, Esq.**
evan@evanjowers.com
+852.5502.3361



Exhibit "H"



Evan Jowers <evan@kinneyrecruiting.com>

# Can I please have extra 6k loan on this payday?
1 message

**Evan Jowers** <evan@kinneyrecruiting.com>                                    Mon, Sep 26, 2016 at 4:40 AM
To: Robert Kinney <robert@kinneyrecruiting.com>
Cc: Renee Sommers <renee@kinneyrecruiting.com>

I need to pay a few bills and buy Tatiana's plane ticket to St. Martin (around 2500). I also have a short 2 day / 1 night Beijing work trip (coming up next week) to pay for, and I need to buy my plane ticket to US (Oct. 28, returning Dec. 1), plus need to get plane tickets Miami to SXM, to St. Barts, to St. Lucia, etc...

Since payday is coming up in 4 days, if you prefer a week notice, it is just as fine getting 7 days from now in wire, if you prefer.

October is not going to be so expensive for me (other than 4S rent). But November is going to be holiday, so that will be somewhat expensive. December will be inexpensive, with half the month at my mom's for the holidays and half in HK for work.

Best,

Evan

Evan P. Jowers, Esq.
Partner / Head of Asia
Kinney Recruiting
    mobile +852.5502.3361

# the below analysis of my spreadsheet (and additional facts) has me at about $230,000 in the black

13 messages

---

**Evan Jowers** <evan@kinneyrecruiting.com>                                    Tue, Aug 16, 2016 at 10:09 PM
To: Robert Kinney <robert@kinneyrecruiting.com>

Robert,

As you can see from my analysis below of my current spreadsheet, including the fact that Yuliya get's 50% of Hui Xu, I am around $230,000 in the black at this time, when considering placements on the board (all payments due within two months, with the larger ones due during next 4 weeks, and none of which are in any danger of dropping off) and my loan that needs to be paid back in after tax funds.

–

I have $1,222,080 in placements on board. None of these placements are in any doubt. As we both know it's partner placements that can and will fall apart, but the two pending partner placement fees are 100% - Alex Tao has already started at A&O and Hui Xu has already left Covington and is starting at Latham (any day now, as soon as work visa is ready).

The associates - Max Chu (starts next week at K&E), Phong Quan (starts next week at K&E), Caitrin McKiernan (starts early September at Shearman), Jenny Qi (starting in September), and Alice Li (starting in September) are all rock solid. In fact, all of these associates have already given notice at their firm (except for Jenny, but there is no issue there, she is simply waiting for her HK work visa to give notice to Cleary in BJ) and all but Jenny and Alice have already left their current firm. Jackie Tang is the salary partner placement at K&E. She has already left Skadden and is simply waiting for work visa to transfer over to K&E. Expect start date in late August.

Further, I am about to place Richard Li (at Latham), expecting this 4th year associate placement will be on the board within the next week.

So, I have $1,22,080 in placements on the board for the year thus far.

I have been paid $323,575 thus far.

Plus I owe $65,000 in loan balance (not sure how much of that is Four Seasons payments, because there is 30k limit on the interest free Four Seasons loan category below. The Four Seasons number is important because this is tax free).

Plus I currently owe $30,000 in the interest free Four Seasons payments category).

Plus I owe $10,000 in draws.

---

Let's see here what commissions I have still coming in, compared to what I owe in loans (including quick look at how much of loans I need to pay back after taxes):

the first 300k of revenue I bring I get 50% commissions (45, 50 and then 55, for 50 avg) - so my commissions for first 300k is 150k

For the next 922k in revenue I brought in I get 60%. This is $553,200.

Thus, so far this year I have, according to the figures on my spreadsheet, $703,000 in commissions (whether paid or not paid yet at this time).

From the $703,000, $323,575 has already been paid so that obviously comes off the top.

That leaves me with approx. $380,000 still to be paid.

–

Further reductions from loans / draws:

$30,000 in interest free Four Seasons payments (paid back before taxes)

$65,000 in loans, but I have currently $17,000 pending in "business expenses" and some of the loan amount appears to be the spillover (from 30k limit) Four Seasons payment amount. The spillover Four Seasons and the $17,000 in business expenses helps take away some of the after tax amount in loan payback. So let's say (very conservatively) only 45k of loan amount has to e paid back in after tax funds.

So that leaves 40k in after tax pay back being about 55k in before tax funds, plus the other 20k in loan category (offset re taxes) so that is approx. 75k in before tax funds to pay the 65k loan amount back.

So we have reductions before tax of 30k, 75k, plus 10k in draws, totaling $115,000.

---

$380,000 reduced by $115,000 leaves around $265,000 I am still getting, according to spreadsheet.

---

Yuliya's 50% on Hui Xu though is not on spreadsheet. So that takes $62,000 off my total. That leaves me with $203,000 still coming.

I am getting about 3k more for the Jing Kang 8k still owed on placement fee.

Also, the 18k I am getting on Alice Li (new placement on board but not in spreadsheet) is not included here.

I that is about 20k to add back into my commissions pending amount - for a total of $223,000.

I will have some reimbursable expenses adding to my total. That should be at least another 10k or so coming.

Anyways, I am at minimum well over $200,000 in the black, according to the above numbers (taken from spreadsheet and brought further up to date with some info missing on spreadsheet - info that lowers my amount due / coming).

Further, all of these commissions coming will hit during August and September or early October (with the two partner placements hitting in August or to mid September).

And OF COURSE, I WILL HAVE MORE PLACEMENTS TO PUT ON THE BOARD, AS ALWAYS, DURING THE COMING WEEKS AND MONTHS. I have a lot of activity going on now with interviews and very good new candidates quite active.

I am close to putting Richard Li on board and likely will be placing Jun Feng soon after. There are others in the pipeline as well.

Best,

Evan

---

**Robert Kinney** <robert@kinneyrecruiting.com>                 Tue, Aug 16, 2016 at 10:15 PM
To: Evan Jowers <evan@kinneyrecruiting.com>

This is great detail. Sending to renee to go through it. I hope/expect that your numbers are right.

What's your request for your birthday loan? :-)

We got home at 1:30 am this morning. I hve been pretty much a zombie since. I have to stop driving to/from that place.

Robert E. Kinney, Esq.
Kinney Recruiting LLC

 Toll Free: +1-888-848-5757 x701
 Cell: +1-512-636-1395
 Robert@KinneyRecruiting.com

www.kinneyrecruiting.com



This communication may be privileged or contain confidential information. If it has been sent to you in
error, please do not read it, reply to the sender that you received it in error, and delete it. Any distribution
or other reproduction is strictly prohibited.

[Quoted text hidden]

---

**Evan Jowers** <evan@kinneyrecruiting.com>       Tue, Aug 16, 2016 at 10:28 PM
To: Robert Kinney <robert@kinneyrecruiting.com>

Thanks!

I will get back to you today on what I hope to borrow now for T's birthday, and also let you know about what my needs
will be in expensive September coming up (T in HK). My biggest expense recently and still some left in coming weeks is
paying off 100% (as os required ) of 4 weeks in St Barts and 10 days in St Lucia (Nov 1 to dec 10). That is what has
been draining my funds lately :-) but makes for a carefree Nov and Dec re funds needed. Also, I spent 14k at dentist
recently and very unexpectedly  (the final 5k of that paid few weeks ago).

Yes, you should fly there from now on! :-) one cross country trip w family is fun, then its probably not so interesting 2nd
and 3rd time :-)

[Quoted text hidden]

---

**Evan Jowers** <evan@kinneyrecruiting.com>       Wed, Aug 17, 2016 at 12:57 AM
To: Robert Kinney <robert@kinneyrecruiting.com>

Please do send 12k for T's birthday and other things.

I will need another loan beginning September because Tatiana arrives here Sept. 2 and I have to pay then final payment
for St. Barts villa.

The spending is going to be pretty heavy in September, but then get much lighter throughout October, when I won't
spend much at all and then November and December will already be mostly paid for (the expensive villas will be fully
paid for by early Sept.).

September may be my most expensive month.


Evan P. Jowers, Esq.
Partner / Head of Asia
Kinney Recruiting
 mobile +852.5502.3361


[Quoted text hidden]

---

**Evan Jowers** <evan@kinneyrecruiting.com>       Wed, Aug 17, 2016 at 4:00 PM
To: Robert Kinney <robert@kinneyrecruiting.com>

If you could send 12k today or tomorrow that would be wonderful!

Tatiana's birthday is Tuesday but she is heading to birthday trip with her girlfriends on Friday.

We are lucky because in Russian culture the birthday girl pays for girlfriends' holiday when it's her birthday. Tatiana is going to spa resort in Lithuania, whereas the girls she is bringing took Tatiana on their birthday trips to Cannes, St. Tropez and Aruba.

:-))

Evan P. Jowers, Esq.
Partner / Head of Asia
Kinney Recruiting
    mobile +852.5502.3361

[Quoted text hidden]

---

**Robert Kinney** <robert@kinneyrecruiting.com>                    Wed, Aug 17, 2016 at 4:07 PM
To: Evan Jowers <evan@kinneyrecruiting.com>

you can find a bargain in any rip-off.  It's a gift!

Robert E. Kinney, Esq.
Kinney Recruiting LLC

    Toll Free:  +1-888-848-5757 x701
    Cell: +1-512-636-1395
    Robert@KinneyRecruiting.com

www.kinneyrecruiting.com



This communication may be privileged or contain confidential information. If it has been sent to you in error, please do not read it, reply to the sender that you received it in error, and delete it.  Any distribution or other reproduction is strictly prohibited.

[Quoted text hidden]

---

**Robert Kinney** <robert@kinneyrecruiting.com>                    Wed, Aug 17, 2016 at 4:07 PM
To: Evan Jowers <evan@kinneyrecruiting.com>

I told Renee to send it though - loan for 12K.  That's a lot of money for a birthday.

Robert E. Kinney, Esq.
Kinney Recruiting LLC

    Toll Free:  +1-888-848-5757 x701
    Cell: +1-512-636-1395
    Robert@KinneyRecruiting.com

www.kinneyrecruiting.com



This communication may be privileged or contain confidential information. If it has been sent to you in

Exhibit "I"



Evan Jowers <evan@kinneyrecruiting.com>

# pipeline, request for funds for my 6 week holiday coming up.
9 messages

**Evan Jowers** <evan@kinneyrecruiting.com>                         Tue, Oct 25, 2016 at 9:17 AM
To: Robert Kinney <robert@kinneyrecruiting.com>

Robert,

I am doing fine with my pipeline. Am about $135,000 in black (admittedly around 40k less than I thought when I ran numbers with you in HK) plus I have around $50,000 in tax refund coming in January / February. However, to be on safe side, I am canceling the Miami apartment idea and just going with the big holiday coming up. We will just spend a week or so in Miami in January and that's it. Thus, I won't have the expensive Miami / HK split budget to deal with first three months of next year. I will simply return to Hong Kong in mid January as long as all is fine with expected placements and my tax refund (even if something goes wrong with one placement I will be fine).

Because of a lot of up front costs I am incurring in early November (portion of caribbean holiday not yet paid for and Miami apartment January to April) I hope to get paid early on October 31 (by a few days to a few weeks) on the pending 7 placements (new hires already started at each firm and invoices have been sent out, with start dates ranging from August to October, with 0% chance of reversals). . However, if the 7 soon to be paid placement fees are used to take away my entire current debt to Kinney, I will only have around $37,000 coming to me pre-tax. There is also the $14,000 I am due from profit sharing on Yuliya in '15. That brings me to $51,000 pre-tax. However, I need if possible around that much after tax on Oct. 31 pay day. Going beyond 7 about to hit placement fees, I have 2 more placements in pipeline with January start dates and I also have the $24,000 approx. in profit sharing on Yuliya for '16 (if you agree to give this to me) coming in early '17. Of course there will be more placements in November and December to add to board (as there always is).

Here below are the 7 about to be paid placements and start dates -

Phong Quan - August 22 - K&E (BJ) - K&E says we will receive payment this week

Jackie Tang - August 29 - K&E (HK) - K&E says we will receive payment this week

Hui Xu - September 12 - Latham (SHG) - past due - expect payment in first half November

Chunbei Li - September 19 - WSGR (SHG) - expect payment any day now

Max Chu - September 26 - K&E (HK) - K&E says we will receive payment this week

Caitrin McKiernan - October 12 - Shearman (HK) - payment due November 12

Jenny Chi - October 17 - Latham (HK) - payment due November 17. Latham HK usually pays early

- also, I am due the approximate $14,000 2015 Yuliya profit sharing bonus (as per our discussions last week)

- I wish I could get the approximate $24,0000 2016 Yuliya profit sharing bonus as well, but you said I have to wait to get that.

- I also have two placements with start dates in January that amount to around $60,000 in commissions for me.

- I am about $135,000 (pre-tax) in black in pipeline and also have at minimum $50,000 in tax refund coming in January / February

————————————————

Here are expenses I have to cover October 26 to November 10, plus a few other items I will need to cover during November :

- Miami hotel and rental car 4 days - around $1,200 total

- $7,872 to Jade Mountain St. Lucia (this is the remaining balance owed for that 11 day stay - November 19 to 30). This charge will be debited from my bank card on October 31.

- I also have to on October 31 check in to a hotel in St. Martin for two nights (cost for both nights total around $800)

- I have to pay by November 7 around $10000 for November 30 to December 15 Anguilla villa (I will be there until Dec. 6 and my wife will remain there until Dec. 15).

- I have to on November 5 pay the remaining balance of $4000 for my wife's 30 day apartment rental in Aruba - Dec. 15 to January 15.

- I have to on November 1 pay the remaining balance of around $1000 for 17 days rental car in St. Barts

- I have to buy plane tickets for us from St. Martin to St. Lucia round trip. (approx. $500 total)

- I have to buy Tatiana's St. Martin to Aruba one way and Aruba to Miami one way (Approx. $700 total)

- The St. Barts / St. Lucia month of November lodging will be paid for as I arrive to each place, but there will be spending there, I think it will be around $400 per day for a total of $12,000

- The Anguilla 6 days with both of us there - around $300 per day - $1800 and then my wife only there 9 days around $100 per day - for $2700.

- I have to buy a plane ticket to return from Hong Kong to US December 16 (I already have the ticket Miami to Hong Kong December 6). Approx. $1000 round trip

- I need to pay for the St Martin to Miami ticket Dec. 6 (to connect for HK flight) - approx.. $400.

- I will need to book hotel in Hong Kong for 9 days Dec. 7 to 16. - approx. $2500

- My wife will need spending money in Aruba for New Year's with her friend and for that entire month - approx. $3000

-----------

TOTAL - $48,472

My current commissions (including the bonus discretionary bonus % I can get on placements) -

first 300k revenue - 150k commissions

next 849,700 revenue - 509,820 commissions

---

$660,000 in commissions

+14k '15 bonus
+24k "16 bonus (estimated and not approved yet)

_____

$700,000 in income

have received 395,424 in income thus far. Also have loan balance of 103,000 on Oct. 15 spreadsheet.

there is an additional approximate $11,000 payment just sent to Four Seasons last week. This brings the loan balance to approx. 114,000

have $5,000 draws balance

have 30k four seasons balance

     ------ [the loan balance is after tax pay back. However, $48,000 is for Four Seasons payments (over and beyond the 30k limit interest free Four Seasons loans). Thus, I have a total of 78k of total loans that are for Four Seasons and paid back with pre-tax funds. This leaves me with another 66k in loans that would be paid back in after tax, but keep in mind that I do have about 38k in business expenses pending. So approximately all but 28k in loan balance is pre-tax. So I will add 11k to the loan balance on gross up and say that it's 160k loan balance (in pre-tax funds)

700,000 in commissions

minus 395k received income

minus 160k loan balance

------------------------

$135,000 is my current pipeline in black

- 60k in placements to be paid in January

- 24k bonus to be potentially paid in early '17

$51,000 is what I am going to be ahead in black shortly, once the 7 placements are paid within the next few weeks.

------------------------

So I have $135,000 in pipeline in black.

Plus I have at minimum $50,000 tax refund coming by late January.

------------------------

-I need 50k now though. That is the problem.

Evan P. Jowers, Esq.
Partner / Head of Asia
Kinney Recruiting
    mobile +852.5502.3361

---

**Robert Kinney** <robert@kinneyrecruiting.com>                                    Tue, Oct 25, 2016 at 9:24 AM
To: Evan Jowers <evan@kinneyrecruiting.com>

Thanks. Will review. Also will send $3k today. Final day of feasibility period on office today so I have little time until tomorrow.
[Quoted text hidden]

Exhibit "J"

# these are the live candidates (not submitted through Kinney) off the top of my head....

16 messages

---

**Evan Jowers** <evan@evanjowers.com>                Tue, Dec 27, 2016 at 9:10 PM
To: Robert Kinney <robert@kinneyrecruiting.com>

These were submissions right before I left Kinney (through Vargas) or right after

 (long time friend)
      (was referred to me)
     (placed previously, friend)
   (has been waiting for 6 months to work with me, planned Dec. job search)
     (referred by good friend)
     (referred by food friend)

I may be forgetting about one, off top of my head, but I don't think so.

These persons all asked me to make sure I am representing them and leave no chance to the possibility that I would lose representation after leaving Kinney. I always intended to split these candidates with you, although it seems quite unfair to have normal split with James, for example. Vargas never was getting anything more than nominal amount for any of his administrative submission.

These are all placeable folks but none are shoo ins by any means. Perhaps Longhao is the most likely placement any time soon.

I never tried to hide any of the above activity. You can see it clear as day simply by looking at my kinney emails.

Best,

Evan

Evan P. Jowers, Esq.
evan@evanjowers.com
+852.5502.3361

**Ⓔ JOWERS | VARGAS**

---

Exhibit "K"

**Yuliya** <yuliya@kinneyrecruiting.com>                    Sat, Dec 17, 2016 at 5:47 AM
To: Robert Kinney <robert@kinneyrecruiting.com>

Hi Robert:

Yes, I've heard about Evan's decision.  He was struggling with it for some time.  I am sure you aren't going to be surprised if I say that whichever way you guys decide I will stay with Evan.  We have a long history together and it would be weird to do otherwise.  I hope you understand...

Evan has been distraught about the whole thing and I hope both of you can talk and work it out.

Kind regards,
Yuliya.


[Quoted text hidden]