# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| **MWK RECRUITING INC.,** | |
| Plaintiff | **Civil Action No.: 1:18-cv-00444-RP** |
| v. | **JURY TRIAL DEMANDED** |
| **EVAN P. JOWERS,** | |
| **YULIYA VINOKUROVA,** | |
| **ALEJANDRO VARGAS, AND** | |
| **LEGIS VENTURES (HK)** | |
| **COMPANY LIMITED,** | |
| Defendants | |

## SECOND AMENDED COMPLAINT

Plaintiff MWK Recruiting Inc., now known as Counsel Holdings Inc, ("MWK")[1] hereby asserts the following claims against Defendant Evan P. Jowers ("Jowers"), Defendant Yuliya Vinokurova ("Vinokurova"), Defendant Alejandro Vargas ("Vargas"), and Legis Ventures (HK) Company Limited (collectively "Defendants"), and on information and belief alleges as follows:

## THE PARTIES

1.      MWK is a corporation organized under the law of the state of Texas having its principal place of business at 824 W 10th Street, Suite 202, Austin, Texas 78703.

2.      Defendant Jowers is an individual with residence in the state of Florida.

---

[1]      On January 1, 2019, Plaintiff, MWK Recruiting Inc., merged into Counsel Holdings Inc. On February 25, 2019, MWK Recruiting Inc. filed a Notice of Merger, Change of Name, and Request to Modify the Caption. *See* Dkt. No. 68. As a result of this merger, MWK Recruiting Inc. is now known as Counsel Holdings Inc. ("CH-INC").

3.      Defendant Vinokurova is an individual and citizen of the state of Florida.

4.      Defendant Vargas is an individual and citizen of Colombia whose residential address is Apartment 513, Int. 5, Calle 140, No. 11-63, Bogota, Colombia.

5.      Legis is a private limited company organized under the laws of Hong Kong, having its registered address at Rooms 05-15 13A/F South Tower, World Finance Ctr Harbour City, 17 Canton Road Tsim Sha Tsui, Kowloon, Hong Kong.

## JURISDICTION AND VENUE

6.      This action arises under the Federal Defense of Trade Secrets Act, 18 U.S.C. 1836, *et seq*.

7.      The amount in controversy exceeds the value of $75,000, and there is complete diversity among all parties.

8.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1332.

9.       Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2).

## NON-PARTY ENTITIES

10.     MWK Recruiting LLC ("MWK-LLC") was a Texas limited liability company, which has converted to MWK.

11.     Kinney Recruiting L.P., ("KR-LP") was a Texas limited partnership and has ceased operation.

12.     Recruiting Partners GP, Inc. ("RP-GP") is a Texas corporation, which is a predecessor of MWK.

13.      Kinney Recruiting LLC ("KR-LLC") is a Texas limited liability company, which is wholly owned by MWK.

14.     Counsel Unlimited LLC ("CU-LLC") is a Texas limited liability company, which is

wholly owned by MWK.

15.     Kinney Overseas LLC ("KO-LLC") is a Texas limited liability company, which is wholly owned by MWK.

16.     Kinney Recruiting Limited ("KRL-HK") is a private limited company organized under the laws of Hong Kong, which is wholly owned by KO-LLC.

17.     Kinney Recruiting GmbH ("KR-GmbH") is a limited liability company organized under the laws of Germany, which is wholly owned by KO-LLC.

## AGREEMENTS, ASSIGNMENTS, CONVERSIONS, AND MERGERS

18.     Effective May 1, 2006, Jowers and KR-LP entered into an Associate Recruiter Employment Agreement (the "Jowers Agreement"). A true and correct copy of the Jowers Agreement is attached hereto as Exhibit 1.

19.     According to Section 15 of the Jowers Agreement (SUCCESSORS AND ASSIGNS):

> 15.1 The parties to this Agreement expressly authorize that the restrictive covenants contained herein be enforceable by the Company's assignees and/or successors.

20.     According to Section 16 of the Jowers Agreement (NOTICES):

> 16.1 All notices to be given under this Agreement shall be given in writing by registered or certified mail addressed to the Company at 824 W 10th Street, Suite 202, Austin, TX 78701, and to the Employee addressed as shown below, or by band delivery to either party. Either party may designate a different address by written notice to the other party. Notices to the Company. which are hand delivered, may only be delivered to Robert B. Kinney, Esq., 824 W 10th Street, Suite 202, Austin, TX 78701.

21.     According to Section 19 of the Jowers Agreement (SEVERABILITY):

> 19.2 The parties to this agreement expressly authorize that the restrictive covenants contained herein be enforceable by Kinney Recruiting L.P. assignees and/or successors.

22.     The Jowers Agreement does not require notice of assignment of the agreement to be

provided to Jowers.

23.     Effective May 1, 2006, Vinokurova and KR-LP entered into an Associate Recruiter Employment Agreement (the "Vinokurova Agreement"). A true and correct copy of the Vinokurova Agreement is attached hereto as Exhibit 2.

24.     According to Section 15 of the Vinokurova Agreement (SUCCESSORS AND ASSIGNS):

> 15.1 The parties to this Agreement expressly authorize that the restrictive covenants contained herein be enforceable by the Company's assignees and/or successors.

25.     According to Section 16 of the Vinokurova Agreement (NOTICES):

> 16.1 All notices to be given under this Agreement shall be given in writing by registered or certified mail addressed to the Company at 824 W 10th Street, Suite 202, Austin, TX 78701, and to the Employee addressed as shown below, or by band delivery to either party. Either party may designate a different address by written notice to the other party. Notices to the Company. which are hand delivered, may only be delivered to Robert B. Kinney, Esq., 824 W 10th Street, Suite 202, Austin, TX 78701.

26.     According to Section 19 of the Vinokurova Agreement (SEVERABILITY):

> 19.2 The parties to this agreement expressly authorize that the restrictive covenants contained herein be enforceable by Kinney Recruiting L.P. assignees and/or successors.

27.     The Vinokurova Agreement does not require notice of assignment of the agreement to be provided to Vinokurova.

28.     On December 31, 2007, KR-LP and RP-GP executed an Assignment of Employment and Other Agreements by Kinney Recruiting, L.P. to Recruiting Partners GP, Inc. (the "First Assignment"). A true and correct copy of the First Assignment is attached hereto as Exhibit 3. The First assignment assigned KR-LP's rights and obligations under the Jowers Agreement and the Vinokurova Agreement to RP-GP.

29.     Even though the Jowers Agreement does not require it, Jowers received notice of the First Assignment, at least by, the issuance of W-2s to his address identifying the employer as RP-GP. *See* Exhibit A, Declaration of Evan P. Jowers, Exhibit 1 at pp. 1-5:







30.     Even though the Vinokurova Agreement does not require it, Vinokurova received notice of the First Assignment, at least by, the issuance of W-2s to his address identifying the employer as RP-GP.

31.     On February 1, 2012, Jowers and RP-GP entered into a Forgivable Loan Agreement and Promissory Note (the "2012 Forgivable Loan"). A true and correct copy of the Forgivable Loan is attached hereto as Exhibit 4.

32.     The 2012 Forgivable Loan does not prohibit assignment of the agreement.

33.     The 2012 Forgivable Loan does not require notice of the assignment of the agreement.

34.     On October 25, 2012, RP-GP and KR-LLC executed an Assignment of Employment and Other Agreements by Kinney Recruiting, Inc. (the "Second Assignment"). A true and correct copy of the Second Assignment is attached hereto as Exhibit 5. The Second Assignment assigned RP-GP's rights and obligations under the Jowers Agreement, the Vinokurova Agreement, and the 2012 Forgivable Loan to KR-LLC.

35.     Even though the Jowers Agreement does not require it, Jowers received notice of the
Second Assignment, at least by, the issuance of W-2s to his address identifying the employer as
KR-LLC. *See* Exhibit A-1 at pp. 1-5:








36.     Even though the Vinokurova Agreement does not require it, Vinokurova received notice of the Second Assignment, at least by, the issuance of W-2s to his address identifying the employer as KR-LLC.

37.     On November 1, 2012, Jowers and CU-LLC entered into a Loan Agreement and Promissory Note (the "Revolving Loan Agreement"). A true and correct copy of the Revolving Loan Agreement is attached hereto as Exhibit 6.

38.     The Revolving Loan Agreement does not prohibit assignment of the agreement.

39.     The Revolving Loan Agreement does not require notice of the assignment of the agreement.

40.     On January 31, 2017, KR-LLC and MWK-LLC executed an Assignment of Notes, Security Agreement, and Claims. (the "Third Assignment). A true and correct copy of the Third Assignment is attached hereto as Exhibit 7. The Third Assignment assigned KR-LLC's rights and obligations under the Jowers Agreement, the Vinokurova Agreement, and the 2012

Forgivable Loan to MWK-LLC. The Third Assignment also assigned any and all claims KR-LLC had against the defendants to MWK-LLC.

41.     On January 31, 2017, CU-LLC and MWK-LLC executed an Assignment of Notes, Security Agreements, and Claims (the "Fourth Assignment"). A true and correct copy of the Fourth Assignment is attached hereto as Exhibit 8. The Fourth Assignment assigned CU-LLC's rights and obligations under the Revolving Loan Agreement to MWK-LLC. The Fourth Assignment also assigned any and all claims CU-LLC had against the defendants to MWK-LLC.

42.     On March 12, 2018, MWK-LLC filed a Certification of Conversion of a Limited Liability Company Converting to a Corporation with the Texas Secretary of State (the "Certificate of Conversion"). A true and correct copy of the Certificate of Conversion is attached hereto as Exhibit 9. By way of filing the Certificate of Conversion, MWK-LLC converted to MWK.

43.     On December 31, 2018, MWK and CH-INC filed a Certificate of Merger with the Texas Secretary of State (the "Certificate of Merger"). A true and correct copy of the Certificate of Merger is attached as Exhibit 10. By way of filing the Certificate of Merger, MWK merged into CH-INC.

## **BACKGROUND**

44.     MWK, along with its subsidiaries and predecessor entity KR-LP, (collectively "MWK"), represent a leading global recruiting firm serving attorneys around the world.

45.     MWK's legal placement service is marketed worldwide. This segment of the professional recruiting industry is extremely competitive.

46.     Since its inception, MWK has attained significant success and competitive advantage in the legal recruiting market, especially in the Hong Kong-based Asian Market, and has been

involved in the placement of well over 1,000 attorneys.

47.     MWK owns or licenses all intellectual property it uses and pays for the development of such intellectual property.

48.     In the world of legal recruiting for top international law firms, the key drivers for fee-paying placement activity is knowledge of the most qualified attorneys' interests, motivation, desires regarding their employment, as well as the economics behind their practices, so that these individual interests, motivations and economic profiles can be matched to employer profiles in any given market.

49.     MWK has and does develop and create confidential compilations of information about clients and candidates at the top of the legal world is highly valuable, not only in terms of providing short term placement activity, but also in terms of allowing those who possess it to use it to cultivate further relationships and develop further proprietary information. This information constitutes part of MWK's trade secrets.

50.     All information regarding potential candidates collected by MWK employees, including Jowers and Vinokurova, when employed as a recruiter are property of MWK and also constitute MWK's trade secrets.

51.     MWK has spent well over $1,000,000 investing in the development of the Asian legal recruiting market, including the development of its trade secrets.

52.     MWK employees while employed as a recruiter with MWK, including Jowers and Vinokurova, use MWK equipment, including computers, to store MWK's confidential trade secret information.

53.     MWK also stores its confidential trade secret information in electronic and hard copy form in its offices in Austin, Texas.

54.     MWK employees, including Jowers and Vinokurova, are only able to access electronic information by use of assigned accounts and are able to physical access hard copies at the Austin office.

55.     To protect this confidential information from unauthorized use, MWK secures access to electronic files by password protection and access to hard copies by locked storage files.

56.     To further protect MWK's trade secrets, MWK requires employees, including Jowers and Vinokurova, to maintain the confidentiality of MWK's trade secrets.

57.     As part of each employee's employment agreement, including Jowers and Vinokurova, the employee must agree to the following:

> 1.6 "Company's Proprietary Information" means the Company's confidential information but not limited to client and candidate lists, interim employees, personal information supplied by candidates and interim employees, information concerning the identity of clients and their personnel, the personnel and partnership needs and requirements of clients, terms and conditions under which the Company deals with clients, billing rates, profit margins, financial data, applications, resumes, candidate and employee data sheets, job orders, search assignments, planners, invoices, manuals, computer programs and data, Company personnel information, audio and video cassettes, records and any information received from a client or candidate under an expectation of confidentiality. The terms "customer list" and "candidate list" are not limited to physical writings or compilations. "Customer lists" and "candidate lists" include information contained in or reproduced from the memory of an employee. The company's Proprietary Information includes all such information developed by its employees, whether or not during working hours, that is related to Company's business. The Company's Proprietary Information may also be trade secrets.
>
> 3.2 The Employee has been provided access to, and has received, the Company's Proprietary Information, and understands that Employee will continue to have access to the Company's Proprietary Information throughout Employee's employment. In consideration of the Company's provision of Proprietary Information, Employee acknowledges and agrees that during Employee's service and thereafter, pursuant to this agreement, Employee will hold in strictest confidence and will not disclose, discuss, transmit, use, lecture upon, or publish any Proprietary Information, except as such disclosure, discussion, transmission,

use or publication may be required in connection with Employee's service to the Company, or unless Robert Kinney expressly authorizes such in writing.

## 7. **Non-Disclosure Covenants**

7.1 Upon termination of employee's employment, the Employee will not retain any copies of the Company's Proprietary Information. When the Employee's service with the Company is completed, Employee will immediately deliver to the Company all Proprietary Information, together with all copies thereof, and any other material containing or disclosing any Proprietary Information. Employee will also immediately deliver all Company Property, including but not limited to laptops, pagers, cell phones, corporate credit cards, keys, and/or access cards. Employee further agrees that all property situated on the Company's premises and/or owned, leased, or licensed by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by personnel of the Company at any time with or without notice.

7.2 At all times during and after the Employee's employment, the Employee shall not use or disclose to any person the Company's Proprietary Information, except as such disclosure or use may be required in connection with the Employee's employment, or unless the Robert Kinney expressly authorizes such in writing.

## 8. **Non-Solicitation Covenants**

8.1 For a period of one year following the effective date of termination of the Employee's employment, the **Employee shall not, in the course of the personnel placement service business, solicit or provide services to any candidate or client** with whom the Employee had contact with, knowledge of, or access to during the twelve months immediately preceding the effective date of termination, and shall not assist any entity other than the Company in so doing. (emphasis added)

8.2 For a period of one year following the effective date of termination of the Employee's employment, the Employee shall not solicit or hire away any employee of the Company, or any person whose employment of the Company has been terminated for less than six months, nor shall Employee induce, solicit, or otherwise encourage any supplier, independent contractor, or any other business relation of the Company, or in any way interfere with the relationship between any such employee, supplier, independent contractor, or other business relation and the Company (including, without limitation, making any negative or disparaging statements regarding the Company or its respective officers, directors, employees, or principles).

58.     While employed by MWK, all recruiters, including Jowers and Vinokurova, must agree to work exclusively for MWK. Jowers and Vinokurova agreed to the following:

> 4.4 The Employee shall not engage in any other business activities in competition with the Company's personnel placement service business and shall not engage in any activity related to the personnel placement service business other than in benefit of the Company.

59.     On multiple occasions, from the inception of their employment with MWK until termination of their employment, Jowers and Vinokurova traveled to Austin, Texas for the purpose of training and meetings at MWK headquarters. Each of them maintained regular contacts with Texas for a period of years related to their employment by MWK.

60.     While in Texas, and during their employment with MWK, Jowers and Vinokurova obtained trade secrets from MWK.

61.     In particular, while employed with MWK, Jowers obtained MWK confidential trade secret information concerning the following MWK candidates: James Chang, Longhao Zhang, Richard Han, Pamela U, Claudia Lau, and Xiao Zhang (the "MWK Candidates.")

62.     Prior to terminating his employment with MWK, Jowers submitted the MWK Candidates through Vargas instead of MWK:



63.    Jowers admitted to submitting some of the MWK candidates through Vargas while he was still employed with MWK and using MWK trade secret information to place other MWK Candidates through his own company immediately after terminating his employment with MWK.

64.    As stated by Jowers in an email dated December 26, 2016:

> I was not trying to "steal" the live candidates. They chose to work with me and asked me to make sure I would not lose representation of them. I knew that you would likely shut me out of representation when I left Kinney, so for these handful of candidates they were either submitted through Vargas just before I left Kinney or I submitted them through my new company shortly after leaving Kinney. These candidates did not want you involved in their search. I always planned to share the potential fees with you for any of these live candidates, while also making sure I could represent them in their job search going forward, according to their wishes.

A true and correct copy of this email is attached as Exhibit 11.

65.    In an email sent on December 29, 2016, Jowers stated:

> I really was not trying to gain anything financially or hurt Kinney by sending a few submissions through Vargas or through the new company (after I left Kinney). I could have simply declined to represent these people at all, but that would have been bad for them and for Kinney. If i submitted them through Kinney, then they would have lost my representation shortly afterwards, very bad for the candidates and causing awkward situation for firm clients. Vargas didn't want any piece of potential placements simply to submit these candidates. I always intended to give Kinney it's share and I insisted to Vargas he should get something, even if it was just 10% of my part. It certainly was not a gift to Vargas. If anything it was a bother for him.

Exhibit D, Declaration of Robert E. Kinney at D:2-2.

66.     Vargas admits to communicating with candidates that are based in the United States through the operations of Legis. *See* Exhibit B, Declaration of Alejandro Vargas at ¶ 9.

67.     Jowers is a US citizen and maintains a residence in Florida. Exhibit A at ¶ 5.

68.     Vinokurova is a US citizen. *See* Exhibit C, Declaration of Yuliya Vinokurova at ¶ 3.

69.     Vinokurova is presently employed by Legis Ventures. Exhibit C at ¶ 2.

70.     The evanjowers.com website is based in the United States, the domain uses the United States ".com" designation, which identifies the website as a US based commercial website to candidates. Exhibit D at ¶¶ 8–11, Exhibits D:4, D:5, D: 6.[2]

71.     The evanjowers.com domain is registered to Jowers at an address in Louisiana. Exhibit B at ¶¶ 8, 9, Exhibit D:4.

72.     The evanjowers.com website is completely written in English and solicits candidates residing in the United States to "Get In Touch" regarding available jobs by sending an email to "jobs@evanjowers.com". Exhibit D at ¶ 11, Exhibit D:6.

73.     According to the Legis website, www.evanjowers.com, Vinokurova has a United States based telephone number to contact Vinokurova, and Vinokurova spends time working in the Legis New York office.

---

[2]     The Declaration of Robert E. Kinney (Exhibit D) is fully incorporated herein by reference.



### Yuliya Vinokurova

yuliya@evanjowers.com
HK: +852 8191 0334
US: +1 (917) 725-2028

Yuliya Vinokurova (BA, Boston College '01) is a co-founder of Jowers / Vargas and has played a leading role in Evan Jowers' team for twelve years. She splits her time between St. Petersburg, Russia and Hong Kong, and also spends time in our New York and London offices. Further she will be leading our planned effort to open a Moscow offices soon. Yuliya has made numerous placements of US attorneys in Asia in big law, as well as assisted Evan with many of his placements, including at the partner level. She has had success in placing US attorneys at top law firms in Hong Kong, Beijing, Shanghai  Singapore, Seoul, Tokyo, Moscow, London, Frankfurt, New York, Los Angeles, Orlando and Miami. She has helped open new US law firm offices in Asia. She runs all our marketing efforts and manages our recruiting staff, while also maintaining her position as one of the leading US attorney recruiters in Asia over the past decade. Yuliya has been in the legal recruiting industry since 2006.

*See* "Yuliya Vinokurova – Jowers | Vargas," available at https://www.evanjowers.com/yuliya-vinokurova/ (last accessed March 13, 2019).

74.     According to the Legis website, www.evanjowers.com, Jowers has a United States based telephone number to contact Jowers, Jowers is a "co-founder" of Legis, and "[h]is focus is moving ***US associates, counsel and partners*** to Asia." (emphasis added).



### Evan Jowers

evan@evanjowers.com
HK: +852 5502-3361
US: +1 (917) 292-8657

Evan Jowers is based in Hong Kong and is a co-founder of our company. He has had extraordinary success in big law recruiting, particularly in Asia, having made well over 300 US attorney big law placements in Asia since 2007. His focus is moving US associates, counsel and partners to Asia and within Asia, with particular emphasis on Hong Kong / China. Evan has represented and career advised the majority of the recently promoted or entry level laterally hired US partners, over the past few years, at the top tier US firms in Hong Kong / China. Most of these attorneys Evan has had relationships with since their junior to mid-level associate years, and in some cases all the way back to their law school studies.

*See* "Evan Jowers – Jowers | Vargas," available at https://www.evanjowers.com/evan-jowers/ (last accessed March 13, 2019).

75.     Jowers acknowledged that when he made the Counsel Holdings Candidate placements, he did not have a work visa for Hong Kong–and was thus working as a resident of Florida as a US citizen:

> I am having serious problems with HK authorities now re my taxes for '15 and '16 owed and my being here without work visa. I am working things out with them, but will have to pay a penalty. My new company is quickly applying for a work visa for me. It's really Alejandro' operation in HK until I can come on board legally. Also, the IRS is having doubts that I really intended to move to HK in '15, because no work visa. I may have to pay 1.5 years of HK taxes, plus late penalties, up front, while having to wait until '18 for IRS to reimburse me (if IRS does not refund me '15 and '16 HK taxes now).

Exhibit D at ¶ 3, Exhibit D:2-2.

76.     The evanjowers.com website identifies Jason Cunningham as the head of Legis' Boston office and identifies a United States based telephone number to contact Mr. Cunningham. The website also states Mr. Cunningham works out of Legis' New York and Los Angeles offices:



### Jason Cunningham

jason@evanjowers.com
+1 (508) 965-1000

Jason Cunningham (JD, Harvard '06) heads our Boston office and also plays a leading role at and frequently visits our New York office. He also works out of our Los Angeles, London and Hong Kong offices on occasion. Jason focuses on partner, counsel and associate moves in US, Europe and Asia markets.

Jason practiced as an associate for seven years at Gibson Dunn & Crutcher LLP in both their litigation and real estate groups in the Los Angeles and New York offices. He founded and ran a successful recruiting company, Lodestar Recruiting, for a few years before merging the company with Evan Jowers' brand in 2017 and joining Hong Kong based Jowers / Vargas as a partner. Jason will also be a partner in our soon to be launched New York based Jowers / Langer.

*See* "Jason Cunningham – Jowers | Vargas," available at https://www.evanjowers.com/jason-cunningham/ (last accessed March 13, 2019).

77.     In particular, one of listed recruiters (Jason Cunningham) for Legis is based exclusively in the United States.

**Jason Cunningham** (JD, Harvard '06) is our New York and Boston based lateral move specialist focusing on partner, counsel, and associate moves across all major U.S. legal markets. Jason practiced as an attorney for seven years at Gibson Dunn & Crutcher LLP in both their litigation and real estate groups in the Los Angeles and New York offices. His new position as Head of North American Recruiting means he will be the domestic lynchpin for candidates looking to make a lateral move to the Asian markets (or vice-versa) as well as frequently traveling to Hong Kong and other major Asian markets. He is always available to meet candidates in-person in any major U.S. market and frequently travels to large European markets as well to meet candidates. Jason ran his own successful recruiting company, Lodestar Recruiting, before merging the company with Evan Jowers ' brand to form Jowers | Cunningham (launching in late 2017). Jason splits time living in Boston and New York City. He earned his undergraduate degree at Georgetown University and prior to that attended Phillips Andover Academy.

Exhibit D:6.

78.    The evanjowers.com website describes Mr. Cunningham as the "the New York and Boston" based lateral move specialist focusing on partner, counsel, and associate moves across all major U.S. legal markets." *Id.* "As Head of North American Recruiting, Jason is the ***domestic*** linchpin for candidates looking to make a lateral move to the Asian markets (or vice-versa). . ." *Id.*

79.    The description of the US market as the "domestic" market further supports Legis' efforts to focus of the website is to candidates in the United States and not directed to the Asian or other market. *Id.*

80.    The evanjowers.com website touts that Mr. Cunningham "is always available to meet candidates in-person in any major U.S. market. . ." *Id.* For each of the four listed recruiters on the attorney's page, the website lists U.S. educational and prior employment credentials for each, emphasizing the US focus of the website and its targeting of US based candidates. *Id.*

81.    On the contact page of the evanjowers.com website, it lists Mr. Cunningham's email address and phone number to be used to contact Legis with respect to North America. Exhibit D at ¶ 11, Exhibit D:6.

82.    The listed phone number for Mr. Cunningham on the evanjowers.com website has a "508" area-code, which is designated for suburb of Boston, Massachusetts. Displaying a US based phone number for contacting Mr. Cunningham provides further demonstration of Legis'

focus to and solicitation of US based candidates. Exhibit B at ¶ 12.

83.     In April 2017, Mr. Cunningham sent the following email describing Legis as being a "domestic [US] and international recruiting firm formed by Evan Jowers":

Hello,

I'm writing you to announce the merger of my company, Lodestar Recruiting, with Jowers/Vargas, a domestic and international recruiting firm formed by Evan Jowers.  My new position at Jowers/Vargas is Head of North American Recruiting.

Evan Jowers has developed an extremely successful recruiting practice with over 500 partner and associate attorney placements in North America and Asia during the past decade.  I'll be overseeing all of the domestic offices, focusing on U.S.-based associate, counsel, and partner placements.  I'll also be assisting with our London office opening in May.

For those of you who don't know me, I practiced at Gibson Dunn in Los Angeles and New York for 7 years after graduating from Harvard Law.  I began my career in Real Estate and eventually shifted my practice to Securities and White Collar Litigation.  In 2013, I started Lodestar Recruiting and ran that company until this past year.  I grew up in Massachusetts, went to Georgetown University for college, and now split my time between Boston, New York and Los Angeles.

This merger expands networks and strengthens the recruiting resources we provide to attorneys and employers.  Should you have legal recruiting needs, either in the U.S. or abroad, please do not hesitate to reach out.

Sincerely,
Jason Cunningham


**Jason Cunningham**

Head of North American Recruiting

508.965.1000 (mobile)

jason@evanjowers.com

Exhibit B-7. In the email, Mr. Cunningham states he will be overseeing the US (domestic) offices of Legis and will be focusing of U.S.-based associate, counsel, and partner placements. *Id*.

84.     The evanjowers.com website touts the close relationship Jowers and Vargas have with "US big law."

> Evan Jowers and Alejandro Vargas have been building close relationships in US big law in their Hong Kong home and other Asia markets. Evan has made well over 300 US associate, counsel and partner placements in Asia. Evan has placed and long-term advised many of these hiring partners in their own careers, as well as helped build their teams. Alejandro has worked with many of them on China and Pan Asia deals over the years.

*See* "Jowers | Vargas – Big Law Asia Recruiting," available at https://www.evanjowers.com/ (last accessed March 13, 2019).

85.     The evanjowers.com website identifies Joshua Carr as a recruiter for Legis, exclusively provides a United States contact phone number for Mr. Carr, and states he works within the United States in New York and Central Florida:



*See* "Joshua Carr – Jowers | Vargas," available at https://www.evanjowers.com/joshua-carr/ (last accessed March 13, 2019).

86.     The evanjowers.com website identifies Jade Sealey as a recruiter for Legis and exclusively provides a United States based mobile telephone number to contact Ms. Sealey:



## Jade Sealey

jade@evanjowers.com
+1 (323) 842-1367 (US mobile)

After finishing graduate school at UC Santa Cruz, LA-based Jade Sealey plunged headlong into the world of theatre and film, performing Shakespeare, Chekhov, and new works on New York and LA stages, and hustling as a working actor in numerous independent films, TV shows and commercials (a career she maintains between devoting time to her candidates). Before joining Jowers Vargas, Jade spent two years as a managing director at Manhattan-based recruiting shop, Whistler Partners, where she places several associates and partners at some of the top media/entertainment firms and VC/tech firms in the country. Prior to that, she worked for eight years as a paralegal at a prominent Pasadena civil rights firm, Traber & Voorhees. This reinforced Jade's desire to help people and make a difference in the world—a sensibility that she brings to her work at Jowers Vargas and to every aspect of her life. Jade is relentless in her pursuit of excellence; whether as a mother, a sprinter running the 400 on the junior Olympic track team, as Viola in Twelfth Night, or in finding the perfect fit for an attorney.

*See* "Jade Sealey – Jowers | Vargas," available at https://www.evanjowers.com/jade-sealey/ (last accessed March 13, 2019).

87.     The evanjowers.com website identifies Adam Langer as the head of the New York office of Legis, and exclusively provides a United States based mobile telephone number to contact Mr. Langer:



## Adam Langer

adam@evanjowers.com
+1 917-501-9376 (US mobile)

Adam Langer is head of our New York office and also a co-founder of Jowers / Langer (our US and Europe focused sister company). Adam is by any measure a rising star in the big law recruiting industry.

Adam has in just four years in the attorney recruiting industry built already a 25+ annual placement practice. He has had a particular focus on M&A, tech, emerging companies, venture capital, and entertainment / media practices. Adam is widely considered one of the handful of industry leaders in these important niche areas. While he continues to dominate in his speciality areas, Adam joined the Jowers recruiting team in September 2018 in order to expand his practice on a truly global platform, and to be a part of a different kind of attorney recruiting company, relationship focused, that he strongly believes in.

> Adam started his professional life as a broker. In the years after, he took a wild ride in the condo conversion game, built a real estate office and switched gears to develop a sizeable insurance practice, which he sold shortly before launching his attorney recruiting career. The most valuable thing he's taken from those experiences into his current career? A profound understanding that legal recruiting is not about sales; it's about the far more human skill of relationship management.

*See* "Adam Langer – Jowers | Vargas," available at https://www.evanjowers.com/adam-langer/ (last accessed March 13, 2019).

88.     The evanjowers.com website identifies Alexis Lamb as a recruiter for Legis, provides a United States based phone number to contact Ms. Lamb, and states Ms. Lamb works out of New York and South Florida:



## Alexis Lamb

alexis@evanjowers.com
US: +1 (917) 336-2692
HK: +852 5808-4137

Alexis Lamb (JD UTexas '04), Partner, splits her time between Hong Kong, New York, and South Florida. She is extremely knowledgeable about the big law legal markets in Asia as well as in the US. Prior to recruiting, she practiced as an M&A / Private Equity associate in the New York office of O'Melveny & Myers and a US Capital Markets associate in the Hong Kong office of Linklaters, focusing primarily on Pan Asia work. She successfully took her Big Law experience to transition into a role as a trusted career adviser, counseling associates looking to make a move from the US into Asia or within the Asia markets, as she herself was placed by Evan Jowers from OMM into Linklaters. Along with recruiting, she plays a vital role in developing and implementing the Company's various marketing-related initiatives, as well as managing the Company's operational systems. Prior to joining Jowers-Vargas, Alexis served as Director of Talent at Bliss Lawyers, a US-based alternative legal model, and as a senior recruiter for two New York-based recruiting agencies.

*See* "Alexis Lamb – Jowers | Vargas," available at https://www.evanjowers.com/alexis-lamb/ (last accessed March 13, 2019).

89.     In 2018, employees of Legis, including Jowers and Vargas, attended the annual National Association for Law Placement (NALP), to promote Legis US based recruiting business. Exhibit B at ¶¶ 14. 15, Exhibit B-9.

90.     Legis is registered to attend the 2019 NALP conference in the United States.

## PERSONAL JURISDICTION

### *Jowers:*

91.     The 2012 Forgivable Loan Agreements provides that "[v]enue for any disputes arising

from or related to [the Forgivable Loan Agreement] shall lie solely, and is convenient, in Travis

County, Texas."

> **12.    MISCELLANEOUS.**
>
>         (a)     This Agreement shall be governed exclusively by, and be construed and
> enforced in accordance with, the laws of the State of Texas.  Venue for any disputes
> arising from or related to this Agreement shall lie solely, and is convenient, in Travis
> County, Texas.  The parties agree that they will not contest the choice of venue and
> choice of law provisions of this Paragraph in any future proceedings.

Exhibit 4, p. 4.

92.     This is a mandatory venue/forum selection clause. By submitting to venue in Travis

County, Texas, Jowers waived challenges to personal jurisdiction in the courts of Travis County,

including the Federal District Court for the Western District of Texas, Austin Division, which is

the Court Jowers removed this action to after it was originally filed in state court in Travis

County, Texas.

93.     The Revolving Loan Agreement provides that all actions related to the Revolving Loan

Agreements shall be brought exclusively in Travis County, Texas:

> 7.13    **GOVERNING LAW AND VENUE.**  THIS AGREEMENT IS BEING EXECUTED
> AND DELIVERED, AND IS INTENDED TO BE PERFORMED, IN TRAVIS COUNTY, TEXAS AND
> THE LAWS (EXCLUDING CHOICE OF LAW PROVISIONS) OF SUCH STATE SHALL GOVERN
> THE VALIDITY, CONSTRUCTION ENFORCEMENT AND INTERPRETATION OF THIS
> AGREEMENT, EXCEPT TO THE EXTENT FEDERAL LAWS OTHERWISE GOVERN THE
> VALIDITY, CONSTRUCTION, ENFORCEMENT AND INTERPRETATION OF ALL OR ANY

> PART OF THIS AGREEMENT.  ALL LEGAL ACTIONS RELATED TO THIS AGREEMENT SHALL
> BE BROUGHT IN THE APPROPRIATE COURT OF LAW LOCATED IN TRAVIS COUNTY,
> TEXAS, TO THE EXCLUSION OF ALL OTHER VENUES.

Exhibit 6, pp. 42-43. This is a mandatory venue/forum selection clause. By agreeing to this forum/venue selection clause, Jowers has waived challenges to personal jurisdiction in this Court.

94.     The Jowers Agreement provides that Jowers "agrees to the exclusive personal jurisdiction and venue of any court in Travis County, Texas and waives any defense thereto.":



Exhibit 1 at § 13. By agreeing to this clause, Jowers has waived personal jurisdiction in this Court.

95.     Based on Jowers' submission of personal jurisdiction and venue in the Jowers Agreement, the 2012 Forgivable Loan, and the Revolving Loan Agreement, this Court has personal jurisdiction over Jowers.

### *Vinokurova:*

96.     The Vinokurova Agreement provides that Vinokurova "agrees to the exclusive personal jurisdiction and venue of any court in Travis County, Texas and waives any defense thereto.":

Exhibit 2 at § 13. By agreeing to this clause, Vinokurova has waived personal jurisdiction in this

Court.

97.     Based on Vinokurova's submission of personal jurisdiction and venue in the Vinokurova Agreement, this Court has personal jurisdiction over Vinokurova.

### *Legis:*

98.     Based on Legis' contact with the United States, the Court has personal jurisdiction over Legis pursuant to Rule 4(k)(2).

99.     Rule 4(k)(2) "provides for service of process and personal jurisdiction in any district court for cases arising under federal law where the defendant has contacts with the United States as a whole sufficient to satisfy due process concerns and the defendant is not subject to jurisdiction in any particular state." *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 650 (5th Cir. 2004).

100.    Rule 4(k)(2) states that, for a claim arising under federal law, "serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2).

101.    Thus, to assert jurisdiction under Rule 4(k)(2), the Court must find that (1) Plaintiffs' claim arises under federal law; (2) Defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (3) exercising jurisdiction does not offend the Constitution. Each of these three provisions is satisfied in this case.

102.    MWK asserts a federal cause of action arising under the Federal Defense of Trade Secrets Act. This satisfies the first prong of the analysis.

103.    Legis does not have "continuous and systematic general business contacts" with Texas or any other state, such that it would be generally subject to jurisdiction of the courts of any state.

104.     Based on its statements, representations, and actions, Legis is not subject to jurisdiction in any state's courts of general jurisdiction. This satisfies the second prong of the analysis.

105.     Exercising jurisdiction over Legis does not offend the Constitution because, first, MWK's alleged injuries arise from and are directly connected with Legis' deliberate contacts with the United States and, second, Legis had minimum contacts with the United States such that exercise of jurisdiction over Legis comports with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Wash.*, 66 S. Ct. 154, 158 (1945).

*Legis Has Extensive and Deliberate Contacts with The United States*

106.     Legis was formed by Vargas as a Hong Kong company on November 21, 2016. Exhibit D ¶ 2.

107.     Almost immediately after its creation, Legis recruited and began coordinating with Jowers to join Legis with the plan to exploit MWK's confidential, proprietary, and trade secret information ("MWK's Trade Secrets"). *Id.*, ¶ 3.

108.     Vargas was once a candidate of MWK and was aware that MWK was a Texas based company, operated out of Austin, Texas, and maintained MWK's Trade Secrets. *Id.*, ¶ 4.

109.     Jowers is a US citizen and maintains a residence in Florida. *Id.*, ¶ 5.

110.     Jowers and Vargas conspired together under the establishment of Legis to use and exploit MWK's Trade Secrets to interfere with MWK's existing and prospective relationships in an effort to obtain commissions for the placement of US based candidates of which MWK had developed confidential business relationships. *Id.*, ¶ 18.

111.     On December 16, 2016, Jowers terminated his employment with MWK. *Id.*, ¶ 6.

112.     He brought MWK's Trade Secrets to Legis both before and after resigning. *Id.*, ¶ 18.

113.     As part of the plan to exploit MWK's Trade Secrets, in November 2016, Legis

established the web domain "evanjowers.com" ("the Domain") as a portal for US based attorneys to interface with Legis. *Id.*, ¶ 8.

114.    Legis' contact address for the registration of the Domain in Metairie, Louisiana. *Id.*, ¶ 9.

115.    The DNS records for the Domain show the Domain is hosted in Mountainview, California by Google Cloud Services. *Id.*, ¶ 10.

116.    The Domain hosts an English-language website with several pages promoting services to US attorneys. *Id.*, ¶ 11.

117.    With this website, Legis advertises to US based associates, counsel, and partners for placement in Asia. ("[Jowers] has made well over 200 US associate, counsel and partner placements in Asia."). *Id.*

118.    The website includes contact information for Legis using an area code based in Massachusetts ("(505) 965-1000"). *Id.*, ¶ 12.

119.    Jowers, an employee of Legis, regularly returns to Florida to attend conferences, where he recruits candidates on behalf of Legis. *Id.*, ¶ 14. Jowers, Vargas, and other representatives of Legis have also attended an annual trade conference in Florida. *Id.*, ¶ 15. At the recent conference in April 2018, Legis operated a display booth and marketed to MWK's candidates and clients in the US. *Id.*, ¶ 15.

120.    Although Legis does not operate any regular and established place of business in the US, Legis does have a representative who is based in New York and Boston. *Id.*, ¶ 16. ("Jason Cunningham (JD, Harvard '06) is our New York and Boston based lateral move specialist focusing on partner, counsel, and associate moves across all major U.S. legal markets."). *Id.*

121.    According to the website "[Mr. Cunningham] is always available to meet candidates in-person in any major U.S. market and frequently travels to large European markets as well to

meet candidates." *Id*.

122.    Although Legis avails itself of the benefits of the US, according to the New York Secretary of State, the Massachusetts Secretary of State, the California Secretary of State, and the Texas Secretary of State, Legis is not registered to do business in any of these jurisdictions. *Id.*, ¶ 17.

123.    Based on Legis' extensive and deliberate continuous activities in the US, Legis has established sufficient minimum contacts with the US such that being "haled into court" here should be no surprise.

> *Exercise Of Jurisdiction Over Legis Comports With Traditional Notions Of Fair Play And Substantial Justice*

124.    Having established purposeful availment by Legis of the privilege of doing business with the United States, the burden of proof shifts to Legis to show that the assertion of jurisdiction is unfair and unreasonable. *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999).

125.    To the extent that Rule 4(k)(2) serves as the basis for exercise of jurisdiction over Legis, the analysis revolves around whether the exercise of jurisdiction by any US court is fair and reasonable. In all these actions, exercise of personal jurisdiction over Legis by this Court is fair and reasonable with or without use of Rule 4(k)(2).

126.    In deciding whether it is fair and reasonable to require a nonresident defendant to litigate in a forum, a court must consider several factors: (1) the burden on the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in securing relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Central Freight Lines Inc. v. APA Transport Corp*., 322 F.3d 376, 384 (5th Cir. 2003) (citing *Burger King*, 105 S. Ct. at 2185, and *Asahi Metal Industry Co., Ltd. v. Superior Court of California,*

*Solano County*, 107 S. Ct. 1026, 1033 (1987)).

127.    While litigation in the US may be inconvenient for Legis, MWK could be equally inconvenienced if required to litigate in Hong Kong. As demonstrated above, Legis representatives are at work in the US all the time, and Legis' sole director and shareholder, Vargas, has traveled to the US on at least one occasion this year on business.

128.    There is no indication as to why litigation in the US or Texas is especially burdensome to Legis. Texas has an interest in this case because it involves a Texas business whose trade secrets were misappropriated, and the effects of Legis' actions were felt in Texas.

129.    Exercising personal jurisdiction over Legis in this case does not offend traditional notions of fair play and substantial justice in light of Texas' and the interest in the case. *Wien Air Alaska*, 195 F.3d at 215.

130.    Because MWK has asserted a federal cause of action, Legis is not subject to jurisdiction in any state's courts of general jurisdiction, and exercising jurisdiction over Legis does not offend the Constitution, this Court has jurisdiction over Legis under Rule 4(k)(2).

### ***Vargas:***

131.    The Court has jurisdiction over Vargas because 1) Legis is the alter ego of Vargas; 2) Legis was formed and has been used for illegal purposes in violation of 18 U.S.C. §§1831 *et. seq.*; and 3) Legis has been used as a sham to perpetrate a fraud. Especially in view of the lower standard applied to cases in which a plaintiff seeks attribution of contacts to a defendant rather than to pierce the veil for liability on the claims, this case is not even close. *See Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d at 653.

132.    Legis is the alter ego of Vargas because, 1) Vargas owns all the stock in Legis and exerts complete control over Legis; 2) Legis's office in Hong Kong is Vargas's office, so there is no

"separate headquarters"; 3) Vargas is the only officer, director, and shareholder of Legis; 4) Vargas consistently has failed to follow corporate formalities; 5) Vargas, as the sole decisionmaker at Legis by his and Jowers's own admission, exercises complete control and authority over general policy at Legis; and, finally, 6) Vargas, as the sole decisionmaker for the company, exercises control over daily operations.

133.    As the sole shareholder, director and officer of Legis, Vargas formed Legis as a Hong Kong private company limited by shares on November 26, 2016. Exhibit B ¶ 2; Exhibit A ¶ 6. He has maintained sole ownership since. *Id*. As Vargas has admitted and Jowers has trumpeted as if it were helpful to his case, Vargas is the "sole officer and owner" of Legis. Exhibit B ¶ 2; Exhibit A ¶¶ 2, 6, 10. While sole ownership of the stock of a corporate entity is not, by itself, sufficient to permit a court to fuse the contacts of the corporation with that of its owner, this is a factor in favor of imputing jurisdictional contacts to Vargas.

134.    In addition to having admitted to being the sole owner of Legis, Vargas was the sole incorporator of the entity, and began failing to observe formalities immediately. He and Jowers operated their business as the "Jowers Vargas" recruiting firm from November 21, 2016 until June 26, 2018, without filing a trade name registration in Hong Kong connecting Legis to "Jowers Vargas," as was required under Hong Kong Law. Exhibit D ¶ 13. Failing to put a physical address on their website was helpful in avoiding service, but it was not legal. It was only after they made the required branch office filing that their Hong Kong office address could be identified. Exhibit D ¶ 13. While operating as "Jowers Vargas," Vargas, along with his co-conspirators, Jowers and Vinokurova, took various specific steps that harmed MWK in violation of its rights. During this time, the only publicly known trade name for their business was Jowers Vargas, which if anything was a partnership. For the purposes of negotiating contracts with

clients, however, Jowers and Vargas used the Legis entity, and Jowers signed for Legis. Exhibit D ¶ 25. Following notification by counsel for MWK that Legis had failed to comply with Hong Kong law by filing of its trade name, Legis filed a trade name certificate in Hong Kong on June 26, 2018, linking Legis to "Jowers Vargas" for the first time and providing, for the first time, a local address for the business in Hong Kong. Vargas and Legis have also failed to comply with the requirement to obtain a license to operate an employment agency in Hong Kong. Exhibit D ¶ 25.

135.    The contacts of Legis to the United States should also be imputed to Vargas because he is being sued for his OWN conduct, not just for the conduct of Legis. His actions in assisting with the theft of MWK property in violation of 18 U.S.C. §§ 1831 *et. seq.* were illegal. Because Legis was used for illegal activity, Vargas is not entitled to the protections of the fiduciary shield. As is clear from the evidence available simply from the website located at evanjowers.com, the business Jowers and Vargas run is nothing more than a charade designed to separate Jowers from direct liability to MWK. The domain name itself is telling, but the bio of Vargas says he "decided to join Evan's team."  Exhibit D ¶ 27. To the extent that he seeks to hide behind Legis as means of avoiding the jurisdiction of the Court, black letter law makes doing so impossible for Vargas. If Legis is amenable to jurisdiction of this Court, then so is Vargas.

## COUNT I
## FEDERAL TRADE SECRET MISAPPROPRIATION

136.    Plaintiff re-alleges each allegation contained in the above Paragraphs, as if fully set forth herein.

137.    MWK is the owner of trade secret information, including financial, business, and economic information, that is tangible or intangible and that was and is stored, managed, maintained, and secured on its computer systems and within business records in its offices in the

state of Texas. MWK also owns trade secrets consisting of confidential, proprietary information about MWK candidates' desires to change employer, their preferences regarding any possible change of employer, such as their compensation expectations, their personal situations, etc. MWK also owns trade secrets consisting of confidential, proprietary information about clients of MWK, such as the types of candidate they want to hire, their proclivities related to negotiations, hiring, "secret" financial information, vulnerabilities, etc. While some relevant information about MWK's clients and candidates is available to any member of the public who cares to look at publicly available information, vast amounts of the most valuable information becomes known to MWK only through the efforts of its employees and other agents, including its recruiters' conversations with clients and candidates about their wants and desires. The clients and candidates who provide MWK with the information that constitutes its trade secrets do so because of MWK's perceived place in the market for attorney hiring at the top employers worldwide, because of MWK's large investment in promoting its name to the top attorneys worldwide, and because of a perception that valuable, secret information provided to MWK is being delivered to professionals who will keep it confidential.

138.    MWK uses efforts that are reasonable under the circumstances to protect its trade secret information. MWK's databases, maintained from its headquarters in Austin, Texas, are password protected and utilize the latest security technology. Each employee and contractor of MWK is subject to confidentiality agreements, and MWK protects its trade secret information when necessary through legal action.

139.    The value of the MWK trade secret information is that it is not generally known to or readily ascertainable using proper means by other persons not with MWK who can derive similar economic benefit from this information. To ascertain the trade information that MWK possesses

would require a competitor to hold a similar market position to MWK, an effort that typically would involve years of effort and many thousands or millions of dollars in well-allocated marketing dollars, salaries, etc. Only by improperly utilizing MWK trade secret information obtained by improper means have Jowers, Vinokurova, Vargas, and Legis managed to, make multiple matches of candidates and clients they would not otherwise have made.

140.    As the employer of recruiters who operate around the world as agents of MWK to gather proprietary information that constitutes its trade secrets, MWK also is responsible for maintaining the MWK databases that reside in Texas and contain much of the relevant trade secret information owned by MWK.

141.    MWK's trade secrets are extremely valuable to MWK, and the company's business model, market position, and profits depend on the preservation of their secrecy. Anyone possessing MWK's trade secrets who uses them for the benefit of anyone other than MWK would harm MWK by doing so.

142.    Jowers, Vargas, Legis, and Vinokurova, with knowledge that they were doing so by improper means in violation of their contractual and legal duties, acquired MWK trade secret information for the express purpose of converting it to their own use.

143.    Jowers, Vargas, Legis, and Vinokurova disclosed or used trade secret information of MWK without any express or implied consent of MWK. Further, Jowers and Vinokurova knew or had reason to know that the trade secret information of MWK possessed by them had been acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret and limit the use of the trade secret information to the sole purpose of benefitting MWK.

144.    In particular, Jowers and Vinokurova accessed the business records of MWK stored at its offices in Austin, Texas and acquired MWK's trade secret information. Jowers, Vargas, Legis,

and Vinokurova improperly used this trade secret information to place candidates with law firms with the intent to deprive MWK of benefit and income from this trade secret information.

145.    MWK has been harmed and damaged by the misappropriation of its trade secret information by Jowers, Vargas, Legis, and Vinokurova.

**COUNT II**
**TEXAS TRADE SECRET MISAPPROPRIATION**

146.    Plaintiff re-alleges each allegation contained in the above Paragraphs, as if fully set forth herein.

147.    MWK is the owner of trade secret information, including financial, business, and economic information, that is tangible or intangible and that was and is stored, managed, maintained, and secured on its computer systems and within business records in its offices in the state of Texas. MWK also owns trade secrets consisting of confidential, proprietary information about MWK candidates' desires to change employer, their preferences regarding any possible change of employer, such as their compensation expectations, their personal situations, etc. MWK also owns trade secrets consisting of confidential, proprietary information about clients of MWK, such as the types of candidate they want to hire, their proclivities related to negotiations, hiring, "secret" financial information, vulnerabilities, etc. While some relevant information about MWK's clients and candidates is available to any member of the public who cares to look at publicly available information, vast amounts of the most valuable information becomes known to MWK only through the efforts of its employees and other agents, including its recruiters' conversations with clients and candidates about their wants and desires. The clients and candidates who provide MWK with the information that constitutes its trade secrets do so because of MWK's perceived place in the market for attorney hiring at the top employers worldwide, because of MWK's large investment in promoting its brands to the top attorneys

worldwide, and because of a perception that valuable, secret information provided to MWK is being delivered to professionals who will keep it confidential.

148.    MWK uses efforts that are reasonable under the circumstances to protect its trade secret information. MWK's databases, maintained from its headquarters in Austin, Texas, are password protected and utilize the latest security technology. Each employee and contractor of MWK is subject to confidentiality agreements, and MWK protects its trade secret information when necessary through legal action.

149.    The value of the MWK trade secret information is that it is not generally known to or readily ascertainable using proper means by other persons not with MWK who can derive similar economic benefit from this information. To ascertain the trade information that MWK possesses would require a competitor to hold a similar market position to MWK, an effort that typically would involve years of effort and many thousands or millions of dollars in well-allocated marketing dollars, salaries, etc. Only by improperly utilizing MWK trade secret information obtained by improper means have Jowers, Vinokurova, Vargas, and Legis managed to, make multiple matches of candidates and clients they would not otherwise have made.

150.    As the employer of recruiters who operate around the world as agents of MWK to gather proprietary information that constitutes its trade secrets, MWK also is responsible for maintaining the MWK databases that reside in Texas and contain much of the relevant trade secret information owned by MWK.

151.    MWK's trade secrets are extremely valuable to MWK, and the company's business model, market position, and profits depend on the preservation of their secrecy. Anyone possessing MWK's trade secrets who uses them for the benefit of anyone other than MWK would harm MWK by doing so.

152.    Jowers, Vinokurova, Vargas, and Legis, individually and in cooperation with each other, have misappropriated, used, and/or disclosed MWK trade secrets both before and after termination of the employment of Jowers and Vinokurova by MWK. They did so in violation of a confidential or contractual relationship with MWK and/or after acquiring MWK trade secrets after notice that such disclosure was improper.

153.    Jowers and Vinokurova themselves, and in cooperation with Vargas and Legis, have used and/or disclosed MWK trade secrets after acquiring them by improper means. They have wrongfully used MWK's trade secrets to place candidates with clients of MWK. Defendants' individual and cooperative current and/or intended unlawful misappropriation of trade secrets is wrongful.

154.    MWK has been and/or will be damaged by Defendants' misappropriation of its trade secrets, and has suffered actual, incidental, and consequential damages, as well as injury that is difficult or impossible to measure by any certain pecuniary standard.

**COUNT III**
**BREACH OF CONTRACT**
**EMPLOYMENT AGREEMENT - JOWERS**

155.    Plaintiff re-alleges each allegation contained in the above Paragraphs, as if fully set forth herein.

156.    While employed by MWK, Jowers agreed to work exclusively for MWK.

> 4.4 The Employee shall not engage in any other business activities in competition with the Company's personnel placement service business and shall not engage in any activity related to the personnel placement service business other than in benefit of the Company.

Exhibit 1 at p. 3.

157.    While still employed by MWK, Jowers, by his own admission, breached this agreement by submitting candidates through Vargas. This breach was material and caused MWK damage in

the amount of the commissions for the placement of the MWK Candidates.

158.     Additionally, during his time as an employee of MWK, Jowers was subject to a valid contract of employment containing restrictive covenants. The restrictive covenants were expressly enforceable by the assignees and/or successors of Jowers's original employer, Kinney Recruiting L.P. The restrictive covenants have been validly assigned to MWK.

159.     The Jowers employment agreement was a valid and enforceable contract from the date of its execution and remained valid and enforceable upon the date of termination of Jowers's employment with MWK. Jowers was provided with compensation in the form of salary and commissions. In addition, MWK provided a large marketing budget promoting its recruiters, training, internal referrals, etc. Jowers was the beneficiary of a dramatic amount of notoriety and success as a result of the resources allocated to him by MWK. In exchange, he was expected to contribute to MWK by working with clients and candidates using the MWK proprietary information to place those candidates and obtain fees, while contributing to the growth and development of MWK.

160.     In conjunction with his employment with MWK, Jowers obtained confidential, proprietary information about MWK candidates' desires to change employer, their preferences regarding any possible change of employer, such as their compensation expectations, their personal situations, etc. Likewise, Jowers obtained a large amount of confidential, proprietary information about clients of MWK, such as the types of attorney they want to hire, their proclivities related to negotiations, "secret" financial information, vulnerabilities, etc. While some relevant information about MWK's clients and candidates is available to any member of the public who cares to look, vast amounts of valuable information become known to MWK only through the efforts of its recruiters, their conversations with attorneys, interviews that are granted

to its candidates, offer letters that are received for candidates, deals that are negotiated, closed, etc. By its very nature, the value of MWK's proprietary and confidential information is highest when it is fresh and diminishes over time. Effective use of MWK proprietary information begets acquisition not only of placement fees but also of additional proprietary information. MWK and its recruiters are experts at obtaining and effectively using the MWK confidential proprietary information gleaned by each placement.

161.    Some proprietary information known to MWK about its clients and candidates is so sensitive that it must be protected forever in order to protect the legitimate business interests of MWK. Other proprietary information immediately loses most of its value upon the occurrence of a certain event. For example, proprietary and confidential information about what a certain client and candidate are seeking, and that they are a match for each other, loses all almost all its value once a candidate accepts a position with a client. Nevertheless, certain aspects of the confidential information learned in the negotiation of an employment arrangement between a client and a candidate might need to remain confidential and proprietary information forever so as to protect MWK's business interests.

162.    The restrictive covenants contained in MWK's employment agreement with Jowers were limited in scope and narrowly tailored in terms of the time, area, and line of business they covered in order to protect legitimate business interests of MWK as they function in the business environment occupied by MWK.

163.    Prior to and following his termination of employment, Jowers provided and is still providing services to Vargas and Legis in a position that has substantially the same functions and/or responsibilities as the position occupied while at MWK at the time of his resignation. Jowers has revealed MWK proprietary information without authorization, and he has placed and

continues to place and attempt to place candidates he is contractually prohibited from placing and clients for whom he is contractually prohibited from serving.

164.    Without MWK's consent, Jowers has violated the restrictive covenants contained in his employment agreement and outlined above, and Jowers has failed to perform his affirmative obligations. Jowers has materially breached the provisions of his employment agreement as outlined above.

165.    As a direct and proximate result of Jowers's breach of the obligations of confidentiality, non-solicitation contained in the Jowers Employment Agreement, MWK has suffered damages.

166.    MWK and each of its relevant subsidiaries, predecessors, or related parties who were direct employers of Jowers has performed in every material way required of them under the terms of the Jowers Employment Agreement.

167.    But for Jowers's promises and covenants contained in the Jowers Employment Agreement, MWK would not have disclosed MWK's trade secret information to Jowers.

**COUNT IV**
**BREACH OF CONTRACT**
**EMPLOYMENT AGREEMENT - VINOKUROVA**

168.    Plaintiff re-alleges each allegation contained in the above Paragraphs, as if fully set forth herein.

169.    During her time as an employee of MWK, Vinokurova was subject to a valid contract of employment containing restrictive covenants. The restrictive covenants were expressly enforceable by the assignees and/or successors of Vinokurova's original employer, Kinney Recruiting L.P. The restrictive covenants have been validly assigned to MWK.

170.    The Vinokurova employment agreement was a valid and enforceable contract from the date of its execution and remained valid and enforceable upon the date of termination of

Vinokurova's employment with MWK. Vinokurova was provided with compensation in the form of salary and commissions. In addition, MWK provided a large marketing budget promoting its recruiters, training, internal referrals, etc. Vinokurova was the beneficiary of a dramatic amount of notoriety and success as a result of the resources allocated to her by MWK. In exchange, he was expected to contribute to MWK by working with clients and candidates using the MWK proprietary information to place those candidates and obtain fees, while contributing to the growth and development of MWK.

171.    In conjunction with her employment with MWK, Vinokurova obtained confidential, proprietary information about MWK candidates' desires to change employer, their preferences regarding any possible change of employer, such as their compensation expectations, their personal situations, etc. Likewise, Vinokurova obtained a large amount of confidential, proprietary information about clients of MWK, such as the types of attorney they want to hire, their proclivities related to negotiations, "secret" financial information, vulnerabilities, etc. While some relevant information about MWK's clients and candidates is available to any member of the public who cares to look, vast amounts of valuable information become known to MWK only through the efforts of its recruiters, their conversations with attorneys, interviews that are granted to its candidates, offer letters that are received for candidates, deals that are negotiated, closed, etc. By its very nature, the value of MWK's proprietary and confidential information is highest when it is fresh and diminishes over time. Effective use of MWK proprietary information begets acquisition not only of placement fees but also of additional proprietary information. MWK and its recruiters are experts at obtaining and effectively using the MWK confidential proprietary information gleaned by each placement.

172.    Some proprietary information known to MWK about its clients and candidates is so

sensitive that it must be protected forever in order to protect the legitimate business interests of MWK. Other proprietary information immediately loses most of its value upon the occurrence of a certain event. For example, proprietary and confidential information about what a certain client and candidate are seeking, and that they are a match for each other, loses all almost all its value once a candidate accepts a position with a client. Nevertheless, certain aspects of the confidential information learned in the negotiation of an employment arrangement between a client and a candidate might need to remain confidential and proprietary information forever so as to protect MWK's business interests.

173.    The restrictive covenants contained in MWK's employment agreement with Vinokurova were limited in scope and narrowly tailored in terms of the time, area, and line of business they covered in order to protect legitimate business interests of MWK as they function in the business environment occupied by MWK.

174.    Prior to and following her termination of employment, Vinokurova provided and is still providing services to Vargas and Legis in a position that has substantially the same functions and/or responsibilities as the position occupied while at MWK at the time of her resignation. Vinokurova has revealed MWK proprietary information without authorization, and he has placed and continues to place and attempt to place candidates he is contractually prohibited from placing and clients for whom he is contractually prohibited from serving.

175.    Without MWK's consent, Vinokurova has violated the restrictive covenants contained in her employment agreement and outlined above, and Vinokurova has failed to perform her affirmative obligations. Vinokurova has materially breached the provisions of her employment agreement as outlined above.

176.    As a direct and proximate result of Vinokurova's breach of the obligations of

confidentiality, non-solicitation contained in the Vinokurova Employment Agreement, MWK has suffered damages.

177.    MWK and each of its relevant subsidiaries, predecessors, or related parties who were direct employers of Vinokurova has performed in every material way required of them under the terms of the Vinokurova Employment Agreement.

178.    But for Vinokurova's promises and covenants contained in the Vinokurova Employment Agreement, MWK would not have disclosed MWK's trade secret information to Vinokurova.

179.    In conjunction with her employment with MWK, Vinokurova executed written confidentiality and non-competition agreements which prohibit certain competitive activities and the disclosure or use of MWK's confidential and trade secret information. Vinokurova provided and is still providing services to Vinokurova, Vargas, and Legis in a position that has substantially the same functions and/or responsibilities as the position occupied while at MWK at the time of her resignation. Vinokurova has placed and is now attempting to place candidates she is contractually prohibited from placing, and to work with clients of MWK for whom she is contractually prohibited from providing services.

180.    Without MWK's consent, Vinokurova has violated the restrictive covenants contained in her employment agreement and outlined above, and Vinokurova has failed to perform her affirmative obligations. Vinokurova has breached the provisions of the Agreements as outlined above.

181.    As a direct and proximate result of Vinokurova's breach, MWK has suffered damages.

182.    MWK and each of its relevant subsidiaries, predecessors, or related parties who were direct employers of Vinokurova has performed in every material way required of it under the terms of the Vinokurova employment agreement.

183.    But for Vinokurova's promises and covenants, MWK would not have disclosed MWK's trade secret information to Vinokurova.

## COUNT V
## BREACH OF CONTRACT
## LINE OF CREDIT - JOWERS

184.    Plaintiff re-alleges each allegation contained in the above Paragraphs, as if fully set forth herein.

185.    On or about November 1, 2012, Jowers executed a loan agreement and related promissory note payable to Counsel Unlimited LLC. This debt was later assigned to MWK.

186.    The loan agreement and promissory note are valid and are each governed by Texas law.

187.    MWK tendered the loan amounts to Jowers as required by the loan agreement.

188.    MWK is the owner and holder of the promissory note.

189.    MWK has performed or tendered performance according to the note, and all conditions precedent have been satisfied.

190.    As of the date of his resignation, there was $48,535.98 in balance outstanding under the Jowers Line of Credit.

191.    Jowers breached the terms of the note by failing to repay it when it was due in full.

192.    After applying all offsets, payments and credits, the balance of $61,371.05 was due and owing on the note as of June 29, 2018.

193.    MWK has been damaged as a result of Jowers's breach in the amount of $61,371.05.

## COUNT VI
## BREACH OF CONTRACT
## LOAN - JOWERS

194.    Plaintiff re-alleges each allegation contained in the above Paragraphs, as if fully set forth herein.

195.    On or about January 29, 2012, Jowers executed a loan agreement and related promissory note payable (the "2012 Forgivable Loan") to Recruiting Partners G.P., Inc. d/b/a Kinney Recruiting, Inc. This debt was later assigned to MWK.

196.    The loan agreement and promissory note are valid and are each governed by Texas law.

197.    MWK tendered the loan amounts to Jowers as required by the loan agreement.

198.    MWK is the owner and holder of the promissory note.

199.    MWK has performed or tendered performance according to the note, and all conditions precedent have been satisfied.

200.    As of the date of his resignation, there was $24,552.17 owed to MWK by Jowers under the 2012 Forgivable Loan.

201.    Jowers breached the terms of the note by failing to repay it when it was due in full.

202.    After applying all offsets, payments and credits, the balance of $24,603.47 was due and owing on the note as of June 29, 2018.

203.    MWK has been damaged as a result of the Jowers's breach in the amount of $24,603.47;

## CIVIL CONSPIRACY

204.    Plaintiff re-alleges each allegation contained in the above Paragraphs, as if fully set forth herein.

205.    Defendants have together embarked upon a deliberate scheme to conspire against MWK to usurp MWK's rights and opportunities, as alleged in Counts I-VI above.

206.    They did so, by their own admission, in order to quickly establish a new recruiting company in Asia where MWK had taken years to establish its own position through hard work.

207.    The Defendants, on information and belief, established a meeting of the minds during the course of 206 that they would, together, take over MWK's market position and harm MWK.

208.    As alleged in Counts I-VI, the Defendants engaged in multiple, overt unlawful acts in order to accomplish their goals.

209.    The proximate result of the Defendants' actions was to harm MWK and cause it grave economic damage.

## EXEMPLARY DAMAGES AND ATTORNEYS FEES

210.    The conduct of Defendants as specified above, was willful and intentional, and was performed in conscious disregard of MWK's rights. MWK is entitled to recover exemplary damages against Defendants in an amount to be determined by the trier of fact.

211.    By Jowers's admission, his and Vinokurova's misappropriation of Plaintiff's trade secrets was willful, was done with the intent of harming MWK, and was done with complete indifference to Plaintiff's rights. Plaintiff's damages resulted from Jowers's willful and malicious misappropriation of Plaintiff's trade secrets, which entitles Plaintiff to exemplary damages and attorneys fees under Texas Civil Practice & Remedies Code section 134A.004(b); 134A.005 and the Federal Defense of Trade Secrets Act 18 U.S.C. 1836.

## PRAYER FOR RELIEF

MWK respectfully requests the Court enter judgment against Defendants:

1.    declaring that Jowers, Vinokurova, Vargas, and Legis misappropriated trade secrets under the Federal Defense of Trade Secrets Act;

2.    awarding MWK its damages suffered as a result of Defendants' violation of the Federal Defense of Trade Secrets Act;

3.    declaring that Jowers, Vinokurova, Vargas, and Legis misappropriated trade secrets under the Texas Uniform Trade Secrets Act.

4.      awarding reasonable damages suffered for suffered as a result of Defendants' violation of the Texas Uniform Trade Secrets Act;

5.      declaring that Jowers breached the employment agreement with MWK.

6.      awarding MWK its damages suffered as a result of Jowers breach of the employment with MWK;

7.      declaring that Vinokurova breached the employment agreement with MWK;

8.      awarding MWK its damages suffered as a result of Vinokurova's breach of the employment with MWK;

9.      declaring that Jowers breached the Revolving Loan Agreement;

10.     awarding MWK its damages for Jowers's breach of the Revolving Loan Agreement;

11.     declaring that Jowers breached the 2012 Forgivable Loan Agreement;

12.     awarding MWK its damages for Jowers's breach of the 2012 Forgivable Loan Agreement;

13.     declaring that Jowers, Vinokurova, Vargas, and Legis are jointly and severally liable as the result of having formed a civil conspiracy to misappropriate the trade secrets of MWK under the Federal Trade Secrets Act and the Texas Uniform Trade Secrets Act;

14.     awarding MWK exemplary damages as a result of Defendants' willful and intentional acts;

15.     awarding MWK its costs, attorneys' fees, expenses, and interest; and

16.     granting MWK such further relief as the Court finds appropriate.

## JURY DEMAND

MWK demands trial by jury under Fed. R. Civ. P. 38.

Dated:  March 22, 2019                                  Respectfully Submitted

/s/ Robert E. Kinney
Robert E. Kinney (*pro hac vice*)
Texas State Bar No. 00796888
Robert@KinneyRecruiting.com

**Robert E. Kinney**
824 West 10th Street, Suite 102
Austin, Texas 78701
Tel: (512) 636-1395

Raymond W. Mort, III
Texas State Bar No. 00791308
raymort@austinlaw.com

**THE MORT LAW FIRM, PLLC**
106 E. Sixth Street, Suite 900
Austin, Texas 78701
Tel/Fax: (512) 865-7950

**ATTORNEYS FOR PLAINTIFF**