## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| **MWK RECRUITING, INC,** | |
| Plaintiff | **Case No. 1:18-cv-00444-RP** |
| v. | |
| **EVAN P. JOWERS,** | |
| Defendants | |
| **EVAN P. JOWERS,** | |
| Counterclaimant | |
| v. | |
| **MWK RECRUITING, INC.,** **ROBERT E. KINNEY,** **KINNEY RECRUITING LLC, and** **KINNEY RECRUITING LIMITED,** | |
| Counterdefendants | |

<u>**MWK'S NOTICE TO THE COURT**</u>

# Exhibit E

# MWK's Proposed Findings of Fact and Conclusions of Law

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| **MWK RECRUITING, INC,** | |
| Plaintiff | |
| v. | **Case No. 1:18-cv-00444-RP** |
| **EVAN P. JOWERS,** | |
| Defendant | |
| **EVAN P. JOWERS,** | |
| Counterclaimant | |
| v. | |
| **MWK RECRUITING, INC.,**<br>**ROBERT E. KINNEY,**<br>**KINNEY RECRUITING LLC, and**<br>**KINNEY RECRUITING LIMITED,** | |
| Counterdefendants | |

## MWK'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Plaintiff MWK files this, its Proposed Findings of Fact and Conclusions of Law pursuant to Local Rule CV-16(f)(8) and the Court's Order of October 15, 2021 (Dkt. 301):

# I.   FINDINGS OF FACT

## A.   The Parties and Non-Party Entities

1.     Evan P. Jowers ("Jowers") is a United States citizen domiciled in the State of Florida.

2.     Counsel Holdings, Inc. ("**Counsel Holdings**") is a corporation organized under the law of the state of Texas, formed January 1, 2019, with its principal place of business in Austin, Texas.

3.     MWK Recruiting, Inc. ("**MWK**") was a Texas corporation which was merged into Counsel Holdings effective January 1, 2019, by filing, along with Counsel Holdings, a Certificate of Merger with the Texas Secretary of State.

4.     MWK Recruiting LLC ("**MWK LLC**") was a Texas limited liability company formed September 13, 2012, which was converted into MWK on March 12, 2018, by filing a Certification of Conversion of a Limited Liability Company Converting to a Corporation with the Texas Secretary of State.

5.     Recruiting Partners, L.P. (**RP-LP**"), was a Texas limited partnership, which has ceased operation and was terminated at the end of 2007.

6.     Kinney Recruiting LP ("**KR-LP**") was an assumed name for RP-LP which was registered with the Texas Secretary of State on April 9, 2004, and which remained valid until RP-LP was terminated.

7.     Recruiting Partners GP, Inc. ("**RP-GP**") is a Texas corporation.

8.     Kinney Recruiting, Inc. ("**KR-Inc**.") was an assumed name for RP-GP, which was registered with the Texas Secretary of State March 5, 2007, and which remained valid until March 5, 2017.

9.      Kinney Recruiting LLC ("**KR-LLC**") is a Texas limited liability company formed September 13, 2012, which was wholly owned by MWK-LLC at the time of formation but is now wholly owned by Counsel Holdings by operation of the conversion of MWK-LLC to MWK and the merger between MWK and Counsel Holdings.

10.    Counsel Unlimited LLC ("**CU-LLC**") is a Texas limited liability company formed September 13, 2012, which was wholly owned by MWK-LLC at the time of formation but is now wholly owned by Counsel Holdings by operation of the conversion of MWK-LLC to MWK and the merger between MWK and Counsel Holdings.

11.    Kinney Overseas LLC ("**KO-LLC**") is a Texas limited liability company formed September 13, 2012, which was wholly owned by MWK-LLC at the time of formation but is now wholly owned by Counsel Holdings by operation of the conversion of MWK-LLC to MWK and the merger between MWK and Counsel Holdings.

12.    MWK, MWK LLC, RP-LP, RP-GP, KR-Inc., KR-LLC, CU-LLC, and KO-LLC each has always had its principal place of business in Austin, Texas.

13.    Kinney Recruiting Limited ("**KRL-HK**") is a private limited company organized under the laws of Hong Kong, which is wholly owned by KO-LLC.

14.     Robert Kinney, a citizen and resident of Austin, Texas, has at all times relevant been an officer, director, or manager of and had the power to bind each of MWK, MWK LLC, RP-LP, RP-GP, KR-Inc., KR-LLC, CU-LLC, KO-LLC, and KRL-HK.

**B.     Formation and Assignment of Agreements**

      **i.     Jowers Agreement**

15.     Jowers and RP-LP entered into an Associate Recruiter Employment Agreement (the "Jowers Agreement") effective May 1, 2006.

16.     Jowers signed the Jowers Agreement on his own behalf.

17.     Robert Kinney signed the Jowers Agreement on behalf of RP-LP d/b/a Kinney Recruiting LP.

18.     The Jowers Agreement states that "controversies, claims, disputes or matters in questions arising out of or relating to this Agreement shall be construed, governed, and enforced in accordance with the laws of Florida."

19.     The Jowers Agreement states that "the Employee has freely chosen to enter this Agreement."

20.     Jowers expressly agreed in the contract of employment at issue in this case "to the exclusive personal jurisdiction and venue of any court in Travis County, Texas and waive[d] any defense" to personal jurisdiction and venue of any court in Travis County, Texas.

21.     The Jowers Agreement specified Jowers's duties as an Associate Recruiter, his compensation, and other terms of his employment in detail.

22.     The Jowers Agreement was a contract for at-will employment, terminable by either party at any time, subject to survival of certain confidentiality and non-competition provisions.

23.     The Jowers Agreement contains a provision expressly authorizing enforcement by the assignees and/or successors of RP-LP.

24.     The Jowers Agreement does not require notice of assignment of the agreement by Jowers's employer to be provided to Jowers.

25.      On December 31, 2007, RP-LP and RP-GP executed an Assignment of Employment and Other Agreements (the "**First Assignment**").

26.     Jowers received notice of the First Assignment because after January 1, 2008, he received his paychecks and W-2's from RP-GP.

27.     On October 25, 2012, RP-GP and KR-LLC executed an Assignment of Employment and Other Agreements (the "**Second Assignment**"). The Second Assignment assigned RP-GP's rights and obligations under the Jowers Agreement to KR-LLC.

28.     Jowers received notice of the Second Assignment at least because his paychecks and W-2's were from KR-LLC after October 15, 2012.

### ii.     Forgivable Loan

29.     On February 1, 2012, Jowers and RP-GP entered into a Forgivable Loan Agreement (the "**2012 Forgivable Loan Agreement**").

30.     Jowers signed the 2012 Forgivable Loan Agreement on his own behalf.

31.     Jowers signed 2012 Forgivable Loan Agreement of his own free will, after saying, "I agree with that strategy. Sure, it is great for me to get a nice deserved bonus, but not worth it for you if someone in my shoes takes a big bonus after a great year and then splits."

32.     Robert Kinney signed 2012 Forgivable Loan Agreement on behalf of RP-GP.

33.     The 2012 Forgivable Loan Agreement does not prohibit assignment of the Agreement, nor does it require notice of any assignment to be provided to Jowers.

34.     The 2012 Forgivable Loan Agreement has an associated promissory note in the original face amount of $50,000 (the "**2012 Forgivable Loan Promissory Note**"), which is signed by Jowers as the debtor.

35.     Jowers signed the 2012 Forgivable Loan Promissory Note on his own behalf.

36.     The Second Assignment also assigned RP-GP's rights and obligations under the 2012 Forgivable Loan and the 2012 Forgivable Loan Promissory Note to KR-LLC.

### iii.    Revolving Loan

37.     On November 1, 2012, Jowers and CU-LLC entered into a Loan Agreement (the "**2012 Revolving Loan Agreement**").

38.     Jowers signed the 2012 Revolving Loan Agreement on his own behalf and Robert Kinney signed on behalf of CU-LLC.

39.     The 2012 Revolving Loan Agreement has an associated promissory note in the original face amount of $150,000 (the "**2012 Revolving Loan Promissory Note**"), which is signed by Jowers as the debtor.

40.     The 2012 Revolving Loan Agreement has an associated security agreement (the "**2012 Revolving Loan Security Agreement**"), which is signed by Jowers as the debtor.

### iv.     Further Assignments

41.     On January 31, 2017, KR-LLC and MWK-LLC executed an Assignment of Notes, Security Agreement, and Claims (the "**Third Assignment**"). The Third Assignment assigned KR-LLC's rights and obligations under the Jowers Agreement, the 2012 Forgivable Loan Agreement, and the 2012 Forgivable Loan Promissory Note to MWK-LLC. At the same time, KR-LLC assigned all claims KR-LLC had against Jowers to MWK-LLC.

41.     On January 31, 2017, CU-LLC and MWK-LLC executed an Assignment of Notes, Security Agreements, and Claims (the "**Fourth Assignment**"). The Fourth Assignment assigned CU-LLC's rights and obligations under the 2012 Revolving Loan Agreement, the 2012 Revolving Loan Promissory Note, and the 2012 Revolving Loan Security Agreement to MWK-LLC. At the same time, CU-LLC also assigned all claims CU-LLC had against Jowers to MWK-LLC.

42.     After merging with MWK, Counsel Holdings is the current owner of all claims against Jowers under the Jowers Agreement, the 2012 Forgivable Loan Agreement, the 2012 Forgivable Loan Promissory Note, the 2012 Revolving Loan

Agreement, the 2012 Revolving Loan Promissory Note, and the 2012 Revolving Loan Security Agreement, as well as all other claims KR-LLC has against Jowers and "any other person acting in concert with them in misappropriating intellectual property and trade secrets of" KR-LLC and CU-LLC.

43.     After merging with MWK, Counsel Holdings holds the 2012 Forgivable Loan Promissory Note and the 2012 Revolving Loan Promissory Note.

**C.     Parties Rights and Obligations Under the Jowers Agreement; Amendment of Jowers's Compensation Terms**

44.     Following the Second Assignment, Jowers was employed by KR-LLC effective October 16, 2012.

45.     Jowers delivered a resignation letter to Robert Kinney on December 16, 2016, at approximately 1 pm Central Time in the United States. At the time Jowers submitted his resignation letter, he was in Korea, and the time there was 15 hours ahead of Central Time.

46.     The Jowers Agreement contains an "**Exhibit A**" detailing Jowers's compensation.

47.     The Jowers Agreement stated that Jowers's compensation would be pursuant to the terms contained in Exhibit A, and also stated: "Exhibit A may be modified from time to time as the Company, in it is sole discretion, deems appropriate, provided that no such modification may be applied retroactively."

48.     Each pay period, MWK's bookkeeper calculated the total gross commissions for Jowers based on his current "Net Cash In" as of the close of payroll, then deducted commissions and draw/salary previously paid to Jowers.

49.     During the entirety of his employment with MWK, Jowers was a W-2 employee and Florida resident, and taxes were withheld from his net pay and remitted to the IRS with each payroll by his employer.

50.     Each pay period, Jowers received a "commission spreadsheet" which detailed his commissions. The commission spreadsheets also showed the names of the candidates placed, the clients where they were placed with, Jowers's percentage credit for the relevant placements, the commissions paid, and other information about outstanding loans, draw balances, etc. Jowers also received a paystub showing tax deductions along with each commission spreadsheet.

51.     Between the date that Jowers began working under the Jowers Agreement and January 2011, several changes to Jowers's compensation structure occurred.

52.     Although not required, Jowers's employer obtained Jowers's agreement to each change in his compensation structure prior to the changes taking effect.

53.     Jowers's employer did not withhold or threaten to withhold compensation already earned by Jowers to obtain his signature on the agreement or his assent to changes in the compensation terms of the Jowers Agreement.

54.     In each case when there was a modification of Jowers's compensation, Jowers's employer performed consistent with the terms of the modification by paying Jowers as agreed.

55.     During and at all times after January 2011, Jowers's top commission rate was 50%. Although he was paid at the same commission rate for more than five years, Jowers never asserted that he was entitled to more than 50%.

56.     On December 15, 2016, the day before he resigned, Jowers's was paid a bonus of $32,677.00.

57.     Jowers and his employer agreed that the Company would pay usual and ordinary expenses incurred by Jowers in connection with the recruiting business.

58.     To submit expenses for reimbursement, Jowers was required to utilize an online expense reporting software called Expensify.

59.     Between June of 2015 and the termination of his employment, Jowers submitted expense reports totaling $92,625.55.

60.     Of the $92,625.55 Jowers submitted for reimbursement, his employer approved $91,029.55 for reimbursement.

61.     Of the $91,029.55 of Jowers's expenses approved for reimbursement during 2015-2016, Jowers was reimbursed $90,883.63 by means of his employer adding the reimbursements to six separate paychecks.

62.     Jowers's employer reimbursed $38,197.94 by means of an addition to Jowers's payroll on December 31, 2015.

63.     Jowers's employer reimbursed $2,147.00 by means of an addition to Jowers's payroll on February 12, 2016.

64.     Jowers's employer reimbursed $4,550.93 by means of an addition to Jowers's payroll on June 30, 2016.

65.     Jowers's employer reimbursed $8,387.23 by means of an addition to Jowers's payroll on July 15, 2016.

66.     Jowers's employer reimbursed $8,230.72 by means of an addition to Jowers's payroll on September 15, 2016.

67.      Jowers's employer reimbursed $29,370.06 by means of an addition to Jowers's payroll on October 31, 2016.

68.     Jowers's employer reimbursed all of the usual and ordinary expenses involved in the operation of Jowers's business.

69.     Jowers's employer fully performed its commitment to "expend considerable time and money…establishing relationships and goodwill with existing and prospective clients and candidates."

70.      Jowers acknowledged and agreed to all provisions of the Jowers Agreement.

### D.     Misappropriation of Trade Secrets

71.     Within the scope of his employment, Jowers accessed and developed valuable confidential information regarding clients and candidates of his employer.

72.     All information Jowers developed in the scope of his employment regarding attorney candidates who could be placed and client firms where such attorney candidates could be placed was proprietary information of Jowers's employer within the meaning of the Jowers Agreement.

73.     The information regarding candidates that Jowers received during his employment was sensitive financial and client-related information about attorneys'

law practices that would drive any new law firm's decision to hire those candidates. This information constituted trade secrets of KR-LLC when Jowers received it.

74.     While still employed by KR-LLC, on September 7, 2016, Jowers met with Mr. Steven Kang, a partner and head of the Korea practice at Freshfields Bruckhaus Deringer, an international law firm. Jowers obtained confidential information regarding Mr. Kang at that meeting, which information was information of KR-LLC.

75.     During his employment by KR-LLC, Jowers contacted Latham regarding Mr. Kang's candidacy using a private email address to send the message to, evanjowers@yahoo.com, and provided confidential information regarding Mr. Kang belonging to KR-LLC to Latham from that address.

76.     KR-LLC did not have access to the email messages sent or received by Jowers using evanjowers@yahoo.com.

77.     Jowers was not authorized to provide such confidential information to Latham from his private email address.

78.     Latham began discussions with Mr. Kang based on the confidential information that Jowers shared with Latham during the course of Jowers's employment by KR-LLC.

79.     On December 14, 2016, in preparation for an upcoming interview of Mr. Kang by Latham, Jowers sent to a representative of Latham further confidential information about Mr. Kang in order to promote Mr. Kang's candidacy.

80.    Following his resignation on December 16, 2016, Jowers then followed up with representatives of Latham on December 30, 2016, forwarding the same information he had previously sent from his private email address on December 14, 2016.

81.    The information about Mr. Kang that Jowers shared with Latham & Watkins was obtained by Jowers while Jowers was still employed by KR-LLC.

82.    The email messages Jowers sent to representatives of Latham during the course of Jowers's employment with KR-LLC contained specific, non-general, valuable, and actionable information that was not generally known to the public.

83.    The email messages Jowers sent to representatives of Latham during the course of Jowers's employment with KR-LLC contained specific, non-general, valuable, and actionable information which was not readily ascertainable by proper means.

84.    The email messages Jowers sent to representatives of Latham during the course of Jowers's employment with KR-LLC resulted in interviews for Mr. Kang and his eventual placement at Latham & Watkins.

85.    The email messages Jowers sent to representatives of Latham resulted in a fee of 1,342,492 Hong Kong dollars being paid to Legis Ventures on August 7, 2017.

86.    Legis Ventures is a recruiting firm founded by Evan Jowers and Alejandro Vargas.

87.     Had Jowers submitted Mr. Kang to Latham & Watkins from his email address at KR-LLC, instead of from his private email address, Latham & Watkins would have been liable to pay the fee resulting from Mr. Kang's placement to KR-LLC rather than Legis Ventures.

88.     While still employed by KR-LLC, Jowers also obtained confidential information regarding candidate James Chang.

89.     Shortly after his resignation, Jowers shared this same information about Mr. Chang with DLA Piper and asked DLA Piper's managing partner in Hong Kong to consider interviewing Mr. Chang on the basis of that information.

90.     The email messages Jowers sent to representatives of DLA Piper contained specific, non-general, valuable, and actionable information that was not generally known to the public, which had been received by Jowers during his employment with KR-LLC and which was not readily ascertainable by proper means.

91.     The email Jowers sent to representatives of DLA Piper resulted in an interview for Mr. Chang and his eventual placement at DLA Piper.

92.     The email Jowers sent to representatives of DLA Piper resulted in a fee of 798,034 Hong Kong dollars being paid to Legis Ventures on December 12, 2017.

93.     Prior to terminating his employment with KR-LLC, Jowers shared information with a competitor, Alejandro Vargas, regarding certain candidates of KR-LLC with whom Jowers had been working prior to termination of his employment.

94.     While still employed by KR-LLC, Jowers obtained confidential information regarding Rose Zhu and sent it to representatives of Kirkland & Ellis.

95.     Shortly after his resignation, Jowers sent much of the same confidential information regarding Ms. Zhu to representatives of Pillsbury Winthrop Shaw Pittman (HK) LLP, Winston & Strawn, and Baker & McKenzie.

96.     The email Jowers sent to these entities regarding Ms. Zhu contained specific, non-general, valuable, and actionable information that was not generally known to the public, which had been received by Jowers during his employment with KR-LLC and which was not readily ascertainable by proper means, and it resulted in an interview for Ms. Zhu and her eventual placement at Baker & McKenzie.

97.     The placement of Rose Zhu at Baker & McKenzie LLP occurred on or about May 17, 2017, and a fee of 453,600 Hong Kong dollars was paid by Baker & McKenzie for such placement to Legis Ventures.

98.     Prior to his resignation from KR-LLC, Jowers received from Claudia Lai specific, non-general, valuable, and actionable information that was not generally known to the public, which had been received by Jowers during his employment with KR-LLC and which was not readily ascertainable by proper means.

99.     Instead of submitting Ms. Lai as a candidate from KR-LLC, Jowers passed her resume and confidential information to Alejandro Vargas, a competitor of KR-LLC, so that he could submit her as a candidate from a competing platform, Legis Ventures.

100.     Prior to Jowers's resignation, Mr. Vargas began sending the same confidential information regarding Ms. Lai he had obtained from Jowers to various

clients of KR-LLC, including Latham & Watkins, for the purpose of obtaining interviews for her.

101.    Also prior to Jowers's resignation, Longhao Wang provided specific, non-general, valuable, and actionable information that was not generally known to the public to Jowers in connection with his desire to change employer. The information was not readily ascertainable by proper means.

102.    Also prior to Jowers's resignation, Mr. Vargas emailed Latham & Watkins regarding Mr. Wang, and provided Latham the same specific, non-general, valuable, and actionable information regarding Mr. Wang that was not generally known to the public, which he had received from Jowers during Jowers's employment with KR-LLC. This information was not readily ascertainable by proper means.

103.    With Jowers's assistance and information obtained while Jowers was employed by KR-LLC, Mr. Vargas continued to submit Mr. Wang as a candidate to other firms, including Gibson Dunn, Simpson Thacher, and Latham & Watkins, which is where Mr. Wang was eventually hired.

104.    Jowers and Mr. Vargas secured Mr. Wang's placement at Latham & Watkins on or about September 24, 2018, and a fee of 390,000 Hong Kong dollars was paid by that firm to Legis Ventures.

105.    Prior to Jowers's resignation, Pamela Usukumah provided Jowers with confidential information which constituted specific, non-general, valuable, and actionable information not generally known to the public, which was not readily ascertainable by proper means.

106.    Jowers passed Ms. Usukumah's confidential information and materials to Mr. Vargas and, using that information, Mr. Vargas submitted Ms. Usukumah as a candidate to Latham & Watkins, Ropes & Gray, and other firms, including Morrison & Foerster.

107.    The placement of Ms. Usukumah at Morrison & Foerster occurred on or about August 1, 2017, and a fee of 458,893 Hong Kong dollars was paid by that firm to Legis Ventures.

108.    While still employed by KR-LLC, Jowers received specific, non-general, valuable, and actionable information that was not generally known to the public regarding Meng Ding. This information was not readily ascertainable by proper means.

109.    Following his resignation, Jowers continued to market Mr. Meng to client firms of KR-LLC using the same confidential information he had obtained prior to his resignation.

110.    Jowers submitted Mr. Meng to Kirkland & Ellis using the confidential information regarding Mr. Meng he had obtained prior to his resignation from KR-LLC. The submission by Jowers sent to Kirkland & Ellis resulted in an interview for Mr. Meng and his eventual placement at Kirkland & Ellis.

111.    Jowers placed Meng Ding at Kirkland & Ellis LLP on or about November 16, 2017, and a fee of 878,765 Hong Kong dollars was paid by that firm to Legis Ventures.

### E.    Breach of Jowers Agreement

112.    For one year following termination of his employment, Jowers was prohibited under the Jowers Agreement from soliciting or providing services to any candidate or client with whom he had contact, knowledge, or access during the twelve months immediately preceding the effective date of termination, and from assisting any entity other than the Company in doing so.

113.    Pursuant to the Jowers Agreement, for any period of time during which Jowers engages in activities constituting a violation of the restrictive covenants, the one-year period following termination automatically extended to include such additional period.

114.    Jowers had an adequate opportunity to review and negotiate the Jowers Agreement. Jowers agreed that he would be able to earn a livelihood without violating the restrictions contained in the Jowers Agreement.

115.    Jowers was not coerced into signing the Jowers Agreement. He understood that the agreement restricted his right to disclose or use proprietary information of KR-LLC during or subsequent to his employment with the company, and he understood that the Jowers Agreement restricted him from soliciting clients and candidates for one year after his service was terminated, or longer in the event of breach.

116.    Jowers had contact with, knowledge of, and/or access to at least each of the following firms between December 17, 2015, and December 16, 2016: Allen & Overy, Baker & McKenzie LLP, Cleary Gottlieb Steen & Hamilton LLP, Cooley LLP,

Covington & Burling, DLA Piper LLP, Gibson, Dunn & Crutcher LLP, Gunderson Dettmer, Kirkland & Ellis LLP, Latham & Watkins LLP, Linklaters, Morrison & Foerster, LLP, Skadden, Arps, Slate, Meagher & Flom, LLP, and Weil, Gotshal & Manges, LLP.

117.    Jowers had contact with, knowledge of, and/or access to at least each of the following persons between December 17, 2015, and December 16, 2016: Kevin Cooper, Ferish Patel, Ingram Weber, Rose Zhu, Nicole (Wenhan) Ma, James Chang, Jason (Jiaxing) Xu, Ryan Grimm, Meng Ding, Steve (Wonsuk) Kang, Jennifer (Xiafei) Liu, Benjamin Su, Longhao Wang, Amit Singh, Pamela Usukumah, Chuan Liu, Mengqi Zhang, Steve Sha,  and Yiting Li.

118.    On April 19, 2017, Jowers solicited or aided others in soliciting Weil Gotshal.

119.    On September 14, 2017, Jowers solicited or aided others in soliciting Weil Gotshal.

120.    On February 12, 2018, Jowers solicited or aided others in soliciting Latham & Watkins LLP.

121.    On March 14, 2018, Jowers solicited or aided others in soliciting Latham & Watkins LLP.

122.    On March 15, 2018, Jowers solicited or aided others in soliciting Weil Gotshal.

123.    On July 30, 2018, Jowers solicited or aided others in soliciting Latham & Watkins LLP.

124.   On March 20, 2019, Jowers solicited or aided others in soliciting Weil Gotshal.

125.   On October 7, 2019, Jowers solicited or aided others in soliciting Latham & Watkins LLP.

126.   On July 17, 2020, Jowers solicited or aided others in soliciting Weil Gotshal.

127.   On November 16, 2020, Jowers solicited or aided others in soliciting Weil Gotshal.

128.   Jowers began competing with his employer prior to his resignation by sending confidential candidate information directly to Latham & Watkins LLP, a law firm client of KR-LLC, using his private email address, and by sending such confidential information to Alejandro Vargas, who then sent the information to those clients.

129.   As a result of his failure to honor his obligations under the Jowers Agreement, Jowers caused KR-LLC a loss of goodwill of clients and candidates of the firm.

130.   Jowers and his employer negotiated a liquidated damages clause which provided that "the Employee shall pay to the Company, upon demand, as liquidated damages…any fee paid for services rendered in violation of [the restrictive covenants], whether paid to the Employee or to any other person, firm, or entity; plus all costs and expenses, including reasonable attorney's fees, incurred by the Company in the enforcement of its rights relating to such violation."

131.   After terminating his employment, Jowers placed Mr. Kang at Latham.

132.   The placement fee paid by Latham & Watkins LLP for the placement of Mr. Kang to Evan Jowers was 1,342,492 Hong Kong Dollars, which was paid to Legis Ventures Hong Kong Company Limited ("Legis Ventures").

133.   Legis Ventures is a company that Jowers founded, organized under the laws of Hong Kong.

134.   Although the shares in Legis Ventures were nominally owned by Alejandro Vargas, Jowers controlled Legis Ventures and had a 60% interest in the profits of Legis Ventures.

135.   Jowers used Legis Ventures as a conduit for the placement activity that he began prior to leaving the employment of KR-LLC. Jowers assisted Legis Ventures in all its placement activity.

136.   Jowers placed, or assisted another entity in the placement of, Ryan Grimm at Gunderson Dettmer on or about March 6, 2017, and a fee of 58,750 United States dollars was paid by that firm for such placement to Legis Ventures.

137.   Jowers placed, or assisted another entity in the placement of, Congsi Wu at Baker & McKenzie LLP on or about May 17, 2017, and a fee of 84,209 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

138.   Jowers placed, or assisted another entity in the placement of, Rose Zhu at Baker & McKenzie LLP on or about May 17, 2017, and a fee of 453,600 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

139.    Jowers placed, or assisted another entity in the placement of, Steve (Wonsuk) Kang at Latham & Watkins LLP on or about June 28, 2017, and a fee of 1,342,492 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

140.    Jowers placed, or assisted another entity in the placement of, Jolyn Ang at Gunderson Dettmer on or about July 5, 2017, and a fee of 351,462 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

141.    Jowers placed, or assisted another entity in the placement of, Nicole (Wenhan) Ma at Covington & Burling LLP on or about July 10, 2017, and a fee of 45,000 United States dollars was paid by that firm for such placement to Legis Ventures.

142.    Jowers placed, or assisted another entity in the placement of, Pamela Usukumah at Morrison & Foerster, LLP on or about August 1, 2017, and a fee of 458,893 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

143.    Jowers placed, or assisted another entity in the placement of, James Chang at DLA Piper UK LLP on or about August 1, 2017, and a fee of 798,034 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

144.    Jowers placed, or assisted another entity in the placement of, Jennifer (Xiafei) Liu at Latham & Watkins LLP on or about August 14, 2017, and a fee of 458,250 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

145.    Jowers placed, or assisted another entity in the placement of, Zhonghua (Stephen) Shi at Latham & Watkins LLP on or about August 31, 2017, and a fee of 78,249.50 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

146.    Jowers placed, or assisted another entity in the placement of, Mengqi Zhang at Weil, Gotshal & Manges LLP on or about September 11, 2017, and a fee of 351,528 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

147.    Jowers placed, or assisted another entity in the placement of, Judy Huang at Kirkland & Ellis LLP on or about October 3, 2017, and a fee of 507,747 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

148.    Jowers placed, or assisted another entity in the placement of, Jason (Woo-Jong) Lim at Cleary Gottlieb Steen & Hamilton LLP on or about October 9, 2017, and a fee of 351,264 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

149.    Jowers placed, or assisted another entity in the placement of, Olivia Wang at Kirkland & Ellis LLP on or about October 9, 2017, and a fee of 158,232 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

150.    Jowers placed, or assisted another entity in the placement of, Meng Ding at Kirkland & Ellis LLP on or about November 16, 2017, and a fee of 878,765 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

151.     Jowers placed, or assisted another entity in the placement of, Chuan Liu at Morrison & Foerster, LLP on or about January 15, 2018, and a fee of 459,463 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

152.     Jowers placed, or assisted another entity in the placement of, Benjamin Su at Latham & Watkins LLP on or about February 12, 2018, and a fee of 1,960,360 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

153.     Jowers placed, or assisted another entity in the placement of, Aster (Yi) Lin at Latham & Watkins LLP on or about April 9, 2018, and a fee of 353,239 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

154.     Jowers placed, or assisted another entity in the placement of, Vanessa Ho at Gunderson Dettmer on or about April 18, 2018, and a fee of 45,000 United States dollars was paid by that firm for such placement to Legis Ventures.

155.     Jowers placed, or assisted another entity in the placement of, Samson (Shansang) Peng at Latham & Watkins LLP on or about April 19, 2018, and a fee of 353,194 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

156.     Jowers placed, or assisted another entity in the placement of, Ingram Weber at Allen & Overy LLP on or about May 16, 2018, and a fee of 56,000 United States dollars was paid by that firm for such placement to Legis Ventures.

157.     Jowers placed, or assisted another entity in the placement of, Xunming Lim at Allen & Overy LLP on or about June 8, 2018, and a fee of 80,729 United States dollars was paid by that firm for such placement to Legis Ventures.

158.   Jowers placed, or assisted another entity in the placement of, Kevin Chow at Latham & Watkins LLP on or about July 16, 2018, and a fee of 460,677.25 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

159.   Jowers placed, or assisted another entity in the placement of, Jason (Jiaxing) Xu at Gibson, Dunn & Crutcher LLP on or about July 23, 2018, and a fee of 427,900 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

160.   Jowers placed, or assisted another entity in the placement of, Longhao Wang at Latham & Watkins LLP on or about September 24, 2018, and a fee of 390,000 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

161.   Jowers placed, or assisted another entity in the placement of, Cecile Yang at Morrison & Foerster, LLP on or about November 5, 2018, and a fee of 428,450 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

162.   Jowers placed, or assisted another entity in the placement of, Amit Singh at Linklaters on or about November 10, 2018, and a fee of 3,045,767 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

163.   Jowers placed, or assisted another entity in the placement of, Michele Discepola at Linklaters on or about November 10, 2018, and a fee of 646,230 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

164.   Jowers placed, or assisted another entity in the placement of, Christie Mok at Linklaters on or about January 28, 2019, and a fee of 379,698 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

165.    Jowers placed, or assisted another entity in the placement of, Gillian Teo at Morrison & Foerster, LLP on or about February 7, 2019, and a fee of 431,524.35 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

166.    Jowers placed, or assisted another entity in the placement of, Valerie Wood at Gunderson Dettmer on or about February 25, 2019, and a fee of 30,000 United States dollars was paid by that firm for such placement to Jowers Langer LLC.

167.    Jowers placed, or assisted another entity in the placement of, Brian Snyder at Morrison & Foerster, LLP on or about March 4, 2019, and a fee of 814,437 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

168.    Jowers placed, or assisted another entity in the placement of, Calvin Soon at Linklaters on or about March 25, 2019, and a fee of 250,010 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

169.    Jowers placed, or assisted another entity in the placement of, Eric Xu at Morrison & Foerster, LLP on or about May 6, 2019, and a fee of 180,000 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

170.    Jowers placed, or assisted another entity in the placement of, Brittany Nicely (Chiang) at Gunderson Dettmer on or about May 7, 2019, and a fee of 50,000 United States dollars was paid by that firm for such placement to Jowers Langer LLC.

171.    Jowers placed, or assisted another entity in the placement of, Erika Tang at Gibson, Dunn & Crutcher LLP on or about June 24, 2019, and a fee of

597,037.50 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

172.    Jowers placed, or assisted another entity in the placement of, Ferish Patel at Cooley LLP on or about July 29, 2019, and a fee of 3,170,352 Hong Kong dollars was paid by that firm for such placement to Legis Ventures Ventures.

173.    Jowers placed, or assisted another entity in the placement of, Constantinos Pappas at Gibson, Dunn & Crutcher LLP on or about August 5, 2019, and a fee of 55,000 United States dollars was paid by that firm for such placement to Jowers Langer LLC.

174.    Jowers placed, or assisted another entity in the placement of, Kyle Menges at Gunderson Dettmer on or about August 5, 2019, and a fee of 50,000 United States dollars was paid by that firm for such placement to Jowers Langer LLC.

175.    Jowers placed, or assisted another entity in the placement of, Rui Xie at Gibson, Dunn & Crutcher LLP on or about September 23, 2019, and a fee of 371,925 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

176.    Jowers placed, or assisted another entity in the placement of, Samson (Shansang) Peng at Skadden, Arps, Slate, Meagher & Flom, LLP on or about September 24, 2019, and a fee of 46,980 United States dollars was paid by that firm for such placement to Legis Ventures.

177.    Jowers placed, or assisted another entity in the placement of, James Jackson at Cooley LLP on or about September 30, 2019, and a fee of 637,199.06 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

178.    Jowers placed, or assisted another entity in the placement of, Tae Hun Kim at Linklaters on or about October 14, 2019, and a fee of 603,510.60 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

179.    Jowers placed, or assisted another entity in the placement of, Stan (Wang) Yao at Skadden, Arps, Slate, Meagher & Flom, LLP on or about November 4, 2019, and a fee of 47,095 United States dollars was paid by that firm for such placement to Legis Ventures.

180.    Jowers placed, or assisted another entity in the placement of, Yiting Li at Skadden, Arps, Slate, Meagher & Flom, LLP on or about November 12, 2019, and a fee of 47,500 United States dollars was paid by that firm for such placement to Legis Ventures.

181.    Jowers placed, or assisted another entity in the placement of, John Maselli at DLA Piper LLP (US) on or about November 18, 2019, and a fee of 125,000 United States dollars was paid by that firm for such placement to Jowers Langer LLC.

182.    Jowers placed, or assisted another entity in the placement of, Miae Woo at Cooley LLP on or about January 13, 2020, and a fee of 217,637 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

183.    Jowers placed, or assisted another entity in the placement of, Khadijah Owens at Gunderson Dettmer on or about March 2, 2020, and a fee of 50,000 United States dollars was paid by that firm for such placement to Jowers Langer LLC.

184.    Jowers placed, or assisted another entity in the placement of, Qi Zhang at Weil, Gotshal & Manges, LLP on or about March 9, 2020, and a fee of 368,870 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

185.    Jowers placed, or assisted another entity in the placement of, Kevin Cooper at Cooley LLP on or about March 20, 2020, and a fee of 232,500 United States dollars was paid by that firm for such placement to Legis Ventures.

186.    Jowers placed, or assisted another entity in the placement of, Jason Li at Gunderson Dettmer on or about April 13, 2020, and a fee of 50,000 United States dollars was paid by that firm for such placement to Jowers Langer LLC.

187.    Jowers placed, or assisted another entity in the placement of, Lianchen (Claire) Liu at Linklaters on or about April 14, 2020, and a fee of 62,224.80 Singapore Dollars was paid by that firm for such placement to Legis Ventures.

**F.    2012 Revolving Loan Agreement and Promissory Note**

188.    Jowers signed the 2012 Revolving Loan Promissory Note, which was issued pursuant to the 2012 Revolving Loan Agreement.

189.    By his signature on the 2012 Revolving Loan Promissory Note, Jowers waived grace, diligence, presentment, demand, notice of demand, dishonor, notice of dishonor, protest, notice of protest, and any and all exemption rights against the indebtedness evidenced by the note.

190.    Counsel Holdings is the successor in interest to the assignee of the 2012 Revolving Loan Agreement, 2012 Revolving Loan Promissory Note, and the 2012 Revolving Loan Security Agreement.

191.    Jowers received advances from time to time at his request under the 2012 Revolving Loan Agreement, beginning shortly after the 2012 Revolving Loan Agreement was executed and continuing until shortly before Jowers terminated his employment with KR-LLC.

192.    Advances to Jowers under the 2012 Revolving Loan Agreement were paid to Jowers by KR-LLC and/or KRL-HK, acting on behalf of CU-LLC.

193.    Following payment of an advance under the 2012 Revolving Loan Agreement to Jowers by KR-LLC or KRL-HK on behalf of CU-LLC, the advances to Jowers became liabilities from CU-LLC to KR-LLC or KRL-HK, as applicable.

194.    KR-LLC was entitled, by agreement with Jowers, to process repayments by Jowers to CU-LLC under the 2012 Revolving Loan Agreement by payroll deduction from Jowers's KR-LLC payroll.

195.    Every two weeks, Jowers received from KR-LLC a spreadsheet which showed a running tally of his balances under the 2012 Revolving Loan Agreement.

196.    On August 17, 2016, Jowers confirmed a $65,000 balance under the 2012 Revolving Loan Agreement and also confirmed that he owed $30,000 on a separate, interest-free loan.

197.    On September 25, 2016, Jowers confirmed that his loan balance was $102,000 as of that date.

198.    Jowers's paystub for September 30, 2016, indicates that $19,097.23 was deducted from his payroll in order to repay part of the 2012 Revolving Loan.

199.    Jowers's commission and loan balance spreadsheet for September 30, 2016, showed that Jowers owed CU-LLC $93,009.74 under the 2012 Revolving Loan Agreement as of September 30, 2016, after applying the $19,097.23 repayment to the outstanding balance.

200.    After receiving the updated balances as of September 30, 2016, Jowers did not question the accuracy of the account statement.

201.    Jowers's commission spreadsheet of September 30, 2016, also indicated that he still owed KR-LLC $30,000 under a separate, "zero-interest" loan agreement.

202.    As of October 14, 2016, Jowers has requested and received another ad advance under the 2012 Revolving Loan of $10,000, and the total balance for the 2012 Revolving Loan as of that date was $103,009.74.

203.    On October 18, 2016, CU-LLC advanced Jowers an additional $10,309.93 under the 2012 Revolving Loan in the form of a payment made to the Four Seasons Hotel in Hong Kong.

204.    On October 26, 2016, Jowers requested and received a further $3,000 draw from CU-LLC under the 2012 Revolving Loan.

205.    Further transactions between CU-LLC and Jowers under the 2012 Revolving Loan Agreement gave rise to indebtedness of Jowers to CU-LLC of $47,433.94 as of the date of Jowers's resignation from KR-LLC on December 16, 2016.

206.    As of December 15, 2016, Jowers still had indebtedness to KR-LLC under the "zero interest" loan of $30,000.

207.    Under the parties' agreement, KR-LLC was permitted, in its discretion, to offset Jowers's indebtedness to KR-LLC by payroll deductions from Jowers's paychecks.

208.    KR-LLC withheld $30,147.85 from Jowers's paycheck dated December 15, 2016, to repay loans to Jowers.

209.    KR-LLC applied $30,000 of the withheld funds from the December 15, 2015, paycheck to repay the $30,000 "zero-interest" loan in full.

210.    MWK's bookkeeper, Renee Sommers, told Jowers by email on December 16, 2016, that he had "$48,000ish" in loan balances remaining, and this statement was accurate.

211.    Following his resignation from KR-LLC on December 16, 2016, Jowers was in default under the 2012 Revolving Loan Agreement.

212.    After applying all offsets and applicable interest, as of January 31, 2017, Jowers owed $49,010.84 under the 2012 Revolving Loan Agreement.

213.    Jowers has remaining indebtedness of $49,010.84 plus simple interest of 17% per year accruing since January 31, 2017, under the 2012 Revolving Loan Agreement and the 2012 Revolving Loan Promissory Note.

214.    Jowers has not paid and remains in default under the 2012 Revolving Loan Agreement.

215.    The daily rate of interest accruing on the indebtedness under the 2012 Revolving Loan Agreement since January 31, 2017, is 0.047222222%, or $23.14 per day based on the principal balance of $49,010.84.

### G.    2012 Forgivable Loan and Promissory Note

216.    The 2012 Forgivable Loan Agreement created a $50,000 indebtedness of Jowers effective February 1, 2012, which was forgivable over nine years pro rata. Under the 2012 Forgivable Loan Agreement and the 2012 Forgivable Loan Promissory Note signed by Jowers, Jowers's termination of his employment on December 16, 2016, the remaining indebtedness became "immediately due and payable."

217.    As of the date of his resignation, December 16, 2016, the remaining indebtedness under the 2012 Forgivable Loan Promissory Note and the 2012 Forgivable Loan Agreement was $24,552.17, plus simple interest at 1.17% per annum.

218.    As of the date of his resignation, December 16, 2016, the remaining indebtedness under the 2012 Forgivable Loan Promissory Note and the 2012 Forgivable Loan Agreement was $24,552.17, plus simple interest at 1.17% per annum.

### H.    Jowers's Counterclaim for Breach of Contract – Hong Kong Office Expenses

275.    Jowers never had a contractual relationship during his time of employment with Robert Kinney, KR-HK, or MWK. After October 15, 2012, Jowers had no contractual relationship with RP-GP, but rather only with KR-LLC. The Jowers Agreement was between Jowers and KR-LLC from October 15, 2012, forward. Reimbursement of Jowers's office expenses was governed by the Jowers Agreement.

276.    KR-LLC reimbursed to Jowers all his usual and ordinary office expenses in accordance with the Jowers Agreement.

## II.    CONCLUSIONS OF LAW

### A.    Jurisdiction and Venue

277.    This action arises under the Federal Defense of Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. Therefore, the Court has subject matter jurisdiction over this suit based on 28 U.S. Code § 1331.

278.    There is complete diversity of citizenship among all parties. Therefore, the Court has subject-matter jurisdiction over this suit based on 28 U.S.C. § 1332. (Dkt. 87, at 10, n. 7; 28 U.S.C. § 1332).

279.    This Court has personal jurisdiction over Jowers for all claims related to the 2012 Forgivable Loan and the 2012 Revolving Loan by virtue of his contractual consent in those documents. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n.14 (1985).

280.    This Court has personal jurisdiction over Jowers for all claims related to his employment agreement by virtue of the forum selection clause in the Jowers Agreement. (Dkt. 87, at 11); *see Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 444–45 (5th Cir. 2008).

281.    This Court may exercise supplemental jurisdiction over all MWK's contract claims under the Jowers Agreement and its tort claims alleging theft of trade secrets because all such claims arise out of the "same operative facts" as the other claims before the Court, namely, Jowers's submitting certain candidates through a

competitor in violation of his duties of non-disclosure and non-competition. *D–Two Commc'ns v. Comtel*, MO-09-CV-031, 2009 WL 10670036, at *2 (W.D. Tex. Nov. 30, 2009); (Dkt. 87, at 13).

282.   Venue is proper as Jowers expressly agreed in the contract of employment at issue in this case "to the exclusive personal jurisdiction and venue of any court in Travis County, Texas and waive[d] any defense" to personal jurisdiction and venue of any court in Travis County, Texas.

### B.   Misappropriation of Trade Secrets

283.   Under both the Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act, a trade secret is defined as information the owner has taken reasonable measures to keep secret and which derives independent economic value from not being generally known or readily ascertainable through proper means. TEX. CIV. PRAC. & REM. CODE § 134A.002(6); 18 U.S.C. § 1839(3). Misappropriation under both statutes includes (1) "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret" and (2) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." TEX. CIV. PRAC. & REM. CODE § 134A.002(3); 18 U.S.C. § 1839(5). "Improper means" include the "breach or inducement of a breach of a duty to maintain secrecy." TEX. CIV. PRAC. & REM. CODE § 134A.002(2); 18 U.S.C. § 1839(6)(A).

284.   "A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *CQ, Inc. v. TXU Min. Co.*, 565 F.3d 268, 274 (5th Cir. 2009) (quoting *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex.1996)). "It differs from other secret information in a business in that it is not simply information as to single or ephemeral events in the conduct of the business. . . . A trade secret is a process or device for continuous use in the operation of the business." *Id.* (quoting Restatement of Torts § 757, cmt. b.). To determine whether a trade secret exists, courts examine several factors: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). "Customer lists, pricing information, client information, customer preferences, buyer contacts, and marketing strategies have all been recognized as trade secrets." *Rimkus Consulting Grp., Inc. v. Cammarata*, 255 F.R.D. 417, 441 (S.D. Tex. 2008).

285.   "Texas courts consistently consider three factors when determining whether a customer list is a trade secret: (1) what steps, if any, an employer has taken to maintain the confidentiality of a customer list; (2) whether a departing employee

acknowledges that the customer list is confidential; and (3) whether the content of the list is readily ascertainable." *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003). To show misappropriation, a plaintiff must show that the defendant acquired its trade secrets through improper means, such as through "breach or inducement of a breach of a duty to maintain secrecy." TEX. CIV. PRAC. & REM. CODE § 134A.002(2); 18 U.S.C. § 1839(6)(A). A defendant can be liable for misappropriation of trade secrets if, at the time of the unauthorized use or disclosure of the information, the defendant knew he obtained the information under circumstances giving rise to a duty to maintain its secrecy. TEX. CIV. PRAC. & REM. CODE § 134A.002(3)(B)(ii)(b); *see also HIS Co. v. Stover*, 202 F. Supp. 3d 685, 696 (S.D. Tex. 2016).

286.    "Damages in misappropriation cases can take several forms: the value of plaintiff's lost profits; the defendant's actual profits from the use of the secret[;] the value that a reasonably prudent investor would have paid for the trade secret; the development costs the defendant avoided incurring through misappropriation; and a 'reasonable royalty.'" *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013); TEX. CIV. PRAC. & REM. CODE § 134A.004(a) ("Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not considered in computing actual loss.").

287.    The information Jowers disclosed to third parties while working for KR-LLC regarding Steve Kang, James Chang, Rose Zhu, Claudia Lai, Longhao Wang, Pamela Usukumah, and Meng Ding constituted trade secrets of KR-LLC.

288.   Jowers's disclosure of this information constituted trade secret misappropriation because, at the time of the disclosure, Jowers knew or had reason to know that the knowledge of the trade secrets was acquired under circumstances giving rise to maintain the secrecy of the trade secret or limit the use of the trade secret.

289.   "Willful and malicious" misappropriation is defined as "intentional misappropriation resulting from the conscious disregard of the rights of the owner of the trade secret." TX. CIV. PRAC. & REM. § 134A.002(7).

290.   "Willful means intentional and malicious adds the absence of just cause or excuse." *Matter of Caton*, 157 F.3d 1026, 1030 (5th Cir. 1998).

291.   Jowers's misappropriation of trade secrets was willful and malicious.

292.   The evidence regarding Jowers's willful and malicious misappropriation of trade secrets is clear and convincing. *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848 (Tex. 2017).

293.   Jowers's misappropriation of the trade secrets of his employer caused damages to MWK in the amount of the placement fees generated from these candidates:   HKD$1,342,492 (Steve   Kang);   HKD$798,034 (James   Chang); HKD$390,000 (Longhao Wang); HKD$458,893 (Pamela Usukumah); and HKD$878,765 (Meng Ding) because Jowers was unjustly enriched by these amounts; totaling 3,868,184 Hong Kong dollars.

294.    Jowers also caused loss of goodwill in the relationships with the clients of MWK where these candidates were placed, as well as other damages that are difficult to quantify.

295.    For Jowers's willful misappropriation of trade secrets, the Court awards exemplary damages in an amount of United States dollars equivalent to 7,725,368 Hong Kong dollars, twice the amount of damages found. 18 U.S.C. § 1836(b)(3)(C); Tex. Civ. Prac. & Rem. Code § 134A.004(b).

296.    For Jowers's willful and malicious misappropriation of trade secrets, the Court will award reasonable attorney fees to MWK in an amount to be determined upon presentation of attorney fee evidence. 18 U.S.C. § 1836(b)(3)(D); Tex. Civ. Prac. & Rem. Code § 134A.005(3).

## C.    Revolving Loan

297.    The 2012 Revolving Loan Agreement, the 2012 Revolving Loan Promissory Note, and the 2012 Revolving Loan Security Agreement are governed by Texas law. (Dkt. 87, at 28, n. 15).

298.    Under Texas law, a plaintiff suing for recovery on a promissory note does not have to prove all essential elements of a breach of contract claim, but rather need only establish: "(1) there is a note, (2) the plaintiff is legal owner and holder, (3) the defendant is the maker, and (4) a certain balance is 'due and owing.'" *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 324 (Tex. App. 2011) (citing *Blankenship v. Robins*, 899 S.W.2d 236, 238 (Tex. App.—Houston [14th Dist.] 1994, no writ).

299.    The 2012 Revolving Loan Promissory Note is an existing promissory note.

300.    Counsel Holdings is the legal owner and holder of the 2012 Revolving Loan Promissory Note.

301.    Jowers is the maker of the 2012 Revolving Loan Promissory Note.

302.    $45,857.04 USD plus simple interest of 17% per year accruing since January 31, 2017, is due and owing under the 2012 Revolving Loan Agreement and the 2012 Revolving Loan Promissory Note.

303.    The Court finds that Counsel Holdings is entitled to damages totaling $49,010.84 USD plus simple interest of 17% per year ($23.14 per day) accruing since January 31, 2017.

### D.    Forgivable Loan

304.    The 2012 Forgivable Loan Promissory Note is governed by Texas law. (Dkt. 87, at 28, n. 15).

305.    Under Texas law, a plaintiff suing for recovery on a promissory note does not have to prove all essential elements of a breach of contract claim, but rather need only establish: "(1) there is a note, (2) the plaintiff is legal owner and holder, (3) the defendant is the maker, and (4) a certain balance is 'due and owing.'" *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 324 (Tex. App. 2011) (citing *Blankenship v. Robins*, 899 S.W.2d 236, 238 (Tex. App.—Houston [14th Dist.] 1994, no writ).

306.    The 2012 Forgivable Loan Promissory Note is an existing promissory note.

307.    Counsel Holdings is the legal owner and holder of the 2012 Forgivable Loan Promissory Note.

308.    Jowers is the maker of the 2012 Forgivable Loan Promissory Note.

309.    $24,552.17 USD plus simple interest of 1.17% per annum ($0.79 per day) accruing since December 16, 2016, is due and owing on the 2012 Forgivable Loan Promissory Note.

310.    The Court finds that Counsel Holdings is entitled to damages totaling $24,552.17 USD plus simple interest of 1.17% per annum accruing since December 16, 2016.

**E.    Breach of Jowers Agreement**

311.    The Jowers Agreement is governed by Florida law.

312.    Under Florida law, the elements of breach of contract are: (1) a valid contract; (2) a material breach; and (3) damages. *Beck ex rel. Estate of Southeast Banking Corp. v. Lazard Freres & Co.*, 175 F.3d 913 (11th Cir. 1999).

313.    "A contract is made under Florida law when the three elements of contract formation are present: offer, acceptance, and consideration." *Pezold Air Charters v. Phoenix Corp.*, 192 F.R.D. 721, 725 (M.D. Fla. 2000).

314.    It is undisputed that the contract formation elements of offer and acceptance were present.

315.    Under Florida law, because the Jowers Agreement was terminable by both MWK and Jowers, and Jowers continued his employment for MWK after each of the above modifications to the contract, there was valid consideration. *Coastal*

*Unilube, Inc. v. Smith*, 598 So. 2d 200, 201 (Fla. Dist. Ct. App. 1992) ("Where employment was a continuing contract terminable at the will of either employer or employee, the Florida Courts have held continued employment constitutes adequate consideration to support a contract."); *see also Open Magnetic Imaging, Inc. v. Nieves-Garcia*, 826 So. 2d 415, 417–18 (Fla. Dist. Ct. App. 2002).

316.    Because offer, acceptance, and consideration existed, The Jowers Agreement is a valid and enforceable contract.

317.    Under Florida law, a restrictive covenant in the employment setting is valid if the employer can prove "(1) the existence of one or more legitimate business interests justifying the restrictive covenant; and (2) that the contractually specified restraint is reasonably necessary to protect the established interests of the employer." *Veterinary Orthopedic Implants, Inc. v. Haas*, No. 3:20-cv-868-J-34MCR, 2020 WL 5369087 at *17 (M.D. Fla. Sep. 8, 2020) (citing *AutoNation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004); Fla. Stat. § 542.335(1)(b), (c).

318.    Under Florida law, a "legitimate business interest" includes, but is not limited to "[t]rade secrets, as defined . . . [by state statute]; [v]aluable confidential business or professional information that otherwise does not qualify as trade secrets; [s]ubstantial relationships with specific prospective or existing customers, patients, or clients; [c]ustomer, patient, or client goodwill associated with: [a]n ongoing business or professional practice, by way of trade name, trademark, service mark, or 'trade dress'; [a] specific geographic location; or [a] specific marketing or trade area; [and] [e]xtraordinary or specialized training." Fla. Stat. § 542.335(1)(b)(1)-(5). *See*

*also White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So. 3d 774, 782-83 (Fla. 2017).

319.   MWK "need only establish the existence of one legitimate business interest to justify the enforcement of its restrictive covenant." *Veterinary Orthopedic Implants, Inc. v. Haas*, No. 3:20-cv-868-J-34MCR, 2020 WL 5369087, at *4 (M.D. Fla. Sep. 8, 2020).

320.   MWK has established that his employer had a legitimate business interest in protecting its substantial client and candidate relationships.

321.   Further, MWK has established that his employer had a legitimate business interest in protecting certain confidential business information to which Jowers had access.

322.   Jowers's employer had a legitimate business interest in preventing Jowers from soliciting or providing services to any client or candidate of his employer with whom Jowers had had contact during the year prior to termination of his employer, as well as any client or candidate of his employer he had knowledge of or access to through his employer during the year prior to termination.

323.   The worldwide reach of the restrictive covenants at issue in the Jowers Agreement is reasonable. Where the legitimate business interest at issue is confidential and proprietary information, courts have found restrictive covenants which extend beyond the specific region where the employee worked on behalf of his former employer may be reasonably necessary to protect the former employer's interests. *See Proudfoot Consulting Co.*, 576 F.3d at 1238-39 (collecting cases); *see*

*also Autonation, Inc.*, 347 F. Supp. 2d at 1307-08 (finding a prohibition on working in "any geographic space in which [former employer] operates" reasonably necessary to protect confidential business information relevant to the markets in which it operates).

324.    MWK has made a *prima facie* showing that the one-year period during which Jowers was restricted was reasonable.

325.    Jowers has not met his burden of demonstrating that the restraint is "overbroad, overlong, or otherwise not reasonably necessary." *See* Fla. Stat. § 542.335(1)(c).

326.    Jowers materially breached the Jowers Agreement by (1) violating Section 3.2; (2) violating Section 4.4; and (3) violating Section 8.1.

327.    As the valid assignee, Counsel Holdings has suffered damages as a result of Jowers's breaches in the form of lost placement fees and lost profits as a result of the loss of goodwill from clients and candidates caused by Jowers's breaches, as well as damage to its reputation and loss of goodwill from clients and candidates.

328.    The liquidated damages provision contained in the Jowers Agreement is valid and enforceable as reasonable in its terms and as agreed to by both parties in light of the difficulty of quantifying the damages sustained in the area of goodwill and client relationships.

329.    For his breaches of contract, Jowers is liable for liquidated damages in the full amount of the fees paid to Legis Ventures for services rendered to clients and candidates in violation of Section 8.1 of the Jowers Agreement.

330.    This Court can take judicial notice of the exchange rate between the Hong Kong Dollar, the Singapore Dollar, and the United States dollar. *Ruiz v. Federal Government of Mexican Republic*, No. 07-CV-079, 2007 WL 2978332, at *2 n.13 (W.D. Tex. Sept. 28, 2007), appeal dism'd, 286 Fed. App'x. 843 (5th Cir. 2008).

331.    For purposes of the exchange of Hong Kong Dollar amounts to United States dollar amounts, the exchange rate shall be: 1 Hong Kong Dollar to 0.13 United States Dollars.

332.    For purposes of the exchange of Singapore Dollar amounts to United States dollar amounts, the exchange rate shall be: 1 Singapore Dollar to 0.74 United States Dollars.

### F.    JOWERS'S DEFENSES

#### i.    Failure to State a Claim

333.    The Court finds that Counsel Holdings has properly pled and proven its claims for each of its causes of action. Accordingly, Jowers's first defense fails.

#### ii.    Duress

334.    Under Florida law, in order to prove duress, " it must be shown (a) that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or will and (b) that this condition of mind was caused by some improper and coercive conduct of the opposite side. " *City of Miami v. Kory*, 394 So.2d 494 (Fla. 3d DCA 1981). "Threatened action cannot constitute duress, when there are adequate legal remedies available with which to challenge it." *Id*., citing *Hartsville Oil Mill v. United States*, 271 U.S. 43 (1926).

335.    Likewise, under Texas law, "A common element of duress in all its forms (whether called duress, implied duress, business compulsion, economic duress or duress of property) is improper or unlawful conduct or threat of improper or unlawful conduct that is intended to and does interfere with another person's exercise of free will and judgment." *Dallas County Community College v. Bolton*, 185 S.W.3d 868, 878-79 (Tex. 2005). "To meet his burden on his affirmative defense, Jowers had to establish that KR-LLC or CU-LLC threatened to do an act that it had no legal right to do." *Lujan v. Navistar Fin. Corp.*, 433 S.W.3d 699, 707 (Tex. App. 2014).

336.    The Court finds that Jowers has not presented sufficient evidence to support a finding that any of his employing entities threatened to commit an action that they otherwise had no legal right to commit. Accordingly, Jowers's second defense fails.

### iii.    Prior Material Breach

337.    The Truth in Lending Act states, "Except as specified in sections 1635, 1640, and 1666e of this title, this subchapter and the regulations issued thereunder do not affect the validity or enforceability of any contract or obligation under State or Federal law." 15 U.S.C. § 1610(d).

338.    Even if CU-LLC violated the Truth in Lending Act, such violation would not constitute a breach of the 2012 Revolving Loan Agreement.

339.    12 C.F.R. § 226, known as Regulation Z, was issued by the Board of Governors of the Federal Reserve System to implement the federal Truth in Lending

Act, which is contained in title I of the Consumer Credit Protection Act, as amended (15 U.S.C. 1601 et seq.).

340. Regulation Z applies to individuals or businesses that offer or extend credit when four conditions are met: (1) the credit is offered to consumers; (2) the offering or extension of credit is done regularly; (3) the credit is subject to a finance charge or is payable by a written agreement in more than four installments; and (4) the credit is primarily for personal family or household purposes. 12 C.F.R. § 226.1(c).

341. "A person regularly extends consumer credit only if it extended credit (other than credit subject to the requirements of § 226.32) more than 25 times (or more than 5 times for transactions secured by a dwelling) in the preceding calendar year." 12 C.F.R. § 226.2(a)(17)(v).

342. The 2012 Revolving Line of Credit was an open-end credit plan within the meaning of Regulation Z. 12 C.F.R. § 226.2(a)(20).

343. Because the 2012 Revolving Line of Credit was an open-end credit plan, "transactions means accounts, so that outstanding accounts are counted instead of individual credit transactions." *In re Stratton*, 299 B.R. 616, 621 (Bankr. D. Or. 2003) (citing Official Staff Interpretation, 12 C.F.R. Pt. 226, Supp. I, Subpart A, Cmt. 2(a)(17)(i)(4)).

344. Accordingly, the 2012 Revolving Line of Credit is not a "regular" offering that falls within the meaning and requirements of Regulation Z. The Court finds that Jowers's third defense fails.

### iv.    Waiver

345.    Florida and Texas courts define "waiver" as the voluntary and intentional relinquishment of a known right or conduct which implies the voluntary and intentional relinquishment of a known right. *Raymond James Financial v. Saldukas*, 896 So. 2d 707, 711 (Fla. 2005); *Shields Ltd. v. Boo Nathaniel Bradberry & 40/40 Enters.*, 526 S.W.3d 471, 474 (Tex. 2017).

346.    With respect to the Jowers Agreement, KR-LLC never waived its right to keep its proprietary information confidential, and therefore MWK's claims against Jowers are not barred by defense of waiver.

347.    With respect to the 2012 Revolving Loan Agreement, CU-LLC never waived its right to collect on any outstanding debts, and therefore MWK's claims against Jowers are not barred by the defense of waiver.

348.    With respect to the 2012 Forgivable Loan Agreement, KR-LLC never waived its right to collect on outstanding amounts due, therefore MWK's claims against Jowers are not barred by the defense of waiver.

349.    For the Jowers Agreement, waiver of the rights of Jowers's employer to enforce its rights is barred by a valid and enforceable non-waiver provision.

350.    For the 2012 Revolving Loan Agreement and the 2012 Forgivable Loan Agreement, waiver of the lenders' rights to enforce their rights is barred by valid and enforceable non-waiver provisions.

351.    Accordingly, the Court finds that Jowers's fourth defense fails.

### v. Estoppel

352.    The affirmative defense of estoppel consists of four elements: "(1) the plaintiff must know the facts of the defendant's infringing conduct; (2) the plaintiff must intend that its conduct shall be acted on or must so act that the defendant has a right to believe that it is so intended; (3) the defendant must be ignorant of the true facts; and (4) the defendant must rely on the plaintiff's conduct to its injury." *Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003).

353.    None of MWK or its related entities' actions were ever intended to communicate to Jowers that his course of infringing conduct would be overlooked, ignored, approved, or affirmed in any manner.

354.    Jowers was not ignorant of any material true facts pertinent to these claims, nor was his knowledge of the situation so impaired as to support any reasonable reliance on his part that MWK or its related entities' ever intended to overlook, ignore, approve, or affirm his infringing conduct in any manner.

355.    For these reasons, the Court finds that Jowers's fifth defense fails.

### vi. Fraud

356.    The affirmative defense of fraud requires proof of "(1) a misrepresentation of a material facts; (2) knowledge by the person making the statement that the representation is false; (3) intent by the person making the statement that the representation would induce another to rely and act on it; and (4) that the plaintiff suffered injury in justifiable reliance on the representation." *Tomasini v. Mt. Sinai Med. Ctr. of Fla., Inc.*, 315 F. Supp. 2d 1252, 1259 (S.D. Fla.

2004) (quoting *Susan Fixel, Inc. v. Rosenthal Rosenthal, Inc.*, 842 So.2d 204, 209 (Fla. 3d DCA 2003)).

357.    There is no material fact within the Jowers Agreement that was misrepresented to Jowers by his employer.

358.    There is no material fact within the Forgivable Loan Agreement or associated Promissory Note that was misrepresented to Jowers by his employer.

359.    There is no material fact within the Revolving Loan Agreement or associated Promissory Note and Security Agreement that was misrepresented to Jowers by his employer.

360.    Jowers's employer did not knowingly make any misrepresentations to Jowers in negotiation of the Jowers Agreement.

361.    Jowers's employer did not knowingly make any misrepresentations to Jowers in negotiation of the Forgivable Loan Agreement or associated Promissory Note.

362.    Jowers's employer did not knowingly make any misrepresentations to Jowers in negotiation of the Revolving Loan Agreement or associated Promissory Note and Security Agreement.

363.    Jowers did not suffer any injury in justifiable reliance on any representation from his employer under the terms of the Jowers Agreement.

364.    Jowers did not suffer any injury in justifiable reliance on any representation from his employer under the terms of the Forgivable Loan Agreement or associate Promissory Note.

365. Jowers did not suffer any injury in justifiable reliance on any representation from his employer under the terms of the Revolving Loan Agreement or associate Promissory Note and Security Agreement.

366. For these reasons, the Court finds that Jowers's sixth defense fails.

### vi.    Overbroad, Overlong, and Not Reasonably Necessary

367. According to Florida law, "[a] party seeking to enforce a restrictive covenant must plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant and that the restriction is reasonably necessary to protect those legitimate business interests. *Partylite Gifts, Inc. v. MacMillan*, 895 F. Supp. 2d 1213, 1224 (M.D. Fla. 2012) (citing Fla. Stat. § 542.335(1)(b) & (c)).

368. "If the party seeking enforcement of the restrictive covenant establishes a *prima facie* case, the party opposing enforcement has the burden of establishing that the contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interests." *Id.* (citing Fla. Stat. § 542.335(1)(c); *North Am. Prods. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1228 (M.D. Fla. 2002)).

369. "Generally, legitimate business interests include trade secrets, valuable confidential business or professional information that otherwise does not qualify as trade secrets, substantial relationships with specific prospective or existing customers or clients, customer or client goodwill associated with a specific geographic

location or specific marketing or trade area, and extraordinary or specialized training." *Id.*

370.    MWK and its related entities had legitimate business interests in the confidential business and professional information that it gathered from candidates and clients in the major legal markets all over the world, in the substantial relationships that it cultivated with candidates and clients in the major legal markets all over the world, and in the goodwill and performance record that it established with candidates and clients in the major legal markets all over the world.

371.    MWK has established a *prima facie* case that its restrictive covenants were reasonably necessary to protect its legitimate business interests.

372.    Jowers has failed to provide any facts sufficient to support a conclusion that the restrictive covenants in the Jowers Agreement were overbroad.

373.    Jowers has failed to provide facts sufficient to support a conclusion that the restrictive covenants in the Jowers Agreement were overlong.

374.    Jowers has failed to provide facts sufficient to support a conclusion that the restrictive covenants in the Jowers Agreement were not reasonably necessary to protect MWK and its related entities' legitimate business interests.

375.    For these reasons, the Court finds that Jowers's seventh, eighth, and ninth defenses fail.

### vii.    Illegality

376.    A transaction is not illegal on grounds of usury unless the lender exacts a greater compensation than allowed by law for the debtor's use of the money. *First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285, 287 (Tex. 1994).

377.    Neither KR-LLC nor any of its related entities exacted a greater compensation than allowed by law for Jowers's use of the money lent to him under the 2012 Revolving Loan Agreement.

378.    Jowers has not produced evidence sufficient to support a conclusion that the 2012 Revolving Loan Agreement is usurious or illegal in any of its terms.

379.    Jowers has not produced evidence sufficient to support a conclusion that the Jowers Agreement is controlled by Hong Kong law or that any of its provisions are illegal.

380.    For these reasons, the Court finds that Jowers's tenth defense fails.

### viii.    Lack of Consideration and Failure of Consideration

381.    As stated *supra*, the Court finds that consideration supported the Jowers Agreement through its entirety. Accordingly, the Court finds that Jowers's eleventh and twelfth defenses fail.

### ix.    Rescission

382.    Jowers has not produced evidence sufficient to support a conclusion that any of the agreements between him and his employer were obtained by fraud.

383.    Jowers has not produced evidence sufficient to support a conclusion that any of the agreements between him and his employer were obtained by duress.

384.   Jowers has not produced evidence sufficient to support a conclusion that any of the agreements between him and his employer were materially breached by his employer.

385.   Accordingly, Jowers has no legally sufficient grounds for claiming the right to rescission of any of the contracts between him and his employer. Therefore, the Court finds that Jowers's thirteenth defense fails.

### x.   Unclean Hands

386.   To avail itself of the defense of unclean hands, the defendant must show that it was "personally" injured by the plaintiff's inequitable conduct. *Mitchell Bros. Film Grp. v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979).

387.   Jowers has not produced evidence sufficient to support a conclusion that his employer acted in any manner contrary to the express terms of the Jowers Agreement, the Forgivable Loan Agreement, or the 2012 Revolving Loan Agreement.

388.   Jowers has not produced evidence sufficient to support a conclusion that his employer acted inequitably toward Jowers.

389.   Jowers has not produced evidence sufficient to support a conclusion that he sustained personal loss or injury due to the inequitable actions of his employer.

390.   For these reasons, the Court finds that Jowers's fourteenth defense fails.

### xi.   Unconscionability

391.   "The test for unconscionability assesses whether, in light of the parties' general commercial background and needs, the provision is so unilateral as to have been unconscionable at the time of formation. The objective is to prevent oppression

and unfair surprise, not to disturb the allocation of risks stemming from one party's superior bargaining position." *Davis v. EGL Eagle Global Logistics LP*, 243 F. App'x 39, 45-46 (5th Cir. 2007) (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 756 (Tex. 2001)).

392.   The restrictive covenants included in the Jowers Agreement were not unconscionable because their inclusion was solicited by Jowers himself.

393.   The restrictive covenants included in the Jowers Agreement were not unconscionable because Jowers freely assented to the language and extent of the restrictive covenants included in the agreement

394.   The restrictive covenants included in the Jowers Agreement were not unfairly surprising to Jowers at the time of formation.

395.   The restrictive covenants included in the Jowers Agreement were not oppressive to Jowers at the time of formation

396.   The restrictive covenants included in the Jowers Agreement did not render the agreement unconscionable.

397.   For these reasons, the Court finds that Jowers's fifteenth defense fails.

### xii.   Information Readily Ascertainable by Proper Means

398.   In considering whether information is readily ascertainable, courts have considered the expense of compiling it and the method used to acquire customer information. *See Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 625–26 (S.D. Tex. 2011). "Even if the information is readily available in the industry, it will be

protected if the competitor obtained it working for the former employer." *Id.* (citing *Brummerhop*, 840 S.W.2d at 633).

399.    Because Jowers obtained the proprietary and confidential information that he shared with others while he was still working for KR-LLC, that information was not readily ascertainable by him through any other proper means. Accordingly, the Court finds that Jowers's sixteenth defense fails.

### xiii.    Independent Development

400.    The Court finds that Jowers is unable to make the requisite showing for independent development with regard to the trade secret information relating to Steve Kang, James Chang, Longhao Wang, Pamela Usukumah, Claudia Lai, and Meng Ding. Accordingly, the Court finds that Jowers's seventeenth defense fails.

### xiv.    Payment

401.    Jowers has the burden of proving that the 2012 Revolving Loan Agreement and associated 2012 Revolving Loan Promissory Note had been repaid, as payment is an affirmative defense. *See United States v. Central Gulf Lines, Inc.*, 974 F.2d 621, 629-30 (5th Cir. 1992) (assigning the burden of proof to the party pleading an affirmative defense); *Federal Deposit Ins. Corp. v. Waldron,* 630 F.2d 239, 241 (4th Cir. 1980); *Desjardins v. Desjardins,* 308 F.2d 111, 116 (6th Cir. 1962); *Current News Features v. Pulitzer Pub. Co.,* 81 F.2d 288, 290-91 (8th Cir. 1936).

402.    MWK's possession of the original notes, Jowers's acknowledgment that he executed them, and the fact that the notes were not marked paid, "constituted prima facie proof that the notes remained unpaid." *The Cadle Co. v. Reg. H*, 21 S.W.3d

670, 675 (Tex. App. 2000) (citing *Naylor v. Gutteridge,* 430 S.W.2d 726, 731 (Tex.App.-Austin 1968, writ ref'd n.r.e.).

403.   Jowers has not established that the 2012 Revolving Loan promissory note has been repaid. *Branch Banking & Tr. Co. v. Swig Partners GP, LLC*, No. 05-15-00878-CV, at *7 (Tex. App. Dec. 13, 2017) ("Bank's records showing the loan as having a zero-dollar balance did not establish" that the loan had been repaid.). Accordingly, the Court finds that Jowers's eighteenth defense fails.

## G.   JOWERS'S COUNTERCLAIMS

### i.   Breach of Contract – Hong Kong Office Expenses

404.   The Court finds that Jowers has not produced evidence sufficient to support a conclusion that a valid and enforceable contract existed between him and his employer providing for the payment of Hong Kong Office expenses. Because no valid and enforceable contract existed in relation to the payment of Hong Kong Office expenses, Jowers's employer did not breach a contract by refusing to pay Hong Kong Office expenses.

### ii.   Breach of Contract – Unpaid Bonuses

405.   As set forth in the Court's August 24th, 2021, Order, the Court has granted summary judgment in favor of Counsel Holdings as to Jowers's contract claim for unpaid bonuses. (Dkt. 285 at 31).

### iii.   Breach of Contract – Retroactive Reduction of Commissions

406.   As set forth in the Court's August 24th, 2021, Order, the Court has granted summary judgment in favor of Counsel Holdings as to Jowers's contract claim for commission reductions. (Dkt. 285 at 31).

### iv.   Promissory Estoppel

407.   As set forth in the Court's August 24th, 2021, Order, the Court has granted summary judgment in favor of Counsel Holdings as to Jowers's contract claim for promissory estoppel. (Dkt. 285 at 31).

### v.   Usury

408.   As set forth in the Court's August 24th, 2021, Order, the Court has granted summary judgment in favor of Counsel Holdings as to Jowers's contract claim usury. (Dkt. 285 at 31).

### vi.   Unjust Enrichment

409.   As set forth in the Court's August 24th, 2021, Order, the Court has granted summary judgment in favor of Counsel Holdings as to Jowers's contract claim for unjust enrichment. (Dkt. 285 at 31).

Dated:  October 20, 2021

Respectfully Submitted

/s/ Robert E. Kinney
Robert E. Kinney
Texas State Bar No. 00796888
Robert@KinneyPC.com

**Robert E. Kinney**
824 West 10th Street, Suite 200
Austin, Texas 78701
Tel: (512) 636-1395

Raymond W. Mort, III
Texas State Bar No. 00791308
raymort@austinlaw.com

**THE MORT LAW FIRM, PLLC**
100 Congress Ave., Suite 2000
Austin, Texas 78701
Tel/Fax: (512) 865-7950

**ATTORNEYS FOR MWK**