# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |
|---|---|
| **MWK RECRUITING, INC,** | |
| Plaintiff | **Case No. 1:18-cv-00444-RP** |
| v. | |
| **EVAN P. JOWERS,** | |
| Defendant | |
| **EVAN P. JOWERS,** | |
| Counterclaimant | |
| v. | |
| **MWK RECRUITING, INC.,**<br>**ROBERT E. KINNEY,**<br>**KINNEY RECRUITING LLC, and**<br>**KINNEY RECRUITING LIMITED,** | |
| Counterdefendants | |

## MWK'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

The Court held a bench trial in the above-styled and numbered case December 6 to 8, 2021. After considering the testimony and documentary evidence, the Court enters the following findings of fact and conclusions of law:

# Table of Contents

I.     FINDINGS OF FACT ............................................................................... 1

    A.   THE PARTIES AND NON-PARTY ENTITIES ........................................ 1

    B.   EVENTS BEFORE JOWERS AGREEMENT, DECEMBER 16, 2006 ........ 3

    C.   FORMATION AND ASSIGNMENT OF AGREEMENTS............................. 5

       i.     Jowers Agreement ............................................................. 5

       ii.    Forgivable Loan ................................................................. 8

       iii.   Revolving Loan .................................................................. 9

       iv.   Further Assignments to MWK-LLC ................................. 9

    D.   JOWERS'S EMPLOYMENT AGREEMENT .......................................... 10

       i.     Choice of Law and Forum............................................... 10

       ii.    Duties of Recruiter and Acknowledgments ..................... 11

       iii.   Amendments to Jowers's Compensation ........................ 12

       iv.   Expense Reimbursements ............................................... 14

       v.    Hong Kong Four Seasons Expenses ............................... 15

    E.   PLAINTIFF'S AFFIRMATIVE CLAIMS................................................ 16

       i.     Misappropriation of Trade Secrets ................................. 16

       ii.    Breach of Contract - Jowers Agreement ......................... 26

       iii.   2012 Revolving Loan Agreement and Promissory Note.................. 46

       iv.   2012 Forgivable Loan and Promissory Note.................... 48

    F.   JOWERS'S REMAINING COUNTERCLAIMS ...................................... 49

       i.     Hong Kong Office Expenses ............................................ 49

       ii.    Claim for Hui Xu Placement Fee ..................................... 50

    G.   PREVIOUSLY ADJUDICATED CLAIMS ............................................. 50

    H.   FACTS RELEVANT TO JOWERS'S AFFIRMATIVE DEFENSES ........... 52

       i.     Failure to State a Claim................................................... 52

       ii.    Duress .............................................................................. 52

       iii.   Prior Material Breach...................................................... 53

       iv.   Waiver .............................................................................. 53

       v.    Estoppel............................................................................ 53

       vi.   Fraud ............................................................................... 54

vii.  Overbroad, Overlong, and Not Reasonably 130Necessary ................ 55

viii. Illegality ............................................................................................. 55

ix.   Lack of Consideration ...................................................................... 55

x.    Rescission .......................................................................................... 55

xi.   Unclean Hands .................................................................................. 55

xii.  Unconscionability ............................................................................. 56

xiii. Information Readily Ascertainable ................................................... 56

xiv.  Independent Development ................................................................. 56

xv.   Payment ............................................................................................. 57

I.    ATTORNEY FEES ........................................................................................... 57
J.    LITIGATION MISCONDUCT ............................................................................. 57

II.   CONCLUSIONS OF LAW ................................................................... 60

A.    JURISDICTION AND VENUE ............................................................................ 60
B.    ASSIGNMENT OF AGREEMENTS ..................................................................... 61
C.    CHOICE OF LAW ............................................................................................ 63
      i.    Florida Law Applies .......................................................................... 63

      ii.   Estoppel - Hong Kong Law Does Not Apply ..................................... 63

D.    MWK'S CLAIMS ............................................................................................ 65
      i.    Misappropriation of Trade Secrets .................................................... 65

      ii.   Revolving Loan .................................................................................. 70

      iii.  Forgivable Loan ................................................................................. 71

      iv.   The Jowers Agreement ....................................................................... 72

E.    JOWERS'S PLEADED DEFENSES ..................................................................... 79
      i.    Failure to State a Claim ..................................................................... 79

      ii.   Duress ................................................................................................. 80

      iii.  Prior Material Breach ......................................................................... 81

      iv.   Waiver ................................................................................................ 83

      v.    Estoppel .............................................................................................. 84

      vi.   Fraud .................................................................................................. 85

      vii.  Overbroad, Overlong, and Not Reasonably Necessary ..................... 85

      viii. Illegality ............................................................................................. 88

ix.  Lack of Consideration and Failure of Consideration ....................... 89

x.   Rescission ................................................................................. 89

xi.  Unclean Hands ......................................................................... 90

xii. Unconscionability .................................................................... 91

xiii. Information Readily Ascertainable by Proper Means ..................... 91

xiv. Independent Development ........................................................ 92

xv.  Payment .................................................................................. 92

F.  JOWERS'S AFFIRMATIVE CLAIMS ...................................................... 93

i.   Hong Kong Office Expenses ..................................................... 93

ii.  Hui Xu Placement Fee ............................................................. 94

**III.  RESPONSES TO JOWERS'S PROPOSED FINDINGS AND CONCLUSIONS ...................................................................... 94**

## I. FINDINGS OF FACT

### A. The Parties and Non-Party Entities

1.    Evan P. Jowers ("**Jowers**") is a United States citizen domiciled and resident in the State of Florida. (Jowers Decl. dated May 25, 2018, P-136, at ¶3-4).

2.    Beginning in June 2003, "Jowers resided in Florida continuously for more than 11 years." Even when he left Florida, Jowers had "a firm, fixed intention to permanently remain in Florida." (Decl. of Jowers dated May 25, 2018, P-136, at ¶¶3-4).

3.    Robert E. Kinney ("**Kinney**") is a United States citizen domiciled in the State of Texas. (Transcript Volume I at 59 (hereinafter "Trans." followed by a roman numeral to indicate the volume number)).

4.    Counsel Holdings, Inc. ("**Counsel Holdings**") is a corporation organized under the law of the state of Texas, formed January 1, 2019, with its principal place of business in Austin, Texas. (Cert. of Merger between Counsel Holdings and MWK, P-14; Trans. I, at 142-143).

5.    MWK Recruiting, Inc. ("**MWK-INC**") was a Texas corporation which was merged into Counsel Holdings effective January 1, 2019, by filing, along with Counsel Holdings, a Certificate of Merger with the Texas Secretary of State. (Cert. of Merger between Counsel Holdings and MWK-INC, P-14; Trans. I, at 142-143).[1]

---

[1] Consistent with prior briefing, this submission will also use "MWK" to refer to the Kinney Recruiting entities collectively where specificity is not needed for clarity.

6.     MWK Recruiting LLC ("**MWK LLC**") was a Texas limited liability company formed September 13, 2012, which was converted into MWK-INC on March 12, 2018, by filing a Certification of Conversion of a Limited Liability Company Converting to a Corporation with the Texas Secretary of State. (Cert. of Conversion, P-13; Trans. I, at 142-143).

7.     Kinney Recruiting LP ("**KR-LP**") was an assumed name for Recruiting Partners, L.P. ("**RP-LP**"), which was registered with the Texas Secretary of State on April 9, 2004. (Assumed Name Cert. of RP-LP, P-1; Trans. I, at 139, 186).

8.     Kinney Recruiting, Inc. ("**KR-Inc**.") was an assumed name for Recruiting Partners GP, Inc. ("**RP-GP**"). (Assumed Name Cert. of RP-GP, P-3; Trans. I, at 140).

9.     Kinney Recruiting LLC ("**KR-LLC**") is a company for which Jowers worked from October 15, 2012, until Jowers ceased employment with Kinney Recruiting on December 16, 2016. Jowers conceded that KR-LLC was his final Kinney Recruiting employer in his proposed finding of fact #1: "On December 16, 2016, Jowers resigned from Kinney Recruiting LLC, a different entity." (Dkt. 305-4, at 3). Jowers always received payment of his salary and commissions from the entity that employed him during the period Jowers was employed by the Kinney Recruiting entities, and Jowers knew what entity was paying him. (Jowers Paystubs, P-120; Jowers W-2's, P-15; Trans. I, at 31-36).

10.     Counsel Unlimited LLC ("**CU-LLC**") is company that loaned money to Jowers.  (Loan Agreement, P-9; Trans. I, at 168).

11.     Kinney Recruiting Limited ("**KRL-HK**") is a private limited company organized under the laws of Hong Kong. (Trans. I, at 129).

**B.     Events Before Jowers Agreement, December 16, 2006**

12.     In February 2004, Kinney established RP-LP as a legal recruiting firm based in Austin, Texas, which did business as Kinney Recruiting LP (KR-LP). (Trans. I, at 139).

13.     In the ensuing two years, Kinney hired additional recruiters, set up a website, conducted other marketing activities, and began to implement a business plan which included an expansion of Kinney Recruiting into Asia. (Trans. I, at 60-61). By the spring of 2006, when he hired Jowers, Kinney had begun to develop a network of clients and contacts in Asia. (Trans. II, at 165-167).

14.     Kinney and Jowers were acquainted with each other from mutual prior employment at another legal recruiting firm. (Trans. II, at 161).

15.     From the middle of 2003 until the end of 2005, Jowers worked as in-house counsel for a Miami-based company. Jowers worked unpaid in the position for that last 18 months to two years, after his employer was indicted in the Eastern District of Pennsylvania. By the time he and Kinney discussed employment with Kinney Recruiting, Jowers was financially strapped. (Jowers, Trans. II, at 183-184).

16.     Jowers joined Kinney Recruiting, in April 2006, and received as a base pay a monthly salary of $3,000. (P-2, at 9, ¶2.1; Trans. I, at 63; D-10 (email discussing the after-tax amount of salary Jowers received)). In addition, Jowers was on a commission scale. *Id.* Nevertheless, as Jowers testified, after seven months, by November of 2006, Jowers had "only made half a placement up the until that point."

(Trans. II, at 176). This was the only placement Jowers made in 2006. (Trans. I, at 63).

17.     Jowers     was     also     provided     with     necessary     equipment     and reimbursement for expenses, subject to approval by Kinney. (Email Between Jowers and Kinney dated Oct. 28, 2006, D-13).

18.     Soon after beginning to work with Kinney Recruiting, Jowers became interested in Kinney's work in Asia and Kinney Recruiting's business plan for expansion in Asia. (Email from Jowers to Kinney dated May 24, 2006, D-7; Trans. I, at 63; Trans. II, at 165-169).

19.     When Jowers requested that Kinney fund advertising that was specially focused on mass marketing to candidates interested in Asia, Kinney expressed reluctance to put the capital Jowers wanted Kinney Recruiting to commit into the plans Jowers wanted, for fear that the investment could wind up being wasted if Jowers later took placement candidates and clients with him after resigning. (Trans. I, at 64-66).

20.     On August 20, 2006, after discussions with Kinney regarding these concerns, Jowers wrote to Kinney to say that, because of the financial backing Jowers was seeking from Kinney, Jowers would be "happy to sign a non-compete to give [Kinney] peace of mind." (P-17; Trans. I, at 66).

21.     Jowers and Kinney continued through the fall of 2006 to have discussions regarding the terms of the arrangement by which Jowers would continue to work for Kinney Recruiting. (Trans. II, at 175-178). Kinney

communicated various proposals to Jowers during the fall of 2006. (*see, e.g.*, D-11; Trans. II, at 178; Trans. I, at 64).

22.     The discussions between Jowers and Kinney culminated in Kinney sending Jowers a final draft an associate recruiter employment agreement in December 2016, which Jowers signed and faxed back to Kinney. (P-19; Trans. I, at 66, 79; Trans. II, at 185-186).

### C.     Formation and Assignment of Agreements

#### i.     Jowers Agreement

##### a)     Formation of Jowers Agreement

23.     Jowers and RP-LP entered into an Associate Recruiter Employment Agreement (the "Jowers Agreement") effective May 1, 2006, but the document was signed December 16, 2021. (P-2; Trans. II, at 185-186).

24.     Jowers signed the Jowers Agreement on his own behalf. (Jowers Decl., P-138, at ¶4; Trans. II, at 139, 186).

25.     Kinney signed the Jowers Agreement on behalf of RP-LP d/b/a Kinney Recruiting LP. (P-2; Trans. I, at 64).

26.     The Jowers Agreement states that "the Employee has freely chosen to enter this Agreement." (Jowers Agreement, P-2, at ¶3.7).

27.     Jowers had an adequate opportunity to review and negotiate the Jowers Agreement. (P-17; Trans. II, at 179-182 (Jowers describing discussions with Kinney); Trans. I, at 84-85). Jowers agreed that he would be able to earn a livelihood without violating the restrictions contained in the Jowers Agreement. (Jowers Agreement, P-2, signature page).

28.     Jowers was not coerced into signing the Jowers Agreement. Kinney did not threaten Jowers to obtain his signature on any agreement. (Trans. I, at 86; Trans. II, at 74). Jowers testified that he had free will when he signed each agreement and Jowers did not specify any illegal threat allegedly made by any person to obtain his signature. (Trans. II, at 96).

29.     Jowers understood that the agreement restricted his right to disclose or use proprietary information of KR-LLC during or subsequent to his employment with the company, and he understood that the Jowers Agreement restricted him from soliciting clients and candidates for one year after his service was terminated, or longer in the event of breach. (P-17; Trans. I, at 84-86).

30.     The Jowers Agreement contains a merger clause at Section 14, which states that there are "no representations, inducements, arrangements, promises, or agreements outstanding between" the parties "other than those contained in this Agreement." The merger clause also explicitly supersedes any prior employment agreements between the parties. (P-2, at ¶14.1; Trans. I, at 80).

### b)     Assignment of Jowers Agreement to KR-LLC

31.     The Jowers Agreement contains a provision expressly authorizing assignment of the Jowers Agreement without prior notice to Jowers and enforcement by the assignees and/or successors of RP-LP. (Jowers Agreement, P-2, ¶¶15.1; 19.2; Trans. I, at 140).

32.     Effective December 31, 2007, RP-LP assigned the Jowers Agreement to RP-GP. (Assignment to RP-GP, P-4; Trans. I, at 139-140).

33.     Jowers received notice of the assignment of the Jowers Agreement to RP-GP. (Jowers W-2's, P-15).

34.     Effective as of October 16, 2012, RP-GP assigned its rights and obligations under the Jowers Agreement to KR-LLC. (Assignment to KR-LLC, P-7; Trans. I, at 140-141).

35.     Jowers received notice of the assignment to KR-LLC. (Jowers W-2's, P-15; Trans. I, at 31).

36.     At no point did Jowers contest the assignment of any agreement prior to his termination of employment. (Trans. I, at 141).

37.     After RP-GP assigned the Jowers Agreement to KR-LLC effective October 16, 2012, Jowers was employed by KR-LLC. (*cf.*, Paystub for 10/15/2012, P-116, at 49 (payor, RP-GP); Paystub for 10/31/2012, P-116, at 52 (payor, KR-LLC)).

38.     Jowers's employer until his resignation on December 16, 2016, was Kinney Recruiting LLC. (Trans. I, at 173; Jowers's Proposed Finding of Fact, Dkt. 305-4, at 3, ¶1). Jowers wrote to Kinney on February 3, 2016, confirming he understood his employer was KR-LLC, and not any Hong Kong entity. (Trans. I, at 35-36).

39.     Jowers delivered a resignation letter to Kinney on December 16, 2016, at approximately 1 pm Central Time in the United States. At the time Jowers submitted his resignation letter, he was in Korea, and the time there was 15 hours ahead of Central Time, approximately 4 am December 17, 2016. (Trans. I, at 37).

ii.     **Forgivable Loan**

a)     **Formation of Forgivable Loan**

40.     On February 1, 2012, Jowers and RP-GP entered into a Forgivable Loan Agreement (the "**2012 Forgivable Loan Agreement**"). (P-5; Trans. I, at 178).

41.     Jowers signed the 2012 Forgivable Loan Agreement on his own behalf and of his own free will. (Trans. II, at 95-96).

42.     Jowers signed 2012 Forgivable Loan Agreement of his own free will, after writing to Kinney with regard to the loan, "I agree with that strategy. Sure, it is great for me to get a nice deserved bonus, but not worth it for you if someone in my shoes takes a big bonus after a great year and then splits." (P-37; Trans. I, at 179-180; Trans. II, at 96).

43.     The 2012 Forgivable Loan Agreement does not prohibit assignment of the Agreement, nor does it require notice of any assignment to be provided to Jowers. It also does not require that demand be made prior to declaration of default. (P-5, at 6 (promissory note)).

44.     The 2012 Forgivable Loan Agreement has an associated promissory note in the original face amount of $50,000 (the "**2012 Forgivable Loan Promissory Note**"), which is signed by Jowers as the debtor. (P 5, at 6 of 7; Trans. I, at 178).

45.     Jowers signed the 2012 Forgivable Loan Promissory Note on his own behalf and of his own free will. (Trans. II, at 96).

### b)    Assignment of Forgivable Loan to KR-LLC

46.    RP-GP assigned its rights and obligations under the 2012 Forgivable Loan and the 2012 Forgivable Loan Promissory Note to KR-LLC effective October 16, 2012. (Assignment to KR-LLC, P-7; Trans. I, at 140-141).

### iii.    Revolving Loan

47.    On November 1, 2012, Jowers and CU-LLC entered into a Loan Agreement (the "**2012 Revolving Loan Agreement**"). (P-9; Trans. I, at 168).

48.    Jowers signed the 2012 Revolving Loan Agreement on his own behalf. (Trans. II, at 69, 101; P-141, at ¶19). Kinney signed on behalf of CU-LLC. (Trans. I, at 168).

49.    The 2012 Revolving Loan Agreement has an associated promissory note in the original face amount of $150,000 (the "**2012 Revolving Loan Promissory Note**"), which Jowers also signed as the debtor. (P-8; Trans. II, at 69).

50.    The 2012 Revolving Loan Agreement has an associated security agreement (the "**2012 Revolving Loan Security Agreement**"), which Jowers also signed as the debtor. (P-10; Trans. II, at 69).

### iv.    Further Assignments to MWK-LLC

51.    On January 31, 2017, KR-LLC assigned its rights, obligations, and claims under the Jowers Agreement, the 2012 Forgivable Loan Agreement, and the 2012 Forgivable Loan Promissory Note to MWK-LLC. (P-11; Trans. I, at 141-142 and 164-165).

52.    Also on January 31, 2017, CU-LLC assigned its rights, obligations and claims under the 2012 Revolving Loan Agreement, the 2012 Revolving Loan

Promissory Note, and the 2012 Revolving Loan Security Agreement to MWK-LLC. (P-12; Trans. I, at 173-176).

53.     After merging with MWK-INC, Counsel Holdings is the current owner of all claims against Jowers under the Jowers Agreement, the 2012 Forgivable Loan Agreement, the 2012 Forgivable Loan Promissory Note, the 2012 Revolving Loan Agreement, the 2012 Revolving Loan Promissory Note, and the 2012 Revolving Loan Security Agreement, as well as all other claims KR-LLC has against Jowers and "any other person acting in concert with them in misappropriating intellectual property and trade secrets of" KR-LLC and CU-LLC. (P-11; P-12; Trans. I, at 177).

54.     Counsel Holdings is the holder of the 2012 Forgivable Loan Promissory Note and the 2012 Revolving Loan Promissory Note. *Id.*

## D.     Jowers's Employment Agreement

### i.      Choice of Law and Forum

55.     The Jowers Agreement states that "controversies, claims, disputes or matters in questions arising out of or relating to this Agreement shall be construed, governed, and enforced in accordance with the laws of Florida." (Jowers Agreement, P-2, ¶12.1).

56.     Jowers expressly agreed in the contract of employment at issue in this case "to the exclusive personal jurisdiction and venue of any court in Travis County, Texas and waive[d] any defense" to personal jurisdiction and venue of any court in Travis County, Texas. (Jowers Agreement, P-2, ¶13.1; Order on Motion to Dismiss, Dkt. 87, at 14).

57.     As of the date that this suit was removed to this Court, Jowers was a resident of Florida and "not a citizen of any other country or jurisdiction." According to Jowers, at that time he did not have "any type of visa for Hong Kong," even though he was "an attorney recruiter in Hong Kong…with Legis Ventures," and had "been since December 2016." (Jowers Decl., P-136, at ¶¶2-3).[2]

### ii.     Duties of Recruiter and Acknowledgments

58.     The Jowers Agreement specified Jowers's duties as an Associate Recruiter, his initial compensation, and other terms of his employment in detail. (Jowers Agreement, P-2).

59.     The Jowers Agreement contains an acknowledgement by Jowers that his employer would expend time and money establishing relationships and good will with existing and prospective clients and candidates. (P-2, at ¶3.4). One of Jowers's duties under the Jowers Agreement was to help establish these relationships and good will for his employer, not for himself.

60.     Jowers acknowledged that he did not need to accept employment under the Jowers Agreement. (P-2, at ¶3.6). He also acknowledged under bold-faced wording that he was signing without duress or coercion, and that the agreement restricted his use of proprietary information "during or subsequent to" his

---

[2] Jowers testified about his fear of arrest while working for Kinney Recruiting in Hong Kong with no Hong Kong work permit. (Trans. II, at 201-202). The relevance of this testimony is not clear, but the assertion is not credible. According to his declaration filed in this case May 25, 2018, more than 18 months after his resignation, Jowers had continued working in Hong Kong for Legis Ventures with no work visa. (Jowers Decl., P-136, at ¶¶2-3).

employment, and that he would be prohibited from soliciting customers. (P-2, at 7-8).

### iii.    Amendments to Jowers's Compensation

61.    The Jowers Agreement was a contract for at-will employment, terminable by either party at any time, subject to survival of certain confidentiality and non-competition provisions. (Jowers Agreement, P-2, ¶11.1).

62.    The Jowers Agreement contains an "**Exhibit A**" detailing Jowers's compensation. (Jowers Agreement, P-2, Exhibit A).

63.    The Jowers Agreement stated that Jowers's compensation would be pursuant to the terms contained in Exhibit A and stated: "Exhibit A may be modified from time to time as the Company, in it is sole discretion, deems appropriate, provided that no such modification may be applied retroactively." (Jowers Agreement, P-2, ¶6.1).

64.    Each pay period, Jowers's employer calculated the total gross commissions for Jowers based on his current "Net Cash In" as of the close of payroll, then deducted commissions and draw/salary previously paid to Jowers. These calculations were reflected on Jowers's "commission spreadsheets." The commission spreadsheets also showed the names of the candidates placed, the clients they were placed with, Jowers's percentage credit for the relevant placements, the commissions paid, and other information about outstanding loans, draw balances, etc. Jowers also received a paystub showing tax deductions along with each commission spreadsheet. (Commission Spreadsheets 2008-2016, P-112 to P-120). If Jowers had questions regarding the calculations, he would ask. (*See, e.g.*, Email

from Jowers to Renee Sommers requesting clarification, P-40, at 5). Kinney or his bookkeeper would reconcile any differences between the amounts calculated by MWK's bookkeeper and by Jowers. (P-40; Trans. I, at 68-74).

65.     During the entirety of his employment with MWK, Jowers was a W-2 employee and Florida resident, and taxes were withheld from his net pay and remitted to the IRS with each payroll by his employer. (P-15; Trans. I, at 31-34).

66.     Between the date that Jowers began working under the Jowers Agreement and January 2011, several changes to Jowers's compensation structure occurred. Jowers acquiesced each change. (*See, e.g.*, Email of January 28, 2009, D-49; Trans. II, at 191 (Jowers testifying that he was "fine with" a change to 62.5% commissions in 2008)). That Jowers felt he "had no choice" regarding whether to acquiesce was due to his financial situation. (Trans. II, at 68-69, 194-198).

67.     Although not required by the Jowers Agreement, Kinney obtained Jowers's agreement to each change in his compensation structure prior to the changes taking effect. (*See, e.g.*, Trans. I, at 195; 200; Trans. II, at 48-49).

68.     In each case when there was a modification of Jowers's compensation, the adjustment was not retroactive and Jowers's employer performed consistent with the terms of the modification by paying Jowers as agreed. (Trans. I, at 67-68).

69.     During and at all times after January 2011 until his resignation, Jowers's top commission rate was 50%. Jowers was aware of the 50% top commission rate. (Email to Jowers re no agreement to pay 60%, P-158; Email from Jowers acknowledging "45 to 50% deal," P-159 at 2; Trans. I, at 68).

### iv.    Expense Reimbursements

70.    Jowers and his employer agreed that the Company would pay usual and ordinary expenses incurred by Jowers in connection with the recruiting business. (P-2, at ¶2.2).

71.    From early in his employment with Kinney Recruiting in 2006, Jowers was aware that his expenses were subject to approval before being reimbursed. (Trans. II, at 179; 181-182 (Jowers describing expenses he was required to pay portions of)). The Jowers Agreement did not change the requirement that his expenses be approved by Kinney prior to reimbursement. (Trans. I, at 39, 242).

72.    Between June of 2015 and the termination of his employment, Jowers submitted expense reports totaling $92,625.55. (Expense reports submitted by Jowers seeking reimbursement of expenses totaling $92,625.55, P-35).

73.    Of the $92,625.55 of expenses Jowers submitted for reimbursement in 2015 and 2016, Jowers was reimbursed $90,883.63 by means of his employer adding the reimbursements to six separate paychecks through October 31, 2016. (Jowers's paystubs for 2015-2016 showing expense reimbursements totaling $90,883.63, P-36. Specifically, KR-LLC reimbursed Jowers 1) $38,197.94 by means of an addition to Jowers's payroll on December 31, 2015; 2) $2,147.00 by means of an addition to Jowers's payroll on February 12, 2016; 3) $4,550.93 by means of an addition to Jowers's payroll on June 30, 2016; 4) $8,387.23 by means of an addition to Jowers's payroll on July 15, 2016; 5) $8,230.72 by means of an addition to Jowers's payroll on September 15, 2016; and 6) $29,370.06 by means of an addition to Jowers's payroll on October 31, 2016. *Id*.

74.     The Court finds that KR-LLC reimbursed Jowers all of the usual and ordinary expenses involved in the operation of Jowers's business during 2015 and 2016. (Trans. II, at 240-243; P-36).

### v.     Hong Kong Four Seasons Expenses

75.     With regard to the expense for Jowers's housing in Hong Kong, Jowers was aware before incurring the costs that he was not going to be reimbursed for the costs of the Four Seasons hotel stays. Kinney informed Jowers that MWK was not going to pay for Jowers's stay in the Four Seasons in Hong Kong, and that Jowers would have to pay for the costs or borrow the money to do so. MWK established a $30,000 "zero interest" loan for Jowers to pay for the hotel charges without incurring interest, to the extent that he was able to keep the balance below $30,000. (Trans. I, at 39-40; Trans. II, at 14-15). MWK would have had no reason to establish such a loan except that Jowers had asked for a low-interest loan to pay for his housing. Jowers acknowledged that he authorized all charges to the revolving loan. (Trans. II, at 102).

76.     Although Kinney sent Jowers a draft of a contract of employment that, if it had been executed, would have made Jowers an employee of Kinney Recruiting Limited, that contract was never executed and did not come into force. (Trans. II, at 28-34; Trans. II, at 225-226 (Jowers testifying that he was "losing faith" because Kinney had not signed"). Even had the contract been consummated, there was no language in the contract that required Jowers's expenses his employer did not deem usual and ordinary to be reimbursed. (Hong Kong draft agreement, D-313, at ¶2.3).

### E.    Plaintiff's Affirmative Claims

#### i.    Misappropriation of Trade Secrets

77.    Within the scope of his employment, Jowers accessed and developed valuable confidential information regarding clients and candidates of his employer, creating and using lists of candidates for placement and clients where those placements could occur which included extensive information about those candidates and clients. (Trans. I, at 145). By virtue of his contractual obligations, all information Jowers developed in the scope of his employment regarding attorney candidates who could be placed and client firms where such attorney candidates could be placed was proprietary information of Jowers's employer within the meaning of the Jowers Agreement. (P-2, at ¶1.4, 1.5, 1.6, 3.2, 3.3, 3.4, 3.8, 4.3, 4.4, 4.5). Jowers was obligated before and after termination of his employment not to retain copies of his employer's proprietary information and not to use or disclose such information without express authorization to do so. (P-2, at ¶7.1, 7.2).

78.    As an employee, Jowers's efforts to work on making placements of candidates were efforts Jowers made on behalf of his principal, which in 2016 was KR-LLC. Jowers worked for years on many of the relationships he possessed at MWK, some of which relationships would become valuable placements. (Trans. II, at 141).

79.    The information regarding candidates who wanted to be placed in new positions that Jowers received during his employment with Kinney Recruiting was a compilation of highly sensitive information about those candidates which contained financial and client-related information about attorneys' law practices

that would drive any new law firm's decision to interview and hire those candidates. (Trans. I, at 165-168).

80.     This information was not generally known outside of the individual who shared the information and Kinney Recruiting.

81.     Kinney Recruiting did not give any authorization to Jowers to share information about the candidates in question. (Trans. I, at 144; 165-168; Trans. II, at 154).

82.     The information that Jowers shared was valuable to him and to his competitors, as was indicated by the fact that Jowers designated, during the discovery process in this case, the email messages he had sent to clients prior to and after his departure from the employment of Kinney Recruiting as "attorneys eyes only" pursuant to the protective order in this case, indicating that the sensitivity of the information had longevity. (P-149; P-57; Trans. I, at 116).

83.     Jowers used his private email address to hide his actions and make it difficult for him to be found. As Jowers testified, he took a "risk" by sharing information directly with law firm clients in a way that could be discovered later. (Trans. II, at 157). Jowers knew he was required to maintain the information at issue secret.

### a)     Steve Kang

84.     Jowers first met Mr. Steven Kang while working for Kinney Recruiting. (Trans. II, at 139-141; Deposition of Latham, P-130, at 16:6 to 16:18).

85.     While still employed by KR-LLC, on September 7, 2016, Jowers met with Mr. Steven Kang, a partner and head of the Korea practice at Freshfields Bruckhaus Deringer, an international law firm. Jowers obtained confidential information regarding Mr. Kang at that meeting regarding his interest in changing positions, placing Mr. Kang on Kinney Recruiting's candidate list. (Trans. II, at 142-143; Deposition of Latham, P-130, at 16:19 to 17:1).

86.     During his employment by KR-LLC, Jowers contacted Latham regarding Mr. Kang's candidacy using a private email address to send the message to, evanjowers@yahoo.com, and provided confidential information regarding Mr. Kang belonging to KR-LLC to Latham from that address. (Deposition of Latham & Watkins, P-130, at 17:2 to 17:3; Jowers Emails to/from S Cooke, Dec. 9-12, 2016, P-56; Trans. II, at 87-88; 145-160; 242-250).

87.     Jowers obtained from representatives of Latham detailed information which would enable him to make a match of Steve Kang to Latham and permit that firm to have the best chance of consummating a transaction with Mr. Kang, as well as similarly detailed information from Mr. Kang. (Trans II, 145-160).

88.     Latham began discussions with Mr. Kang based on the confidential information that Jowers shared with Latham from his personal email address while Jowers was still employed by KR-LLC. (Trans. II, at 153-154). Jowers intentionally hid this information from his employer. (*Id.*)

89.     On December 14, 2016, in preparation for an upcoming interview of Mr. Kang by Latham, Jowers sent to a representative of Latham further

confidential information about Mr. Kang in order to promote Mr. Kang's candidacy. (P-57).

90.     Following his resignation on December 16, 2016, Jowers then followed up with representatives of Latham on December 30, 2016, forwarding the same information he had previously sent from his private email address on December 14, 2016. (P-57).

91.     The email messages Jowers sent to representatives of Latham during his employment with KR-LLC contained specific information about Mr. Kang's practice and interest in moving firms that was not generally known to the public and not readily ascertainable by proper means. (Trans. II, at 158-159).

92.     When Jowers sent the email messages to Latham regarding Mr. Kang, he was under a duty to maintain the confidentiality of that information for his employer and not to use that information to trade for his own account. (P-2, at ¶7.2).

93.     The email messages Jowers sent to representatives of Latham during his employment with KR-LLC resulted in interviews for Mr. Kang and his eventual placement at Latham & Watkins. (Deposition of Latham & Watkins, at 6:16-7:15).

94.     The email messages Jowers sent to representatives of Latham resulted in a fee of 1,342,492 Hong Kong dollars being paid to Legis Ventures on August 7, 2017. (Deposition of Latham & Watkins, at 6:16-7:15).

95.     Legis Ventures is a recruiting firm founded by Evan Jowers and Alejandro Vargas.  (Trans. II, at 116-117).

96.     By submitting Mr. Kang to Latham & Watkins from his private email address instead of his email address at KR-LLC, Jowers materially breached the Jowers Agreement and deprived his employer of the fee resulting from Mr. Kang's placement at Latham & Watkins.

### b)     James Chang

97.     While still employed by KR-LLC, Jowers also obtained confidential information regarding candidate James Chang, including the details of Mr. Chang's review by his supervising partners on December 7, 2016, and placed Mr. Chang on Kinney Recruiting's candidate list. (Email Messages Between Jowers and J Chang, P-97; P-59).

98.     Shortly after his resignation, Jowers shared this same information about Mr. Chang (including the results of his review by supervising partners) with DLA Piper and asked DLA Piper's managing partner in Hong Kong to consider interviewing Mr. Chang on the basis of that information. (P-61, at 1-4; Deposition of DLA Piper, P-126, at 10:14-12:21).

99.     The email messages Jowers sent to representatives of DLA Piper contained specific information about Mr. Chang's practice and interest in moving firms that was not generally known to the public and not readily ascertainable by proper means, which Jowers had a duty to keep confidential because it had been received by Jowers during his employment with KR-LLC. (Exhibit to Deposition of DLA Piper, P-61, at 1).

100.    The email Jowers sent to representatives of DLA Piper regarding James Chang resulted in an interview for Mr. Chang and his eventual placement at DLA Piper. (Deposition of DLA Piper, P-126, at 10:14-12:21).

101.    The email Jowers sent to representatives of DLA Piper regarding James Chang resulted in a fee of 798,034 Hong Kong dollars being paid to Legis Ventures on December 12, 2017. (Deposition of DLA Piper, P-126, at 12:3-12:21).

### c)    Rose Zhu

102.    While still employed by KR-LLC, in October 2016, Jowers obtained confidential information regarding Rose Zhu regarding her practice size, clients, and collections from clients, as well as her reasons for seeking a move of firms, her current compensation, and other information relevant to obtaining interviews for Ms. Zhu, and placed Ms. Zhu on Kinney Recruiting's candidate list. Jowers used that information to market Ms. Zhu to Kirkland & Ellis on behalf of Kinney Recruiting. (Emails to/from Kirkland & Ellis representative, P-62).

103.    Shortly after his resignation, Jowers sent the same confidential information regarding Ms. Zhu he had sent to Kirkland & Ellis to representatives of Pillsbury Winthrop Shaw Pittman (HK) LLP, Winston & Strawn, and Baker & McKenzie. (Email to Pillsbury, P-63, at 2-3; Email to Winston & Strawn, P-64; Email to Baker & McKenzie, P-65).

104.    Jowers recognized the continuing secret nature of the information regarding Ms. Zhu's practice as of the time he produced it in discovery in this case,

as evidenced by the "Attorneys' Eyes Only" designation on the information as produced by Jowers. (P-65).

105.   The information Jowers sent regarding Ms. Zhu contained specific information about Ms. Zhu's practice and interest in moving firms that was not generally known to the public and not readily ascertainable by proper means, which had been received by Jowers during his employment with KR-LLC. Sending this information resulted in an interview for Ms. Zhu and her eventual placement at Baker & McKenzie. Jowers had a duty not to reveal this information to third parties except for the benefit of Kinney Recruiting. (Deposition of Baker & McKenzie, P-122, at 8:2-9:4).

106.   The placement of Rose Zhu at Baker & McKenzie LLP occurred on or about May 17, 2017, and a fee of 453,600 Hong Kong dollars was paid by Baker & McKenzie for such placement to Legis Ventures. (P-93, at 1-7; Deposition of Baker & McKenzie, P-122, at 8:2-9:4).

### d)   Longhao Wang

107.   Also prior to Jowers's resignation, Longhao Wang sent a notification to Kinney Recruiting of his interest in becoming a candidate of Kinney Recruiting and provided specific information relevant to his interest in moving, thereby becoming a person on the Kinney Recruiting candidate list. The information was not generally known to the public and was not readily ascertainable by proper means. (P-69).

108.   Also prior to Jowers's resignation, Mr. Vargas emailed Latham & Watkins regarding Mr. Wang, and provided Latham the same specific information

regarding Mr. Wang and his interest in moving firms that was not generally known to the public, which he had received from Jowers during Jowers's employment with KR-LLC. This information was not readily ascertainable by proper means. (P-69).

109.  Jowers provided information regarding Mr. Wang to Mr. Vargas, his partner, for further action, prior to resigning from Kinney Recruiting. (P-53).

110.  Mr. Vargas continued to submit Mr. Wang as a candidate to other firms, including Gibson Dunn, Simpson Thacher, and Latham & Watkins, which is where Mr. Wang was eventually hired. (P-69).

111.  Jowers and Mr. Vargas secured Mr. Wang's placement at Latham & Watkins on or about September 24, 2018, and a fee of 390,000 Hong Kong dollars was paid by that firm to Legis Ventures. (Deposition of Latham & Watkins, P-130, at 7:16-8:7).

### e)    Pamela Usukumah

112.  Prior to Jowers's resignation, Pamela Usukumah provided Jowers with confidential information which constituted specific information not generally known to the public, which Jowers had a duty to keep confidential and which was not readily ascertainable by proper means. (P-71).

113.  Jowers knew of Ms. Usukumah from the marketing investment of Kinney Recruiting. (Trans. II, at 250-251).

114.  Jowers passed Ms. Usukumah's confidential information and materials to Mr. Vargas. (P-53). Mr. Vargas submitted Ms. Usukumah as a candidate to Latham & Watkins, Ropes & Gray, and other firms, including Morrison & Foerster.

(P-73, P-74, P-75). When Mr. Vargas obtained feedback from the firms following his submissions, he reported it to Jowers. (P-74).

115.  Jowers continued pursuing the placement of Ms. Usukumah following his resignation and placed Ms. Usukumah at Morrison & Foerster. (Trans. II, at 250-251).

116.  The placement of Ms. Usukumah at Morrison & Foerster occurred on or about August 1, 2017, and a fee of 458,893 Hong Kong dollars was paid by that firm to Legis Ventures. (P 102, at 1-4; Deposition of Morrison & Foerster, P-132, at 6:23-8:12)

### f)  Meng Ding

117.  While still employed by KR-LLC, Jowers received specific information from Meng Ding regarding his career, his partnership prospects, his experience, and what would motivate Mr. Meng to move firms. Despite Mr. Jowers's avowed failure to put the information he possessed regarding Mr. Meng into the Kinney Recruiting databases, Mr. Meng was part of the candidate list of Kinney Recruiting prior to Jowers's resignation, along with the information associated with him, which was not generally known to the public or readily ascertainable by proper means. (Trans. II, at 259-260).

118.  Mr. Meng sent this information to Jowers, instructing him to "please keep these in strict confidence." Jowers acknowledged the confidential nature of the information in his response to Mr. Meng, sent while Jowers was still employed by KR-LLC. (P-77; P-78).

119.   Following his resignation, Jowers continued to market Mr. Meng to client firms of KR-LLC using the same confidential information he had obtained prior to his resignation. (P-79).

120.   Jowers submitted Mr. Meng to Kirkland & Ellis using the confidential information regarding Mr. Meng he had obtained prior to his resignation from KR-LLC. The submission by Jowers sent to Kirkland & Ellis resulted in an interview for Mr. Meng and his eventual placement at Kirkland & Ellis. When Jowers produced that email message in the discovery phase of this case, he marked it "Attorneys' Eyes Only," signifying its continuing value and secrecy. (P-80)

121.   Jowers placed Meng Ding at Kirkland & Ellis LLP on or about November 16, 2017, and a fee of 878,765 Hong Kong dollars was paid by that firm to Legis Ventures. (Deposition of Kirkland & Ellis, P-129, at 8:2-9:4).

### g)    Summary of Trade Secret Damages

122.   By sending out the information that he did regarding the candidates who were on the Kinney Recruiting candidate list with specific, confidential information, Jowers breached his duties under the Jowers Agreement to maintain the confidentiality of that information. (Trans. I, at 143-149).

123.   Alejandro Vargas assisted Jowers in the breach of his duties to MWK. (P-67; P-69; P-73; P-74).

124.   The information contained in the Kinney Recruiting candidate list was valuable information belonging to MWK, not Jowers.

125.   The total amount of the fees earned by Jowers and his company, Legis, from the placement of Steve Kang, Rose Zhu, James Chang, Pamela Usukumah, Longhao Wang, and Meng Ding, was $559,444.99, based on the rates of exchange for the dates the payments were made. (Trans. I, at 76-77; P-163; Mot. re Judicial Notice of Exchange Rates, Dkt. 337).

126.   As damages, Counsel Holdings is seeking disgorgement of the $559,444.99 in fees earned by Jowers and Jowers Vargas for the placement of Steve Kang, Rose Zhu, James Chang, Pamela Usukumah, Longhao Wang, and Meng Ding.

127.   MWK also seeks exemplary damages, attorney fees, and costs. (Trans. I, at 167).

### ii.   Breach of Contract - Jowers Agreement
#### a)   Breaches prior to Resignation

128.   Jowers breached his confidentiality (P-2, at ¶3.2) and non-competition (P-2, at ¶4.4) obligations under the Jowers Agreement in September 2016, prior to his resignation on December 16, 2016 (US Central Time), by sending the confidential candidate information regarding Steve Kang directly to Latham & Watkins LLP, using his private email address. (P-57; Dep. of Latham & Watkins, P-130, at 16:19-17:3).

129.   Jowers also breached the same obligations by sending confidential information regarding KR-LLC's candidates to Alejandro Vargas, a competitor of KR-LLC, for further transmission to KR-LLC's clients. (P-53; P-69; P-73; P-74).

130.   Jowers did not produce email from his personal email account, evanjowers@yahoo.com, in response to discovery requests in this case; rather, what email was produced in this case from the evanjowers@yahoo.com email account came from subpoenaed information from MWK's clients. Jowers blames his attorneys for failing to produce the requested information. (Trans. II, at 84-87).

131.   As a result of his failure to honor his obligations under the Jowers Agreement, Jowers caused KR-LLC a loss of goodwill of clients and candidates of MWK.

### b)   Legitimate Business Interests Protected

132.   The reason for the restrictive covenants in the Jowers Agreement was to protect certain legitimate business interests of Kinney Recruiting. (P-2, at ¶¶3.3, 3.4; Trans. I, at 65-66; 81-88). MWK invested in a specific marketing or trade area for the benefit of Jowers at Jowers's request and urging: the Asia legal hiring market. As a result of the development of substantial goodwill associated with MWK's ongoing business, Jowers developed substantial relationships with specific clients and candidates of MWK. (P-20, P-21). Jowers also was expected to and did come into the possession of valuable confidential information regarding candidates and clients, some of which constituted trade secrets of his employer. When Jowers wrote to Kinney in August 2006 to offer him "peace of mind" by suggesting that he would be willing to sign a "non-compete," Jowers intended to induce investment by MWK that would allow him to develop the very relationships, goodwill, and confidential/trade secret information he ultimately was able to develop. (*Id.*; P-17).

Specifically, Jowers's signature on the Jowers Agreement induced investment by MWK in development of its business in Asia through Jowers, such as investment in advertising in the Asia Chronicles publication on Above the Law. (Trans. II, at 25; 47-48; 211). MWK also paid for substantial travel expenses of Jowers to see clients and candidates. (P-35). Much of Jowers's time as a recruiter is spent advising specific attorneys with whom he has developed substantial relationships on their careers, as well as on their hiring practices. (Trans. II, at 211-212). By its very nature, it takes substantial time to accomplish the placement of a candidate in the legal recruiting industry. (Jowers Decl., P-143; Trans. I, at 88). MWK, as Jowers's employer, paid for development of the goodwill, relationships, and confidential information that constituted its legitimate business interests, such as by paying for publication of the Asia Chronicles publication on abovethelaw.com. (Trans. II, at 25).

### c)      Limitations on Scope of Restrictions

133.   The scope of the non-solicitation covenant at issue in this case is limited and was narrowly tailored to cover only the work that Jowers was involved with. For example, the restrictive covenant only covered services provided by Jowers in the personnel placement service business; a former employee could provide other types of services for the same entities that were covered by the restrictive covenant. (P-2, at ¶8.2; Trans. I, at 82-86). Further, the restriction only applied to candidates and clients for whom Jowers had had contact, knowledge or access during the year prior to his termination of employment. *Id*.   Counsel

Holdings seeks only to enforce the non-solicitation covenant as to the clients and candidates with which Jowers had contact during the year prior to his termination. (Trans. II, at 50). This is a narrowly tailored restrictive covenant.

### d)    One Year Restrictive Covenant

134.    For one year following termination of his employment, Jowers was prohibited under the Jowers Agreement from soliciting or providing services to any candidate or client with whom he had contact, knowledge, or access during the twelve months immediately preceding the effective date of termination, and from assisting any entity other than the Company in doing so. (Jowers Agreement, P 2 ¶8.1).

135.    Jowers resigned his employment with KR-LLC on December 16, 2016. (Dkt. 305-4, at 3, ¶1). Jowers had contact with each of the following clients of MWK between December 17, 2015, and December 16, 2016: Allen & Overy (P-20, at 58), Baker & McKenzie LLP (P-20, at 14, 16), Cleary Gottlieb Steen & Hamilton LLP (P-20, at 11), Cooley LLP (P-20, at 1), Covington & Burling (P-20, at 25, 28), DLA Piper LLP (P-20, at 61), Gibson, Dunn & Crutcher LLP (P-20, at 65), Gunderson Dettmer (P-20, at 24, 37-39), Kirkland & Ellis LLP (P-20, at 54), Latham & Watkins LLP (P-20, at 40), Linklaters (P-20, at 52), Morrison & Foerster, LLP (P-20, at 64), Skadden, Arps, Slate, Meagher & Flom, LLP (P-20, at 33), and Weil, Gotshal & Manges, LLP (P-20, at 57). (Summary Slide, P-161)

136.    Jowers had contact with each of the following candidates of MWK between December 17, 2015, and December 16, 2016: Kevin Cooper (P-20, at 3),

Ferish Patel (P-20, at 24), Ingram Weber (P-20, at 34), Rose Zhu (P-20, at 70), Nicole (Wenhan) Ma (P-20, at 25-32), James Chang (P-20, at 71-77), Jason (Jiaxing) Xu (P-20, at 40-41), Meng Ding (P-77; P-78), Steve (Wonsuk) Kang (P-20, at 14; Trans. II, at 142-143; Deposition of Latham, P-130, at 16:19 to 17:1), Benjamin Su (P-20, at 40), Longhao Wang (P-69), Amit Singh (P-20, at 58), Pamela Usukumah (P-71), and Steve Sha (P-20, at 11). (Summary Slide, P-160).

### e)    Tolling of Length of Restrictive Covenant

137.    Pursuant to the Jowers Agreement, for any period during which Jowers engages in activities constituting a violation of the restrictive covenants, including assistance provided to any other entity, the one-year period following termination automatically extended to include such additional period. (Jowers Agreement, P-2, at ¶¶8.1, 9.4).

138.    Legis Ventures is a company that Jowers founded, organized under the laws of Hong Kong.  (P-88). Jowers controls Legis Ventures and Legis Ventures is the vehicle by which placement activity that Jowers has assisted with has been conducted. (Emails to/from Legis Accountant, P 91; Dep. of Alexis Lamb, P-135, at 61:11-62:15; Trans. II, at 85, 122, 126-127).

139.    "Jowers Vargas" is the trade name by which Jowers operates Legis Ventures, Jowers Vargas LLC, a Florida company, and Jowers Langer, LLC, also a Florida company, each of which is involved in the personnel placement business for attorneys. (Trans. II, at 117-119).

140.    Jowers assists with each of the placements that are made by Jowers Vargas. (Trans. II, at 128:4-130:13; Dep. of Alexis Lamb, at 78:11 to 78:14; 82:19 to 83:4; 97:10-98:6;12 to 122:16 to 123:6).

141.    On April 19, 2017, Jowers solicited or assisted Jowers Vargas in soliciting Weil Gotshal as a client for personnel placement services. (P-21, at 1; Trans. II, at 128:4-130:13; Dep. of Alexis Lamb, at 78:11 to 78:14; 82:19 to 83:4; 97:10-98:6;12 to 122:16 to 123:6). Weil Gotshal was a firm Jowers had had contact with in the course of providing personnel placement services during the one year period prior to his resignation on December 16, 2016. (*See, above*, at 29, ¶133).

142.    On September 14, 2017, Jowers solicited or assisted Jowers Vargas in soliciting Weil Gotshal as a client for personnel placement services. (P-21, at 2; Trans. II, at 128:4-130:13; Dep. of Alexis Lamb, at 78:11 to 78:14; 82:19 to 83:4; 97:10-98:6;12 to 122:16 to 123:6). Weil Gotshal was a firm Jowers had had contact with in the course of providing personnel placement services during the one year period prior to his resignation on December 16, 2016. (*See, above*, at 29, ¶133).

143.    On February 12, 2018, Jowers solicited or assisted Jowers Vargas in soliciting Latham & Watkins LLP as a client for personnel placement services. (P-21, at 3-7; Trans. II, at 128:4-130:13; Dep. of Alexis Lamb, at 78:11 to 78:14; 82:19 to 83:4; 97:10-98:6;12 to 122:16 to 123:6). This was a client of KR-LLC Jowers had had contact with in the course of providing personnel placement services during the one year period prior to his resignation on December 16, 2016. (*See, above*, at 29, ¶133).

144.    On March 14, 2018, Jowers solicited or assisted Jowers Vargas in soliciting Latham & Watkins LLP. (P-21, at 8-9; Trans. II, at 128:4-130:13; Dep. of Alexis Lamb, at 78:11 to 78:14; 82:19 to 83:4; 97:10-98:6;12 to 122:16 to 123:6). This was a client of KR-LLC Jowers had had contact with in the course of providing personnel placement services during the one year period prior to his resignation on December 16, 2016. (*See, above*, at 29, ¶133).

145.    On March 15, 2018, Jowers solicited or assisted Jowers Vargas in soliciting Weil Gotshal as a client for personnel placement services. (P-21, at 9-10; Trans. II, at 128:4-130:13; Dep. of Alexis Lamb, at 78:11 to 78:14; 82:19 to 83:4; 97:10-98:6;12 to 122:16 to 123:6). This was a client of KR-LLC Jowers had had contact with in the course of providing personnel placement services during the one year period prior to his resignation on December 16, 2016. (*See, above*, at 29, ¶133).

146.    On July 30, 2018, Jowers solicited or assisted Jowers Vargas in soliciting Latham & Watkins LLP as a client for personnel placement services. (P-21, at 12-19; Trans. II, at 128:4-130:13; Dep. of Alexis Lamb, at 78:11 to 78:14; 82:19 to 83:4; 97:10-98:6;12 to 122:16 to 123:6). This was a client of KR-LLC Jowers had had contact with in the course of providing personnel placement services during the one year period prior to his resignation on December 16, 2016. (*See, above*, at 29, ¶133).

147.    On March 20, 2019, Jowers solicited or assisted Jowers Vargas in soliciting Weil Gotshal as a client for personnel placement services. (P-21, at 20; Trans. II, at 128:4-130:13; Dep. of Alexis Lamb, at 78:11 to 78:14; 82:19 to 83:4;

97:10-98:6;12 to 122:16 to 123:6). This was a client of KR-LLC Jowers had had contact with in the course of providing personnel placement services during the one year period prior to his resignation on December 16, 2016. (*See, above*, at 29, ¶133).

148.   On October 7, 2019, Jowers solicited or assisted Jowers Vargas in soliciting Latham & Watkins LLP as a client for personnel placement services. (P-21, at 21-26; Trans. II, at 128:4-130:13; Dep. of Alexis Lamb, at 78:11 to 78:14; 82:19 to 83:4; 97:10-98:6;12 to 122:16 to 123:6). This was a client of KR-LLC Jowers had had contact with in the course of providing personnel placement services during the one year period prior to his resignation on December 16, 2016. (*See, above*, at 29, ¶133).

149.   On July 17, 2020, Jowers solicited or assisted Jowers Vargas in soliciting Weil Gotshal as a client for personnel placement services. (P-21, at 27; Trans. II, at 128:4-130:13; Dep. of Alexis Lamb, at 78:11 to 78:14; 82:19 to 83:4; 97:10-98:6;12 to 122:16 to 123:6). This was a client of KR-LLC Jowers had had contact with in the course of providing personnel placement services during the one year period prior to his resignation on December 16, 2016. (*See, above*, at 29, ¶133).

150.   On November 16, 2020, Jowers solicited or assisted Jowers Vargas in soliciting Weil Gotshal as a client for personnel placement services. (P-21, at 28). (P-21; Trans. II, at 128:4-130:13; Dep. of Alexis Lamb, at 78:11 to 78:14; 82:19 to 83:4; 97:10-98:6;12 to 122:16 to 123:6). This was a client of KR-LLC Jowers had had contact with in the course of providing personnel placement services during the one year period prior to his resignation on December 16, 2016. (*See, above*, at 29, ¶133).

151.   By virtue of the above-listed actions, the period of the restrictive covenants contained in the Jowers Agreement extended by their terms to November 16, 2021.

### f)   Placements Made in Violation of Non-Solicitation Covenant

152.   Jowers placed, or assisted Jowers Vargas in the placement of, **Ryan Grimm** at Gunderson Dettmer on or about March 6, 2017, and a fee of 58,750 United States dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Gunderson Dettmer, P-128, at 8:18-10:2; P-99, at 21-22; Trans. II, at 128:4-130:13; Dep. of Alexis Lamb, at 78:11 to 78:14; 82:19 to 83:4; 97:10-98:6;12 to 122:16 to 123:6).

153.   Jowers placed, or assisted Jowers Vargas in the placement of, **Rose Zhu** at Baker & McKenzie LLP on or about May 17, 2017, and a fee of 453,600 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Baker & McKenzie, P-122, at 8:2-9:4; P-93, at 1-7).

154.   Jowers placed, or assisted Jowers Vargas in the placement of**, Congsi Wu** at Baker & McKenzie LLP on or about May 17, 2017, and a fee of 84,209 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Baker & McKenzie, P-122, at 9:5-10:4; P-93, at 8-10).

155.   Jowers placed, or assisted Jowers Vargas in the placement of, **James Chang** at DLA Piper UK LLP on or about August 1, 2017, and a fee of 798,034 Hong Kong dollars was paid by that firm for such placement to Legis Ventures.

(Deposition of DLA Piper, P-126, at 10:14-12:21; P 61, at 1-4; Alexis Lamb Deposition, P-135, at 112:22-113:19).

156.    Jowers placed, or assisted Jowers Vargas in the placement of, **Steve (Wonsuk) Kang** at Latham & Watkins LLP on or about June 28, 2017, and a fee of 1,342,492 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Latham & Watkins, P-130, at 6:16-7:15; P-58, at 4-9).

157.    Jowers placed, or assisted Jowers Vargas in the placement of, **Jolyn Ang** at Gunderson Dettmer on or about July 5, 2017, and a fee of 351,462 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Gunderson Dettmer, P-128, at 6:21-8:17; P 99, at 1-2, 15-16).

158.    Jowers placed, or assisted Jowers Vargas in the placement of, **Jennifer (Xiafei) Liu** at Latham & Watkins LLP on or about August 14, 2017, and a fee of 458,250 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Latham & Watkins, P-130, at 8:8-8:24; P 58, at 15-19).

159.    Jowers placed, or assisted Jowers Vargas in the placement of, **Zhonghua (Stephen) Shi** at Latham & Watkins LLP on or about August 31, 2017, and a fee of 78,249.50 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Latham & Watkins, P-130, at 8:25-9:16; P 58, at 20-23).

160.    Jowers placed, or assisted Jowers Vargas in the placement of, **Pamela Usukumah** at Morrison & Foerster, LLP on or about August 1, 2017, and a fee of

458,893 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Morrison & Foerster, P-132, at 6:23-8:12; P 102, at 1-4; Alexis Lamb Deposition, P-135, at 111:4-112:21).

161.    Jowers placed, or assisted Jowers Vargas in the placement of, **Nicole (Wenhan) Ma** at Covington & Burling LLP on or about July 10, 2017, and a fee of 45,000 United States dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Covington & Burling, D-5, at 7:17-8:18; P 96, at 1-3).

162.    Jowers placed, or assisted Jowers Vargas in the placement of, **Mengqi Zhang** at Weil, Gotshal & Manges LLP on or about September 11, 2017, and a fee of 351,528 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Weil Gotshal, P-134, at 7:4-8:7; P 104, at 1-4).

163.    Jowers placed, or assisted Jowers Vargas in the placement of, **Jason (Woo-Jong) Lim** at Cleary Gottlieb Steen & Hamilton LLP on or about October 9, 2017, and a fee of 351,264 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Cleary, P-123, at 7:9-8:23; P 94, at 1-24).

164.    Jowers placed, or assisted Jowers Vargas in the placement of, **Judy Huang** at Kirkland & Ellis LLP on or about October 3, 2017, and a fee of 507,747 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Kirkland & Ellis, P-129, at 8:10-9:22; P 100, at 1).

165.    Jowers placed, or assisted Jowers Vargas in the placement of, **Olivia Wang** at Kirkland & Ellis LLP on or about October 9, 2017, and a fee of 158,232

Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Kirkland & Ellis, P-129, at 9:23-11:6; P 100, at 2-3).

166. Jowers placed, or assisted Jowers Vargas in the placement of, **Xunming Lim** at Allen & Overy LLP on or about June 8, 2018, and a fee of 80,729 United States dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Allen & Overy, P-121, at 8:2-9:1; Alexis Lamb Deposition, P-135, at 140:21-140:25).

167. Jowers placed, or assisted Jowers Vargas in the placement of, **Meng Ding** at Kirkland & Ellis LLP on or about November 16, 2017, and a fee of 878,765 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Kirkland & Ellis, P-129, at 11:7-12:12; P 100, at 4-5).

168. Jowers placed, or assisted Jowers Vargas in the placement of, **Chuan Liu** at Morrison & Foerster, LLP on or about January 15, 2018, and a fee of 459,463 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Morrison & Foerster, P-132, at 8:13-9:25; P 102, at 5-9).

169. Jowers placed, or assisted Jowers Vargas in the placement of, **Benjamin Su** at Latham & Watkins LLP on or about February 12, 2018, and a fee of 1,960,360 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Latham & Watkins, P-130, at 9:17-10:9; P 58, at 24-28; Alexis Lamb Deposition, P-135, at 136:19-136:21).

170. Jowers placed, or assisted Jowers Vargas in the placement of, **Aster (Yi) Lin** at Latham & Watkins LLP on or about April 9, 2018, and a fee of 353,239

Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Latham & Watkins, P-130, at 10:10-10:25; P 58, at 29-34; Alexis Lamb Deposition, P-135, at 138:7-138:22).

171.    Jowers placed, or assisted Jowers Vargas in the placement of, **Samson (Shansang) Peng** at Latham & Watkins LLP on or about April 19, 2018, and a fee of 353,194 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Latham & Watkins, P-130, at 11:1-11:16; P 58, at 35-44).

172.    Jowers placed, or assisted Jowers Vargas in the placement of, **Vanessa Ho** at Gunderson Dettmer on or about April 18, 2018, and a fee of 45,000 United States dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Gunderson Dettmer, P-128, at 10:3-11:8; P 99, at 3-6, 25; Alexis Lamb Deposition, P-135, at 139:10-139:14).

173.    Jowers placed, or assisted Jowers Vargas in the placement of, **Ingram Weber** at Allen & Overy LLP on or about May 16, 2018, and a fee of 56,000 United States dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Allen & Overy, P-121, at 6:24-8:1; Alexis Lamb Deposition, P-135, at 139:15-140-11).

174.    Jowers placed, or assisted Jowers Vargas in the placement of, **Kevin Chow** at Latham & Watkins LLP on or about July 16, 2018, and a fee of 460,677.25 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Latham & Watkins, P-130, at 11:17-12:9; P 58, at 45-52; Alexis Lamb Deposition, P-135, at 78:8-78:12, 142:1-142:8).

175.    Jowers placed, or assisted Jowers Vargas in the placement of, **Jason (Jiaxing) Xu** at Gibson, Dunn & Crutcher LLP on or about July 23, 2018, and a fee of 427,900 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Gibson Dunn, P-127, at 6:23-8:8; P 98, at 1-3; Alexis Lamb Deposition, P-135, at 142:1-142:8).

176.    Jowers placed, or assisted Jowers Vargas in the placement of, **Longhao Wang** at Latham & Watkins LLP on or about September 24, 2018, and a fee of 390,000 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Latham & Watkins, P-130, at 7:16-8:7; P 58, at 10-14; Alexis Lamb Deposition, P-135, at 143:2-143:6).

177.    Jowers placed, or assisted Jowers Vargas in the placement of, **Cecile Yang** at Morrison & Foerster, LLP on or about November 5, 2018, and a fee of 428,450 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Morrison & Foerster, P-132, at 10:1-11:16; P 102, at 10-13; Alexis Lamb Deposition, P-135, at 85:17-87:2).

178.    Jowers placed, or assisted Jowers Vargas in the placement of, **Amit Singh** at Linklaters on or about November 10, 2018, and a fee of 3,045,767 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Linklaters, P-131, at 16:3-17:19; P 101, at 15-19; Alexis Lamb Deposition, P-135, at 143:10-143:13).

179.    Jowers placed, or assisted Jowers Vargas in the placement of, **Michele Discepola** at Linklaters on or about November 10, 2018, and a fee of 646,230 Hong

Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Linklaters, P-131, at 14:11-16:2; P 101, at 14).

180.   Jowers placed, or assisted Jowers Vargas in the placement of, **Valerie Wood** at Gunderson Dettmer on or about February 25, 2019, and a fee of 30,000 United States dollars was paid by that firm for such placement to Jowers Langer LLC. (Deposition of Gunderson Dettmer, P-128, at 11:15-13:15; P 99, at 23-24; Alexis Lamb Deposition, P-135, at 144:16-145:14).

181.   Jowers placed, or assisted Jowers Vargas in the placement of, **Gillian Teo** at Morrison & Foerster, LLP on or about February 7, 2019, and a fee of 431,524.35 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Morrison & Foerster, P-132, at 11:17-13:7; P 102, at 14-18; Alexis Lamb Deposition, P-135, at 83:19-85:16).

182.   Jowers placed, or assisted Jowers Vargas in the placement of, **Christie Mok** at Linklaters on or about January 28, 2019, and a fee of 379,698 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Linklaters, P-131, at 7:11-9:2; P 101, at 1-3; Alexis Lamb Deposition, P-135, at 80:13-80:23).

183.   Jowers placed, or assisted Jowers Vargas in the placement of, **Calvin Soon** at Linklaters on or about March 25, 2019, and a fee of 250,010 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Linklaters, P-131, at 12:16-14:10; P 101, at 10-13).

184.   Jowers placed, or assisted Jowers Vargas in the placement of, **Brian Snyder** at Morrison & Foerster, LLP on or about March 4, 2019, and a fee of 814,437 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Morrison & Foerster, P-132, at 13:8-14:23; P 102, at 19-23; Alexis Lamb Deposition, P-135, at 88:24-89:14).

185.   Jowers placed, or assisted Jowers Vargas in the placement of, **Brittany Nicely (Chiang)** at Gunderson Dettmer on or about May 7, 2019, and a fee of 50,000 United States dollars was paid by that firm for such placement to Jowers Langer LLC. (Deposition of Gunderson Dettmer, P-128, at 13:16-15:15; P 99, at 9-12; Alexis Lamb Deposition, P-135, at 147:16-148:12).

186.   Jowers placed, or assisted Jowers Vargas in the placement of, **Lianchen (Claire) Liu** at Linklaters on or about April 14, 2020, and a fee of 62,224.80 Singapore Dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Linklaters, P-131, at 10:20-12:15; P 101, at 7-9).

187.   Jowers placed, or assisted Jowers Vargas in the placement of, **Eric Xu** at Morrison & Foerster, LLP on or about May 6, 2019, and a fee of 180,000 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Morrison & Foerster, P-132, at 14:24-16:15; P 102, at 24-28).

188.   Jowers placed, or assisted Jowers Vargas in the placement of, **Erika Tang** at Gibson, Dunn & Crutcher LLP on or about June 24, 2019, and a fee of 597,037.50 Hong Kong dollars was paid by that firm for such placement to Legis

Ventures. (Deposition of Gibson Dunn, P-127, at 8:9-9:7; P 98, at 4-6; Alexis Lamb Deposition, P-135, at 148:13-149:4).

189.   Jowers placed, or assisted Jowers Vargas in the placement of, **Constantinos Pappas** at Gibson, Dunn & Crutcher LLP on or about August 5, 2019, and a fee of 55,000 United States dollars was paid by that firm for such placement to Jowers Langer LLC. (Deposition of Gibson Dunn, P-127, at 10:7-11:23; P 98, at 10-12; Alexis Lamb Deposition, P-135, at 149:21-150:6, 151:2-152:23).

190.   Jowers placed, or assisted Jowers Vargas in the placement of, **Kyle Menges** at Gunderson Dettmer on or about August 5, 2019, and a fee of 50,000 United States dollars was paid by that firm for such placement to Jowers Langer LLC. (Deposition of Gunderson Dettmer, P-128, at 15:16-17:15; P 99, at 19-20; Alexis Lamb Deposition, P-135, at 156:1-156:11).

191.   Jowers placed, or assisted Jowers Vargas in the placement of, **Ferish Patel** at Cooley LLP on or about July 29, 2019, and a fee of 3,170,352 Hong Kong dollars was paid by that firm for such placement to Legis Ventures Ventures. (Deposition of Cooley, P-124, at 6:18-7:15; P 95, at 1-2; Alexis Lamb Deposition, P-135, at 149:5-149:20).

192.   Jowers placed, or assisted Jowers Vargas in the placement of, **Rui Xie** at Gibson, Dunn & Crutcher LLP on or about September 23, 2019, and a fee of 371,925 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Gibson Dunn, P-127, at 9:8-10:6; P 98, at 7-9; Alexis Lamb Deposition, P-135, at 156:12-156:23).

193.    Jowers placed, or assisted Jowers Vargas in the placement of, **Samson (Shansang) Peng** at Skadden, Arps, Slate, Meagher & Flom, LLP on or about September 24, 2019, and a fee of 46,980 United States dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Skadden, P-133, at 8:10-9:15).

194.    Jowers placed, or assisted Jowers Vargas in the placement of, **James Jackson** at Cooley LLP on or about September 30, 2019, and a fee of 637,199.06 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Cooley, P-124, at 7:17-8:16; P 95, at 3-4; Alexis Lamb Deposition, P-135, at 157:6-157:11).

195.    Jowers placed, or assisted Jowers Vargas in the placement of, **Stan (Wang) Yao** at Skadden, Arps, Slate, Meagher & Flom, LLP on or about November 4, 2019, and a fee of 47,095 United States dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Skadden, P-133, at 9:16-10:8; Alexis Lamb Deposition, P-135, at 159:2-159:21).

196.    Jowers placed, or assisted Jowers Vargas in the placement of, **Yiting Li** at Skadden, Arps, Slate, Meagher & Flom, LLP on or about November 12, 2019, and a fee of 47,500 United States dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Skadden, P-133, at 10:9-11:2; Alexis Lamb Deposition, P-135, at 159:24-160:22).

197.    Jowers placed, or assisted Jowers Vargas in the placement of, **John Maselli** at DLA Piper LLP (US) on or about November 18, 2019, and a fee of 125,000 United States dollars was paid by that firm for such placement to Jowers

Langer LLC. (Deposition of DLA Piper, P-126, at 12:22-15:8; P 61, at 5-11; Alexis Lamb Deposition, P-135, at 160:23-161:15).

198.    Jowers placed, or assisted Jowers Vargas in the placement of, **Tae Hun Kim** at Linklaters on or about October 14, 2019, and a fee of 603,510.60 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Linklaters, P-131, at 9:3-10:19; P 101, at 4-6).

199.    Jowers placed, or assisted Jowers Vargas in the placement of, **Miae Woo** at Cooley LLP on or about January 13, 2020, and a fee of 217,637 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Cooley, P-124, at 9:16-10:13; P 95, at 7-9; Alexis Lamb Deposition, P-135, at 161:16-161:23).

200.    Jowers placed, or assisted Jowers Vargas in the placement of, **Khadijah Owens** at Gunderson Dettmer on or about March 2, 2020, and a fee of 50,000 United States dollars was paid by that firm for such placement to Jowers Langer LLC. (Deposition of Gunderson Dettmer, P-128, at 18:25-20:17; P 99, at 17-18; Alexis Lamb Deposition, P-135, at 118:3-118:22).

201.    Jowers placed, or assisted Jowers Vargas in the placement of, **Kevin Cooper** at Cooley LLP on or about March 20, 2020, and a fee of 232,500 United States dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Cooley, P-124, at 8:17-9:15; P 95, at 5-6; Alexis Lamb Deposition, P-135, at 161:24-162:20).

202.    Jowers placed, or assisted Jowers Vargas in the placement of, **Qi Zhang** at Weil, Gotshal & Manges, LLP on or about March 9, 2020, and a fee of 368,870 Hong Kong dollars was paid by that firm for such placement to Legis Ventures. (Deposition of Weil Gotshal, P-134, at 8:8-9:10; P 104, at 5-8).

203.    Jowers placed, or assisted Jowers Vargas in the placement of, **Jason Li** at Gunderson Dettmer on or about April 13, 2020, and a fee of 50,000 United States dollars was paid by that firm for such placement to Jowers Langer LLC. (Deposition of Gunderson Dettmer, P-128, at 17:16-18:24; P 99, at 13-14; Alexis Lamb Deposition, P-135, at 132:4-132:20).

### g)    Summary of Breach of Contract Damages

204.    Jowers and Kinney negotiated a liquidated damages clause which provided that "the Employee shall pay to the Company, upon demand, as liquidated damages…any fee paid for services rendered in violation of [the restrictive covenants], whether paid to the Employee or to any other person, firm, or entity; plus all costs and expenses, including reasonable attorney's fees, incurred by the Company in the enforcement of its rights relating to such violation." (Jowers Agreement, P 2 ¶9.1). The Court has already found that Jowers waived the right challenge the merits of the liquidated damages clause. (Dkt. 285, at 10-12).

205.    As Jowers testified at trial, the liquidated damages under the Jowers Agreement do not constitute all the placement fees earned by Jowers and others he assisted. (Trans. II, at 81 (Jowers: "I don't even want it out there in the public that I've only made 53 placements…"). The liquidated damages also do not cover all

scenarios in which there was a breach by Jowers, nor do they compensate MWK for all damages that occurred if, for example, Jowers or his new colleagues worked to place a candidate or client, maintaining her goodwill, but did not place her, triggering damages. (Trans. I, at 135; 148-149).

206.    MWK's total demonstrated liquidated damages under the Jowers Agreement in United States Dollars is $4,034,337.97. (P-162; Motion for Judicial Notice of Exchange Rates, Dkt. 337). MWK seeks this amount as damages for its breach of contract claims, as well as attorney fees and costs.

207.    MWK does not seek double recovery of damages sustained as a result of Jowers's misappropriation of trade secrets related to the trade secret candidates he took as "live deals," unless awarded as exemplary damages. (Trans. I, at 183).

### iii.    2012 Revolving Loan Agreement and Promissory Note

208.    Jowers signed the 2012 Revolving Loan Promissory Note, which was issued pursuant to the 2012 Revolving Loan Agreement. (Trans. II, at 101).

209.    By his signature on the 2012 Revolving Loan Promissory Note, Jowers waived grace, diligence, presentment, demand, notice of demand, dishonor, notice of dishonor, protest, notice of protest, and all exemption rights against the indebtedness evidenced by the note. (P-8, at 4).

210.    Counsel Holdings is the successor in interest to the assignee of the 2012 Revolving Loan Agreement, 2012 Revolving Loan Promissory Note, and the 2012 Revolving Loan Security Agreement. (Trans. I, at 77).

211.    Jowers authorized all charges to the 2012 Revolving Loan that were presented to him in accountings he received each pay period. (Trans. II, at 102). He

received those accountings twice per month. (Trans. I, at 73-74; 170). When Jowers had questions about the amounts on his loan accountings, he would inquire and the questions would be reconciled. (Trans. I, at 74).

212.   Other than the amount of commissions he was credited for the placement of a candidate named Hui Xu, Jowers does not dispute any specific charges or credits recorded by Counsel Holdings on the 2012 Revolving Loan. (Trans. II, at 102-104). Jowers has not provided his own accounting for the amounts owed under the 2012 Revolving Loan. (Trans. I, at 150-151).

213.   On December 15, 2016, CU-LLC applied a credit to Jowers's balance on the 2012 Revolving Loan of $147.85 following a payroll deduction of $30,147.85. (P-120, at 61).

214.   On December 16, 2016, when Jowers resigned, he was in default under the 2012 Revolving Loan Agreement, by virtue of the cross-default provisions in the 2012 Revolving Loan agreement and Jowers's default on the Forgivable Loan. (P-9, at ¶5.9; Trans. I, at 175-176).

215.   There was a separate $30,000 loan from KR-LLC to Jowers outstanding at the time of Jowers's resignation. (P-39; Trans. I, at 39-41; 231-232). The remaining $30,000.00 of the $30,147.85 December 15, 2016, payroll deduction was applied to pay off the $30,000.00 "zero-interest" loan. (Trans. I, at 39-41).

216.   On January 31, 2017, MWK applied a credit of $41,009 to the balance on the 2012 Revolving Loan, representing full credit for Jowers's portion of the Hui Xu placement fee. (P-165; Trans. I, at 53-56).

217.    Further transactions between CU-LLC, MWK, and Jowers gave rise to continuing indebtedness of Jowers to MWK under the 2012 Revolving Loan Agreement. After applying all offsets and applicable interest, as of January 31, 2017, Jowers owed $8,001.84 under the 2012 Revolving Loan Agreement. (P-165; Trans. I, at 53-56; 176-177).

218.    Following his resignation from KR-LLC on December 16, 2016, Jowers was in default under the 2012 Revolving Loan Agreement. Jowers has not paid and remains in default under the 2012 Revolving Loan Agreement. (Trans. I, at 77, 176-177).

219.    The daily rate of interest accruing on the indebtedness under the 2012 Revolving Loan Agreement since January 31, 2017, is 0.047222222%, or $3.78 per day based on the principal balance of $8,001.84. As of December 6, 2021, Jowers had total indebtedness of $14,690.04 under the 2012 Revolving Loan. (Trans. I, at 176-177).

220.    As damages on this claim, MWK is seeking $14,690.04, plus interest growing at $3.78 per day from December 6, 2021, plus attorney fees and costs. (Trans. I, at 177-178).

221.    Attorney fees, as well as costs are due MWK under the 2012 Revolving Loan Agreement. (P-9, at ¶7.3, 7.10).

### iv.    2012 Forgivable Loan and Promissory Note

222.    The 2012 Forgivable Loan Agreement created a $50,000 indebtedness of Jowers effective February 1, 2012, when Jowers received the $50,000. (Trans. II, at 97).

223.   The indebtedness was forgivable over nine years pro rata. Under the 2012 Forgivable Loan Agreement and the 2012 Forgivable Loan Promissory Note signed by Jowers, Jowers's termination of his employment on December 16, 2016, the remaining indebtedness became "immediately due and payable." (Trans. II, at 96; P-5, at ¶ 6(a), (b)). By failing to pay, Jowers was in default. No demand for payment by the lender was required due to Jowers's waiver contained in the promissory note. (P-5, at 6).

224.   Jowers did not dispute at trial that, as of December 6, 2021, the balance on the loan was $25,982.18, growing at 1.17% simple interest per annum. (Trans. II, at 100; P-164).

225.   Jowers has made no further payments on the 2012 Forgivable Loan since it came due and Jowers remains in default. (Trans. I, at 181).

226.   Jowers admitted he lacks any defense to payment of the balance owed on the 2012 Forgivable Loan. (Trans. II, at 99).

227.   MWK is seeking $25,982.18, plus interest growing at 78.7 cents per day from December 6, 2021, as well attorney fees and costs. (Trans. I, at 182).

**F.     Jowers's Remaining Counterclaims**

   **i.     Hong Kong Office Expenses**

228.   On summary judgment, the Court held that there were material fact issues regarding whether MWK was contractually required to pay for Jowers's housing expenses in Hong Kong. (Dkt. 285, at 8-10). As found above at page 15, there was no agreement by MWK to pay these expenses of Jowers. The purported Hong Kong contract was never executed, as it would have had to be in order to be

enforceable. Even if it had been executed, that contract would not have changed the amount of discretion Jowers's employer had to reimburse only usual and ordinary expenses, as determined by Kinney. Finally, Jowers was never surprised by the refusal to reimburse his expenses – Kinney set up an interest-free loan for Jowers so that he could incur the expenses as a lower cost. (*See, above*, at 15).

229.    Even if Jowers had established that his claim for Hong Kong expenses might have validity, Jowers did not present an accounting of the expenses in question or any other clear evidence from which the Court could determine what expenses were unreimbursed. (*See,* MWK's Pretrial Objections, Dkt. 306, at 8-9).

### ii.    Claim for Hui Xu Placement Fee

230.    Following reconsideration of its initial summary judgment order, the Court determined that a genuine fact issue existed as to the retroactive reduction of the Hui Xu commission. (Dkt. 314, at 8).

231.    The Court finds that Jowers was credited with the full value of his commission for the Hui Xu placement fee as of January 31, 2017, $41,009. Initially, Jowers was not credited with this commission, because MWK exercised its right to hold back amounts owed to Jowers under the Jowers Agreement, due to his admitted breaches of that agreement. Later, MWK retroactively applied the credit as of January 31, 2017. (P-2, at 10, ¶¶4.3, 4.4, and 4.5 ; Trans. I, at 40-43; 53-59; 170-174).

### G.    Previously Adjudicated Claims

### a)    Judgment on the Pleadings (Rule 12(c))

232.   Jowers original Count V (Fraud) was dismissed in its entirety by the Court in ruling on MWK's Motion for Judgment on the Pleadings. (Dkt. 229, at 7-14).

233.   Jowers's original Counts VI and VII (Civil RICO) were also dismissed by the Court in ruling on MWK's Motion for Judgment on the Pleadings. (Dkt. 229, at 14-16).

234.   Jowers's original Count VIII (declaratory relief) was dismissed by the Court in ruling on MWK's Motion for Judgment on the Pleadings. (Dkt. 229, at 17).

235.   Jowers's original Count X (veil piercing) was also dismissed by the Court in ruling on MWK's Motion for Judgment on the Pleadings. (Dkt. 229, at 17-18).

**b)**      **Summary Judgment Rulings**

236.   The Court granted summary judgment that Jowers's contract claims are governed by a four-year statute of limitations and any claims based on events before August 19, 2015, are time barred. (Order on MSJ, Dkt. 285, at 7-8).

237.   The Court has granted summary judgment against Jowers on his claims for unpaid bonuses. (Order on MSJ, Dkt. 285, at 10). MWK objected to several of Jowers's exhibits and his apparent attempt to introduce testimony regarding allegedly unpaid bonuses. (Dkt. 306, at 6). Jowers nevertheless devoted a considerable portion of his testimony to discussion of bonuses he alleges should have been paid. (*see, e.g.*, Trans. II, at 113 (Jowers describing a bonus as a "guaranteed bonus"). These claims were not a subject of the trial in this case.

238.   The Court has granted summary judgment against Jowers on his claims about commissions from 2014 to 2016, other than the claim for commission on the placement of Hui Xu. (Order on MSJ, Dkt. 285, at 11-12; Order on Motion for Recon., Dkt. 314, at 7-8). These claims were not a subject of the trial in this case.

239.   The Court has granted summary judgment against Jowers on his claims regarding promissory estoppel, including claims that Kinney would sponsor, obtain, and pay for a Hong Kong work visa for Jowers. (Order on MSJ, Dkt. 285, at 12-14).  These claims were not a subject of the trial in this case.

240.   The Court has granted summary judgment against Jowers on his claims for usury. (Order on MSJ, Dkt. 285, at 14-15). These claims were not a subject of the trial in this case.

241.   The Court has granted summary judgment against Jowers on his claims for unjust enrichment. (Order on MSJ, Dkt. 285, at 15-16). These claims were not a subject of the trial in this case.

### H.   Facts Relevant to Jowers's Affirmative Defenses

#### i.   Failure to State a Claim

242.   The Court ruled on Jowers's Motion for Judgment on the Pleadings on December 8, 2020. (Dkt. 229). None of MWK's claims were dismissed. The Court further ruled on Jowers's Motion for Summary Judgment on August 24, 2021. (Dkt. 285). Summary judgment was not granted on any of MWK's claims against Jowers.

#### ii.   Duress

243.   Jowers admitted he was not physically coerced by Kinney to obtain his signature to any of the agreements he signed. (Trans. Vol. II, at 74). Jowers

presented no evidence at trial of any other improper or unlawful conduct or threat of improper or unlawful conduct by any party in order to obtain his acquiescence to any of the agreements at issue in this case. At most, Jowers described that he was in a financially inferior position to Kinney and felt that because of this he had no choice but to agree or lose his job. (Trans. II, at 68-69).

### iii.   Prior Material Breach

244.   Amendments to Jowers's compensation were agreed in each case and Jowers acquiesced to all amendments to his compensation and the terms of his employment. (*See, above*, at pages 12 to 13, ¶¶61 to 69).

### iv.   Waiver

245.   MWK did not behave in a way that indicated voluntary relinquishment of any of its rights under the Jowers Agreement, the 2012 Revolving Loan, or the 2012 Forgivable Loan. Regarding its confidential information, MWK required all of its employees to sign confidentiality agreements. (Trans. I, at 186).

### v.   Estoppel

246.   None of MWK or its related entities' actions were ever intended to communicate to Jowers that his course of conduct in breaching the Jowers Agreement would be overlooked, ignored, approved, or affirmed in any manner.

247.   Jowers was not ignorant of any material true facts pertinent to the claims against him, nor was his knowledge of the situation so impaired as to support any reasonable reliance on his part that MWK or its related entities' ever intended to overlook, ignore, approve, or affirm his infringing conduct in any manner. To the contrary, as Jowers testified, he knew he was taking a "big risk"

when he decided to violate his obligations under the Jowers Agreement. (Trans. II, at 157).

### vi.    Fraud

248.    There is no material fact within the Jowers Agreement that was misrepresented to Jowers by Kinney, RP-LP, nor any subsequent employer by assignment of the Jowers Agreement.

249.    There is no material fact within the Forgivable Loan Agreement or associated Promissory Note that was misrepresented to Jowers by RP-GP or KR-LLC.

250.    There is no material fact within the Revolving Loan Agreement or associated Promissory Note and Security Agreement that was misrepresented to Jowers by CU-LLC.

251.    Neither RP-LP nor Kinney knowingly made any misrepresentations to Jowers in negotiation of the Jowers Agreement.

252.    Neither RP-GP nor Kinney knowingly made any misrepresentations to Jowers in negotiation of the Forgivable Loan Agreement or associated Promissory Note.

253.    Neither CU-LLC nor Kinney knowingly made any misrepresentations to Jowers in negotiation of the Revolving Loan Agreement or associated Promissory Note and Security Agreement.

254.    Jowers did not suffer any injury in justifiable reliance on any representation from his employer under the terms of the Jowers Agreement.

255.   Jowers did not suffer any injury in justifiable reliance on any representation from his employer under the terms of the Forgivable Loan Agreement or associate Promissory Note.

256.   Jowers did not suffer any injury in justifiable reliance on any representation from his employer under the terms of the Revolving Loan Agreement or associate Promissory Note and Security Agreement.

### vii.   Overbroad, Overlong, and Not Reasonably 130Necessary

257.   Please see the findings of fact related to the Jowers Agreement located on pages 27 to 29, at ¶¶130 to 132.

### viii.   Illegality

258.   There were no illegal acts by MWK that induced Jowers into accepting or continuing employment with MWK. There were no terms within any of the relevant agreements which were illegal.

### ix.   Lack of Consideration

Jowers received consideration for his agreement to enter into the Jowers Agreement in the form of continued employment and remuneration for that employment. Additionally, Jowers received financing support for the marketing to Asia-related candidates and clients that he hoped to obtain. (Trans. I, at 63-64).

### x.   Rescission

259.   No agreement between Jowers and MWK was procured by fraud, duress, or illegal conduct by MWK or any representative of MWK.

### xi.   Unclean Hands

At all times relevant, MWK acted in accordance with its rights under the

Jowers Agreement, the 2012 Revolving Loan, and the 2012 Forgivable Loan.

### xii.   Unconscionability

260.   Inclusion of the restrictive covenants included in the Jowers Agreement was solicited by Jowers himself. (P-17).

261.   Jowers freely assented to the language and extent of the restrictive covenants included in the agreement. (*See, above*, at 5).

262.   Jowers was not surprised by the inclusion of the restrictive covenants included in the Jowers Agreement. (P-17).

263.   Jowers was not oppressed by the restrictive covenants included in the Jowers Agreement, instead he obtained benefits that he wanted, such as advertising to support the recruiting practice he wanted to grow, as well as continued employment.

### xiii.   Information Readily Ascertainable

264.   As detailed above with regard to the trade secret misappropriation candidates, the information that Jowers used to place those candidates was highly secret information that was not readily ascertainable by others who did not have a relationship with them. (*See, above*, at pages 16 to 26, ¶¶77 to 127).

### xiv.   Independent Development

Jowers did not independently develop the information that he used to place Steve Kang, James Chang, Rose Zhu, Longhao Wang, Pamela Usukumah or Meng Ding. Instead, he used the resources of MWK to do so. (*See, above*, at pages 16 to 26, ¶¶77 to 127).

### xv.   Payment

Jowers conceded that he had not made payment on the 2012 Revolving Loan or the 2012 Forgivable Loan following his departure from employment by KR-LLC.

### I.   Attorney Fees

265.   The Court finds that Jowers has spent between $1.9 million and $2.3 million in attorney fees in this lawsuit as of the time of trial. (Trans. II, at 59-60).

266.   The Court further finds that Jowers believes that this amount of fees is reasonable for him to have spent in defending this matter. (Trans. II, at 59-60).

### J.   Litigation Misconduct

267.   Jowers has spent "over two million in legal fees," in defending this case and prosecuting his own claims, and Jowers has vowed to spend up to $20 million to fight the claims against him, even though the claims against him total significantly less. (Trans. II, at 57-58). This is not reasonable.

268.   The plethora of discovery orders issued in this case, which ruled against Jowers on multiple discovery motions, clearly shows that Jowers's efforts in this case have not been aimed at its legal merits. (*See, e.g.*, Ord. re Mot. to Comp., Dkt. 168; Ord. re Jowers Mot. for Prot. Ord., Dkt. 173; Ord. re Disc. Mot., Dkt. 236; Ord. to Show Cause, Dkt. 237).

269.   The brief Jowers submitted to Magistrate Judge Austin in response to Judge Austin's Order to Show Cause plainly stated Jowers's lack respect for this Court and the judicial process. (*See, e.g.*, Dkt. 245, at 19 ("…that is how little respect I have for your judgement [sic].")).

270.   Jowers's excuses for his conduct in this case are not credible. For example, Jowers asserted at trial that his delay in producing documents during discovery until after he was compelled to do so was because discovery had "barely started" when he made his first document production, which occurred in late May 2020. (Trans. II, at 77-79; Dkt. 168). As is clear from a look at the docket, though, discovery in the case was stayed only until resolution of the parties' motions to dismiss. (Order, Dkt. 82). The Court ruled on those motions July 29, 2019. (Order, Dkt. 87). By the time Jowers made his first document production, the stay had been lifted for ten months. As of trial, Jowers still had not produced an accounting on the loans. (Trans. I, at 150-151). Neither had he produced a tabulation of his expense damages or included anything about them in his proposed findings of fact and conclusions of law. (MWK Objections, Dkt. 306, at 8-9).

271.   Jowers pursued his RICO and fraud counterclaims in this case, as well as the claims against Michelle Kinney, primarily in order to harass MWK for bringing its claims against Jowers. (Trans. II, at 62-66). Jowers pursued the defense of the other claims against him without a rational legal strategy and, in some cases, without any defense at all. (*See, e.g.*, Trans. II, at 97-98 (Jowers re no defense to claims under Forgivable Loan)).

272.   Jowers has used this lawsuit as a vehicle to improperly harass MWK with baseless and irrelevant accusations for pursuing its claims. For example, Jowers accused Kinney of attempting to engage another MWK employee to "steal [Jowers's] car," in a public filing in this case. (Dkt. 246, at 17). Jowers made this

claim despite knowing that MWK had a security interest in the car in question securing a valid loan, the 2012 Revolving Loan. (Trans. II, at 70-71). Jowers knows that executing on a valid security interest is not theft.

273.   Jowers failed to produce email traffic from his evanjowers@yahoo.com account, including those emails referenced in the findings of fact above. (See, above, pages 18 and 27). This failure caused the plaintiff to need to seek the relevant messages from third party witnesses, harming his business and raising the cost of this litigation unnecessarily. (Trans. I, at 45). As noted above, Jowers's first production was ten months after discovery opened.

274.   Jowers plainly stated in his brief to Judge Austin that he expected his willingness to incur enormous – and unwarranted – legal fees in this case would prevent MWK from pursuing him. (Dkt. 245, at 22-23). Jowers's attempt at trial to explain that statement as anything other than an admission the vexatious nature of his handling of this litigation was not credible. (Trans. II, at 91-95). Jowers is correct that, in most cases, an opponent in litigation would not invest the time necessary to counter the relentless strategy of attack that Jowers and his attorneys have employed in this case.

275.   These claims and actions by Jowers were frivolous and have inflicted willful and malicious injury on MWK in an amount that the Court will determine following issuance of these findings of fact and conclusions of law. *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264 (5th Cir. 2005).

276.    MWK has pursued its claims against Jowers in good faith. None of MWK's claims against Jowers have been dismissed by the Court or adjudicated summarily.

## II.    CONCLUSIONS OF LAW

### A.    Jurisdiction and Venue

277.    This action arises under the Federal Defense of Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. Therefore, the Court has subject matter jurisdiction over this suit based on 28 U.S. Code § 1331.

278.    There is complete diversity of citizenship among all parties. Therefore, the Court has subject-matter jurisdiction over this suit based on 28 U.S.C. § 1332. (Dkt. 87, at 10, n. 7; 28 U.S.C. § 1332).

279.    This Court has personal jurisdiction over Jowers for all claims related to the 2012 Forgivable Loan and the 2012 Revolving Loan by virtue of his contractual consent in those documents. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n.14 (1985).

280.    This Court has personal jurisdiction over Jowers for all claims related to his employment agreement by virtue of the forum selection clause in the Jowers Agreement. (Dkt. 87, at 11); *see Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 444–45 (5th Cir. 2008).

281.    This Court may exercise supplemental jurisdiction over all MWK's contract claims under the Jowers Agreement and its tort claims alleging theft of trade secrets because all such claims arise out of the "same operative facts" as the other claims before the Court, namely, Jowers's submitting certain candidates

through a competitor in violation of his duties of non-disclosure and non-competition. *D–Two Commc'ns v. Comtel*, MO-09-CV-031, 2009 WL 10670036, at *2 (W.D. Tex. Nov. 30, 2009); (Dkt. 87, at 13).

282.   Venue is proper as Jowers expressly agreed in the contract of employment at issue in this case "to the exclusive personal jurisdiction and venue of any court in Travis County, Texas and waive[d] any defense" to personal jurisdiction and venue of any court in Travis County, Texas. (P-2, at ¶13.1).

### B.   Assignment of Agreements

283.   The various assignments of the Jowers Agreement by RP-LP, RP-GP, and KR-LLC validly assigned the Jowers Agreement to MWK LLC. The Jowers Agreement expressly stated that the parties agreed that the restrictive covenants contained in it were to "be enforceable by the Company's assignees and/or successors." (P-2, at ¶15.1). Pursuant to longstanding Florida law, assignments of personal service agreements such as the Jowers Agreement are valid. *See, e.g.*, *Pino v. Spanish Broad. Sys. of Fla., Inc.*, 564 So.2d 186, 189 (Fla.Dist.Ct.App. 1990) (holding that the language "transferable or assignable" plus ratification by continued employment was sufficient for valid assignment). Moreover, Florida Statutes Section 542.335, enacted in 1996, provides in pertinent part:

> (1) . . . In any action concerning enforcement of a restrictive covenant:
> . . .
> (f) The court shall not refuse enforcement of a restrictive covenant on the ground that the person seeking enforcement . . . is an assignee or successor to a party to such contract, provided:
> . . .
> 2. In the case of an assignee or successor, the restrictive covenant expressly authorized enforcement by a party's assignee or successor.

Fla. Stat. § 542.335. Because the Jowers Agreement was expressly assignable and the relevant Florida law so provides, the assignments of the Jowers Agreement do not diminish the rights of the successors to Jowers's original employer to enforce the restrictive covenants.

284.    By virtue of MWK-LLC's conversion into MWK, a corporation, and MWK's subsequent merger with Counsel Holdings, Counsel Holdings is the successor in interest to the Jowers Agreement with the right to enforce the restrictive covenants contained in that agreement. *Corporate Express Office Prod. v. Phillips*, 847 So. 2d 406, 414 (Fla. 2003) (holding that "the surviving corporation in a merger assumes the right to enforce a noncompete agreement entered into with an employee of the merged corporation by operation of law, and no assignment is necessary.").

285.    Likewise, the January 31, 2017, assignment by CU-LLC to MWK-LLC was a valid assignment of CU-LLC's rights and obligations under the 2012 Revolving Loan Agreement, the 2012 Revolving Loan Promissory Note, and the 2012 Revolving Loan Security Agreement to MWK-LLC. The 2012 Revolving Loan Agreement expressly authorized assignment by CU-LLC. (P-9, at ¶7.7). Likewise, the 2012 Revolving Loan Security Agreement expressly authorized assignment by CU-LLC. (P-10, at ¶7.8). Assignments of this nature are valid under Texas law, which governs these agreements. *Reinagel v. Deutsche Bank Nat'l Trust Co.*, 735 F.3d 220 (5th Cir. 2013).

### C.    Choice of Law

#### i.    Florida Law Applies

286.   The Court has previously found that the Jowers Agreement is governed by Florida law. (Order re Motion to Dismiss, Dkt. 87, at n.7, citing Jowers Emp't Agreement, P-2, ¶ 12.1). Texas law allows parties to select the law that governs the parties' rights and duties under an agreement. *See* Tex. Bus. & Comm. Code § 1.301(a); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990) ("When parties to a contract reside or expect to perform their respective obligations in multiple jurisdictions, they may be uncertain as to what jurisdiction's law will govern construction and enforcement of the contract. To avoid this uncertainty, they may express in their agreement their own choice that the law of a specified jurisdiction will apply to their agreement."). Here, MWK—a Texas entity—and Jowers—a Florida citizen—agreed that any "controversies, claims, disputes or matters in questions arising out of or relating to this Agreement shall be construed, governed, and enforced in accordance with the laws of Florida." (Dkt. 87, at n.7).

#### ii.    Estoppel - Hong Kong Law Does Not Apply

287.   Jowers specifically argued throughout this litigation that the Jowers Employment Agreement is governed by Florida law. For example, in seeking early dismissal of the case, Jowers argued, "Additionally, the Employment Agreement provides that it is governed by Florida law, which further demonstrates that Florida, not Texas, is the intended forum for all litigation." (Jowers's Motion to Dismiss, Dkt. 84, at 14). In the same motion, Jowers separately argued that the "Jowers Employment Agreement is governed by Florida law," pointing to the

Florida statutory scheme for enforcement of restrictive covenants in employment agreements. *Id.*, at 29. The Court adopted the position Jowers argued for, analyzing the restrictive covenants contained in the Jowers Agreement under Florida law. (Order re Motion to Dismiss, Dkt. 87, at n.12).

288.    Jowers asserted at trial, without reference to any actual Hong Kong legal authority, that the Court should apply Hong Kong law to invalidate the Jowers Agreement with regard to enforceability of the restrictive covenants in the Jowers Agreement. (Trans. II, at 196-199; Trans. III, at 31). To the extent that Jowers is now arguing that Hong Kong law should be applied by the Court to interpret the Jowers Agreement, such an assertion is clearly inconsistent with his prior assertion regarding applicability of Florida law to the Jowers Agreement. To the extent Jowers now seeks to assert he was employed by a different entity, Kinney Recruiting Limited, that assertion is inconsistent with Jowers's own pretrial submissions, which stated in the proposed findings of fact and conclusions of law that "On December 16, 2016, Jowers resigned from Kinney Recruiting LLC." (Dkt. 305-4, at 3).

289.    The Court will exercise its discretion to estop Jowers from arguing that he was working for Kinney Recruiting Limited (the Hong Kong entity) or that Hong Kong (instead of Florida) law applies to the Jowers Agreement. Judicial estoppel is "a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position." *Brandon v. Interfirst Corporation,* 858 F.2d 266, 268 (5th Cir. 1988). The purpose of the

doctrine is "to protect the integrity of the judicial process" by "prevent[ing] parties from `playing fast and loose' with (the courts) to suit the exigencies of self-interest." *Id.* Judicial estoppel is generally applied when "intentional self-contradiction is being used as a means of obtaining unfair advantage." *In re Coastal Plains, Inc.,* 179 F.3d 197, 206 (5th Cir. 1999), *cert. denied,* 528 U.S. 1117 (2000). The Fifth Circuit has stated that judicial estoppel applies: (1) where the position of the party to be estopped is clearly inconsistent with its previous one; and (2) that party must have convinced the court to accept that previous position. *Ahrens v. Perot Systems Corp.,* 205 F.3d 831, 833 (5th Cir.), *cert. denied,* 531 U.S. 819 (2000). Courts, however, may invoke the equitable doctrine of judicial estoppel at their discretion. *New Hampshire v. Maine,* 532 U.S. 742, 750 (2001). Because Jowers argued for applicability of Florida law, a position that the Court then adopted, and now argues that a different law should apply to the contract, the Court will exercise its discretion to prevent Jowers from asserting that Hong Kong law applies to invalidate the enforcement of restrictive covenants contained in the Jowers Agreement.

### D.   MWK's Claims

#### i.    Misappropriation of Trade Secrets

290.   Under both the Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act, a trade secret is defined as information the owner has taken reasonable measures to keep secret and which derives independent economic value from not being generally known or readily ascertainable through proper means. TEX. CIV. PRAC. & REM. CODE § 134A.002(6); 18 U.S.C. § 1839(3).

Misappropriation under both statutes includes (1) "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret" and (2) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." TEX. CIV. PRAC. & REM. CODE § 134A.002(3); 18 U.S.C. § 1839(5). "Improper means" include the "breach or inducement of a breach of a duty to maintain secrecy." TEX. CIV. PRAC. & REM. CODE § 134A.002(2); 18 U.S.C. § 1839(6)(A).

291.   "A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *CQ, Inc. v. TXU Min. Co.*, 565 F.3d 268, 274 (5th Cir. 2009) (quoting *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex.1996)). "It differs from other secret information in a business in that it is not simply information as to single or ephemeral events in the conduct of the business. . . . A trade secret is a process or device for continuous use in the operation of the business." *Id.* (quoting Restatement of Torts § 757, cmt. b.). To determine whether a trade secret exists, courts examine several factors: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which

the information could be properly acquired or duplicated by others. *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003). "Customer lists, pricing information, client information, customer preferences, buyer contacts, and marketing strategies have all been recognized as trade secrets." *Rimkus Consulting Grp., Inc. v. Cammarata*, 255 F.R.D. 417, 441 (S.D. Tex. 2008).

292.   "Texas courts consistently consider three factors when determining whether a customer list is a trade secret: (1) what steps, if any, an employer has taken to maintain the confidentiality of a customer list; (2) whether a departing employee acknowledges that the customer list is confidential; and (3) whether the content of the list is readily ascertainable." *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003). To show misappropriation, a plaintiff must show that the defendant acquired its trade secrets through improper means, such as through "breach or inducement of a breach of a duty to maintain secrecy." TEX. CIV. PRAC. & REM. CODE § 134A.002(2); 18 U.S.C. § 1839(6)(A). A defendant can be liable for misappropriation of trade secrets if, at the time of the unauthorized use or disclosure of the information, the defendant knew he obtained the information under circumstances giving rise to a duty to maintain its secrecy. TEX. CIV. PRAC. & REM. CODE § 134A.002(3)(B)(ii)(b); *see also HIS Co. v. Stover*, 202 F. Supp. 3d 685, 696 (S.D. Tex. 2016).

293.   The information Jowers disclosed to third parties while working for KR-LLC regarding Steve Kang, James Chang, Rose Zhu, Longhao Wang, Pamela Usukumah, and Meng Ding falls under the categories of information that Texas

courts have constituted trade secrets of MWK. MWK required its employees to sign non-disclosure agreements. (Trans. I, at 186). Jowers acknowledged by his own signature on the Jowers Agreement and by his efforts to keep his activities secret that the list he possessed of "live candidates" was confidential. The information was also not readily ascertainable. Therefore, the candidate list containing these six names and the associated information about them which led to their constituted trade secrets of MWK.

294.   Jowers's disclosure of this information constituted trade secret misappropriation because, at the time of the disclosure, Jowers knew or had reason to know that the knowledge of the trade secrets was acquired under circumstances giving rise to maintain the secrecy of the trade secret or limit the use of the trade secret.

295.   "Damages in misappropriation cases can take several forms: the value of plaintiff's lost profits; the defendant's actual profits from the use of the secret[;] the value that a reasonably prudent investor would have paid for the trade secret; the development costs the defendant avoided incurring through misappropriation; and a 'reasonable royalty.'" *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013); TEX. CIV. PRAC. & REM. CODE § 134A.004(a) ("Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not considered in computing actual loss.").

296.   "Willful and malicious" misappropriation is defined as "intentional misappropriation resulting from the conscious disregard of the rights of the owner of the trade secret." Tx. Civ. Prac. & Rem. § 134A.002(7).

297.   "Willful means intentional and malicious adds the absence of just cause or excuse." *Matter of Caton*, 157 F.3d 1026, 1030 (5th Cir. 1998).

298.   Jowers's misappropriation of trade secrets was willful and malicious.

299.   The evidence regarding Jowers's willful and malicious misappropriation of trade secrets is clear and convincing. *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848 (Tex. 2017).

300.   Jowers's misappropriation of the trade secrets of his employer caused damages to MWK in the amount of the placement fees generated from these candidates:   HKD$1,342,492 (Steve Kang);   HKD$798,034 (James Chang); HKD$390,000 (Longhao Wang);   HKD$458,893 (Pamela Usukumah); and HKD$878,765 (Meng Ding) because Jowers was unjustly enriched by these amounts; totaling 3,868,184 Hong Kong dollars, or $559,444.99 United States dollars.

301.   Jowers also caused loss of goodwill in the relationships with the clients of MWK where these candidates were placed, as well as other damages that are difficult to quantify.

302.   Because the damages for placement of the six candidates are duplicative of damages the Court is awarding for breach of contract, the Court will not award actual damages for Jowers's misappropriation of trade secrets.

303.   For Jowers's willful misappropriation of trade secrets, the Court awards exemplary damages in an amount of $559,444.99 United States dollars, the amount of damages found. 18 U.S.C. § 1836(b)(3)(C); Tex. Civ. Prac. & Rem. Code § 134A.004(b).

304.   For Jowers's willful and malicious misappropriation of trade secrets, the Court will award reasonable attorney fees to MWK in an amount to be determined upon presentation of attorney fee evidence. 18 U.S.C. § 1836(b)(3)(D); Tex. Civ. Prac. & Rem. Code § 134A.005(3).

### ii.    Revolving Loan

305.   The 2012 Revolving Loan Agreement, the 2012 Revolving Loan Promissory Note, and the 2012 Revolving Loan Security Agreement are governed by Texas law. (Dkt. 87, at 28, n. 15).

306.   Under Texas law, a plaintiff suing for recovery on a promissory note does not have to prove all essential elements of a breach of contract claim, but rather need only establish: "(1) there is a note, (2) the plaintiff is legal owner and holder, (3) the defendant is the maker, and (4) a certain balance is 'due and owing.'" *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 324 (Tex. App. 2011) (citing *Blankenship v. Robins*, 899 S.W.2d 236, 238 (Tex. App.—Houston [14th Dist.] 1994, no writ).

307.   The 2012 Revolving Loan Promissory Note is an existing promissory note.

308.   Counsel Holdings is the legal owner and holder of the 2012 Revolving Loan Promissory Note.

309.   Jowers is the maker of the 2012 Revolving Loan Promissory Note.

310.   $8,001.84 United States dollars plus simple interest of 17% per year accruing since January 31, 2017, or $3.78 per day, is due and owing under the 2012 Revolving Loan Agreement and the 2012 Revolving Loan Promissory Note.

311.   In addition, the Court will award reasonable attorney fees to MWK in an amount to be determined upon presentation of attorney fee evidence. Attorney fees are recoverable by MWK under the Loan Agreement's indemnity provisions. (P-9, at ¶7.7). They are also recoverable under the costs and expenses provision of the associated Security Agreement. (P-10, ¶7.5). Attorney's fees are recoverable by MWK under section 38.001(8) of the Texas Civil Practice and Remedies Code. That section permits a trial court to award attorney's fees "if the claim is for . . . (8) an oral or written contract." Tex. Civ. Prac. Rem. Code Ann. § 38.001(8).

### iii.   Forgivable Loan

312.   The 2012 Forgivable Loan Promissory Note is governed by Texas law. (Dkt. 87, at 28, n. 15).

313.   Under Texas law, a plaintiff suing for recovery on a promissory note does not have to prove all essential elements of a breach of contract claim, but rather need only establish: "(1) there is a note, (2) the plaintiff is legal owner and holder, (3) the defendant is the maker, and (4) a certain balance is 'due and owing.'" *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 324 (Tex. App. 2011) (citing *Blankenship v. Robins*, 899 S.W.2d 236, 238 (Tex. App.—Houston [14th Dist.] 1994, no writ).

314.   The 2012 Forgivable Loan Promissory Note is an existing promissory note.

315.   Counsel Holdings is the legal owner and holder of the 2012 Forgivable Loan Promissory Note.

316.   Jowers is the maker of the 2012 Forgivable Loan Promissory Note.

317.   $25,982.18 USD plus simple interest of 1.17% per annum ($0.78 per day) accruing since December 6, 2021, is due and owing on the 2012 Forgivable Loan Promissory Note.

318.   The Court finds that Counsel Holdings is entitled to damages totaling $25,982.18 USD plus simple interest of 1.17% per annum accruing since December 6, 2021.

319.   The Court will also award reasonable attorney fees to MWK in an amount to be determined upon presentation of attorney fee evidence. Attorney's fees are recoverable by MWK under section 38.001(8) of the Texas Civil Practice and Remedies Code. That section permits a trial court to award attorney's fees "if the claim is for . . . (8) an oral or written contract." Tex. Civ. Prac. Rem. Code Ann. § 38.001(8).

### iv.   The Jowers Agreement

### a)   Valid Contract under Florida Law

320.   Under Florida law, the elements of breach of contract are: (1) a valid contract; (2) a material breach; and (3) damages. *Beck ex rel. Estate of Southeast Banking Corp. v. Lazard Freres & Co.*, 175 F.3d 913 (11th Cir. 1999).

321.   "A contract is made under Florida law when the three elements of contract formation are present: offer, acceptance, and consideration." *Pezold Air Charters v. Phoenix Corp.*, 192 F.R.D. 721, 725 (M.D. Fla. 2000).

322.   It is undisputed that the contract formation elements of offer and acceptance were present.

### b)   Valid Modifications

323.   Under Florida law, because the Jowers Agreement was terminable by both MWK and Jowers at will, and Jowers continued his employment for MWK after each modification of the contract, there was valid consideration for each of the modifications. *Coastal Unilube, Inc. v. Smith*, 598 So. 2d 200, 201 (Fla. Dist. Ct. App. 1992) ("Where employment was a continuing contract terminable at the will of either employer or employee, the Florida Courts have held continued employment constitutes adequate consideration to support a contract."); *see also Open Magnetic Imaging, Inc. v. Nieves-Garcia*, 826 So. 2d 415, 417–18 (Fla. Dist. Ct. App. 2002).

324.   Jowers argues that Section 14.1 of the Jowers Agreement, which requires that modifications to the Agreement be "in a writing signed by the party to be charged," limited the ability of MWK to modify the Agreement even prospectively, despite Section 6.1's grant of authority to modify Exhibit A to the Agreement "from time to time as the Company, in its sole discretion, deems appropriate, provided that no such modification may be applied retroactively." (P-2, at ¶6.1). This argument is unavailing, not least because, in Florida, it is "well established that a written contract may be modified by a subsequent oral agreement or subsequent conduct of the parties, even though the written contract purports to prohibit such modification." *Siever v. Bwgaskets, Inc.*, 669 F. Supp. 2d 1286, 1298 (M.D. Fla. 2009) (citing authorities). The parties agreed to modify the Jowers

Agreement in 2011 to change Jowers's commission scale to the level it remained throughout the remainder of his employment. *See, above*, at 13, ¶¶68-69. Even if the Court had not so found, Jowers's continued work for more than five years under the 45%/50% commission scale constituted a waiver of the writing requirement of Section 14.1. *See, Linear Corp. v. Standard Hardware Co.*, 423 So. 2d 966 (Fla. Dist. Ct. App. 1983).

325.   Because offer, acceptance, and consideration existed, the Jowers Agreement is a valid and enforceable contract.

326.   The Jowers Agreement contains a merger clause. (*See, above*, at 6, ¶30). Although the existence of a merger clause does not conclusively establish that the integration of the agreement is total, it is a highly persuasive statement that the parties intended the agreement to be totally integrated and generally works to prevent a party from introducing parol evidence to vary or contradict the written terms. *See, Environmental Services v. Carter*, 9 So. 3d 1258, 1265 (Fla. Dist. Ct. App. 2009). Here, the restrictive covenants were clear and complete. The merger clause precludes the consideration of other documents to vary the terms of the agreement. *Id.*

### c)   Valid Restrictive Covenants

327.   Under Florida law, a restrictive covenant in the employment setting is valid if the employer can prove "(1) the existence of one or more legitimate business interests justifying the restrictive covenant; and (2) that the contractually specified restraint is reasonably necessary to protect the established interests of the

employer." *Veterinary Orthopedic Implants, Inc. v. Haas*, No. 3:20-cv-868-J-34MCR, 2020 WL 5369087 at *17 (M.D. Fla. Sep. 8, 2020) (citing *AutoNation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004); Fla. Stat. § 542.335(1)(b), (c).

328.  Under Florida law, a "legitimate business interest" includes, but is not limited to "[t]rade secrets, as defined . . . [by state statute]; [v]aluable confidential business or professional information that otherwise does not qualify as trade secrets; [s]ubstantial relationships with specific prospective or existing customers, patients, or clients; [c]ustomer, patient, or client goodwill associated with: [a]n ongoing business or professional practice, by way of trade name, trademark, service mark, or 'trade dress'; [a] specific geographic location; or [a] specific marketing or trade area; [and] [e]xtraordinary or specialized training." Fla. Stat. § 542.335(1)(b)(1)-(5). *See also, White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So. 3d 774, 782-83 (Fla. 2017).

329.  Counsel Holdings "need only establish the existence of one legitimate business interest to justify the enforcement of its restrictive covenant." *Veterinary Orthopedic Implants, Inc. v. Haas*, No. 3:20-cv-868-J-34MCR, 2020 WL 5369087, at *4 (M.D. Fla. Sep. 8, 2020). Yet, COUNSEL HOLDINGS has established several legitimate business interests. First, Counsel Holdings had a legitimate business interest in protecting its substantial client and candidate relationships Jowers described in his testimony as being so valuable to him. (*See, above*, at page 27). Second, Counsel Holdings has established that it had a legitimate business interest in protecting certain confidential business information to which Jowers had access,

including its trade secrets. (*See, above*, at page 16). Third, Counsel Holdings had a legitimate business interest in protecting the client and candidate goodwill associated with the MWK brand, particularly in Asia, where Jowers had been heavily promoted by MWK. (*See, above*, at page 27).

### d)    Worldwide Reach was Appropriately Tailored

330.    The worldwide reach of the restrictive covenants at issue in the Jowers Agreement is reasonable. Where the legitimate business interest at issue is confidential and proprietary information, courts have found restrictive covenants which extend beyond the specific region where the employee worked on behalf of his former employer may be reasonably necessary to protect the former employer's interests. *See Proudfoot Consulting Co.*, 576 F.3d at 1238-39 (collecting cases); *see also Autonation, Inc.*, 347 F. Supp. 2d at 1307-08 (finding a prohibition on working in "any geographic space in which [former employer] operates" reasonably necessary to protect confidential business information relevant to the markets in which it operates).

331.    Counsel Holdings has made a *prima facie* showing that the one-year period during which Jowers was restricted was reasonable.

332.    "In determining the reasonableness in time of a postterm restrictive covenant predicated upon the protection of trade secrets, a court shall presume reasonable in time any restraint of 5 years or less and shall presume unreasonable in time any restraint of more than 10 years. All such presumptions shall be rebuttable presumptions." Fla. Stat. § 542.335(1)(e). Because the restrictive

covenant in the Jowers Agreement is predicated upon the protection of trade secrets, the Court presumes that its restraint of five years is reasonable. The period of the liquidated damages sustained in this case even after tolling due to Jowers's breaches spans from Jowers's date of resignation until April 2020, a period of less than four years. Having made no effort to rebut the presumption that the period of the restrictive covenant in the Jowers Agreement is reasonable, Jowers has not met his burden of demonstrating that the restraint is "overbroad, overlong, or otherwise not reasonably necessary." *See* Fla. Stat. § 542.335(1)(c).

### e)      Tolling Clause is Enforceable

333.   The Jowers Agreement contains a tolling clause which states, "The one-year time periods referred to in Section 8 shall be extended to include any period of time during which the Employee engages in activities constituting a. violation of that Section." (P-2, at ¶9.4). After trial on the merits, such clauses are routinely enforced in courts applying Florida law. *See, e.g., Proudfoot Consulting v. Gordon*, 576 F.3d 1223, 1232 (11th Cir. 2009) (affirming the district court's holding that a "breach could be used to toll the six-month restrictive period even if that breach was not intentional."). Another recent Eleventh Circuit case applying Florida law considered the tolling clause unremarkable, holding, "To be sure, the employment agreements toll the duration of the twelve-month-long non-compete and employee non-solicitation covenants for as long as 'the [e]mployee is found to have been in violation of such restriction[s].'" *Vital Pharm. v. Alfieri*, No. 20-14217, at *11 (11th Cir. Jan. 20, 2022).

334.    Based on the evidence in the record, the last placement made by Jowers in violation of the restrictive covenants in this case was the placement of **Jason Li**, who Jowers and Jowers Vargas (with Jowers's assistance) placed Gunderson Dettmer on or about April 13, 2020. (*See, above*, at page 45, ¶201). Although Jowers testified at trial that he had made 79 placements in 2021 alone, the identity of the placed candidates and the firms where they were placed is unknown. Therefore, the restrictive covenants contained in the Jowers Agreement expired effective April 13, 2021.

### f)    Breach by Jowers and Damages

335.    Jowers materially breached the Jowers Agreement by (1) violating Section 3.2; (2) violating Section 4.4; and (3) violating Section 8.1.

336.    As the valid assignee, Counsel Holdings has suffered damages as a result of Jowers's breaches in the form of lost placement fees and lost profits as a result of the loss of goodwill from clients and candidates caused by Jowers's breaches, as well as damage to its reputation and loss of goodwill from clients and candidates.

### g)    Damages

337.    The Court has previously held that, due to Jowers's failure to plead unenforceability of the liquidated damages clause until summary judgment, he waived this defense. (Dkt. 285, at 19-21). However, even if the Court had not so held, the liquidated damages provision contained in the Jowers Agreement would be valid and enforceable as reasonable in its terms and as agreed to by both parties in

light of the difficulty of quantifying the damages sustained in the area of goodwill and client relationships.

338.    For his breaches of contract, Jowers is liable for liquidated damages in the full amount of the fees paid to Jowers Vargas for services rendered to clients and candidates in violation of Section 8.1 of the Jowers Agreement. Counsel Holdings's total demonstrated liquidated damages under the Jowers Agreement in United States Dollars is $4,034,337.97.

339.    The Court will also award reasonable attorney fees to Counsel Holdings in an amount to be determined upon presentation of attorney fee evidence. Attorney's fees are recoverable by Counsel Holdings under the Jowers Agreement. (P-2, at ¶¶9.1, 10.1).

### h)    Exchange Rates

340.    The Court will take judicial notice of the exchange rate between the Hong Kong Dollar, the Singapore Dollar, and the United States dollar published by the United States Federal Reserve Bank. (*See*, Motion for Judicial Notice of Exchange Rates, Dkt. 337).

### E.    Jowers's Pleaded Defenses

### i.    Failure to State a Claim

341.    The Court finds that Counsel Holdings has properly pled and proven its claims for each of its causes of action. (Ord. on Mot. for J. on Pleadings, Dkt. 229). Accordingly, Jowers's first defense fails.

### ii.   Duress

342.   Under Florida law, in order to prove duress, "it must be shown (a) that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or will and (b) that this condition of mind was caused by some improper and coercive conduct of the opposite side." *City of Miami v. Kory*, 394 So.2d 494 (Fla. 3d DCA 1981). "Threatened action cannot constitute duress, when there are adequate legal remedies available with which to challenge it." *Id.*, citing *Hartsville Oil Mill v. United States*, 271 U.S. 43 (1926).

343.   Likewise, under Texas law, "A common element of duress in all its forms (whether called duress, implied duress, business compulsion, economic duress or duress of property) is improper or unlawful conduct or threat of improper or unlawful conduct that is intended to and does interfere with another person's exercise of free will and judgment." *Dallas County Community College v. Bolton*, 185 S.W.3d 868, 878-79 (Tex. 2005). "To meet his burden on his affirmative defense, Jowers had to establish that KR-LLC or CU-LLC threatened to do an act that it had no legal right to do." *Lujan v. Navistar Fin. Corp.*, 433 S.W.3d 699, 707 (Tex. App. 2014).

344.   The Court finds that Jowers has not presented sufficient evidence to support a finding that any of his employing entities threatened to commit an action that they otherwise had no legal right to commit. Accordingly, Jowers's second defense fails.

### iii.    Prior Material Breach

345.    Jowers asserts that Counsel Holdings's claims are barred due to its prior material breaches of obligations of under each of the Jowers Agreement, the Revolving Loan Agreement, and the Forgivable Loan Agreement.

### a)    Truth in Lending Act

346.    The Court has already ruled that Jowers's claims that MWK violated the Truth in Lending Act and that MWK failed to register as a lender were forfeited by his failure to raise them timely. (Dkt. 285, at n. 5). Therefore, this issue is not part of this case.

347.    Nevertheless, MWK did not violate the Truth in Lending Act. The Truth in Lending Act states, "Except as specified in sections 1635, 1640, and 1666e of this title, this subchapter and the regulations issued thereunder do not affect the validity or enforceability of any contract or obligation under State or Federal law." 15 U.S.C. § 1610(d). Even if CU-LLC violated the Truth in Lending Act, such violation would not constitute a breach of the 2012 Revolving Loan Agreement. 12 C.F.R. § 226, known as Regulation Z, was issued by the Board of Governors of the Federal Reserve System to implement the federal Truth in Lending Act, which is contained in title I of the Consumer Credit Protection Act, as amended (15 U.S.C. 1601 et seq.). Regulation Z applies to individuals or businesses that offer or extend credit when four conditions are met: (1) the credit is offered to consumers; (2) the offering or extension of credit is done regularly; (3) the credit is subject to a finance charge or is payable by a written agreement in more than four installments; and (4) the credit is primarily for personal family or household purposes. 12 C.F.R. §

226.1(c). "A person regularly extends consumer credit only if it extended credit (other than credit subject to the requirements of § 226.32) more than 25 times (or more than 5 times for transactions secured by a dwelling) in the preceding calendar year." 12 C.F.R. § 226.2(a)(17)(v).

348.     The 2012 Revolving Line of Credit was an open-end credit plan within the meaning of Regulation Z. 12 C.F.R. § 226.2(a)(20). Because the 2012 Revolving Line of Credit was an open-end credit plan, "transactions means accounts, so that outstanding accounts are counted instead of individual credit transactions." *In re Stratton*, 299 B.R. 616, 621 (Bankr. D. Or. 2003) (citing Official Staff Interpretation, 12 C.F.R. Pt. 226, Supp. I, Subpart A, Cmt. 2(a)(17)(i)(4)). Accordingly, the 2012 Revolving Line of Credit is not a "regular" offering that falls within the meaning and requirements of Regulation Z. The Court finds that Jowers's third defense fails.

### b)     Breach of the Jowers Agreement

349.     Jowers has not demonstrated that MWK committed a material prior breach of the Jowers Agreement that would justify his failure to comply with the restrictive covenants contained in it. As described above, Jowers acquiesced to each modification of his compensation. In *Acosta v. Dist. Bd. of Trustees of Miami-Dade Comm. College*, 905 So. 2d 226, at 228-229 (Fla. 3d DCA 2005) ("Where a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement."). By continuing to work under the Jowers Agreement for ten years despite what he now describes as

dramatic hardships, Jowers has waived any right to rescind he might otherwise have had.

### iv.   Waiver

350.   Florida and Texas courts define "waiver" as the voluntary and intentional relinquishment of a known right or conduct which implies the voluntary and intentional relinquishment of a known right. *Raymond James Financial v. Saldukas*, 896 So. 2d 707, 711 (Fla. 2005); *Shields Ltd. v. Boo Nathaniel Bradberry & 40/40 Enters.*, 526 S.W.3d 471, 474 (Tex. 2017).

351.   With respect to the Jowers Agreement, KR-LLC never waived its right to keep its proprietary information confidential, and therefore Counsel Holdings's claims against Jowers are not barred by defense of waiver. Other employees of MWK were under restrictions regarding their ability to disclose proprietary information. (Trans. I, at 185-186).

352.   With respect to the 2012 Revolving Loan Agreement, CU-LLC never waived its right to collect on any outstanding debts, and therefore Counsel Holdings's claims against Jowers are not barred by the defense of waiver. (Trans. II, at 227).

353.   With respect to the 2012 Forgivable Loan Agreement, KR-LLC never waived its right to collect on outstanding amounts due, therefore Counsel Holdings's claims against Jowers are not barred by the defense of waiver. (Trans. II, at 227).

354.   For the Jowers Agreement, waiver of the rights of Jowers's employer to enforce its rights is barred by a valid and enforceable non-waiver provision. (P-2, at ¶18.1).

355. For the 2012 Revolving Loan Agreement and the 2012 Forgivable Loan Agreement, waiver of the lenders' rights to enforce their rights is barred by valid and enforceable non-waiver provisions. (Trans. II, at 227; Rev. Loan Prom. Note, P-8, at 4; Forg. Loan Prom. Note, P-5, at 6)

356. Accordingly, the Court finds that Jowers's fourth defense fails.

### v. Estoppel

357. The affirmative defense of estoppel consists of four elements: "(1) the plaintiff must know the facts of the defendant's infringing conduct; (2) the plaintiff must intend that its conduct shall be acted on or must so act that the defendant has a right to believe that it is so intended; (3) the defendant must be ignorant of the true facts; and (4) the defendant must rely on the plaintiff's conduct to its injury." *Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003).

358. None of Counsel Holdings or its related entities' actions were ever intended to communicate to Jowers that his course of conduct would be overlooked, ignored, approved, or affirmed in any manner.

359. Jowers was not ignorant of any material true facts pertinent to these claims, nor was his knowledge of the situation so impaired as to support any reasonable reliance on his part that Counsel Holdings or its related entities' ever intended to overlook, ignore, approve, or affirm his infringing conduct in any manner.

360. For these reasons, the Court finds that Jowers's fifth defense fails.

### vi.    Fraud

361.   The affirmative defense of fraud requires proof of "(1) a misrepresentation of a material facts; (2) knowledge by the person making the statement that the representation is false; (3) intent by the person making the statement that the representation would induce another to rely and act on it; and (4) that the plaintiff suffered injury in justifiable reliance on the representation." *Tomasini v. Mt. Sinai Med. Ctr. of Fla., Inc.*, 315 F. Supp. 2d 1252, 1259 (S.D. Fla. 2004) (quoting *Susan Fixel, Inc. v. Rosenthal Rosenthal, Inc.*, 842 So.2d 204, 209 (Fla. 3d DCA 2003)).

362.   Because there were no misrepresentations made to Jowers in the formation of the relevant agreements, nor any material fact within the relevant agreements that was misrepresented to Jowers, Jowers is unable to rely on the affirmative defense of fraud to avoid liability on the claims in this case.

363.   Further, Jowers did not suffer any injury in justifiable reliance on any representation made in any of the agreements at issue in this case.

364.   For these reasons, the Court finds that Jowers's sixth defense fails.

### vii.    Overbroad, Overlong, and Not Reasonably Necessary

365.   According to Florida law, "[a] party seeking to enforce a restrictive covenant must plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant and that the restriction is reasonably necessary to protect those legitimate business interests. *Partylite Gifts, Inc. v. MacMillan*, 895 F. Supp. 2d 1213, 1224 (M.D. Fla. 2012) (citing Fla. Stat. § 542.335(1)(b) & (c)).

366.    "If the party seeking enforcement of the restrictive covenant establishes a *prima facie* case, the party opposing enforcement has the burden of establishing that the contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interests." *Id.* (citing Fla. Stat. § 542.335(1)(c); *North Am. Prods. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1228 (M.D. Fla. 2002)).

367.    Florida law expressly forbids courts from considering the hardship imposed upon an employee in evaluating the reasonableness of a restrictive covenant. Florida Statutes § 542.335(1)(g)(1) provides that, "[i]n determining the enforceability of a restrictive covenant, a court ... *[s]hall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought*" (emphasis added). The statute also provides that a court considering the enforceability of a restrictive covenant must construe the covenant "in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement" and "shall not employ any rule of contract construction that requires the court to construe a restrictive covenant narrowly, against the restraint, or against the drafter of the contract" (§542.335[1][h]; *see, Environmental Servs., Inc. v. Carter*, 9 So.3d 1258, 1262 (Fla.Dist.Ct.App. 2009). Thus, although the statute requires courts to consider whether the restrictions are reasonably necessary to protect the legitimate business interests of the party seeking enforcement (*see*, §542.335[1][c]; *Environmental Servs., Inc.,* 9 So.3d at 1262), the statute prohibits courts from considering the

hardship on the employee against whom enforcement is sought when conducting its analysis. *See, e.g., Atomic Tattoos, LLC v. Morgan,* 45 So.3d 63, 66 (Fla.Dist.Ct.App.) (refusing to consider economic hardship on defendant).

368. "Generally, legitimate business interests include trade secrets, valuable confidential business or professional information that otherwise does not qualify as trade secrets, substantial relationships with specific prospective or existing customers or clients, customer or client goodwill associated with a specific geographic location or specific marketing or trade area, and extraordinary or specialized training." *Id.*

369. Counsel Holdings and its related entities had a legitimate business interest in protecting their trade secrets, as well as in protecting the confidential business and professional information that it gathered from candidates and clients in the major legal markets all over the world which were not trade secrets, the substantial relationships that it cultivated with specific candidates and clients in the major legal markets all over the world, and the goodwill it had established with candidates and clients in the major legal markets all over the world.

370. Counsel Holdings has established a *prima facie* case that its restrictive covenants were reasonably necessary to protect its legitimate business interests.

371. Jowers has failed to provide any facts sufficient to support a conclusion that the restrictive covenants in the Jowers Agreement were overbroad.

372. Jowers has failed to provide facts sufficient to support a conclusion that the restrictive covenants in the Jowers Agreement were overlong.

373.   Jowers has failed to provide facts sufficient to support a conclusion that the restrictive covenants in the Jowers Agreement were not reasonably necessary to protect Counsel Holdings and its related entities' legitimate business interests.

374.   For these reasons, the Court finds that Jowers's seventh, eighth, and ninth defenses fail.

### viii.   Illegality

375.   A transaction is not illegal on grounds of usury unless the lender exacts a greater compensation than allowed by law for the debtor's use of the money. *First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285, 287 (Tex. 1994).

376.   Neither KR-LLC nor any of its related entities exacted a greater compensation than allowed by law for Jowers's use of the money lent to him under the 2012 Revolving Loan Agreement.

377.   Jowers did not present any evidence to support a conclusion that the 2012 Revolving Loan Agreement is usurious or illegal in any of its terms.

378.   The Jowers Agreement is controlled by Florida law. Florida has the most significant relationship with the parties and the employment of Jowers. By his own admission, Jowers has been domiciled in Florida at all times relevant to the Jowers Agreement. (P-136). Other than his own assertions, not backed by evidence or testimony of any expert, Jowers did not present evidence that any of the provisions of the Jowers Agreement were illegal under Hong Kong law. *See, Arbit. Bet. Trans Chem. Ltd. and China*, 978 F. Supp. 266, 275 (S.D. Tex. 1997) ("Under Rule 44.1 expert testimony accompanied by extracts from foreign legal material is

the basic method by which foreign law is determined."). In any case, the parties did not enter into the Jowers Agreement in 2006 with a view to violating Hong Kong law. *Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 707 (5th Cir. 1999).

379. For these reasons, the Court finds that Jowers's tenth defense (Illegality) fails.

### ix. Lack of Consideration and Failure of Consideration

380. As stated *supra*, the Court finds that consideration supported the Jowers Agreement through its entirety. Accordingly, the Court finds that Jowers's eleventh and twelfth defenses fail.

381. In exchange for his continued employment, Jowers acquiesced to the Jowers Agreement as well as the modifications to it. He continued to be paid until his resignation December 16, 2016. *Coastal Unilube, Inc. v. Smith*, 598 So. 2d 200, 201 (Fla. Dist. Ct. App. 1992) ("Where employment was a continuing contract terminable at the will of either employer or employee, the Florida Courts have held continued employment constitutes adequate consideration to support a contract."); *see also Open Magnetic Imaging, Inc. v. Nieves-Garcia*, 826 So. 2d 415, 417–18 (Fla. Dist. Ct. App. 2002). Because continued employment of Jowers constituted sufficient consideration under Florida law, Jowers's affirmative defense for lack or failure of consideration fails.

### x. Rescission

382. Jowers has not produced evidence sufficient to support a conclusion that any of the agreements between him and his employer were obtained by fraud.

383.    Jowers has not produced evidence sufficient to support a conclusion that any of the agreements between him and his employer were obtained by duress.

384.    Jowers has not produced evidence sufficient to support a conclusion that any of the agreements between him and his employer were materially breached by his employer.

385.    Accordingly, Jowers has no legally sufficient grounds for claiming the right to rescission of any of the contracts between him and his employer. Therefore, the Court finds that Jowers's thirteenth defense fails.

### xi.    Unclean Hands

386.    To avail itself of the defense of unclean hands, the defendant must show that it was "personally" injured by the plaintiff's inequitable conduct. *Mitchell Bros. Film Grp. v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979).

387.    Jowers has not produced evidence sufficient to support a conclusion that his employer acted in any manner contrary to the express terms of the Jowers Agreement, the Forgivable Loan Agreement, or the 2012 Revolving Loan Agreement.

388.    Jowers has not produced evidence sufficient to support a conclusion that his employer acted inequitably toward Jowers.

389.    Jowers has not produced evidence sufficient to support a conclusion that he sustained personal loss or injury due to the inequitable actions of his employer.

390.    For these reasons, the Court finds that Jowers's fourteenth defense fails.

### xii.   Unconscionability

391.   "The test for unconscionability assesses whether, in light of the parties' general commercial background and needs, the provision is so unilateral as to have been unconscionable at the time of formation. The objective is to prevent oppression and unfair surprise, not to disturb the allocation of risks stemming from one party's superior bargaining position." *Davis v. EGL Eagle Global Logistics LP*, 243 F. App'x 39, 45-46 (5th Cir. 2007) (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 756 (Tex. 2001)).

392.   The restrictive covenants included in the Jowers Agreement were not unconscionable because their inclusion was solicited by Jowers himself. (P-17).

393.   The restrictive covenants included in the Jowers Agreement were not unconscionable because Jowers freely assented to the language and extent of the restrictive covenants included in the agreement. (*See, above*, at 5).

394.   The restrictive covenants included in the Jowers Agreement were not unfairly surprising to Jowers at the time of formation.

395.   The restrictive covenants included in the Jowers Agreement were not oppressive to Jowers at the time of formation.

396.   The restrictive covenants included in the Jowers Agreement did not render the agreement unconscionable.

397.   For these reasons, the Court finds that Jowers's fifteenth defense fails.

### xiii.   Information Readily Ascertainable by Proper Means

398.   In considering whether information is readily ascertainable, courts have considered the expense of compiling it and the method used to acquire

customer information. *See Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 625–26 (S.D. Tex. 2011). "Even if the information is readily available in the industry, it will be protected if the competitor obtained it working for the former employer." *Id.* (citing *Brummerhop*, 840 S.W.2d at 633).

399.   Because Jowers obtained the proprietary and confidential information that he shared with others while he was still working for KR-LLC, that information was not readily ascertainable by him through any other proper means. Accordingly, the Court finds that Jowers's sixteenth defense fails.

### xiv.   Independent Development

400.   The Court finds that Jowers is unable to make the requisite showing for independent development with regard to the trade secret information relating to Steve Kang, James Chang, Longhao Wang, Pamela Usukumah, and Meng Ding. Jowers did not independently develop the information regarding these candidates; to the contrary, while he might have been working independently, he was an employee of KR-LLC, and the work he did was for that entity. (*See, above*, at pages 16 to 25). Accordingly, the Court finds that Jowers's seventeenth defense fails.

### xv.   Payment

401.   Jowers has the burden of proving that the 2012 Revolving Loan Agreement and associated 2012 Revolving Loan Promissory Note had been repaid, as payment is an affirmative defense. *See United States v. Central Gulf Lines, Inc.*, 974 F.2d 621, 629-30 (5th Cir. 1992) (assigning the burden of proof to the party pleading an affirmative defense); *Federal Deposit Ins. Corp. v. Waldron,* 630 F.2d

239, 241 (4th Cir. 1980); *Desjardins v. Desjardins,* 308 F.2d 111, 116 (6th Cir. 1962); *Current News Features v. Pulitzer Pub. Co.,* 81 F.2d 288, 290-91 (8th Cir. 1936).

402.   Counsel Holdings's possession of the original notes, Jowers's acknowledgment that he executed them, and the fact that the notes were not marked paid, "constituted prima facie proof that the notes remained unpaid." *The Cadle Co. v. Reg. H*, 21 S.W.3d 670, 675 (Tex. App. 2000) (citing *Naylor v. Gutteridge,* 430 S.W.2d 726, 731 (Tex.App.-Austin 1968, writ ref'd n.r.e.).

403.   Jowers has not established that the 2012 Revolving Loan promissory note has been repaid. *Branch Banking & Tr. Co. v. Swig Partners GP, LLC*, No. 05-15-00878-CV, at *7 (Tex. App. Dec. 13, 2017) ("Bank's records showing the loan as having a zero-dollar balance did not establish" that the loan had been repaid.). Accordingly, the Court finds that Jowers's eighteenth defense fails.

### F.   Jowers's Affirmative Claims

####   i.   Hong Kong Office Expenses

404.   The Court finds that Jowers has not produced evidence sufficient to support a conclusion that a valid and enforceable contract existed between him and his employer requiring the payment of unapproved Hong Kong Office expenses, including the hotel expenses. Jowers was permitted reimbursement of "usual and ordinary" expenses under the Jowers Agreement. (P-2, at 49). Jowers was aware that expense reimbursement was subject to review and approval by MWK. MWK produced evidence that Jowers was reimbursed for the vast majority of the expenses he submitted. *Id*. Because no valid and enforceable contract existed requiring the payment of Hong Kong Office expenses, and because Jowers did not present

evidence of unpaid expenses MWK had agreed to reimburse, Jowers's employer did not breach any binding agreement with Jowers by refusing to pay Hong Kong Office expenses.

405.   The Court finds that Jowers was never promised that his employer would pay for his rent at the Four Seasons Apartments. To the contrary, the evidence presented at trial demonstrated that Jowers was told that the costs would not be reimbursed and was urged not to incur the costs, but Jowers incurred them anyway by his own choice.

### ii.   Hui Xu Placement Fee

406.   The Court finds that Jowers was credited 100% of the placement commission for Hui Xu that was due to Jowers upon his resignation from KR-LLC this credit was applied by MWK against Jowers's balance on the 2012 Revolving Loan.

## III.   RESPONSES TO JOWERS'S PROPOSED FINDINGS AND CONCLUSIONS

Jowers presented the following findings of fact as part of his submissions prior to the final pretrial conference. (Dkt. 305-4). To ease the task of the Court in preparing its findings and conclusions, MWK hereby responds to Jowers's proposed findings and conclusions with references to the findings and conclusions above (and their associated record references) that deal with the same subject matter.

**Jowers's Proposed Findings and Conclusions:**

1.   Jowers began working at Kinney Recruiting in April 2006. Jowers signed an Associate Recruiter Employment Agreement with Kinney Recruiting, L.P.

dated May 1, 2006. This agreement was executed in December of 2006 (the "Florida Employment Agreement"). On December 16, 2016, Jowers resigned from Kinney Recruiting LLC, a different entity.

**RESPONSE**: Agreed.

2.      Jowers original employer was Kinney Recruiting L.P. SAC ¶ 158. "Kinney Recruiting L.P. ('KR-LP') was a Texas limited partnership that has ceased operation." SAC ¶ 11. Under the Florida Employment Agreement with Kinney Recruiting, L.P., dated May 1, 2006, Jowers promised not to use or disclose any of the "Company's" proprietary information:

> 7.2      At all times during and after Employee's employment, the Employee shall not use or disclose to any person the Company's Proprietary Information, except as such disclosure or use may be required in connection with the Employee's employment, or unless the [sic] Robert Kinney expressly authorizes such in writing.

Dkt. 80-1 at pages 4-5 of 11. The "Company" under the agreement is Kinney Recruiting, L.P. *Id.* at page 1 of 11.

**RESPONSE:** Agreed, except Kinney Recruiting LP was a registered assumed name for Recruiting Partners, L.P., a Texas limited partnership (P-1).

3.      The Florida Employment Agreement provided for a salary of $3,000 per pay period, less applicable withholdings and deductions, paid monthly.

**RESPONSE**: Agreed.

4.     The Florida Employment Agreement provided for the following compensation structure, based on "NET CASH IN," defined as "the Employee's portion of all placement fees received and retained by the Company which result from the placement of candidates with clients of the Company."

a.     45% of the first $75,000.

b.     50% of the next $75,000.

c.     55% of the next $75,000.

d.     60% of the next $75,000.

e.     65% of the excess over $300,000.

**RESPONSE**: Agreed.

5.     There was no evidence presented that the above amounts were ever paid by Plaintiff or any other assignee of the Florida Employment Agreement.

**RESPONSE**: Jowers was paid his commissions twice per month throughout his employment with Kinney Recruiting. (See, above, at The commissions Jowers was paid are detailed on the commission spreadsheets that are of record in the case. (P-112 to P-120). Jowers also never declared a breach. He therefore may be deemed to have acquiesced to any prior breaches. (*See, above*, at page 82).

6.     Jowers' compensation changed over the course of his employment. On March 8, 2008, Plaintiff unilaterally amended the terms of the Florida Employment Agreement by way of email. Under the new terms, Jowers, an employee, was now obligated to pay the majority of Kinney Recruiting's advertising expenses. *Id*. When

Jowers complained that this was unfair, Mr. Kinney responded by stating flatly "I make the decisions and you follow orders. If you don't want that job let me know."

**RESPONSE**: Jowers conceded in his testimony that the commission structure set forth in his contract was the commission structure for 2007 until it was changed in 2008. (Trans. II, at 191). Kinney testified that this was the case as well. (Trans. I, at 67).

7.      In January 2009, Plaintiff or its predecessor changed the agreement unilaterally again, by way of an email dated January 28, 2009, titled "New Asia Plan for 2009." Among the changes where that "[Jowers] commissions go to 45% across the board for 2009" but that Jowers' "draws" (i.e. advances) would increase to $8,200 per month, and Jowers would "make no contribution for expenses." Notably, Kinney also stated that the "noncompete will be amended to apply to Hong Kong/China and be fully enforceable." When Jowers complained about the change in commissions from 65% to 45%, Kinney threatened to withhold Jowers' wages: "I'm not ponying up another $20K this month until I know you are aboard…" If Jowers did not agree to commission changes, Jowers would be fired.

**RESPONSE**: The testimony in this case showed that the changes to Jowers's compensation were discussed with him in advance. Jowers acquiesced to the changes in each case. (*See, above*, at 12-13).

8.      Mr. Jowers' compensation was changed again in 2011 by Plaintiff, who stated that at this point Mr. Jowers commissions would now be 50%.

**RESPONSE**: Jowers lived under this commission structure for five years or more.

9.     In or about June 2015, Jowers moved to Hong Kong, where Jowers lived and worked. At the time his employer presented an employment contract to government authorities in Hong Kong, which is a requirement for foreigners doing business in Hong Kong (the "Hong Kong Employment Agreement."). There was never a dispute throughout 2015 or 2016 as to whether the Hong Kong Employment Agreement was operative.

**RESPONSE**: Kinney sent a draft contract to the Kinney Recruiting accounting firm in Hong Kong, not to any authorities. (Trans. II, at 23). There is no evidence that the authorities in Hong Kong ever received an application for a work visa. There was also no evidence presented at trial that there is any "requirement" that foreigners doing business in Hong Kong have a work visa. Indeed, before covid stopped the travel, gobs of regular business visitors to Hong Kong would travel there and stay for great lengths of time on visitor visas. There was never a dispute as to whether the Hong Kong Employment was operative because it was not operative and no one thought it was, including Jowers.

10.     On November 1, 2012, Evan P. Jowers and Counsel Unlimited LLC entered into the Loan Agreement and Promissory Note (the "Line of Credit Agreement") at the rate of 17% per annum.

**RESPONSE**: Agreed.

11.    Plaintiff has not met its burden to demonstrate that Jowers owed any sum certain regarding the Line of Credit. Jowers was told via email unequivocally by the Kinney Entities accountant, Renee Sommers ("Ms. Sommers") the same day Jowers resigned on December 16, 2016 that the Counsel Unlimited Line of Credit had been paid back. (Tauler Dec., Ex. 6)("Yes, I think the remaining regular bonus and Hui Xu commission will just cover the remaining balance, might be a few hundred short.").

**RESPONSE**: At trial, MWK presented ample evidence to demonstrate the balance owed on the 2012 Revolving Loan. (*See, above*, at 70)

12.    Plaintiff also changed its own accounting of the amounts due on the Line of Credit no less than four times during the pendency of this lawsuit. No competent evidence was ever introduced to explain how the amounts were calculated or why they were not paid back, as stated by Ms. Sommers.

**RESPONSE**: The variations in the accountings provided by MWK were explained at length at trial. (*See*, Trans. II, at 5-22). Jowers never provided an accounting for either loan.

13.    Even if there were some small amount due and owing, the amount would have been completely covered by funds owed to Mr. Jowers for the placement of Hui Xu, which Plaintiff retained completely for himself.

**RESPONSE**: MWK demonstrated with an unchallenged accounting that there was a balance owing on the loan even after a credit was applied for the placement fee for Hui Xu.

14.    Moreover, the evidence demonstrating the Plaintiff did not comply with federal truth-in-lending act and local ordinances with respect to payday loans was persuasive. The Truth in Lending Act requires that lenders who make over 25 loans in the year provide detailed disclosures to a debtor. These were never done. Plaintiff also failed to register as a payday lender in the State of Texas or the City of Austin.

**RESPONSE**: The Court has already concluded that Jowers forfeited arguments regarding the Truth in Lending Act and failure to register as a lender. (Dkt. 285, at n. 5).

16.    On February 1, 2012, Evan P. Jowers and Recruiting Partners GP, Inc. entered into the Forgivable Loan Agreement and Promissory Note (the "2012 Forgivable Loan").

**RESPONSE**: Agreed.

17.    No competent evidence was provided at trial demonstrating an amount due and owing. Plaintiff has not produced admissible evidence that the $50,000 was ever paid to Jowers, or how the balance came to be $24,603.47, only the same spreadsheets that constantly changed, and whose entries were attorney/client privileged.

**RESPONSE**: Jowers conceded at trial that he received the $50,000 and that the $25,982.18 balance sought on this loan by Counsel Holdings of is accurate. (Trans. II, at 97-99).

18.   Six attorneys placed by Jowers are alleged to be trade secrets of the Kinney Entities, but Kinney has not demonstrated use of any information related to these individuals caused Plaintiff damage.

**RESPONSE**: The trade secrets and the damages related to their misappropriation have been proven.  (*See, above*, at pages 16 to 26 and pages 65 to 70).

19.   The trade secrets that are in dispute in this case "are extremely [ephemeral] trade secrets" owned by Plaintiff only for "some fleeting moment of time.

**RESPONSE**: When Jowers produced in discovery the confidential information that he had taken from Kinney Recruiting prior to his resignation, he marked the material "attorneys' eyes only." (Trans. I, at 118-119). The use of the word ephemeral was not intended to signify that trade secrets in the legal recruiting industry were always of extremely short duration. (Trans. I, at 211-213).

20.   No steps are taken to safeguard information provided by candidates. Plaintiff does not require candidates to sign non-disclosure agreements. Candidates often work with (and therefore provide the same information to) other recruiting firms.

**RESPONSE**: Other employees sign confidentiality agreements. (*See, above*, at 67, ¶262).

21.   No Kinney Entity possessed or owned any information regarding these six candidates at the time of Mr. Jowers' departure on December 16, 2016. No

information about these candidates was ever kept in any database belonging to Plaintiff or its predecessors. Plaintiff used Salesforce, a software application, as the only "database" that kept information. Plaintiff's former employee testified that he searched for any evidence of misconduct and found none. There were no other databases owned by Plaintiff accessed by Jowers.

**RESPONSE**: KR-LLC owned the trade secrets created by Jowers while he was employed by KR-LLC. Jowers admittedly failed to use the MWK database to input the information he had gathered, but that does not change the fact he was working for KR-LLC.

22.    Plaintiff failed to provide any evidence of any actual damages for its misappropriation of trade secrets claims against Mr. Jowers Jowers only placed three candidates of the six, and these were several months or sometimes years. No evidence was presented of "lost profits."

**RESPONSE**: MWK is entitled to unjust enrichment damages, which consists of disgorgement of Jowers's unjust gains.

23.    Plaintiff did not present any facts demonstrating that any of Jowers' conduct caused him harm or damages. Plaintiff presented no evidence of actual damages.

**RESPONSE**: MWK has adequately proven its damages.

24.    Plaintiff has not demonstrated that Kinney Recruiting, L.P. assigned the Florida Employment Agreement to Plaintiff. There is no assignment of the Florida Employment Agreement from Kinney Recruiting L.P. to any other entity.

The only assignments inure to a firm called Recruiting Partners GP, Inc. (see Exhibit 3 to the SAC, Dkt. 80-3); next, Kinney Recruiting LLC (see Exhibit 5 to the SAC, Dkt. 80-5); and eventually MWK Recruiting LLC (see Exhibit 7 to the SAC, Dkt. 80-7), which (in turn) allegedly converted itself into MWK Recruiting Inc. (the Plaintiff in this action) on March 12, 2018 (see SAC ¶ 42), and is now Counsel Holdings, Inc. However, the "Company" itself – Kinney Recruiting, L.P. – was never a party to any of those assignments or transactions. Thus, there simply are no alleged transactions by which MWK Recruiting Inc. (or Counsel Holdings, Inc.) could plausibly have become an assignee and/or a successor of Kinney Recruiting, L.P. or its contract with Jowers.

**RESPONSE**: As detailed above, through assignment, Counsel Holdings Inc, is the successor in interest to the relevant agreements in this case.

25.     Furthermore, the assignment to MWK Recruiting LLC (dated January 31, 2017) did not make MWK Recruiting LLC the owner of any trade secrets previously owned either by Kinney Recruiting, L.P. (the actual "Company" mentioned in ¶ 7.2 of the Florida Employment Agreement of May 1, 2006) or by Kinney Recruiting LLC (the alleged assignor). See Exhibit 7 to the SAC (Dkt. 80-7). This assignment document only purported to assign the Florida Employment Agreement "between Jowers and Recruiting Partners, L.P. [sic]" together with any "claims or causes of action" that Kinney Recruiting LLC might have against Jowers. Id., ¶ 1.b & 1.d. Again, there was no agreement "between Jowers and Recruiting Partners, L.P." that could have been assigned to MWK Recruiting LLC. Plainly, this

is because Jowers had only agreed to be employed by Kinney Recruiting, L.P., i.e., the "Company" that is also mentioned in ¶ 7.2 of the Florida Employment Agreement. See Dkt. 80-1; see also SAC ¶ 158 (conceding that "Jower's original employer" was "Kinney Recruiting L.P."). For that reason too, there were never any claims or causes of action for trade secret misappropriation that Kinney Recruiting LLC could have assigned on January 31, 2017 to MWK Recruiting LLC arising from the Florida Employment Agreement because Kinney Recruiting LLC too was never the assignee or successor of the "Company" under the Florida Employment Agreement that contains the ¶ 7.2 confidentiality clause.

**RESPONSE**: The trade secrets at issue in this case indisputably belonged to KR-LLC when Jowers resigned. Jowers's agreements were assigned as they were permitted to be assigned under relevant law.

26.     Jowers did not know of, consent to, or ratify Plaintiff's purported assignment of the Florida Employment Agreement to any other entity.

**RESPONSE:** Jowers was well aware of who his employer was. He was not asked to consent to the assignments. He ratified the assignment by continuing to accept payment from his new employer after each move.

27.     Plaintiff has also waived his right to recover based on the doctrine of waiver. Plaintiff never informed Jowers of claims against him for any unpaid loans until the time of the filing of his original lawsuit, several months after Jowers' resignation from Plaintiff's employ. Jowers was informed by Plaintiff's accountant that no money was due and owing on his loans. As such, Plaintiff has waived

enforcement of the loan obligations his legal representatives stated were satisfied in 2016.

**RESPONSE**: Jowers waived presentment. The (incorrect) statement by MWK's accountant is not a basis for waiver.

28.     Additionally, Plaintiff has waives the right to assert any amounts due and owing on the loans since he stated at his deposition that he lacked any personal knowledge of how any of the numbers were calculated and/or that the contents of the loan calculation were privileged.

**RESPONSE**: The Court does not find that the Plaintiff has waived the right to present an accounting for the loans at issue. Jowers, on the other hand, never presented his own accounting and admitted at trial that he authorized all charges on the revolving loan and that the balance on the forgivable loan was outstanding.

29.     The evidence demonstrates that Plaintiff never provided compensation at the rate set forth in the Florida Employment Agreement, which sets forth a payment schedule whereby Jowers would receive 65% of the fee received by his employer.

**RESPONSE**: The Whether Jowers was ever entitled to 65% of any individual deal depended on two factors occurring: 1) the applicable scale of commissions must go up to 65%; 2) Jowers's placement activity had to reach the required level to entitle him to 65%. Jowers testified that he was never paid 65%. Even if true, the Court finds that there is insufficient evidence in the record to determine that his placements had been sufficient to reach the 65% commission level.

30.     Similarly, the evidence that the Hong Kong contract applies is persuasive. Jowers moved to Hong Kong in June 2015. Kinney initiated the paperwork for Mr. Jowers's visa on June 13, 2016, which included the Hong Komg contract.

**RESPONSE**: The Court has already determined that Jowers failed to present sufficient evidence of any sufficiently definite promise to justify Jowers's reliance on that promise and granted summary judgment on Jowers's promissory estoppel claims. (Dkt. 285, at 12-15).

31.     Mr. Kinney also made false representations that his signature was forthcoming, including on August 21, 2015 ("Ok. Next week.") (Tauler Dec. ¶ 12, Ex. K at 7); September 7, 2015 ("Is an electronic signature on the employment documents sufficient?") Id. at 5. In October, Mr. Jowers sent Kinney no less than four emails asking for a status update and demonstrating increasing concern regarding his continued work without a contract compliant with Hong Kong law. (Dkt. 285, at 12-15).

**RESPONSE**: The Court has already determined that Jowers failed to present sufficient evidence of any sufficiently definite promise to justify Jowers's reliance on that promise and granted summary judgment on Jowers's promissory estoppel claims.

32.     Jowers reasonably believed that the Hong Kong Contract was operative. However, after Jowers resigned, Mr. Kinney asserted that there was no Hong Kong Contract, and that, in reality, the 2006 contract signed by Kinney

Recruiting L.P. (dating back over a decade and spanning various different entities, governed their relationship.

**RESPONSE**: The Court has already ruled on summary judgment that the statements Jowers relies on were not sufficiently definite to be considered promises by Kinney. In proposed finding of fact number one, above, Jowers concedes that his employer at the time of his resignation was Kinney Recruiting LLC. The Court finds that Jowers's employer at the time of his resignation was Kinney Recruiting LLC; on the other had, had it been executed, the draft Hong Kong contract would have created an employment relationship with Kinney Recruiting Limited. Jowers testified at trial that Jowers knew that Kinney did not sign the agreement and that Jowers had eventually begun to "lose faith" that Kinney would do so. (Trans. II, at 226).

33.    The Florida Employment Agreement defines Company Proprietary Information as including "information concerning the identity of clients and their personnel," however the identify of Plaintiff's clients (all AmLaw 200 law firms) and their personnel must be used in order for Jowers to continue his career as a legal recruiter.

**RESPONSE**: Neither the definition of Company Proprietary Information, nor the restrictions on the use of that information contained in the Jowers Agreement, even if Jowers had abided by them, prevented Jowers from continuing his career as a legal recruiter. When Jowers agreed to those provisions, he agreed

that, notwithstanding the restrictions, he could earn a livelihood. (Jowers Agreement, P-2, signature page).

34.    Company Proprietary Information also includes "all information developed by its employees, whether or not during working hours, that is related to Company's business" including information "reproduced from the memory of the employees." This is impermissibly overbroad.

**RESPONSE**: The definition of "Company Proprietary Information" in the Jowers Agreement captures only the information related to the employer's business possessed by the employee, including from memory. (P-2, Definitions).

35.    The restrictive covenants have no time limitation and are not limited in time and as such are overlong.

**RESPONSE**: This is not a correct characterization of the restrictive covenants, which are limited to 12 months following the time when Jowers ceases violating them, plus any period during which Jowers was in violation.

36.    The Employment Agreement's liquidated damages clause provides in relevant part as follows:

> 9.1 The actual damages resulting from violation of Sections 7 and/or 8 of this Agreement by the Employee will be difficult or impossible to ascertain. In the event of such a violation, the Employees shall pay to the Company, upon demand, as liquidated damages, and not as a penalty, the following:
>
> 9.1.l Any fee paid for services rendered in violation of Sections 7 and/or 8, whether paid to the Employee or to any other person, firm, or entity; plus

9.1.2 All costs and expenses, including reasonable attorney's fees, incurred by the Company in the enforcement of its rights relating to such violation

9.4 The one-year time periods referred to in Section 8 shall be extended to include any period of time during which the Employee engages in activities constituting a. violation of that Section.

**RESPONSE**: Agreed.

37.    The Employment Agreement's liquidated damages clause is also overlong, overbroad, and not reasonably necessary since it automatically renews the contract's one-year limitation automatically without any time limit. Jowers could not know what acts his former employer deemed a violation, or what conduct is a violation, since Jowers no longer would have access to the Company's Proprietary Information as defined.

**RESPONSE**: The Court has already determined that Jowers failed to raise a defense of unenforceability regarding the liquidated damages clause. This issue was not tried at trial. Further, there is no evidence to support the assertion that the clause is unenforceable. (Dkt. 285, 19-21). Jowers failed to present evidence to rebut the presumption that, because the restrictive covenant was intended to protect trade secrets, a period of less than five years was reasonable. (See, above, at ¶331).

38.    Plaintiff has not demonstrated that the restrictive covenants are needed to protect a legitimate business interest. No evidence was presented at trial to negate the premise that the restrictive covenants impose a greater restraint than is necessary.

**RESPONSE**: There is ample evidence that the restrictive covenants were intended to protect legitimate business interests of Kinney Recruiting. The Court has determined that the Jowers Agreement is governed by Florida law. Florida law does not establish a premise that the restrictive covenants impose a greater restraint than is necessary; to the contrary, restrictive covenants that comply with the statutory guidelines under Florida law are presumptively valid. Fla. Stat. § 542.335(1)(c).

39.    Kinney's multiple false declarations and perjurious statements under oath to this Court demonstrate unclean hands.

**RESPONSE**: There was no evidence of Kinney having made false statements or perjurious statements. (Trans. I, at 1-246; Trans. II, at 1-54).

Dated:  February 10, 2022

Respectfully Submitted

/s/ Robert E. Kinney
Robert E. Kinney
Texas State Bar No. 00796888
Robert@KinneyPC.com

**Robert E. Kinney**
824 West 10th Street, Suite 200
Austin, Texas 78701
Tel: (512) 636-1395

Raymond W. Mort, III
Texas State Bar No. 00791308
raymort@austinlaw.com

**THE MORT LAW FIRM, PLLC**
100 Congress Ave., Suite 2000
Austin, Texas 78701
Tel/Fax: (512) 865-7950

**ATTORNEYS FOR COUNSEL
HOLDINGS, INC., AND COUNTER-
DEFENDANTS**