## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

MWK RECRUITING, INC.

      Plaintiff,

      v.

EVAN P. JOWERS,

      Defendant/Judgment
      Debtor.

Civil Action No. 1:18-cv-00444-RP

## PLAINTIFF'S MOTION FOR SANCTIONS PURSUANT TO RULE 37, 28 U.S.C. §1927 AND THE COURT'S INHERENT POWER

# Contents

I.     Introduction ........................................................................................1

II.    Legal Authority .................................................................................2

III.   Factual Backround ............................................................................4

    A.   Jowers depended on his attorneys to pursue an aggressive strategy.
        ................................................................................................4

    B.   DLA Piper was the architect of a bad faith litigation strategy
        designed to avoid the merits by multiplying the proceedings.................4

        1.   DLA Piper pursued multiple frivolous claims and
            defenses that were obviously time barred or otherwise
            fatally flawed..............................................................................5

        2.   DLA Piper added multiple parties to the case against
            whom Jowers never had any colorable claim..............................8

        3.   DLA Piper assisted Jowers in committing discovery
            abuses. ......................................................................................8

        4.   DLA Piper used declarations of Jowers that were
            inconsistent with his sworn testimony to avoid
            jurisdiction over Legis............................................................10

        5.   DLA Piper used Jowers's falsified declarations and
            frivolous arguments to obstruct discovery of relevant
            information...............................................................................10

        6.   DLA Piper sought to disqualify Kinney solely to raise
            costs. ......................................................................................12

        7.   DLA Piper was responsible for the excessive AEO
            markings on the documents. .....................................................13

        8.   DLA Piper heaped burdensome discovery on Plaintiff
            based on the invalid RICO, fraud, veil piercing, and
            other claims. ...........................................................................14

        9.   DLA Piper (and Tauler) served needless and harassing
            document and deposition subpoenas on nineteen
            current and former employees of Plaintiff. ...............................14

        10.  DLA Piper is still multiplying these proceedings by
            continuing to represent Jowers in his Hong Kong
            defamation case......................................................................14

    C.   Unreasonable and vexatious multiplication of the proceedings by
        Tauler Smith LLP and Robert Tauler.....................................................15

        1.   After moving to compel a physical inspection of the
            assignment documents, Tauler did not want to see
            them...........................................................................................15

         2.   Tauler blatantly violated discovery rules by failing to
            provide a subpoena to opposing counsel. ....................................16

3. Tauler multiplied the proceedings repeatedly by using the meet and confer process as a device to waste time and harass. ...................................................................... 16

4. Abuse of third parties by Tauler has been constant. .................. 17

5. Tauler repeatedly violated the Court's Protective Order, justifying doing so as retaliation. .................................... 17

6. Tauler repeatedly harassed third party witness Renee Sommers. ...................................................................... 18

7. Deposition misconduct by Tauler led to further wasted time and vexation. ...................................................... 18

8. Summary judgment and trial performance of Tauler demonstrated that he never had any good faith basis for the claims he brought for Jowers or for Jowers's defenses. ...................................................................... 19

IV. Conclusion. ..................................................................... 19

## TABLE OF AUTHORITIES

**Cases**

*Byrne v. Nezhat*, 261 F.3d 1075 (11th Cir. 2001) ............................................................. 7

*Cambridge Toxicology Grp., Inc. v. Exnicios*, 495 F.3d 169 (5th Cir. 2007) .................. 2

*Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991) ............................................................... 3

*F.D.I.C. v. Calhoun*, 34 F.3d 1291 (5th Cir. 1994) ......................................................... 2

*Gautreau v. A.O. Smith Corp.*, 34 Fed.Appx. 962 (5th Cir. Mar. 27, 2002) ................... 8

*Ratliff v. Stewart*, 508 F.3d 225 (5th Cir. 2007) ............................................................. 3

*Strain v. Kaufman Cnty. Dist. Attorney's Off.*, 23 F.Supp.2d 698 (N.D. Tex. 1998) ..... 3

*Travelers Insurance v. St. Jude Hospital of Kenner, La., Inc.*, 38 F.3d 1414 (5th Cir.
      1994) .......................................................................................................................... 3

*Van Dyke v. Retzlaff*, No. 4:18-CV-247, 2021 WL 351360 (E.D. Tex. Feb. 2, 2021) ...... 3

*Whitehead v. Food Max of Mississippi, Inc.*, 332 F.3d 796 (5th Cir. 2003) .................... 6

**Statutes**

28 U.S.C. § 1927 ........................................................................................................1, 2, 3, 9

Fed. R. Civ. P. 1 ................................................................................................................ 2

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 6

Fed. R. Civ. P. 12(c) ..................................................................................................... 6, 7

Fed. R. Civ. P. 21 ............................................................................................................. 1

Fed. R. Civ. P. 37 ............................................................................................................. 1

Plaintiff MWK Recruiting, Inc. (now known as Counsel Holdings, Inc.) ("Counsel" or "Plaintiff") hereby moves pursuant to Fed. R. Civ. P. 37, 28 U.S.C. § 1927 ("§1927") and the Court's inherent power for an award of sanctions against (1) Defendant Evan Jowers ("Jowers"); (2) law firm DLA Piper LLP and its individual attorneys who have been counsel of record in this case, James Bookhout ("Bookhout") and Marc Katz ("Katz") (collectively, "DLA Piper"); and (3) law firm Tauler Smith LLP, and its partner Robert Tauler (collectively, "Tauler") (collectively, DLA Piper and Tauler are referred to as the "Jowers Attorneys"). Because of the result obtained, the extensive record in this case, the clear complicity of the Jowers Attorneys in manifest discovery abuses and in pursuing an unreasonable and vexatious litigation strategy that has multiplied these proceedings exponentially, the Court should exercise its discretion to shift the entire cost burden, including reasonable attorney fees, of both defending the counterclaims brought by Jowers, as well his attorneys, jointly and severally. The additional cost burden of prosecuting the affirmative claims resulting from the Jowers Attorneys sanctionable actions should also be shifted. Plaintiff also requests pursuant to Fed. R. Civ. P. 21 that each of the Jowers Attorneys be added as party defendants to this case.

## I.    Introduction

This is a rare and exceptional case. After more than four years before the Court, despite withering efforts by Jowers and the Jowers Attorneys to multiply the costs and the burden of pursuing the Plaintiff's case *ad infinitum*, all the disputed claims have now been adjudicated in the Plaintiff's favor. On the other hand, Jowers completely failed on the merits with each of his 11 counterclaims and 18 affirmative defenses

brought against seven different counter-defendants. The only success Jowers can claim is that he was able to inflict enormous and unnecessary costs and harassment on the Plaintiff, its attorneys, as well as the Court. Because this case has been fully adjudicated to this result, and because the record so clearly shows the complicity of the Jowers Attorneys in developing and implementing an unreasonable and vexatious strategy and abusing the discovery process, this is precisely the sort of case in which shifting of the entire financial burden of defending the action onto Jowers and the Jowers Attorneys is appropriate. While Jowers was clear from the beginning that he intended to employ an unreasonable and vexatious strategy to defend himself, it was the Jowers Attorneys, beginning with DLA Piper, who were the architects and implementers of that strategy, at times even going beyond what Jowers himself considered advisable. The methods used by the Jowers Attorneys were not just aggressive, but they also included wonton discovery abuses and clear violations of ethical duties that should not be tolerated or tacitly condoned by leaving them unpunished.

## II.    Legal Authority

The Federal Rules of Civil Procedure are designed to ensure the just, speedy, and inexpensive determination of civil claims in federal courts. FED. R. CIV. P. 1. "One way the rules forward these goals is to impose a duty to base claims upon factually and legally supportable grounds and to punish litigants and lawyers who unreasonably pursue frivolous suits." *F.D.I.C. v. Calhoun*, 34 F.3d 1291, 1296 (5th Cir. 1994). Under §1927, parties may also seek certain attorney's fees directly from opposing counsel. An award of fees under §1927 "requires evidence of bad faith, improper motive, or reckless

disregard of the duty owed to the court." *Cambridge Toxicology Grp., Inc. v. Exnicios*, 495 F.3d 169, 180 (5th Cir. 2007) (quotation omitted). In assessing subjective bad faith, a court may sanction parties for conducting litigation with an improper motive even if the complaint was legally adequate. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 53 (1991) ("..sanctions under the bad-faith exception depends not on which party wins the lawsuit, but on how the parties conduct themselves during the litigation."). "The phrase 'unreasonably and vexatiously' describes conduct that is objectively 'harassing or annoying, or evinces the intentional or reckless pursuit of a claim, defense or position that is or should be known by the lawyer to be unwarranted in fact or law or is advanced for the primary purpose of obstructing the orderly process of the litigation.'" *Van Dyke v. Retzlaff*, No. 4:18-CV-247, 2021 WL 351360, at *1 (E.D. Tex. Feb. 2, 2021) (citation omitted). "While the standard under §1927 is vexatious multiplication of litigation, a district court may invoke this provision to award fees . . . for an entire course of proceedings if the case should never have been brought in the first place." *Strain v. Kaufman Cnty. Dist. Attorney's Off.*, 23 F.Supp.2d 698, 702 (N.D. Tex. 1998) (citation omitted). When an attorney's conduct is so obviously unreasonable that a court can infer an 'improper purpose' from the fact that the attorney persisted in it, it is unnecessary for the court to explain at length why the vexatiousness prong has been met." *Ratliff v. Stewart*, 508 F.3d 225, 234 (5th Cir. 2007). The past conduct of an attorney may be used by the Court to infer the motivations of that attorney when taking specific actions before this Court. *See Travelers Insurance v. St. Jude Hospital of Kenner, La., Inc.*, 38 F.3d 1414, 1418 (5th Cir. 1994) (noting that an attorney's actions

in distinct proceedings may be considered to deduce bad faith or improper motive in the present proceeding).

### III.   Factual Backround

### A.   Jowers depended on his attorneys to pursue an aggressive strategy.

As he prepared to resign, Jowers misappropriated his employer's trade secrets and breached his contract of employment. (FF&CL, Dkt. 344, at 24-29). Jowers's planned defense to these acts was, first, to run and hide. (REK Decl., at ¶¶1-2) (Jowers referring to the difficulty Kinney would have in serving him). Second, his plan was to expend unreasonable sums to swamp his adversary. Jowers boasted shortly after resigning that he was prepared to spend $500,000 to avoid honoring his commitments. (REK Decl., at ¶1). He also promised to go bankrupt if necessary to avoid atoning for his actions or complying with his obligations. (REK Decl., at ¶2). At trial, Jowers testified he had spent over $2 million in attorney fees on his losing efforts. (Tr. II, at 59). Jowers spent so much despite having had the chance to settle this case in November 2019 for $750,000. (Mot. for Atty Fees, Dkt. 347, at 2). He has vowed to continue his wasteful strategy by appealing even clearly time barred claims. (Tr. II, at 62). The final prong of Jowers's plan was to attack Plaintiff's reputation. (REK Decl., at ¶1). Jowers repeated the threat to destroy his employer's reputation again and again shortly after resigning. (REK Decl., at ¶2).

### B.   DLA Piper was the architect of a bad faith litigation strategy designed to avoid the merits by multiplying the proceedings.

DLA Piper entered an appearance for Jowers on May 25, 2018. (Dkt. 1). The firm withdrew as counsel two years later, on June 4, 2020. (Dkt. 176). DLA Piper's strategy involved, first, assisting Jowers in pretending he was not a director or other governing

of Legis Ventures (HK) Company Limited ("Legis") to obtain a dismissal for Legis by submitting false declarations. After losing a longshot at dismissal of Jowers, DLA Piper added numerous parties and claims to the case without any reasonable basis for doing so, with the sole purpose being pursuit of unreasonable and vexatious discovery. DLA Piper then assisted Jowers in avoiding his discovery obligations for months by continuing to pretend that he had no possession of Legis documents and by interfering with Plaintiff's efforts to obtain what evidence it needed from third parties. Along the way, to raise costs and vexation, DLA Piper raised frivolous arguments to obtain a disqualification of Robert Kinney ("Kinney") from serving as pretrial counsel to Plaintiff. When that failed, DLA Piper sought to block Kinney from seeing documents by over-designating thousands of them (even public websites) as AEO, adding a separate defamation case in Hong Kong that was factually and legally intertwined with the issues before the Court (but could not be handled by Plaintiff's US legal team), and pursuing discovery against current and former employees of Plaintiff with no intention of or basis for ever using that discovery at trial. After being excoriated by Judge Austin for filing a "demonstrably false" certificate of conference, and with the strategy they had designed laid bare by the Court in May 2020, DLA Piper then installed Tauler, who was happy to continue and even increase the strategy of harassment and waste DLA Piper had set in motion.

1. **DLA Piper pursued multiple frivolous claims and defenses that were obviously time barred or otherwise fatally flawed.**

Even after losing their longshot motion seeking dismissal of the claims against Jowers, Bookhout and Katz were determined to help Jowers make the cost of this litigation exceed whatever threshold of pain Plaintiff was willing to bear. Thus, they

filed their Original Answer and Counterclaims on August 19, 2019, bringing 11 claims and 18 affirmative defenses against seven different defendants. (Dkt. 90). These claims and defenses were designed to embarrass and harass the plaintiffs, not for any legitimate purpose, as evidenced by the result at trial. No evidence at all was presented to support most of them, and there was almost no argument in post-trial briefing. Still, each of the claims and defenses required significant work on the part of the Plaintiff and Counter-defendants to prepare a defense. (REK Decl., at ¶4). The weakness and the inflammatory nature of some of the claims allows the inference that they were brought for an improper purpose. *See Whitehead v. Food Max of Mississippi, Inc.*, 332 F.3d 796 (5th Cir. 2003) (intention to embarrass is an improper purpose). For example, DLA Piper brought fraud claims on behalf of Jowers against five counter-defendants and RICO claims against six counter-defendants. (Dkt. 96, at 59-63). The claims were full of shocking allegations, but each of them was either time barred or was pled without remotely enough specificity to survive a challenge under Fed. R. Civ. P. 12(b)(6). (Order, Dkt. 229, at 7-14). Because fraud and RICO claims need to be disclosed by licensed attorneys on insurance applications, DLA Piper added Kinney without regard to the merits and simply to cause vexation each time a disclosure related to malpractice insurance was required, for example. DLA Piper should have known better, but even after having been put on notice that the claims were fatally flawed by Plaintiff's motion seeking dismissal under Fed. R. Civ. P. 12(c), DLA Piper filed an opposition contesting every issue. (Dkt. 162). The RICO predicate acts alleged by Bookhout and Katz were largely those same time barred and inadequately pled fraud

claims, so the RICO claims also were dismissed along with the fraud. (Dkt. 229, at 14 *et seq*.).

Beyond these claims, DLA Piper even asserted Jowers was entitled to add veil piercing as a separate count, defending that claim even though veil piercing is not cognizable as a separate cause of action. (Dkt. 229, at 17-18). The reason for that claim? To harass Michelle Kinney and embarrass her by including her as a defendant in a case that did not involve her. Jowers testified at trial that he could not remember why he had sued Michelle Kinney and said that doing so was DLA Piper's idea. (Tr. II, at 65). Although Plaintiff had only limited ability to attack Jowers's many pleadings in its Rule 12(c) attack, many other claims (contract claims for unpaid bonuses, commission reductions, promissory estoppel, usury, and unjust enrichment) did not survive summary judgment because even after months of discovery, the claims were time barred or Jowers had no evidence to support them. (Dkt. 285). Asked at trial why he asserted 18 defenses and 11 counterclaims, Jowers launched into a discussion of some of his dismissed claims, testifying:

> DLA Piper was representing me. They had some theories based on the facts. I had almost nothing to do with those counterclaims. To be honest, I wasn't very happy with how that was handled. So while DLA Piper's still representing me in Hong Kong, in the defamation claim, I switched to Tauler Smith in part because how the counterclaims were handled. I do think that -- I'm not an expert in RICO, okay? So when the head of the Dallas office of DLA Piper and his seventh-year associate gets so excited over RICO counterclaim, I'm just busy at work in Hong Kong, you know, I'm trusting them on that. (Tr. II, at 58)

Thus, Jowers blames Katz and Bookhout for filing of the failed counterclaims. The Court should too. DLA Piper's "professional responsibilities in this case required [the firm] to perform a reasonably thorough and objective investigation of the facts before

asserting them as the bases for these causes of action." *Byrne v. Nezhat*, 261 F.3d 1075, 1115 (11th Cir. 2001). There was no excuse for the outrageously aggressive pleading backed by only vague facts used by DLA Piper in this case. Bookhout and Katz did not conduct a proper review, shot from the hip, needlessly caused waste, duplication, and vexation. They set the ball in motion that led to the rest of these proceedings without adequate review, for which they should be sanctioned.

2.    **DLA Piper added multiple parties to the case against whom Jowers never had any colorable claim.**

Similarly, Bookhout and Katz sued seven counter-defendants, including persons and entities that had not had any business with Jowers that could possibly have been the basis of a viable claim. As became clear later, they added these parties in part to justify taking a potential total of 49 hours of deposition testimony. (Order, Dkt. 236, at 15) (the Court referring to this as "absurdity"). Some counter-defendants, such as Recruiting Partners GP, Inc., were companies even Jowers did not assert he had worked for since 2012, such that every potential claim against them was time barred by the time Jowers filed his counterclaims in 2019. DLA Piper pled the RICO and fraud allegations against six defendants. (1st Am. Ans., Dkt. 96). None of these claims had a factual or legal basis and they were therefore frivolous, pled in bad faith, leading to waste. *Cf. Gautreau v. A.O. Smith Corp.*, 34 Fed.Appx. 962 (5th Cir. Mar. 27, 2002).

3.    **DLA Piper assisted Jowers in committing discovery abuses.**

The Court ordered Jowers on April 25, 2020, to provide a response to Rog 1 and the associated RFP. (Dkt. 168, at 7). That RFP called for "all documents related to Placements identified in response to interrogatory one." (Dkt. 143-2, at 4). Plaintiff had obtained certain relevant documents from third party law firms by subpoena. (REK

Decl., at ¶5). When Jowers made his first compelled production of documents on or about May 28, 2020, it was evident to Plaintiff that Jowers had not produced all the responsive documents related to certain candidates. (*See, e.g.*, P-148, Dkt. 341-4, at 1027). In addition, Jowers had not produced any email messages from his private evanjowers@yahoo.com email address. (REK Decl, at ¶5). Plaintiff immediately made Tauler aware of the gaps in the production, but Tauler did not address the problem. Instead, he began the first of many discovery battles. (Dkt. 182-1, at 5). At trial, Jowers was questioned about these gaps in his discovery productions. He insisted that he had provided "all access to all [his] e-mails to DLA." (Tr. II, at 77; *see also* Tr. II, at 84,88). He also said he had given the same email (including the evanjowers@yahoo.com email) to DLA Piper. (Tr. II, at 80). Jowers also said that DLA Piper were "providing all of these documents to Tauler," adding that he was not "very happy with how DLA was getting these documents produced." (Tr. II, at 79).

Jowers never produced the email or the complete records of his placements, limiting Plaintiff's ability to prove its damages. Jowers was happy to boast at trial that he had made far more placements than Plaintiff was able to identify. (Tr. II, at 81) (Jowers: "…you guys are off. I've made a lot more than 53"). To the extent that there were deficiencies in the number and detail regarding placements by Jowers, this was the direct result of DLA Piper's obstruction. DLA Piper had the email and the records, but never produced them. These discovery violations by DLA Piper (and, later, by Tauler) were blatant and extensive and caused significant multiplication because Plaintiff had to subpoena and depose each law firm client for evidence. Sanctions are appropriate under both Rule 37 and §1927.

### 4.    DLA Piper used declarations of Jowers that were inconsistent with his sworn testimony to avoid jurisdiction over Legis.

Jowers claimed in several declarations that Alejandro Vargas was "the sole owner and officer" of Legis. (Dkt. 1-12, at ¶¶2, 7; Dkt. 11-1, at ¶¶2,10; Dkt. 19-1, at ¶¶2,11). Jowers even declared: "I am not a shareholder or owner of any interest in Legis Ventures. I am certainly not a President or Vice President...*I am not a director or other governing person of Legis Ventures*." (Dkt. 11-1, at ¶10; Dkt. 19-1, at ¶11) (emphasis added). Jowers relied on those statements to obtain dismissal of Legis from the case. (Dkt. 87). Later, evidence obtained from third parties revealed that Jowers had been signing contracts on behalf of Legis as its "Founder" since at least March 28, 2017. (Dkt. No. 143-1 at 55; Dkt. 168, at 5). Jowers admitted at trial he was in fact a director of Legis after all. (Tr. II, at 118) ("I'm a director of Legis Ventures..."). After trial, Jowers revealed more. According to DLA Piper, in addition to being director of Legis, Jowers owns 82% of the shares of Legis. (DLA Piper Letter, REK Decl., at ¶6). This obvious manipulation also multiplied these proceedings.

### 5.    DLA Piper used Jowers's falsified declarations and frivolous arguments to obstruct discovery of relevant information.

Asserting Jowers was a "mere" employee of Legis and therefore need not produce relevant information in its possession, DLA Piper obstructed Plaintiff's efforts to obtain any information about Jowers's placement activity. The Court issued its scheduling order on September 10, 2019, setting the close of discovery for July 25, 2020. (Dkt. 98). Plaintiff sent its first discovery requests November 25, 2019. By the time the Plaintiff filed its Motion to Compel on March 25, 2020, with four months remaining in the discovery period, DLA Piper had not produced one single document that was not already in the Plaintiff's possession prior to Jowers's resignation. (Mot. to Compel,

Dkt. 143, at 5). Plaintiff continued to try to obtain the needed documents from Legis and from other third parties via subpoena. (Dkt. 168, at 8-13; s*ee also* Jowers Motion to Quash, Dkt. 165, at 3-4) (recounting Plaintiff's third-party subpoena efforts)). DLA Piper sought to block these efforts first by stonewalling. (*See, e.g.*, Letter from Bookhout, Dkt. 143-1, at 32, 33; 41-42). Next, after blocking service of the subpoena, DLA Piper argued that Plaintiff should not be permitted to serve the subpoena on Legis by alternative means. (Response, Dkt. 151). This argument was frivolous because Jowers had no standing to make it. (Reply, Dkt. 152). When Plaintiff nevertheless obtained service on Legis via Rule 4(k)(2), DLA Piper filed a Motion to Quash all of Plaintiff's third-party subpoenas. (Dkt. 165). Such subpoenas had been the only way that Plaintiff had been able to demonstrate that Jowers was the "Founder" of Legis. (Dkt. 143-1, at 59). With their Motion, DLA Piper filed what Judge Austin called a "a demonstrably false certification."[1] (REK Decl., at ¶16). Again, Jowers had no standing to argue that Plaintiff should not be permitted to obtain third party discovery for reasons other than privilege or privacy, and DLA Piper must have known this. (See, Order Denying Motion, Dkt. 173).

Clearly, DLA Piper's strategy was to block all third-party discovery, continue stonewalling on Legis, and pretend Jowers did not have any information until the clock ran out. But, lest there be any doubt about this, Jowers quoted correspondence from

---

[1] When Plaintiff made Katz and Bookhout aware of the false certificate of conference, they refused to take down the motion, necessitating a hearing and a filing by Plaintiff. (Notice of Communications, Dkt. 171).

Bookhout dated April 10, 2020, in which Bookhout recounted with pride the hoops that he was forcing Plaintiff to jump through to serve Legis:

> "Hi Evan, As you know, the case has seen some activity this week. One item that has come up is Kinney's ongoing and lazy attempt to serve a subpoena on Legis Ventures. You will recall that a few months ago he tried to serve that subpoena in New York, and we were able to swat it away. Now he has moved with the Court for alternative service of the subpoena via email, which is not permissible under the relevant rules. We have filed the attached response vigorously opposing that request. In response, Kinney has sought to have the subpoena served by the clerk via FedEx on Legis in Hong Kong. The subpoena is still objectionable for a number of reasons, not least of which a U.S. subpoena can't require someone in Hong Kong to show up in Austin, Texas." (Dkt. 341-4, at 993).

At trial, Jowers testified he had directed DLA Piper to provide the Legis documents to Plaintiff, but they refused. (Tr. II, at 76).

### 6.   DLA Piper sought to disqualify Kinney solely to raise costs.

DLA Piper sought disqualification of Kinney from serving as counsel for himself, Plaintiff, and other companies. (Motion, Dkt. 100; Order, Dkt. 110). Jowers's statement to the Court admitted the reason for this effort. Jowers said that losing in the DQ effort was the "key watershed moment of this litigation…because Kinney would not have continued his litigation…if he lost his leverage of paying no attorneys fees." (Dkt. 341 4, at 1008). The DQ motion was always frivolous for all the reasons described in Plaintiff's first opposition to it and more. (Opposition, Dkt. 105; Orders, Dkt., 110, Dkt. 281). Tauler later filed two more baseless motions seeking the same relief. (Dkt. 254; Dkt. 294). Because Jowers has admitted the purpose of the disqualification effort was to increase costs for his adversaries, the repetitive motions to disqualify further demonstrate bad faith and multiplication of the proceeding.

### 7.    DLA Piper was responsible for the excessive AEO markings on the documents.

The DQ motion had been rejected, but DLA Piper had another idea. DLA sought to make a change to the PO that would create a separate designation to allow only outside counsel to view them. (REK Decl., Dkt. 182-1, at 2-3). According to Bookhout's written proposal to Plaintiff, this would include only a "small subset" of documents, but Plaintiff suspected that the real purpose was to add more multiplication and pushed back, seeking further clarification. (*Id.*) DLA did not pursue the matter further, and the Court's deadline to make the document production was approaching. As Jowers later made clear in his brief to the Court, DLA Piper was "all excited about" the "Attorneys Eyes Only" motions. (Dkt. 341-4, at 1014). The issue was not settled before DLA Piper withdrew June 4, 2020. When Tauler sent the production, he did so with the PO markings DLA Piper had provided. (Show Cause Resp. of Tauler, Dkt. 245, at 6). Plaintiff quickly realized two things: 1) the produced documents contained numerous improper AEO markings; and 2) certain documents were missing that should have been there. (REK Decl., at ¶7; Disc. Order, Dkt. 236, at 3-8). Many of the marked pages were from public websites. (Dkt. 182-1, at 5). Tauler took the improperly marked documents and filed a motion for enforcement of the protective order as it was, arguing that Kinney was not an eligible attorney. (Motion to Enforce, Dkt. 180). Judge Austin, resolving the issue six months later, ordered the parties to create a separate designation and told Jowers to review and re-classify the documents labeling only the most critical as for outside counsel only, focusing the issue on the merits. (Dkt. 236, at 8). Prevented from multiplying the proceedings in this way any further, Tauler and Jowers lost interest. They refused to review the documents at all. Instead, Tauler

simply blanket de-designated every document as "confidential." (REK Decl., at ¶8). This episode prevented Kinney from being able to view these documents until the discovery was almost over.

### 8. DLA Piper heaped burdensome discovery on Plaintiff based on the invalid RICO, fraud, veil piercing, and other claims.

DLA Piper served excessively burdensome discovery on Plaintiff, attempting to justify it based on the invalid claims and defenses, such as RICO and fraud. DLA Piper caused several rounds of conferences to occur about this and never relented on those claims while they were in the case. (Correspondence w Bookhout, Dkt. 184-4, at 3-5, 8-9; Dkt. 184-5).

### 9. DLA Piper (and Tauler) served needless and harassing document and deposition subpoenas on nineteen current and former employees of Plaintiff.

DLA Piper served subpoenas for document production on five of Plaintiff's employees just after having been warned by Judge Austin to focus on relevant facts. (REK Decl., at ¶9). At around the same time, just before DLA Piper exited the case, Tauler prepared and sent deposition subpoenas to fourteen former employees of Plaintiff. (*Id*.). Tauler did not follow up on these subpoenas except to depose one person in the whole group, Peter Gutensohn, whose testimony was irrelevant and was not used at trial. (REK Decl., at ¶10).

### 10. DLA Piper is still multiplying these proceedings by continuing to represent Jowers in his Hong Kong defamation case.

Even now, DLA Piper continues to represent Jowers in Hong Kong in a defamation action against Kinney and Kinney Recruiting Limited. In that case, the statements Jowers claims are defamatory of him are each statements the Court's judgment confirms were true. (REK Decl., at ¶11). Because this case threatens the

Court's Judgment and is a naked effort to relitigate the case, Plaintiff anticipates asking the Court to renew its injunction of those proceedings.

### C. Unreasonable and vexatious multiplication of the proceedings by Tauler Smith LLP and Robert Tauler

Tauler's work to multiply the proceedings in this case is almost legendary. Tauler entered the case in April 2020 *pro hac vice*. (Dkt. 166). Certain of Tauler's antics have occurred in the presence of the Court and are recounted in the Court's Orders already. (Dkt. 236; Dkt. 249; Dkt. 265). He has been warned by the Court several times, both orally and in writing. The motions disposed of by the Court's orders cumulatively represent hundreds of hours of unnecessary work dealing with blatantly unreasonable and vexatious filings by Tauler. This Motion will outline some particularly vexing events and address evidence that may not already be before the Court.

#### 1. After moving to compel a physical inspection of the assignment documents, Tauler did not want to see them.

Tauler (as well as DLA Piper before him) spent significant time pursuing the idea that the documents assigning claims and causes of action to the Plaintiff were "forged." This claim was absurd from the start, since (1) there is nothing in the law of Texas or Florida that would have required the assignments to be in writing, even though they were in writing; and (2) Plaintiff had demonstrated that it did have assignments in writing. (Dkt. 73). Tauler was nevertheless intent on making an issue of this and moved to compel. (Dkt. 207, at 12-13). When Plaintiff found one of the assignments in original form, it Tauler was not interested in inspecting it. (REK Decl., at ¶12). This episode like many others demonstrated Tauler's machinations were not about the merits, but rather about wasting time.

2.     **Tauler blatantly violated discovery rules by failing to provide a subpoena to opposing counsel.**

Tauler abused process by sending a subpoena to the WDTX Admissions Committee on February 19, 2021. (Dkt. 264-2). There was no legitimate basis to send such a subpoena, as Judge Austin observed in his Order quashing it. (Dkt. 265). Kinney's deposition was scheduled for February 25, 2021. Tauler compounded his abuse of process by not providing the subpoena to Plaintiff's counsel until the evening **after** the deposition of Kinney. (Email, Dkt. 264-1). Kinney answered the questions at the deposition. (REK Decl., at ¶13). Tauler's abuse of process led to other, equally irrelevant lines of inquiry at the same deposition, such as whether Plaintiff took PPP loans in 2020. As justification, Tauler said, "I want to see if [Kinney] will lie about it," and asserted this was relevant to his fraud defense. *Id*.

3.     **Tauler multiplied the proceedings repeatedly by using the meet and confer process as a device to waste time and harass.**

Tauler was determined to use 42 hours of deposition time, 7 hours for each defendant. (*See* Dkt. 236, at 14-16). Using a defective notice for the deposition of Counsel Unlimited LLC, Tauler launched into a meet and confer exchange with Ray Mort on the Sunday after Thanksgiving. The exchange is illustrative of Tauler's penchant for time wasting and maximum vexatiousness. (*See* Dkt. 233-1, at 28-50). Tauler sought to avoid answering a direct question regarding which notice he was contending was the live notice. (*Id*., at 36, 39, 43). This refusal necessitated a series of further email messages that took up three hours or more. Once Tauler did answer, even though it was evident that his notice of deposition had been defective, he filed a motion to compel seeking "terminating sanctions." (Dkt. 226). The motion was denied.

(Dkt. 236, at 16). Tauler would also constantly demand phone calls which were nothing other than an opportunity for him to heap abuse on counsel. (REK Decl., at ¶14).

### 4.    Abuse of third parties by Tauler has been constant.

Tauler has repeatedly threatened third parties in this litigation with no justified reason to do so. Often these third parties have included Plaintiff's business partners. For example, Tauler zeroed in on Breaking Media, Inc., an important advertising partner for Plaintiff. After Tauler became upset by the press coverage he received after Judge Austin's Discovery Order of December 18, 2020, he sent Breaking Media a subpoena seeking a deposition and documents. The material was privileged, and there was no colorable purpose for its discovery. The only purpose was to heap additional costs on others associated with Plaintiff. The subpoenas were quashed after significant and expensive effort by Breaking Media, Inc. (Advisory re NY Order, Dkt. 276). Tauler and Jowers were ordered to pay fees, but they never did. After his subpoena was quashed, and fees awarded, Tauler vowed to appeal and fight "for two years," and continued with the verbal abuse of both Breaking Media and Plaintiff's counsel. (REK Decl., at ¶15). This is illustrative of Tauler's tactic to multiply proceedings infinitely.

### 5.    Tauler repeatedly violated the Court's Protective Order, justifying doing so as retaliation.

Tauler was required to report prior discipline on his application to the bar of this Court but apparently did not do so completely. For the resulting delay in his admission to the Court's bar, Tauler blames Kinney, and considers the issue important enough to justify violating the Court's protective order. (REK Decl., at ¶17). Tauler also felt justified in sending a subpoena to the WDTX Admissions Committee for its records on February 19, 2021. (Order of March 18. 2021, Dkt. 265). None of these actions was in

any way relevant to the present case; they were all therefore unreasonable and vexatious multiplications of the proceedings. At an oral hearing before Judge Austin two days later (Dkt. 269), Jowers's counsel admitted he had filed the documents because he thought it "important that the public knows." (REK Decl., at ¶17). Judge Austin ordered the documents sealed and issued another verbal warning. (*Id*.; Dkt. 270).

**6.    Tauler repeatedly harassed third party witness Renee Sommers.**

In August 2020, Tauler issued a document subpoena to Renee Sommers, the bookkeeper and accountant for Plaintiff. (REK Decl., at ¶18). Kinney informed Tauler that Kinney would represent Sommers, that she did not want a process server at her house amidst the pandemic, and that she would accept service through Kinney. (*Id*.). Tauler pretended he did not understand and sent the process server anyway, multiple times, including days later. (*Id*.). Also, for no purpose and without evidence, Tauler accused Ms. Sommers of complicity in a theft of $30,000 from Jowers during her deposition. (REK Decl., at ¶19). Ultimately, Tauler presented no accounting for the loans that Sommers oversaw, and although he fought to have her appear at trial, further harassing her, Tauler never called her. (Dkt. 325; Dkt. 328; Dkt. 332).

**7.    Deposition misconduct by Tauler led to further wasted time and vexation.**

Tauler conducted depositions of just three witnesses in this case: Kinney, Renee Sommers, and Peter Gutensohn. The Plaintiff conducted a deposition of Alexis Lamb on December 16, 2020. Tauler, though he stated that he was not serving as an attorney for Ms. Lamb at the deposition, nevertheless instructed her not to answer on several occasions, made rampant speaking objections, and generally obstructed. (REK Decl.,

at ¶20). Tauler's misbehavior was so obstructive that Kinney had to obtain an emergency hearing with Judge Austin. (Dkt. 235). Judge Austin instructed Tauler not to interfere or make speaking objections. (REK Decl., at ¶20). Tauler spent significant time during the deposition soliciting from Ms. Lamb salacious allegations about Kinney. None of the material he obtained from Ms. Lamb was relevant to any live issue in the case and was solely intended to harass and embarrass Kinney.

### 8.   Summary judgment and trial performance of Tauler demonstrated that he never had any good faith basis for the claims he brought for Jowers or for Jowers's defenses.

On summary judgment, Tauler declined to present sufficient evidence on almost any Jowers's claims, resulting in their dismissal. (Dkt. 285). Moreover, the legal analysis Tauler used on many issues was so poor that it tends to support the inference that the defense employed was not about the merits of the case. Responding to Plaintiff's motion for summary judgment, for example, Tauler demonstrated he (and DLA Piper before him) had failed to do basic *Erie* doctrine research so that they would know what statutes of limitations applied to the claims by and for Jowers. (Dkt. 259, at 10). Even at trial, with the remaining claims reduced, Tauler again did not present relevant evidence on several claims and defenses. (Dkt. 344, at 15 n.5). After fighting about what was owed on the loans for so long, for example, Jowers did not even offer his own accounting to support his defense. (*Id.* at 41). Jowers's proposed findings and conclusions also did not address much of what was relevant to the case. (Dkt. 343).

### IV.   Conclusion

While many scorched earth litigation campaigns never reach their conclusion on the merits, never have a chance to be fully dissected, and thus presumably lead to a successful outcome for the parties responsible for the scorching, this case presents a

different situation. The actions of DLA Piper in setting up a defense for Jowers in this case were not based on any good faith review of the applicable facts and law. Had DLA Piper cared to conduct a basic analysis, they would have advised Jowers that spending his money on any defense they could provide would not be money well spent. But DLA Piper did not care. Their approach was devil-may-care. By bringing many claims against many parties, spending lavishly on opening a second front in Hong Kong, blocking the Plaintiff from hiring its counsel of choice, obstructing discovery of the relevant material needed to prove its claims, DLA Piper thought they could notch of a win for Jowers regardless of what the facts and law might be by swamping and confounding the Plaintiff. When the strategy started to go south because of hard-nosed opponents and a magistrate who would have none of the gamesmanship, DLA Piper was out. Tauler was willing to pick up the mantel and run with it, using all the tools DLA Piper had left him along with his own brand of vexatiousness. From discovery obstruction, to hiding of documents, to falsification of declarations, to harassment of third parties, this case has hit many of the low notes. As such, it presents an ideal opportunity for the Court to demonstrate to future litigants and their counsel what is expected when attorneys are approached by an unreasonable client suggesting a scorched earth approach before the Western District of Texas, as well as what can happen. Attorneys who in the future might briefly consider pursuing an approach to litigation like the one used by DLA Piper and Tauler in this case should be shown by the sanctions awarded by the Court in this case that the scorched earth approach may not just fail. If the record becomes developed enough, such an approach may cause a catastrophic result for both themselves and their client.

Dated: October 17, 2022                Respectfully Submitted,

/s/ Robert E. Kinney
Robert E. Kinney
Texas State Bar No. 00796888
Robert@KinneyPC.com

**Robert E. Kinney**
824 West 10th Street, Suite 200
Austin, Texas 78701
Tel: (512) 636-1395

Raymond W. Mort, III
Texas State Bar No. 00791308
raymort@austinlaw.com

**THE MORT LAW FIRM, PLLC**
100 Congress Ave, Suite 2000
Austin, Texas 78701
Tel/Fax: (512) 865-7950

**ATTORNEYS FOR JUDGMENT CREDITOR COUNSEL HOLDINGS, INC.**

## <u>Statement Regarding Conference</u>

On March 24, 2021, in an oral conference before Judge Austin, Plaintiff discussed with Judge Austin its intention to seek sanctions in this case. Judge Austin said that if Plaintiff viewed a sanctions motion as advisable, that there would be no need for a conference and that Plaintiff could wait until the conclusion of the case before filing such motion.

/s/ Robert E. Kinney
Robert E. Kinney
